**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOE NACLERIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOCGO INC., STAN VASHOVSKY, ANTHONY CAPONE, ANDRE OBERHOLZER, NORMAN ROSENBERG, and LEE BIENSTOCK,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joe Naclerio ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DocGo Inc. ("DocGo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DocGo securities between

1

November 8, 2022 and September 17, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      DocGo offers mobile health and medical transportation services for various health care providers in the U.S. and the United Kingdom.  In that capacity, the Company purports to leverage its proprietary technology platform to "provide [its] services in collaboration with leading healthcare organizations, via long-term relationships that are intended to drive meaningful revenue, help provide efficient and effective capital allocation and create low-risk opportunities for significant growth."

3.      In November 2022, DocGo announced that Defendant Anthony Capone ("Capone") would be succeeding Defendant Stan Vashovsky ("Vashovsky") as Chief Executive Officer ("CEO") effective January 1, 2023.  In a press release detailing the leadership transition, Defendant Vashovsky was quoted stating, in relevant part, "[w]e are very fortunate to have someone with [Defendant Capone's] skill set and track record to take the reigns as CEO next year, and I have every confidence in the continued growth and success of this company."

4.      In spring 2023, several thousand international migrants arrived in New York City seeking, among other things, employment and/or asylum.  In response, New York City Mayor Eric Adams ("Mayor Adams") announced a new policy calling for the city to relocate migrants outside of New York City's five boroughs.  To oversee the relocation program, New York City awarded DocGo a no-bid $432 million contract (the "Relocation Contract") that took effect in early May 2023.  The contract required DocGo to house migrants and provide them with services including case management, medical care, food, transportation, lodging, and round-the-clock security.

5.       Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DocGo's executive hiring processes were inadequate to fully review and vet the professional and academic backgrounds of job candidates; (ii) the foregoing increased the likelihood of disruptive executive turnover; (iii) contrary to its representations to investors, DocGo had overstated the efficacy of its mobile health and medical transportation services, the very services contemplated by the Relocation Contract; (iv) all of the foregoing, once revealed, was likely to subject DocGo to significant reputational and/or regulatory scrutiny that would negatively impact the Company's financial position and/or prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.       On July 30, 2023, the *New York Times* published an article reporting on a "rocky" start to DocGo's migrant relocation efforts in New York City.  The *New York Times* article reported that asylum-seekers have complained of threats and "broken promises" after New York City awarded DocGo the Relocation Contract.  Specifically, the article stated that "[l]ocal authorities have expressed frustration at the lack of coordination between DocGo and agencies that could provide services to the migrants; local security guards hired by DocGo have repeatedly threatened the migrants; and finding steady work has been nearly impossible[.]"  DocGo's $432 million contract nearly matches the Company's total 2022 revenue of roughly $441 million.

7.       Following publication of the *New York Times* article, DocGo's stock price fell $0.53 per share, or 6.29%, to close at $7.89 per share on July 31, 2023.

8.       Then, on August 22, 2023, the *Albany Times Union* published an article reporting that the New York Attorney General ("AG") had opened an investigation into DocGo and

cautioned the Company to cease limiting migrants' speech or movement.  Specifically, the AG's Civil Rights Bureau sent a letter sent to DocGo's attorneys detailing "serious concerns" it had regarding potential violations of state and federal laws in its handling of the Relocation Contract.

9.      Then, on September 6, 2023, New York City Comptroller Brad Lander ("Comptroller Lander") announced that his office was declining to approve the Relocation Contract.  Comptroller Lander noted in a letter to Department of Housing & Preservation Development ("HPD") commissioner Adolfo Carrión Jr. ("Commissioner Carrión Jr.") that his decision to reject the Relocation Contract was "due to numerous outstanding concerns" including "[i]nsufficient budget detail to justify over $432 million in contract value," "[i]nconclusive reasoning as to the selection of the vendor and contradictory statements about their fiscal ability to provide contracted services," "[i]nadequate vendor responsibility determination, contract oversight and subsequent questions about proper service delivery," and "[i]nadequate information regarding the selection of subcontractors."  Mayor Adams had the authority to proceed with the Relocation Contract over Comptroller Lander's objections and ultimately did so.

10.      On this news, DocGo's stock price fell $0.61 per share, or 7.47%, to close at $7.55 per share on September 6, 2023.

11.      Then, on September 14, 2023, the *Albany Times Union* published an article reporting that Defendant Capone had falsified portions of his professional biography regarding his educational history.  On the following day, September 15, 2023, DocGo disclosed Capone's resignation as CEO in a filing with the SEC.

12.      On this news, DocGo's stock price fell $0.76 per share, or 11.76%, to close at $5.70 per share on September 15, 2023.

13.     Finally, on September 18, 2023, Comptroller Lander announced that his office was commencing a real-time audit of operations and invoices incurred by DocGo in connection with the Relocation Contract.  Specifically, Comptroller Lander noted that his office has "serious concerns about the selection of this vendor and its performance of contract duties."

14.     On this news, DocGo's stock price fell $0.41 per share, or 7.19%, to close at $5.29 per share on September 18, 2023.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  DocGo is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Plaintiff, as set forth in the attached Certification, acquired DocGo securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.     Defendant DocGo is a Delaware corporation with principal executive offices located at 35 West 35th Street, Floor 6, New York, NY.  DocGo's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "DCGO".

22.     Defendant Vashovsky served as DocGo's CEO from prior to the start of the Class Period until January 2023.

23.     Defendant Capone served as DocGo's CEO from January 2023 until September 2023.

24.     Defendant Andre Oberholzer ("Oberholzer") served as DocGo's Chief Financial Officer ("CFO") from prior to the start of the Class Period until January 2023.

25.     Defendant Norman Rosenberg ("Rosenberg") has served as DocGo's CFO since January 2023.

26.     Defendant Lee Bienstock ("Bienstock") served as DocGo's President and Chief Operating Officer from prior to the start of the Class Period until September 2023 and has served as the Company's CEO since September 2023.

27.     Defendants Vashovsky, Capone, Oberholzer, Rosenberg, and Bienstock are referred to herein collectively as the "Individual Defendants."

28.     The Individual Defendants possessed the power and authority to control the contents of DocGo's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of DocGo's SEC filings and press releases

6

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with DocGo, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

29.     DocGo and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

30.     DocGo offers mobile health and medical transportation services for various health care providers in the U.S. and the United Kingdom.  In that capacity, the Company purports to leverage its proprietary technology platform to "provide [its] services in collaboration with leading healthcare organizations, via long-term relationships that are intended to drive meaningful revenue, help provide efficient and effective capital allocation and create low-risk opportunities for significant growth."

### Materially False and Misleading Statements Issued During the Class Period

31.     The Class Period begins on November 8, 2022, the day after DocGo issued a post-market press release announcing, among other things, that Defendant Capone would succeed Defendant Vashovsky as the Company's CEO.  The press release stated, in relevant part:

> [Defendant Vashovsky] will be retiring effective December 31st. Current DocGo President [Defendant Capone] has been named the company's new CEO and [Defendant] Vashovsky will consult with the Company through 2023 to assist with the transition.

7

[Defendant Vashovsky] [. . .] commented, "I am extremely proud of what we have been able to accomplish as a company these past seven years, introducing an entirely novel way of delivering quality care that is beneficial to both patients and payers alike. *We are very fortunate to have someone with Anthony's skill set and track record to take the reigns as CEO next year, and I have every confidence in the continued growth and success of this company*."

[Defendant Capone] [. . .] stated, "By nearly any measure, our performance during the third quarter was significant validation of our unique tech-enabled model and the unmet needs that we are addressing with our mobile health and transportation solutions. *We continue to gain share in our key territories, both in the US and UK, while also entering new markets, and I believe we are very well positioned to maintain the momentum that we currently enjoy*. We are in a very strong financial position, with $179.4 million of total cash and equivalents as of September 30th, plus the recently announced $90 million line of credit that we announced with Citi, which remains undrawn. I anticipate a strong finish to the year and a catalyst-rich 2023 driven by continued strong organic growth and possible opportunistic acquisitions that expand our offering or geographic reach."[1]

32.     On December 6, 2022, DocGo issued a press release entitled "DocGo Releases Annual ESG Report, Outlining Commitment to Ethical Mobile Healthcare Initiatives." The press release stated, in relevant part:

DocGo [. . .] today announced the release of its annual Social Impact and Sustainability Report. The report provides an overview of the progress DocGo has made across a range of Environmental, Social, and Governance (ESG) programs.

"DocGo was founded with a mission to serve the public and improve the overall quality of healthcare like no other company has before," said Stephen Sugrue, DocGo's Chief Compliance Officer. "We have acted diligently beyond our innovative care model as we build on our fundamentals and take a significant step forward in our sustainability journey of creating a better way of life. I am immensely proud of our ambition and leadership to deliver better results for our people, communities and environment."

33.     On March 14, 2023, DocGo filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and annual results for the year ended December 31, 2022 (the

---

[1] All emphases included herein are added unless otherwise indicated.

"2022 10-K").  In providing an overview of the Company's business, the 2022 10-K stated, in relevant part:

> DocGo [. . .] aims to redefine access to healthcare. We strive to deliver high-quality, cost-effective healthcare mobility solutions and unlock the further promise and potential of telehealth treatment through our "last-mile" care capabilities. We do so by leveraging our proprietary technology platform powered by artificial intelligence ("AI"), and our network of healthcare professionals, which has provided service in 29 states and in the United Kingdom. We often provide our services in collaboration with leading healthcare organizations, via long-term relationships that are intended to drive meaningful revenue, help provide efficient and effective capital allocation and create low-risk opportunities for significant growth.

> Our mission is to provide high quality, highly accessible healthcare for all, empowering the delivery of medical transportation and mobile healthcare outside the traditional "brick-and-mortar" facilities, with more accessible, affordable, and efficient patient-centered care. Since our founding in 2015, through more than 8 million patient interactions, we have created a care delivery model that helps provide better care outside of the physical walls of the healthcare system. We began by developing a state-of-the-art, intuitive platform designed to drive greater efficiency and improved access to patient care. Our innovative technology can change the way healthcare facilities manage patient transportation and eliminate many of the common obstacles faced when scheduling service, ultimately freeing medical professionals to focus more time and their valuable resources on what they do best — providing patient care. Additionally, in certain markets, our Mobile Health in-person care model facilitates medical treatment directly to patients in the comfort of their homes, workplaces, and other non-traditional locations. Working under the guidance of prescribing physicians, our network (which includes both company employees and personnel from a variety of subcontracted labor agencies and some independent contractors) of more than 5,000 medical clinicians including Emergency Medical Technicians ("EMTs"), paramedics, licensed practical nurses ("LPNs"), registered nurses ("RNs") Advanced Practice Providers ("APPs") and support staff, provides a wide range of tests, procedures and interventions that previously required a visit to a traditional healthcare setting.

> ***Our Segments***

> ***Mobile Health Solutions***

> The traditional healthcare model requires patients to interact with many levels of healthcare providers — including receptionists, nurses, lab technicians and physicians — for even the most routine tests, procedures and interventions. We recognized that a number of these services could easily be performed by EMTs, paramedics and LPNs under the guidance of physicians, but in the comfort of a

patient's home or workplace. Our patient-centered approach helps limit the need for individuals to seek routine treatment in more expensive and environmentally exposed, less comfortable settings such as emergency departments and urgent care clinics. In addition to providing greater convenience to patients, our Mobile Health solutions help reduce unnecessary burdens on healthcare systems, by freeing up their finite, in-person resources to address more urgent and critical patient needs. DocGo's Mobile Health clinical services, which we expanded into the home and workplace in 2020, facilitate medical care via a turnkey suite of integrated, "last-mile" solutions. Through DocGo On-Demand and additional Mobile Health programs including expanded population offerings, we provide holistic health, social and shelter coordination services to underserved communities.

***

As patients seek more efficient, more convenient healthcare options, we believe our virtual care-enabling solutions are poised for significant growth, by delivering in-person patient care previously inaccessible outside of the more traditional healthcare settings. ***We partner with leading national health systems, insurance carriers, private organizations and employers, state and local governments and managed care organizations, to provide our Mobile Health solutions***, including NYC Health + Hospitals, New York City Department of Homeless Services, Dollar General, and Mount Sinai Health System. For the fiscal year ended December 31, 2022, we generated approximately 74.0% of our revenues from the solutions provided by our Mobile Health segment.

***

***Transportation Services***

DocGo's digitally-enabled medical mobility solutions are offered under the Ambulnz brand. We help provide reliable, efficient access to local clinical services, including primary and specialty care, dialysis treatments for chronic care management, and transfers between clinical settings. Every vehicle in our fleet is equipped with our proprietary technology platform, which is integrated with some of the nation's largest electronic medical record ("EMR") systems.

This integration is designed to provide seamless transfer of electronic patient information and discharge data to our healthcare provider customers, which helps improve order speed and accuracy, and helps eliminate a myriad of manual processes. Consequently, our healthcare facility customers are better able to order, track and manage transportation requests and patient movement, thereby enhancing utilization of resources and cost.

34.     Appended to the 2022 10-K as exhibits were signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 by Defendants Capone and Rosenberg, attesting that "[t]he

information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

35.     That same day, DocGo hosted an earnings call with investors and analysts to discuss the Company's Q4 2022 results (the "Q4 2022 Earnings Call").  During the scripted portion of the Q4 2022 Earnings Call, Defendant Bienstock stated, in relevant part:

> We were very pleased to recently announce a number of successful contract wins and we continue to pursue large opportunities that are working their way through the RFP process.
>
> ***
>
> In addition, our leased hour reimbursement model provides downside margin protection, mitigating our exposure to demand risk. Our recent success in the RFP channel and growing interest in DocGo services across the country highlights the attractiveness of our value proposition to customers.

36.     On May 8, 2023, DocGo issued a press release announcing the Company's Q1 2023 results.  As one of the Company's select corporate highlights, the press release listed "DocGo was awarded a large, statewide population health contract covering a substantial number of lives in New York."  In addition, the press release stated, in relevant part:

> [Defendant Capone] commented, "We are very pleased with our continued operational execution, increase in backlog and growth in our RFP channel during the quarter. In addition, we recently signed agreements to make our remote patient monitoring, chronic care management and mobile urgent care services available to a major kidney care company, a large durable medical equipment provider and numerous large cardiology practices. These agreements are expected to provide us with access to large pools of qualified Remote Patient Monitoring and Chronic Care Management patients for whom DocGo is uniquely designed to service remotely, driving down payor costs and improving patient outcomes. We believe that the total addressable market opportunity is substantial, and we are excited to roll out these offerings over the remainder of the year."

37.     The statements referenced in ¶¶ 31-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made

false and/or misleading statements and/or failed to disclose that: (i) DocGo's executive hiring processes were inadequate to fully review and vet the professional and academic backgrounds of job candidates; (ii) the foregoing increased the likelihood of disruptive executive turnover; (iii) contrary to its representations to investors, DocGo had overstated the efficacy of its mobile health and medical transportation services, the very services contemplated by the Relocation Contract; (iv) all of the foregoing, once revealed, was likely to subject DocGo to significant reputational and/or regulatory scrutiny that would negatively impact the Company's financial position and/or prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge**

38.     On July 30, 2023, the *New York Times* published an article entitled "New York City Had a Migrant Crisis. It Hired a Covid Expert to Help" which reported on a "rocky" start to DocGo's migrant relocation efforts in New York City.  Specifically, the *New York Times* article stated, in relevant part:

> Nearly three months after Mayor Eric Adams ushered in a new policy calling for the city to relocate migrants outside the five boroughs, the program has been plagued by problems, drawing attention to the no-bid contractor leading the effort.
>
> More than 1,500 migrants have been sent to places as far as Buffalo, with more on the way. But many of the migrants have been greeted by protests at their new homes, as well as mistreatment and the false hope of jobs.
>
> ***Behind the broken promises is a medical services company, DocGo, that once contracted with the city to provide Covid testing and vaccination services, but pivoted to migrant care as the pandemic waned and a new crisis emerged***.
>
> The city awarded DocGo a $432 million contract, which took effect in early May, without subjecting it to competitive bidding. The contract called for DocGo to house migrants and provide them with services including case management, medical care, food, transportation, lodging and round-the-clock security.

*But its efforts to resettle migrants in Albany have been rocky, at best. Local authorities have expressed frustration at the lack of coordination between DocGo and agencies that could provide services to the migrants; local security guards hired by DocGo have repeatedly threatened the migrants; and finding steady work has been nearly impossible*.

39.     Following publication of the *New York Times* article, DocGo's stock price fell $0.53 per share, or 6.29%, to close at $7.89 per share on July 31, 2023.

40.     However, just over one week later, on August 7, 2023, DocGo hosted an earnings call with investors and analysts to discuss the Company's Q3 2023 results (the "Q3 2023 Earnings Call"), in which Defendant Capone continued to tout the strength of the Company's services. Specifically, during the scripted portion of the Q3 2023 Earnings Call, Defendant Capone stated, in relevant part:

> The rapid acceleration of revenue growth is driven by multiple factors, including the continued rollout of our medical transportation contract with health and hospitals, and the new mobile health contract with the housing and preservation department to provide primary care, urgent care, behavioral health, social work and other supporting services to migrant populations in New York.
>
> ***
>
> Before we turn it over to Q&A, I very briefly wanted to mention the recent New York Times article that was critical of our partnership with New York City to provide health care and basic services to migrant populations in upstate New York. Understand the core ethos of DocGo was to provide high-quality health care for those that needed the most. Oftentimes performing seemingly impossible tasks for our customers through rapid deployments in response to unprecedented events.
>
> In the early days of this migrant work, we were launching projects on extremely short timelines. All of this was to avoid families and children from sleeping on the streets without access to health care and basic necessities. Every day, DocGo saves lives, treating and transporting thousands and thousands of patients. One of the many key facts left out of the New York Times article was the latest weekly polling of over 500 migrants in our care, which shows that more than 85% of them believe they're being supported and their needs are being met.
>
> And city officials are well aware of this program's success as exemplified last week when Mayor Adams reiterated his confidence in our partnership during a press conference where he praised our work, describing it as a Herculean effort to help

the city with this humanitarian crisis. I am tremendously proud of the work we are doing with the city and our partners upstate especially all the amazing hard work being performed by local CBOs whom we work with daily.

We are all working hard to preserve these migrants basic human dignity and help change their lives for the better. To the thousands of DocGo employees listening, over 2,000 of which are shareholders, the work you do matters. Every day, your efforts are helping some of the world's most vulnerable and helpless citizens find safety, support and a better life. You should be proud of the work you do. I certainly am.

### The Truth Fully Emerges

41.     Despite Defendant Capone's reassurances on the Q3 2023 Earnings Call, on August 22, 2023, the *Albany Times Union* published an article entitled "Attorney general scrutinizing company handling N.Y. migrants."  The article stated, in relevant part:

Attorney General Letitia James' office informed DocGo on Monday that it is investigating the for-profit company's running of shelters for migrants upstate and warned the company to cease any activities limiting the free movement and speech of the migrants in its care.

The attorney general's Civil Rights Bureau sent a letter sent to DocGo's attorneys detailing "serious concerns" it has regarding potential violations of state and federal laws in its handling of the job of finding shelter for thousands of migrants and ensuring they are receiving proper health care and processing.

\*\*\*

The attorney general's office detailed allegations for the company about reports of migrants receiving misleading information when they were bused to hotels upstate, including inaccurate details about employment opportunities and their enrollment in health care plans for which they are not eligible.

There have also been issues with migrants' ability to freely leave their hotels, the letter states. The attorney general's office asserts that there were isolated incidents of DocGo's contracted security officers discouraging or blocking them from speaking with the media and "other actions that may jeopardize migrants' ability to obtain asylum."

In the letter to DocGo's general counsel, Ely D. Tendler, the attorney general's office alleges the company may have violated state or federal laws that prohibit "discrimination and retaliation for engaging in protected activity." The office

requested DocGo's response to the allegations by Sept. 13. A spokesman for the attorney general confirmed the office opened an investigation into DocGo.

42.     Then, on September 6, 2023, Comptroller Lander announced that he was declining to approve the Relocation Contract.  In a letter to HPD Commissioner Carrión Jr., Comptroller Lander stated, in relevant part:

> I am writing to inform you that [the Relocation Contract] was reviewed by my Office, and is being returned to the [HPD] without approval due to numerous outstanding issues and concerns.
>
> Please note, my Office does not make such a decision lightly. Since I took office as Comptroller on January 1, 2022, our Bureau of Contract Administration (BCA) has registered over 30,000 contracts submitted by City agencies; we have returned fewer than 75, or 0.22%. During the same period, we have approved 303 emergency contracts that have been submitted to our Office for review, 69 of which were specifically related to the asylum seeker crisis. This is the first emergency contract we have declined to approve.
>
> After a review of the procedures and basis for determination of the selection of the vendor to provide the described services, we are declining to approve due to several issues and concerns:
>
> **1. Insufficient budget detail to justify over $432 million in contract value.**
>
> The Contract fails to provide meaningful budget detail illustrating how HPD arrived at the proposed contract maximum authority of $432,000,000. The budget provided includes costs for specific services but does not illustrate how the agency arrived at the total amount.
>
> ***
>
> **2. Inconclusive reasoning as to the selection of the vendor and contradictory statements about their fiscal ability to provide contracted services.**
>
> There is little evidence to suggest that [DocGo] had the expertise to provide the services it has been contracted for, calling into question HPD's vetting of the vendor's prior experience and capacity that served as its purported basis for vendor selection. It is a medical services company, not a logistics company, social services provider, or legal service provider. Numerous reports of staff mistreating or misleading asylum seekers, failing to properly respond to reported assault incidents, and inadequate service provision further exacerbate these concerns.
>
> ***

15

### 3. Inadequate vendor responsibility determination, contract oversight and subsequent questions about proper service delivery.

Every vendor awarded a City contract must be found to have the requisite business integrity to justify the award of public dollars pursuant to an affirmative determination of responsibility that must be made by the contracting agency. After a review of HPD's basis for determining the vendor to be responsible as set forth in the package submitted to this Office, we identified the following unaddressed adverse issues:

   a. DocGo failed to provide proof of payment for the lien referenced and indicated in the Responsibility Determination.
   b. DocGo, Inc.'s corporate organization remains unclear, and though news reports indicate DocGo, Inc. is formerly known as Ambulnz, Inc., this is not disclosed in its PASSPort Vendor Questionnaire in response to Section 1, Question 6 ("*Does the submitting vendor now use, or has it in the past ten (10) years used, an EIN, DBA, trade name, or abbreviation other than the submitting vendor's name or EIN, as currently reflected in their vendor profile in PASSPort?*").

### 4. Inadequate information regarding the selection of subcontractors.
The package submitted to our Office fails to provide the method of procurement; the basis for selection or rejection; and the basis for the contract price for each subcontractor, consultant, or supplier, as required by Section 4.05(a) of the agreement. The package is also missing HPD's confirmation that the vendor complied with Section 4.05(B) ("Extent of Competition Required") raising concerns about the procedural compliance and vetting conducted to ensure the capability, capacity, authorization, and integrity of subcontractors.

(Emphasis in original.)

43.    On this news, DocGo's stock price fell $0.61 per share, or 7.47%, to close at $7.55

per share on September 6, 2023.

44.    Then, on September 14, 2023, the *Albany Times Union* published an article entitled

"DocGo CEO Anthony Capone admits he didn't earn graduate degree."  The article stated, in

relevant part:

Last week, a Times Union story called into question prior statements made to investors by Capone, including the scope of a potential multibillion-dollar contract with the U.S. Customs and Border Protection. Capone had pegged the contract at about $4 billion, but government sources said it was never that high and is for about half that amount.

Michael Padovano, the company's spokesman, disputed that Capone misrepresented the contract by citing "facts" for which he declined to provide documentation because he said he was not at liberty to share them.

This week, the Times Union found another discrepancy involving DocGo: Anthony Capone has said he went to the State University of New York at Potsdam for his undergraduate degree, according to his biography on the company's website.

Capone's biography also says he received a graduate degree in artificial intelligence from Clarkson University, which has a campus in Potsdam. But a spokesman for Clarkson University said the school has no record of Anthony Capone enrolling in or completing a graduate degree at the university.

Late Thursday, Capone responded through his spokesman and admitted in a statement the information is false.

"I want to address a serious issue concerning incorrect information about my educational background. Specifically, it has come to my attention that my public biography erroneously states that I hold a bachelor's degree from Clarkson University," Capone said. "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution. This inaccuracy should have been corrected, and I deeply apologize for this error. I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."

Capone added that he takes "full responsibility and am making immediate corrections to all official bios, profiles, and any other materials where this incorrect information appears."

The questions about Capone's public assertions and professional biography come as the company's handling of New York City's migrants continue to mount.

45.     On this news, DocGo's stock price fell $0.76 per share, or 11.76%, to close at $5.70 per share on September 15, 2023.

46.     Finally, on September 18, 2023, Comptroller Lander announced that he was commencing a real-time audit of operations and invoices incurred by DocGo in connection with the Relocation Contract.  A press release issued by Comptroller Lander's office stated, in relevant part:

[Comptroller Lander] today announced he will immediately commence a first-of-its-kind audit of the oversight of the operations and invoices incurred by DocGo,

Inc., the medical services company hired by the city to provide shelter services to new arrivals in the city and upstate. In a new letter sent to the Department of Housing Preservation and Development (HPD), Lander noted his office has "serious concerns about the selection of this vendor and its performance of contract duties," adding that "agencies must seek to obtain as much competition in vendor selection as is practicable" and "ensure that selected vendors have the requisite expertise and wherewithal to perform as required under the contract."

Earlier this month, the office declined to approve the no-bid $432 million contract due to outstanding questions about how this vendor was selected and is performing its duties.

"There are just too many outstanding questions and concerns about DocGo and this $432 million no-bid contract," said [Comptroller Lander]. "New Yorkers deserve real-time oversight and accountability to understand how this price tag was reached, ensure this company has the experience to provide the contracted services, and vet the integrity and responsibility of this vendor."

Lander also indicated that, due to questions surrounding the DocGo contract, his office is currently reviewing whether there is a need to revoke a 2022 prior approval authorization the Comptroller's Office granted the Administration to utilize emergency procurement rather than seek specific prior approval for each individual contract. Lander noted the prior authorization had not been intended as a blanket approval of any contract that any agency wishes to enter into, and that "after 18 months, this is no longer an unexpected situation that merits the broad suspension of due diligence processes to ensure that City funds are being spent wisely and with integrity."

47. On this news, DocGo's stock price fell $0.41 per share, or 7.19%, to close at $5.29 per share on September 18, 2023.

48. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

49. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing,

Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired DocGo securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DocGo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DocGo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DocGo;

- whether the Individual Defendants caused DocGo to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of DocGo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

56.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DocGo securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold DocGo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

57.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

58.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

61.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DocGo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire DocGo securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

62.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DocGo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DocGo's finances and business prospects.

63.     By virtue of their positions at DocGo, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

64.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of DocGo, the Individual Defendants had knowledge of the details of DocGo's internal affairs.

65.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DocGo.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DocGo's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DocGo securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning DocGo's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DocGo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

66.     During the Class Period, DocGo securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DocGo securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DocGo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of DocGo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

67.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

69.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.     During the Class Period, the Individual Defendants participated in the operation and management of DocGo, and conducted and participated, directly and indirectly, in the conduct

of DocGo's business affairs.  Because of their senior positions, they knew the adverse non-public information about DocGo's misstatement of income and expenses and false financial statements.

71.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DocGo's financial condition and results of operations, and to correct promptly any public statements issued by DocGo which had become materially false or misleading.

72.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DocGo disseminated in the marketplace during the Class Period concerning DocGo's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DocGo to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DocGo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DocGo securities.

73.     Each of the Individual Defendants, therefore, acted as a controlling person of DocGo.  By reason of their senior management positions and/or being directors of DocGo, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DocGo to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of DocGo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

74.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DocGo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 27, 2023                              Respectfully submitted,

                                                                   POMERANTZ LLP

                                                                   */s/ Jeremy A. Lieberman*
                                                                   Jeremy A. Lieberman
                                                                   J. Alexander Hood II
                                                                   Thomas H. Przybylowski
                                                                   600 Third Avenue, 20th Floor
                                                                   New York, New York 10016
                                                                   Telephone: (212) 661-1100
                                                                   Facsimile: (917) 463-1044
                                                                   jalieberman@pomlaw.com
                                                                   ahood@pomlaw.com
                                                                   tprzybylowski@pomlaw.com

                                                                   PORTNOY LAW FIRM
                                                                   Lesley F. Portnoy, Esq.
                                                                   1800 Century Park East, Suite 600
                                                                   Los Angeles, California 90067
                                                                   Telephone: (310) 692-8883
                                                                   lesley@portnoylaw.com

                                                                   *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Joe Naclerio, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against DocGo Inc. ("DocGo") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire DocGo securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired DocGo securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in DocGo securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** 10/19/2023
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
        **(Date)**



‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
        **(Signature)**

Joe Naclerio

**DocGo Inc. (DCGO)**                                                          **Joe Naclerio**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 11/8/2022 | 200 | $7.3950 |
| Purchase | 11/10/2022 | 100 | $7.8700 |
| Purchase | 3/17/2023 | 200 | $8.0015 |