UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

JOE NACLERIO, Individually and on Behalf
of All Others Similarly Situated,

                      Plaintiff,

    vs.

DOCGO INC., STAN VASHOVSKY,
ANTHONY CAPONE, and ANDRE
OBERHOLZER,

                   Defendants.

—————————————————————— x

Civil Action No. 1:23-cv-09476-KPF

<u>CLASS ACTION</u>

CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................4

III.  PARTIES .............................................................................................................4

IV.   DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF
      BUSINESS ..........................................................................................................7

      A.    Defendants Misled Investors and Customers About Capone's Educational
            Background ...............................................................................................9

      B.    Defendants Misled Investors About DocGo's Performance and Prospects ..........15

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS ............................................................................................21

      A.    False and Misleading Statements Regarding Capone's Educational
            Background .............................................................................................21

      B.    False and Misleading Statements Regarding the CBP Contract and New
            York State Medicaid Sign Ups ..............................................................28

VI.   LOSS CAUSATION...........................................................................................29

VII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
      MARKET DOCTRINE ......................................................................................32

VIII. CLASS ACTION ALLEGATIONS ...................................................................33

IX.   CAUSES OF ACTION ......................................................................................35

COUNT I ..........................................................................................................................35

COUNT II .........................................................................................................................37

PRAYER FOR RELIEF ...................................................................................................38

JURY DEMAND ..............................................................................................................38

4855-7244-3306.v1

## I.    INTRODUCTION

1.    This is a securities fraud class action brought on behalf of those who purchased DocGo Inc. ("DocGo" or the "Company") common stock between November 5, 2021 and September 15, 2023, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2.    DocGo is a healthcare company that provides medical transportation and mobile health services in the United States and the United Kingdom.  DocGo has two operating segments: Transportation Services, which include emergency response and non-emergency transport services; and Mobile Health Services ("Mobile Health"), which include services performed at home and offices, testing, vaccinations, and event services.

3.    During the Class Period, DocGo positioned itself as a technology company and one of the few public companies committed to bringing healthcare to underserved populations.  DocGo touted a proprietary artificial intelligence ("AI") platform technology, purportedly developed in large part by its President and eventual Chief Executive Officer ("CEO") defendant Anthony Capone ("Capone"), as the Company's largest differentiator in the field of medical transportation and mobile health.  DocGo and Capone also touted the Company's ability to win government contracts and leverage existing contracts into future business, including a purported $4 billion contract with U.S. Customs and Border Protection ("CBP"), which Capone told investors DocGo was well situated to win.  The truth, however, was very different from what defendants led investors to believe.

4.    First, Capone fabricated his educational background.  While Capone pathologically touted his background in computer science and graduate degree in computational learning theory, a

subset of AI, to investors and customers, Capone had never even enrolled in, let alone graduated from, any graduate program in AI or any other field of study.

5.      Second, as an integral part of defendants' efforts to transition the Company's Mobile Health business away from COVID-19 services, DocGo increasingly sought to win non-COVID-19 medical services contracts with government agencies.  In May 2023, DocGo was awarded a controversial $432 million no-bid contract with the New York City Department of Housing Preservation and Development (the "HPD") to provide services to migrants in conjunction with New York City's practice of relocating migrants.  Reeling from intense scrutiny regarding DocGo's poor execution and mismanagement of the HPD contract, Capone sought to placate investors by falsely inflating the value of a future purported contract with CBP, which Capone stated DocGo was positioned to win, telling investors that the contract was worth $4 billion.  In fact, the contract was worth no more than half that amount, and DocGo failed to secure any portion of it.

6.      Also during the Class Period, Capone stated to investors that DocGo had signed up thousands of migrants for the New York State Medicaid Managed Care Plan offered through UnitedHealthcare, with the ability to parlay such sign ups into future business in the Company's Mobile Health segment.  In fact, DocGo did not sign up any migrants for Medicaid programs.

7.      Each of the Individual Defendants (defined herein) was directly involved in the misconduct.  Stan Vashovsky ("Vashovsky"), as DocGo's Chairman and CEO, and Andre Oberholzer ("Oberholzer"), as the Company's Chief Financial Officer ("CFO"), oversaw and made misstatements regarding Capone's hiring and appointment as DocGo's President and CEO. Defendants repeatedly discussed the strengths of DocGo's purported AI technology and Capone's integral role in developing the Company's AI technology and his graduate degree in computational learning theory throughout the Class Period, when in fact Capone did not have a graduate degree in

computational learning theory.  Vashovsky, Capone, and Oberholzer also oversaw the preparation of DocGo's false and misleading proxy statements and Company releases.  As CEO of DocGo, Capone directly oversaw the Company's operations and had access to information concerning the value of contracts in DocGo's pipeline, as well as information concerning the Company's ability to sign up individuals for Medicaid programs.

8.      In September 2023, when defendants could no longer sustain their scheme and wrongful course of business, the true state of affairs at DocGo began to be revealed.   On September 10, 2023, the *Times Union* published an article titled: "DocGo CEO's comments on migrant contracts appear inaccurate."  In the article, the *Times Union* reported the "'over $4 billion'" contract with CBP was worth far below $4 billion and was in fact worth under $2 billion, according to multiple sources familiar with the bidding process.  The *Times Union* also reported Capone's statements to investors about signing migrants onto New York State Medicaid were false.  A UnitedHealthcare representative informed the *Times Union* that DocGo did not even have a contract with UnitedHealthcare in New York.

9.      On September 14, 2023, the *Times Union* published an article titled: "No record that DocGo CEO Anthony Capone earned graduate degree," which was later updated to: "DocGo CEO Anthony Capone admits he didn't earn graduate degree."  In the article, Capone admitted he did "'not have a master's degree from Clarkson University, nor from any other institution.'" On September 15, 2023, after the markets closed, DocGo filed a Form 8-K with the SEC announcing Capone's immediate resignation, purportedly for "personal reasons."  That same day, the *Times Union* published an article titled: "DocGo CEO resigns following report he lied about college degree."

- 3 -

10.     As defendants' misconduct reached the market, DocGo's stock price collapsed, declining more than 56% from its Class Period high of $11.41 on October 11, 2022 to just $4.88 on September 18, 2023.  The decline in the price of DocGo's common stock caused tens of millions of dollars in losses to DocGo investors, who suffered economic harm as the truth about DocGo, its operations, and its prospects began to be revealed.  This action seeks to recover these losses suffered by Lead Plaintiff and the Class (defined herein).

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  A substantial number of the statements, acts, and omissions giving rise to the claims at issue occurred in this District.  DocGo is headquartered in this District, and defendants are subject to personal jurisdiction in this District.

13.     In connection with the statements, acts, and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the Nasdaq Capital Market (the "NASDAQ").

## III.     PARTIES

14.     Lead Plaintiff Genesee County Employees' Retirement System ("Lead Plaintiff" or the "Retirement System") is a public pension fund based in Flint, Michigan with assets of over $250 million for the benefit of more than 1,000 participants.  As set forth in its certification under

- 4 -

the Private Securities Litigation Reform Act of 1995, which was previously filed with the Court and is incorporated herein by reference, the Retirement System purchased DocGo common stock at artificially inflated prices during the Class Period and was damaged thereby. *See* ECF 17-3.

15.     Defendant DocGo is a Delaware corporation with principal executive offices located at 35 West 35th Street, Floor 6, New York, New York 10001. DocGo offers medical transportation and mobile health services in the United States and the United Kingdom. As of December 31, 2023, DocGo had 104,055,168 shares of common stock outstanding. DocGo's common stock trades in an efficient market on the NASDAQ under the ticker symbol "DCGO."

16.     Defendant Vashovsky co-founded DocGo and served as DocGo's CEO until January 2023. Vashovsky has served as the Chairman of DocGo's Board of Directors (the "Board") since 2015.

17.     Defendant Capone joined Ambulnz, Inc. ("Ambulnz") in 2017 and served as Ambulnz's President, Chief Technology Officer ("CTO"), and Chief Product Officer from 2017 until DocGo's Business Combination[1] in 2021. Capone served as DocGo's President until January 2023. Capone served as DocGo's CEO from January 2023 until his abrupt resignation in September 2023.

18.     Defendant Oberholzer served as DocGo's CFO from 2015 until January 2023. In January 2023, Oberholzer became DocGo's Treasurer and Executive Vice President of Capital Markets and Strategy.

19.     Defendants Vashovsky, Capone, and Oberholzer are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with DocGo, are referred to

---

[1]    "Business Combination" refers to Ambulnz's merger with and into a blank check company later renamed DocGo Inc. and further defined below in ¶¶26-29.

herein as "defendants." Defendants are liable under §§10(b) and 20(a) of the 1934 Act for DocGo's false and misleading Class Period statements.

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of DocGo, were privy to confidential, proprietary information concerning DocGo, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse nonpublic information concerning DocGo, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to nonpublic information about its finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, via attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of DocGo's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the ability and authority to control the contents of DocGo's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual

- 6 -

Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to DocGo's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of DocGo stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of DocGo securities. The scheme: (a) deceived the investing public regarding DocGo's business, operations, and management and the intrinsic value of DocGo securities; and (b) caused Lead Plaintiff and members of the Class to purchase DocGo securities at artificially inflated prices.

## IV.    DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

25.     DocGo provides healthcare transportation and mobile services for hospitals and health systems, health plans, governments, and municipalities in the United States and the United Kingdom. DocGo markets itself as a technology company and a leading provider of mobile healthcare services.

26.     DocGo began as Motion Acquisition Corp. ("Motion"), a blank check company formed by business executives in the transportation software and technology sector.  A blank check company is sometimes referred to as a special purpose acquisition company, or "SPAC," and does not initially have any operations or business of its own.  Rather, it raises money from investors in an initial public offering ("IPO") and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.

27.     Motion completed its IPO on October 19, 2020.  Motion's business objective, as stated in its IPO offering documents, was "to identify, acquire and operate a business in the telematics industry," an interdisciplinary field encompassing telecommunications, vehicular technologies, electrical engineering, and computer science.

28.     On January 6, 2021, Motion signed a letter of intent to combine with Ambulnz, which was then a private company.  On March 9, 2021, Motion and Ambulnz announced they had entered into the Business Combination agreement on March 8, 2021.  On October 14, 2021, Motion filed with the SEC a final proxy for the merger recommending shareholders vote in favor of the Business Combination (the "Proxy").  On November 2, 2021, Motion shareholders approved the Business Combination.

29.     On November 5, 2021, Motion and Ambulnz issued a release announcing the completion of the Business Combination.  Ambulnz was merged with and into a subsidiary of Motion, with Motion as the surviving entity, and Motion's named changed to DocGo Inc.  Motion also assumed the business and operations of Ambulnz, allowing Ambulnz to become publicly traded as DocGo.

30.     During the Class Period, DocGo had two business segments: Transportation Services and Mobile Health.  DocGo's Transportation Services segment provided emergency response and nonemergency transportation services offered under the Ambulnz brand (a wholly-owned subsidiary of DocGo after the Business Combination).  DocGo's Mobile Health segment provided healthcare at home and offices, testing, vaccinations, and event services, including onsite healthcare support at sporting events and concerts.  The Company's mobile health services included onsite evaluation, diagnostics, triage, and treatment.

**A.      Defendants Misled Investors and Customers About Capone's Educational Background**

31.     Throughout and prior to the Class Period, DocGo promoted itself as a technology company positioned at the intersection of healthcare and technology.  According to Capone: "DocGo, when you look at its heart, is really a technology company.  From day one when we built the company, that was going to be our focus."  Critical to DocGo's messaging on technology was AI.

32.     While DocGo was promoting itself as a technology company, AI experience and capabilities were increasingly being recognized as important differentiators, particularly for high growth and startup companies.  According to a September 27, 2021 *Harvard Business Review* article titled: "AI Adoption Skyrocketed Over the Last 18 Months," startups were "targeting established industries by employing the latest data-driven technologies to enter new markets with new solutions."  And growth in the AI healthcare market was projected to skyrocket.  As noted in a July 11, 2023 IBM.com article titled: "How can artificial intelligence benefit healthcare?," the AI healthcare market, "valued at $11 billion in 2021, is projected to be worth $187 billion in 2030.  That massive increase means we will likely continue to see considerable changes in how medical

providers, hospitals, pharmaceutical and biotechnology companies, and others in the healthcare industry operate."

33.    At the same time, many companies were finding it hard to attract employees with necessary AI experience.  According to a McKinsey article titled: "The state of AI in 2022 – and a half decade in review":

> Unfortunately, the tech talent shortage shows no sign of easing, threatening to slow that shift for some companies.  A majority of respondents report difficulty in hiring for each AI-related role in the past year, and most say it either wasn't any easier or was more difficult to acquire this talent than in years past.  AI data scientists remain particularly scarce, with the largest share of respondents rating data scientist as a role that has been difficult to fill . . . .

34.    Against this backdrop, DocGo sought to capitalize on the growing AI wave.  DocGo's "technology backbone" purportedly was a proprietary central AI system that managed the logistics behind DocGo's scheduling, patient interactions, and resource allocation.  Based on the Company's representations, analysts believed DocGo's AI technology platform to be the Company's largest differentiator in ambulance services and mobile health.  Needham & Company, which covered DocGo during the Class Period, described DocGo's proprietary AI platform as the Company's "secret sauce."  On June 21, 2023 Canaccord Genuity, which also covered DocGo during the Class Period, wrote: "To be clear, the technology platform is the largest differentiator for DocGo with management emphatically defining itself as a technology company."  On August 18, 2023, BTIG, which also covered DocGo during the Class Period, wrote:

> DCGO's underlying advanced proprietary technology is the core of the company and drives DCGO's value.  Its platform is also the key differentiator that gives it an edge over competitors.

*    *    *

> DCGO has framed itself as a tech company that is at the cross-section between healthcare and technology.

- 10 -

35.     Critical to the Company's purported technology platform were Capone and his education in AI.  For example, on March 15, 2023, at an Oppenheimer Healthcare Conference, Capone specifically linked DocGo's "technology backbone" to his personal background:

> Now, again, the whole piece that we have is on top of our technology backbone.  That technology backbone allows for the procurement, the dispatching, the automation of our services.  And to emphasize again, DocGo's technology is at the same level [a]s the best technology companies in the world.  Although we are a services company where we deliver, we derive nearly all of our revenue from services, clinical services provided in the field.  The technology that we have is of the same caliber of some of the true technology companies that sell technology, that is what they make their money from.
>
> Part of that's due to the fact that that's my background.  That's kind of where I'm heavily weighted towards.  And so, every solution – every problem that we have, we answer with a technology solution.  We deploy code [to] production six to seven times every single day, millions and millions of lines of code doing highly sophisticated AI-based solutions that do all the routing, the dispatching, and the predictive analytics to know who you dispatch to, where, and why.

36.     Indeed, throughout and prior to the Class Period, Capone repeatedly highlighted his purported graduate degree in computational learning theory to investors, customers, and the public in an effort to boost DocGo's prospects and capabilities.

37.     On June 16, 2021, Vashovsky and Capone submitted a "Proposal to the New Jersey Department of Health Office of the Commissioner (the "Proposal") on behalf of Ambulnz, DocGo's medical transportation subsidiary.  The Proposal included Capone's résumé, which stated that Capone had earned a Masters of Computational Learning Theory from Clarkson University in May 2014.  The Proposal also represented Capone had earned a Bachelor of Science in Computer Science, a Bachelor of Arts in Philosophy, and a Bachelor of Arts in Law – each "*Sum Cum Laude*" – from SUNY Potsdam in May 2009:

**EDUCATIONAL EXPERIENCE**

**Masters of Computational Learning Theory -** Clarkson University - May 2014

**Bachelor of Science (CS)** – SUNY College at Potsdam, Graduated Sum Cum Laude **-** May 2009

**Bachelor of Arts (Philosophy) -** SUNY College at Potsdam, Graduated Sum Cum Laude **-** May 2009

**Bachelor of Arts (Law) -** SUNY College at Potsdam, Graduated Sum Cum Laude **-** May 2009

**Dale Carnegie School of Business Communication -** Graduated August 2005

38.    Capone frequently highlighted his supposed academic pedigree when speaking to investors, expressly connecting his advanced degree in AI to the foundational strengths of the Company.  For example, on September 13, 2022, while President of DocGo, Capone stated at an H.C. Wainwright Global Investment Conference:

> So Stan [Vashovsky] came in.  Clinical background: paramedic for 28 years, had been in health care for almost that entire time.  My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer. My graduate degree is in computational learning theory, which was a subset of artificial intelligence.  And so we brought those two together.  We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.

39.    The next day, on September 14, 2022, at a Morgan Stanley Global Healthcare Conference, Capone again emphasized his graduate degree in computational learning theory to investors:

> My name is Anthony Capone, currently the President at DocGo.  Originally, when we formed the company, I was our Chief Technology Officer.  That's kind of where my background is in.  My grad degree is in computational learning theory, which is a discrete subset of computer science, artificial intelligence.

40.    On November 7, 2022, DocGo issued a release announcing Vashovsky was retiring as CEO.  DocGo's Board appointed Capone as CEO, effective January 1, 2023.  In the release, Vashovsky stated:

> "I am extremely proud of what we have been able to accomplish as a company these past seven years, introducing an entirely novel way of delivering quality care that is

- 12 -

beneficial to both patients and payers alike. We are very fortunate to have someone with Anthony's skill set and track record to take the reigns [sic] as CEO next year, and I have every confidence in the continued growth and success of this company."

41.     However, at no time before appointing Capone as CEO did Vashovsky or the rest of

DocGo's Board bother to verify the accuracy of Capone's educational credentials.

42.     After the Board appointed Capone as CEO, Capone continued to tout his credentials

in the rapidly expanding field of AI to investors. For example on January 12, 2023, at a JPMorgan

Healthcare Conference, Capone stated:

> My name is Anthony Capone, as introduced there. I'm Chief Executive Officer. We started the company about 6.5 years ago; I was our Chief Technology Officer. My background, my grad degree is in computational learning theory, which is a subset of AI. So I'm on the technology side. And as I'll go through, our founder is on the clinical side, and we bring the two together to deliver a true, true healthcare service that's built on top of very sophisticated technology backbone.

43.     Later in the same presentation at the JPMorgan Healthcare Conference, Capone again

touted his academic credentials:

> Now one of the key parts, and I like to talk about this quite a lot because it's my background, my graduate degree is in computational learning theory, is our technology. Everybody says they have technology. Everybody has got some app that they like to have. This is not that.

44.     Capone also repeatedly inserted references to his credentials into messaging about the

AI capabilities of DocGo. On August 9, 2023, at a Canaccord Genuity Growth Conference, Capone

stated:

> We started the company. I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

- 13 -

45.     Unbeknownst to investors, however, Capone had not earned a graduate degree in computational learning theory or any other field of study from Clarkson University or any other institution.  In fact, Capone had never even enrolled in any graduate program at Clarkson University.  Nor had Capone earned a triple *summa cum laude* undergraduate degree from SUNY Potsdam.  On September 14, 2023, Albany's *Times Union* published an article titled: "DocGo CEO Anthony Capone admits he didn't earn graduate degree."  In the article, Capone admitted he had never earned any master's degree and refused to confirm that he even held an undergraduate degree from SUNY Potsdam, let alone a triple *summa cum laude* degree, as he had previously represented:

> This week, the *Times Union* found another discrepancy involving DocGo: Anthony Capone has said he went to the State University of New York at Potsdam for his undergraduate degree, according to his biography on the company's website.
>
> Capone's biography also says he received a graduate degree in artificial intelligence from Clarkson University, which has a campus in Potsdam.  But a spokesman for Clarkson University said the school has no record of Anthony Capone enrolling in or completing a graduate degree at the university.
>
> Late Thursday, Capone responded through his spokesman and admitted in a statement the information is false.
>
> "I want to address a serious issue concerning incorrect information about my educational background.  Specifically, it has come to my attention that my public biography erroneously states that I hold a [master]'s degree from Clarkson University," Capone said.  "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution.  This inaccuracy should have been corrected, and I deeply apologize for this error.  I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."
>
> Capone added that he takes "full responsibility and am making immediate corrections to all official bios, profiles, and any other materials where this incorrect information appears."

46.     Amazingly, Capone's admission that he had fabricated parts of his résumé was itself false and misleading as it suggested only that his "public biography" was erroneous when in fact

Capone had systematically lied about his education time and again to investors, customers, and the public.

47.    The next day, on September 15, 2023, DocGo filed a Current Report on Form 8-K with the SEC, announcing Capone's "resignation."

> **B.    Defendants Misled Investors About DocGo's Performance and Prospects**

48.    Though DocGo originated as Ambulnz, with a focus on medical transportation, the Company's Mobile Health segment grew dramatically through 2020, 2021, and 2022. DocGo reported Mobile Health revenues of $234.4 million in 2021 and $325.9 million in 2022. By the first quarter of 2023, the Mobile Health segment comprised over 69% of the Company's business.

49.    Within DocGo's Mobile Health segment, the Company had a number of different segments, or "verticals," including governments, payers, hospitals, and events. DocGo's government vertical was the Company's largest by a significant margin. As Capone stated at a March 7, 2023 Cowen Health Care Conference: "Our government vertical is the largest. That's over 60% of our revenue. And that's what we call population health. So we go to large municipalities. These are very large contracts when you win them."

50.    The growth in DocGo's Mobile Health segment and government vertical had been aided by a surge in COVID-19 testing and other services related to COVID-19. For example, during the pandemic, municipalities and municipal healthcare systems such as New York City and NYC Health + Hospitals engaged DocGo to provide COVID-19 testing and vaccinations for the homeless population. With the pandemic winding down in late 2022 and early 2023, DocGo sought to transition its Mobile Health division away from a COVID-19 testing-centric business to cover a wider range of population health services. One way DocGo sought to do this was by seeking government contract opportunities by responding to Requests for Proposals ("RFPs").

- 15 -

51.     During the Class Period, defendants made multiple statements regarding DocGo's RFP process and DocGo's growing ability to pursue larger and more lucrative government contracts. For example, on January 12, 2023, Capone described "extreme acceleration" in DocGo's RFP channel at a JPMorgan Healthcare Conference:

> When we look into 2023 . . . the biggest growth is probably going to come from the fact we've seen extreme acceleration in our RFP channel, meaning that we're applying for more of these government awards. We're getting better at it, and the size of the awards are getting larger and larger. They used to be in the $2 million to $10 million in annualized revenue. Now they're in the $10 million to sometimes multi-hundred million dollars in annualized revenue that we're applying for.

52.     On March 13, 2023, DocGo hosted an earnings call, during which the Company announced its Q4 2022 results. Then-Chief Operating Officer Lee Bienstock ("Bienstock") discussed DocGo's pursuit of increasingly large RFP opportunities:

> The average size, we've increased significantly. We had originally started with the size that you just mentioned, around the $10 million mark, but we've increased that substantially to $30 million to $50 million, is our average submission at this point. So we're going after larger opportunities, and we're going after more opportunities.

53.     On May 8, 2023, DocGo hosted an earnings call in which it announced the Company's Q1 2023 results. Bienstock again highlighted the growth of DocGo's RFP channel:

> So the number of RFP submissions outstanding has actually doubled since we last reported that number. The total contract value has increased from $1.1 billion to $1.5 billion. So just to clarify that. We're seeing really an increase across the board from federal deals to local municipal deals. We continue to evaluate RFP opportunities across the spectrum on the government side. So, really, it has included representation from the federal opportunities as well as the local and state – municipal opportunities.

54.     Analysts covering DocGo viewed DocGo's RFP efforts as a material component of the Company's future growth and upside. On April 4, 2023, Canaccord Genuity wrote: "We remain encouraged by the greater number of RFPs the company is bidding on and the increasing size of potential contract values that management has highlighted." On April 20, 2023, Cantor Fitzgerald

- 16 -

commented that DocGo's "pace and scale of RFP bids and wins are increasing rapidly," and "[t]he pace of bids has increased to 2-3 per week from 2-3 per month, and the scale of RFPs to $10-200M+ from $2-10M." On May 9, 2023, Cantor Fitzgerald noted that DocGo's "RFP pipeline is now $1.5B, up from $1.1B in March, with the number of RFPs doubled."

55. In spring 2023, DocGo won a no-bid $432 million contract with the HPD that took effect in early May 2023. The HPD contract required DocGo to house migrants and provide them with services including case management, medical care, food, transportation, lodging, and around-the-clock security. The HPD contract was awarded in connection with New York City's policy to relocate migrants outside its five boroughs, including to places such as Albany County, Erie County, and Schenectady County. The HPD contract was the largest contract DocGo had ever received from New York City (or any other state or local government) and nearly matched the Company's total reported revenue in 2022 of $440.5 million.

56. Soon after the HPD contract became effective in May 2023, reports surfaced of DocGo's disruptive behavior in the communities in which the Company had relocated migrants. On July 22, 2023, the *Times Union* reported that on the morning of July 18, 2023, hotel guests at a Super 8 in Rotterdam, New York had been abruptly cleared out of their rooms without notice before DocGo transported migrants there.

57. Then, on July 30, 2023, *The New York Times* published an article reporting on a "rocky, at best" start to DocGo's migrant relocation efforts. *The New York Times* article reported that migrants complained of threats and "broken promises" after New York City awarded DocGo the HPD contract. Specifically, the article stated: "Local authorities have expressed frustration at the lack of coordination between DocGo and agencies that could provide services to the migrants; local security guards hired by DocGo have repeatedly threatened the migrants; and finding steady work

- 17 -

has been nearly impossible."[2]  The July 30, 2023 article reported that DocGo had given migrants "dubious work eligibility and residency letters on what appeared to be a fake [New York City] letterhead."

58.     On August 8, 2023, City of Albany political leaders, including Albany Mayor Kathy Sheehan, County Executive Dan McCoy, and New York Assembly members, convened a press conference to express serious concerns regarding DocGo's performance under the HPD contract.  In his introductory remarks, Albany County Executive Dan McCoy stated: "We need [New York City's] contractor, DocGo, to seriously improve their operations and be a better partner to those in the community and the migrants."  Assembly Member John McDonald later asked during the same press conference: "The question is: What in God's name is DocGo doing?"  Mayor Sheehan stated: "We're here because we are really concerned that there is a lack of accountability with respect to the contractor that Mayor Adams and New York City has hired to do this very important work."

59.     Reeling from mounting public scrutiny and negative media attention earned from DocGo's poor performance on the HPD contract, Capone sought to reassure investors about the Company's performance and future prospects.  On August 9, 2023, the day after Albany leaders convened a press conference to rebuke DocGo, Capone presented at the Canaccord Genuity Growth Conference in Boston, Massachusetts.  During the presentation, Capone highlighted a purported *$4 billion contract* in DocGo's pipeline with CBP to provide medical services for asylum seekers at the southern border, stating the HPD contract had given DocGo the credibility necessary to win it:

---

[2]    *The New York Times* would later follow up with another article on August 21, 2023, "Troubled Migrant Contractor Faces Investigation Into Possible Wrongdoing," reporting that the office of the New York State Attorney General had launched an investigation into DocGo "looking into allegations that the company gave inaccurate information to migrants about employment opportunities, made 'explicit or implicit threats,' and took 'other actions that may jeopardize migrants' ability to obtain asylum.'"

But even more confidence in the existing lines of business with just New York, New York City with multiple asylum seeking programs, we did this in large part because it gave us [all] of the credibility to win the border patrol RFP, which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth. And that one allows us to treat all the asylum seekers as soon as they come across the border and that 72 hour st[i]nt, and we've been working on that for a very long time.

60.     In the same conference, Capone also told investors DocGo could use the HPD contract to transition patients in DocGo's population health vertical into the Company's payer vertical by signing migrants up for New York State Medicaid through UnitedHealthcare:

Just in the one program that I mentioned, which was part of the reason why we raised our earnings was a migrant contract, that we have with New York City. We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare.

And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care.

61.     Capone continued:

United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost.

62.     Analysts covering DocGo commented positively on Capone's stated focus of growing DocGo's payer and corporate vertical, as these verticals provided increased stability for the Company. After the August 9, 2023 Canaccord Genuity Growth Conference, on August 18, 2023 BTIG noted:

DCGO is increasingly prioritizing its payer and corporate vertical which remains small now, making up less than 10% of revenue, but is DCGO's fastest-growing customer base. We like DCGO's shift towards health plans because they are

generally well-insulated from volatility, and have large existing membership bases to tap into. We like the recurring revenue nature of plans.

63.     Analysts also took notice of the CBP contract in DocGo's RFP pipeline. On August 18, 2023, BTIG repeated Capone's reference to the substantial CBP medical services contract, noting: "DCGO is in the process of bidding on a multi-billion dollar contract related to migrant services on the border."

64.     Capone's statements regarding the value of the CBP contract and DocGo's ability to leverage the HPD contract into the much larger CBP contract were also repeated in various news outlets. On September 1, 2023, the *Times Union* reported DocGo was "seeking to turn a $432 million migrant shelter contract with New York City into a $4 billion contract with [CBP] to provide health care for those crossing the border." The same day, *The New York Times* reported DocGo "is now seeking to land a federal contract worth billions of dollars, the company's chief executive officer, Anthony Capone, recently acknowledged."

65.     On September 6, 2023, *The New York Times* repeated Capone's August 9, 2023 assertion at the Canaccord Genuity Growth Conference "that the company had pursued the $432 million city contract largely to give it enough credibility to bid on a $4 billion contract with [CBP]."

66.     The purported $4 billion CBP contract would have been, by a factor of nearly ten, DocGo's largest government contract win in the Company's history. For reference, for the year ended December 31, 2022, DocGo reported total revenues of just $440.5 million. For the year ended December 31, 2021, DocGo reported total revenues of $318.7 million.

67.     Unbeknownst to investors, however, Capone had falsely inflated the value of the CBP contract, which was not worth "o[ve]r $4 billion." In fact, the CBP contract was worth no more than $2 billion – half the amount Capone had led investors to believe at the Canaccord Genuity Growth

- 20 -

Conference.  On September 10, 2023, the *Times Union* published an article reporting: "[T]he five-year contract to provide medical services at the southern border for [CBP] is far below the $4 billion Capone cited in his comments to investors, according to a spokeswoman for the agency."  The *Times Union* reported: "[A]ccording to multiple sources familiar with the ongoing bidding process, the border medical services contract is valued at $2 billion, up from its initial, but later contested, award to a company in October for $1 billion."  Ultimately, DocGo failed to win any portion of the CBP contract.

68.    Also unbeknownst to investors, Capone's statement that DocGo had "already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare" was also false.  In the same September 10, 2023 article, the *Times Union* reported that a spokesperson for DocGo had walked back Capone's comments, admitting the Company "'does not enroll anyone in Medicaid programs.'"  A UnitedHealthcare representative also confirmed to the *Times Union* that UnitedHealthcare did not have a contract with DocGo in New York.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    False and Misleading Statements Regarding Capone's Educational Background

69.    Throughout and prior to the Class Period, defendants repeatedly chose to speak to investors and customers about Capone's academic credentials.  Capone himself incessantly touted his nonexistent graduate degree in AI – a burgeoning field of technology that DocGo marketed to investors as the Company's largest differentiator and backbone.

70.    Prior to the Class Period, Capone appeared on the "AI in Action" podcast, published on September 9, 2021 on YouTube.  During the podcast, Capone discussed his background, stating:

> It's a long journey, I guess.  Started young – I think 12, right before my 13th birthday is when my parents were I guess fortunate enough to get a coworker of

theirs . . . to tutor me in ColdFusion and CFML, and after I learned a little CFML which is a for sure a little bit of a dead language now.  I progressed and started building applications when I was 14, kind of for hire – little things here and there.  National Independent Association of Lighting Distributors was my first account.  I remember getting my first thousand dollar paycheck like it was yesterday and kept coding . . . through high school and into university and went to school, my undergrad, for computer science, ***and then graduate degree in computational learning theory, it's like a subset of AI***.

71.     The statement referenced above in ¶70 remained alive and uncorrected during the Class Period.

72.     On April 29, 2022, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2022 annual meeting of stockholders.  Vashovsky signed the Notice of the 2022 Annual Meeting of Stockholders to which the proxy statement was attached, and the proxy statement was solicited by the entire Board, including Vashovsky.  The proxy statement included biographical information for each executive officer of the Company.  In the proxy statement, DocGo and Vashovsky represented as follows:

> Mr. Capone has served as our President since November 2021.  He is an operational lead for our COVID-19 response across the U.S., including our work with FEMA's New York State COVID-19 deployment.  Mr. Capone previously served as Amb[ul]nz's President, Chief Technology Officer and Chief Product Officer from 2017 until our Business Combination.  Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017.  From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company.  Mr. Capone also founded the largest free developer conference in the U.S., Engineers4Engineers.  ***Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University***.

73.     On September 13, 2022, Capone presented at the H.C. Wainwright Global Investment Conference.  During the presentation, Capone discussed his background, stating:

> So we decided right off the bat that the ability to route our own ambulances, to stack them, to create all of the technology necessary to actually handle the transportation we needed to build out.  That's where I came in.

- 22 -

So Stan came in.  Clinical background: paramedic for 28 years, had been in health care for almost that entire time.  My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer.  ***My graduate degree is in computational learning theory, which was a subset of artificial intelligence***.  And so we brought those two together.  We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.

74.    The next day, on September 14, 2022, Capone presented at the Morgan Stanley Global Healthcare Conference.  During his introductory remarks, Capone discussed his background, stating:

Sure.  Sure.  My name is Anthony Capone, currently the President at DocGo.  Originally, when we formed the company, I was our Chief Technology Officer.  That's kind of where my background is in.  ***My grad degree is in computational learning theory, which is a discrete subset of computer science, artificial intelligence***.

75.    On October 19, 2022, Capone participated in one of Impetus Digital's Fireside Chats, with Impetus Digital CEO & Co-Founder Natalie Yeadon ("Yeadon").  Yeadon introduced Capone in her introductory remarks, stating: "Anthony holds a graduate Computer Science degree in artificial intelligence from Clarkson University, as well as has over 20 years of software engineering experience."  Capone, who was (virtually) present and attentive during the introduction, did not correct Yeadon.

76.    Later in the interview, Capone discussed his background, stating:

First thing, it comes down to utilization.  We built the company originally on utilization. . . .  [T]he reason why most ambulance companies when you get in tend not to make any money is because of low utilization.  So when you get in, you say "well what can I do?"  Well you can't pay people less because they're already usually making very close to minimum wage at a lot of companies, and you can't increase your revenue per transport because that is fixed by Medicare.  So the only thing you really can do to make more money as an ambulance company, is to do more – you run more trips on your shift.  Well we built out our own software.  It's called Dara, which entirely focuses on utilization, it's routing optimization, it really leverages that AI.  ***It's kind of the intellectual reason I guess that I joined the company was that I had the ability to apply my academic training to a very***

- 23 -

*practical circumstance of how do we have the ability to make sure the ambulances are running*?

77.     On November 7, 2022, DocGo filed with the SEC a Current Report on Form 8-K, reporting Vashovsky was retiring and announcing Capone was appointed by the Board to succeed Vashovsky as CEO.  Oberholzer signed the Form 8-K.  In the Form 8-K, DocGo and Oberholzer represented:

> Mr. Capone, age 35, has served as the Company's President since November 2021. Mr. Capone previously held various positions at Ambulnz, Inc. between 2017 and 2021, including those of President, Chief Technology Officer and Chief Product Officer.  Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017.  From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. ***Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University***.

78.     Before being named CEO and while President of the Company, Capone's DocGo biography represented:

> Anthony Capone has served Ambulnz's executive team since 2017 and now serves DocGo as president, having previously served as DocGo CTO, and CPO. ***Mr. Capone holds a graduate CS degree in Artificial Intelligence from Clarkson University*** and has over 18 years of software engineering experience.  His sterling record of entrepreneurial excellence includes leading three companies from start to successful exit.  In addition to his roles at DocGo, Mr. Capone is a member of the Forbes Tech Council, writing on topics at the intersection of healthcare and AI.

79.     In January 2023, when Capone became CEO of DocGo, the Management section of the Company website represented as follows:

> Anthony Capone is CEO of DocGo.  Mr. Capone has served DocGo in a number of roles since 2017, including president, CTO and CPO. ***Mr. Capone holds a graduate CS degree in Artificial Intelligence from Clarkson University*** and has over 18 years of software engineering experience.  His sterling record of entrepreneurial excellence includes leading three companies from start to successful exit.  In addition to his roles at DocGo, Mr. Capone is a member of the Forbes Tech Council, writing on topics at the intersection of healthcare and AI.

- 24 -

80.     On January 12, 2023, Capone presented at the JPMorgan Healthcare Conference. During the presentation, Capone discussed his background, stating:

> My name is Anthony Capone, as introduced there.  I'm Chief Executive Officer.  We started the company about 6.5 years ago; I was our Chief Technology Officer.  ***My background, my grad degree is in computational learning theory, which is a subset of AI***.  So I'm on the technology side.  And as I'll go through, our founder is on the clinical side, and we bring the two together to deliver a true, true healthcare service that's built on top of very sophisticated technology backbone.

81.     Later in the same JPMorgan Healthcare Conference, Capone again inserted his credentials into messaging about the Company's technology:

> Now one of the key parts, and I like to talk about this quite a lot ***because it's my background, my graduate degree is in computational learning theory***, is our technology.  Everybody says they have technology.  Everybody has got some app that they like to have.  This is not that.

82.     On March 7, 2023, Capone presented at the Cowen Health Care Conference.  During the presentation, Capone discussed his background, stating:

> We believe that fee-for-service medicine is a – I'm a software guy.  ***My graduate degree is in computational learning theory***.  Sometimes I fall back to tech terms.  But in tech, you would say that's an anti-pattern.  The concept of fee-for-service medicine is flawed and should go away.  It will eventually disappear in society because it does not make sense.  It's a flawed – you have a perverse incentive model.  So we don't believe in fee-for-service medicine and we – no material part of our business is in fee-for-service medicine.

83.     On March 15, 2023, Capone presented at the Oppenheimer Healthcare Conference. During the presentation, Capone discussed his background, stating:

> When you look at the clinical delivery services that we have, it's significantly different than the way it works.  DocGo, when you look at its heart, is really a technology company.  From day one when we built the company, that was going to be our focus.  ***And that's actually my background.  My degree is in artificial intelligence.  That's what I went to graduate school for***.  And from day one, we built out all of our own technology in-house, and not just technology that sometimes you say I need to have as a service company.

84.     On April 26, 2023, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2023 annual meeting of stockholders.  Vashovsky signed the Notice of

- 25 -

the 2023 Annual Meeting of Stockholders to which the proxy statement was attached, and the proxy statement was solicited by the entire Board of Directors, including Vashovsky. The proxy statement included biographical information for each executive officer of the Company. In the proxy statement, DocGo and Vashovsky represented as follows:

> Mr. Capone has served as our Chief Executive Officer since January 2023. He previously served as our President from November 2021 to December 2022, during which time, he was an operational lead for our COVID-19 response across the U.S., including our work with FEMA's New York State COVID-19 deployment. Mr. Capone previously served as Amb[ul]nz's President, Chief Technology Officer and Chief Product Officer from 2017 until our Business Combination. Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. Mr. Capone also founded the largest free developer conference in the U.S., Engineers4Engineers. ***Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University***.

85.     On August 9, 2023, Capone presented at the Canaccord Genuity Growth Conference. During the presentation, Capone discussed his background, stating:

> While we can do so with high degrees of efficiency and generating good returns for the investors that have taken risks on DocGo is because of our technology, and that's where I really came in originally.
>
> We started the company. ***I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence*** and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

86.     The statements in ¶¶70-85 above were materially false and misleading when made. The facts, which were then known to or recklessly disregarded by DocGo, Vashovsky, Capone, and Oberholzer were as follows:

4855-7244-3306.v1

(a)    Capone did not hold a graduate degree in computational learning theory from Clarkson University (or any other university) and had fabricated his educational credentials; and

(b)    Capone's educational background was material to investors.  As set forth in ¶¶31-44 above, Capone repeatedly emphasized the importance of his educational background, and specifically his graduate degree in computational learning theory, to the Company's technological capabilities.   DocGo's purported technological capabilities were the Company's supposed competitive advantage in the traditional ambulance services business and the stated reason the Company could adapt to meet contract requirements and provide healthcare services to underserved populations.

87.    On September 14, 2023, Capone was quoted by the Albany *Times Union* through his spokesperson, claiming that his "'***public biography erroneously states that I hold a [master]'s degree from Clarkson University***'":

> "I want to address a serious issue concerning incorrect information about my educational background.  Specifically, ***it has come to my attention that my public biography erroneously states that I hold a [master]'s degree from Clarkson University***," Capone said.  "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution.  This inaccuracy should have been corrected, and I deeply apologize for this error.  I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."

88.    The statement in ¶87 above was materially false and misleading when made.  The facts, which were then known to or recklessly disregarded by DocGo and Capone, were that Capone's misstatements regarding his educational credentials were not limited to his public biography.  Rather, as set forth in ¶¶31-44 above, Capone systematically misled investors about his educational credentials during investor conferences and interviews, as well as in written submissions, throughout and prior to the Class Period.

- 27 -

**B.      False and Misleading Statements Regarding the CBP Contract and
New York State Medicaid Sign Ups**

89.      On August 9, 2023, Capone presented at the Canaccord Genuity Growth Conference.

During the presentation, Capone discussed the CBP contract, stating:

> But even more confidence in the existing lines of business with just New
> York, New York City with multiple asylum seeking programs, *we did this in large
> part because it gave us all of the credibility to win the border patrol RFP, which
> we've been working on for seven to eight months.  And that's a five-year contract
> worth o[ve]r $4 billion that contract is.  Almost $1 billion a year, that contract is
> worth*.  And that one allows us to treat all the asylum seekers as soon as they come
> across the border and that 72 hour st[i]nt, and we've been working on that for a very
> long time.

90.      The statement set forth in ¶89 was materially false and misleading when made.  The

facts, which were then known to or recklessly disregarded by DocGo and Capone, were as follows:

(a)      as set forth in ¶67, the contract with CBP was not valued at "o[ve]r $4 billion"

or "$1 billion a year"; and

(b)      due to DocGo's poor performance with the HPD contract, and the intense

public scrutiny that had resulted and was then known to DocGo and Capone, Capone did not believe,

and had no reasonable basis to believe, that the HPD contract gave DocGo "all of the credibility to

win the border patrol RFP."

91.      On August 9, 2023, Capone, at the same Canaccord Genuity Growth Conference

presentation, discussed signing up migrants onto New York State Medicaid, stating:

> Just in the one program that I mentioned, which was part of the reason why we raised
> our earnings was a migrant contract, that we have with New York City.  *We've
> already signed up over 3,000 asylum seekers onto New York State Medicaid
> through United Healthcare*.
>
> *And now because we sign them up, now we have the ability to become their
> primary care provider and treat the preventable diseases on a long-term basis,
> being able to eventually get this per-member, per-month reimbursement because
> we are now comprehensively taking their care*.  And in that particular case, you

- 28 -

know they're coming into the country with no primary care provider and they have no health plan. Of course they don't.

\*       \*       \*

***United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost***.

92.     The statements set forth in ¶91 were materially false and misleading when made. The facts, which were then known to or recklessly disregarded by DocGo and Capone, were as follows:

(a)     DocGo did not enroll anyone, including asylum seekers, in New York State Medicaid programs, as the Company later admitted (¶68);

(b)     DocGo did not have a contract with UnitedHealthcare in New York and did not have the ability to enroll asylum seekers in United Healthcare's managed care program, as DocGo later admitted (*id.*); and

(c)     DocGo's ability to grow its payer vertical was material to the Company's future growth and earnings (¶62).

## VI.    LOSS CAUSATION

93.     As detailed herein, defendants made materially false and misleading statements and/or omitted material information concerning Capone's credentials, as well as DocGo's financial prospects. Defendants' misstatements and omissions were designed to and did artificially inflate, maintain, and manipulate the price of DocGo common stock and deceived Lead Plaintiff and the Class, causing purchasers of DocGo common stock to suffer economic harm as the truth reached the market. When the truth began to come out, it caused the price of DocGo common stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchases of DocGo

- 29 -

common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

94.     On September 10, 2023, the *Times Union* published an article titled: "DocGo CEO's comments on migrant contracts appear inaccurate."  In the article, the *Times Union* reported the "'over $4 billion'" CBP contract referenced by Capone during the August 9, 2023, Canaccord Genuity Growth Conference was in fact worth far below $4 billion, according to a spokeswoman from CBP, and was in fact worth under $2 billion, according to multiple sources familiar with the bidding process.  The *Times Union* also reported Capone's statements to investors about how "the 'municipal sector has long-term revenue opportunity in our payer vertical'" were also false.  While Capone had told investors DocGo had "'already signed up over 3,000 asylum seekers onto New York State Medicaid through UnitedHealthcare'" and DocGo "now ha[d] the ability to become their primary care provider and . . . eventually get this per member, per month reimbursement," the *Times Union* quoted a DocGo spokesperson confirming, in fact: "'DocGo does not enroll anyone in Medicaid . . . and assignment as a primary care provider is not a "byproduct" of this process.'"  The *Times Union* also reported a UnitedHealthcare representative reported DocGo did not even have a contract with UnitedHealthcare in New York.

95.     On this news,  the price of DocGo common stock declined by more than 10% (10.76%), from a close of $7.06 on September 8, 2023 to a low of $6.30 on September 11, 2023.

96.     On September 14, 2023, the *Times Union* published an article titled: "No record that DocGo CEO Anthony Capone earned graduate degree," which was later updated to: "DocGo CEO Anthony Capone admits he didn't earn graduate degree."  In the article, Capone admitted he did "'not have a master's degree from Clarkson University, nor from any other institution.'"  Capone's admission, however, was itself false and misleading as what he claimed to be an "'inaccuracy'" in

his "'public biography'" was in fact a blatant fabrication Capone had repeated at least ten times seeking to bolster his and DocGo's credibility and prospects with investors and customers.

97.    On September 15, 2023, after the markets closed, DocGo filed a Current Report on Form 8-K with the SEC announcing Capone's immediate resignation, purportedly for "personal reasons." That same day, the *Times Union* published an article titled: "DocGo CEO resigns following report he lied about college degree." The article questioned whether Capone had an undergraduate degree from SUNY Potsdam, noting Capone stated only that he had an undergraduate degree from an "'accredited university'" and his spokesman "declined to respond to questions about whether he graduated from SUNY Potsdam."

98.    On this news, the price of DocGo common stock declined by more than 25%, from a high of $6.53 on September 14, 2023 to a low of $4.88 on September 18, 2023.

99.    In total, between August 31, 2023 and September 18, 2023, DocGo's common stock declined from a high of $9.11 on September 1, 2023 to a low of $4.88 on September 18, 2023. David Larsen, a securities analyst with BTIG who followed the Company, directly attributed this decline to news of Capone's falsified credentials and misstatements regarding the size of the CBP contract, as well as news regarding security guard incidents with migrants:

> ***Misstatements and negative news articles are disappointing***. We are negatively surprised that former CEO Anthony Capone had previously indicated that he had earned a graduate degree from Clarkson University, when in reality the school has no record of him attending the institution. Other news articles have also reported that the size of the Southern Border contract that DCGO is currently bidding on is likely in the range of ~$1-$2B over 5 years and not the ~$4B+ highlighted by Mr. Capone. News articles have also highlighted various security guard incidents, with migrants. ***All of these unfavorable headlines have caused shares of DCGO to pull-in from ~$9 per share at 8/31/23 to ~$5 on 9/18/23***.

100.    The decline in the price of DocGo common stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of defendants'

- 31 -

misrepresentations and omissions to investors and the market. The timing and magnitude of the price declines in DocGo common stock compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of defendants' misstatements and omissions and the subsequent significant decline in the value of DocGo common stock when defendants' misrepresentations and other fraudulent conduct were revealed.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

101.    At all relevant times, the market for DocGo stock was an efficient market for the following reasons, among others:

(a)    DocGo stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, DocGo filed periodic public reports with the SEC and the NASDAQ;

(c)    DocGo regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    DocGo was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e)     DocGo's stock price reacted in response to new, material information about DocGo's business.

102.    As a result of the foregoing, the market for DocGo stock promptly digested current information regarding DocGo from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of DocGo stock during the Class Period suffered similar injury through their purchase of DocGo stock at artificially inflated prices, and a presumption of reliance applies.

103.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII.   CLASS ACTION ALLEGATIONS

104.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a "Class" consisting of all persons who purchased or otherwise acquired DocGo common stock during the Class Period.  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DocGo shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes there are thousands of members in the proposed Class, if not more.  Record owners and other members of the Class may be identified from records maintained by DocGo, its transfer agent,

or securities' brokers and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

106.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

107.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of DocGo;

(c)    whether the price of DocGo stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**IX.    CAUSES OF ACTION**

## COUNT I

**Violations of §10(b) of the 1934 Act and SEC Rule 10b-5**
**(Against All Defendants)**

110.    Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

111.    This count is brought by Lead Plaintiff on behalf of itself and the Class.

112.    This count is brought against all defendants.

113.    During the Class Period, each of the defendants named in this Count disseminated or approved the statements as specified above in ¶¶69-92, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    Defendants named in this count violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

        (a)    employed devices, schemes, and artifices to defraud;

        (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of DocGo common stock during the Class Period.

115.    Defendants, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce, and/or the mails, engaged and participated in a continuous

- 35 -

course of conduct to conceal the truth and/or adverse material information about DocGo's business, operations, and financial condition as specified herein.

116.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or recklessly disregarded the true facts that were available to them.

117.    As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of DocGo common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased or otherwise acquired DocGo common stock during the Class Period at artificially high prices and were damaged thereby.

118.    Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for DocGo common stock and suffered losses when the relevant truth was revealed. Lead Plaintiff and the Class would not have purchased DocGo common stock at the prices they paid, or at all, if they had been aware the market prices had been artificially and falsely inflated by these defendants' misleading statements.

119.    As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in DocGo common stock.

120.    By reason of the foregoing, defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

- 36 -

## COUNT II

### Violations of §20(a) of the 1934 Act
### (Against All Defendants)

121.    Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

122.    This count is brought by Lead Plaintiff on behalf of itself and the Class.

123.    This count is brought against all defendants.

124.    Each of the defendants named in this Count acted as a controlling person within the meaning of §20(a) of the 1934 Act.  By virtue of their high-level positions as officers and/or directors of DocGo, their ownership and contractual rights, participation in, and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the allegedly false and misleading statements.

125.    In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I and exercised that power.

126.    As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period when the relevant truth was revealed.

127.    By reason of the foregoing, defendants named in this Count violated §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.      Determining this action is a proper class action by certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding injunctive and such other equitable relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.

DATED:  March 18, 2024             ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                       CHRISTOPHER M. WOOD (admitted *pro hac vice*)
                                       HENRY S. BATOR (admitted *pro hac vice*)


                                           s/ Christopher M. Wood
                                          CHRISTOPHER M. WOOD

                                       200 31st Avenue North
                                       Nashville, TN  37203
                                       Telephone:  615/244-2203
                                       615/252-3798 (fax)
                                       cwood@rgrdlaw.com
                                       hbator@rgrdlaw.com

- 38 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiff

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

4855-7244-3306.v1