UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| JOE NACLERIO, Individually and on Behalf of All Others Similarly Situated, | x : : : : : | |
| Plaintiff, | : : | No. 1:23-cv-09476-KPF |
| v. | : : | |
| DOCGO INC., STAN VASHOVSKY, ANTHONY CAPONE, and ANDRE OBERHOLZER, | : : : : | |
| Defendants. | : x | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DECLARATION OF JASON J. MENDRO IN SUPPORT OF DEFENDANTS DOCGO INC., VASHOVSKY, AND OBERHOLZER'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# EXHIBIT 7

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

---

**FORM 10-K**

---

**(Mark One)**
☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission File Number 001-39618**

# DocGo Inc.
**(Exact name of Registrant as specified in its Charter)**

---

| **Delaware** | **85-2515483** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **35 West 35th Street, Floor 6 New York, New York** | **10001** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (844) 443-6246**

---

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.0001 per share | DCGO | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐    NO ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐    NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒   NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒   NO ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☒ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐   NO ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant as of June 30, 2022, based on the closing price of the shares of common stock on The Nasdaq Stock Market as of such date was $615,536,965. Shares of common stock held by each executive officer and director and by each person who is known to own 10% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates of the Registrant. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of shares of Registrant's Common Stock outstanding as of March 10, 2023 was 102,508,188.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement for its 2023 Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. The Registrant expects to file such proxy statement with the Securities and Exchange Commission within 120 days of the Registrant's fiscal year ended December 31, 2022.

Case 1:23-cv-09476-KPF    Document 62-7    Filed 06/21/24    Page 3 of 42

**Table of Contents**

|  |  | Page |
|---|---|---|
| **PART I** |  |  |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 12 |
| Item 1B. | Unresolved Staff Comments | 48 |
| Item 2. | Properties | 48 |
| Item 3. | Legal Proceedings | 48 |
| Item 4. | Mine Safety Disclosures | 48 |
|  |  |  |
| **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 49 |
| Item 6. | Reserved | 49 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 49 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 62 |
| Item 8. | Financial Statements and Supplementary Data | 62 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 63 |
| Item 9A. | Controls and Procedures | 63 |
| Item 9B. | Other Information | 64 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 64 |
|  |  |  |
| **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 65 |
| Item 11. | Executive Compensation | 65 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 65 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 65 |
| Item 14. | Principal Accountant Fees and Services | 65 |
|  |  |  |
| **PART IV** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 66 |
| Item 16 | Form 10-K Summary | 68 |

**Cautionary Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), regarding, among other things, the plans, strategies, outcomes, and prospects, both business and financial, of the Company. These statements are based on the beliefs and assumptions of our management. Although the Company believes that its plans, intentions and expectations reflected in or suggested by these forward-looking statements are reasonable, the Company cannot assure you that it will achieve or realize these plans, intentions, outcomes or expectations. Forward-looking statements are inherently subject to substantial risks, uncertainties and assumptions, many of which are beyond our control, and which may cause actual results to differ materially from those contained in our forward-looking statements. Accordingly, you should not place undue reliance on such statements. All statements other than statements of historical fact are forward-looking. Forward-looking statements include, but are not limited to, statements concerning possible or assumed future actions, business strategies, plans, goals, future events, future revenues or performance, financing needs, business trends, results of operations, objectives and intentions with respect to future operations, services and products, including our transition to non-COVID related services, geographic expansion, normalization initiative, new and existing contracts, M&A activity, workforce growth, leadership transition, cash position, share repurchase program, our competitive position and opportunities, including our ability to realize the benefits from our operating model, and others. In some cases, these statements may be preceded by, followed by or include the words "believes," "estimates," "expects," "projects," "forecasts," "may," "might," "will," "should," "could," "can," "would," "design," "potential," "seeks," "plans," "scheduled," "anticipates," "intends" or the negative of these terms or similar expressions.

Forward-looking statements are not guarantees of performance and speak only as of the date the statements are made. While DocGo believes that these forward-looking statements are reasonable, there can be no assurance that DocGo will achieve or realize these plans, intentions, outcomes or expectations. You should understand that the following important factors, in addition to those discussed under the heading "*Risk Factors*" and elsewhere in this Annual Report on Form 10-K, could affect the future results and prospects of DocGo and could cause those results or other outcomes to differ materially from those expressed or implied in the forward-looking statements in this Annual Report on Form 10-K.

We undertake no intent or obligation to publicly update or revise any forward-looking statements, whether because of new information, future events, or otherwise.

**Item 1A. Risk Factors.**

**Risks Related to DocGo's Business Strategy**

***DocGo's failure to successfully implement its business strategy could adversely affect its business.***

DocGo's future financial performance and success is dependent in large part upon its ability to implement its business strategy successfully. DocGo's business strategy includes several initiatives, including developing contractual relationships with new healthcare provider partners and expanding its business with existing partners; capitalizing on organic growth opportunities such as growing complementary and integrated service offerings, particularly with respect to its mobile health solutions; pursuing selective acquisitions to expand its geographic presence, among other things; and enhancing operational efficiencies and productivity. DocGo may not be able to implement its business strategy successfully or achieve the anticipated benefits of its business plan, which could adversely affect its long-term growth, profitability and ability to service its debt obligations. Even if DocGo is able to implement some or all of the initiatives of its business plan, one or more initiatives may not be successful or if successful, may not achieve the anticipated goals, results or outcomes, and DocGo's operating results may not improve to the extent it anticipates, or at all, or it could be adversely affected.

Implementation of DocGo's business strategy could also be negatively impacted by a number of factors beyond its control, including increased competition, government regulation, general macroeconomic conditions, including an inflationary environment, rising interest rates and recessionary fears, the geopolitical environment, including the war in Ukraine and rising tensions in the Taiwan Strait, and pandemic or endemics, including COVID-19, and increased operating costs, including costs of labor, or other expenses. In particular, DocGo's future success is contingent on DocGo's ability to both penetrate new markets and to further penetrate existing markets, which is subject to a number of uncertainties, including our ability to obtain necessary licenses in new markets, to establish and grow new customer relationships and our ability to attract and retain skilled personnel, many of which are beyond DocGo's control. Expanding service offerings such as DocGo's mobile health solutions also carries unique risks, including lack of market acceptance or the potential inability to realize an appropriate return, if any, on the capital invested. Government regulations in both DocGo's domestic and international markets can also delay or prevent expansion or the introduction of new service offerings or require changes to some of DocGo's current service offerings, which could negatively impact the success of DocGo's strategies and financial results. In addition, to the extent DocGo has misjudged the nature or extent of industry trends or its competition, it may have difficulty in identifying new provider partners, achieving any geographic expansion, introducing new service offerings or achieving DocGo's other strategic objectives. As such, due to these and other known and unknown risks, DocGo cannot assure you that its business strategy will be successful, and any failure to effectively implement its business strategy and otherwise grow the business could have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo relies on its contractual relationships with its healthcare provider partners.***

DocGo significantly relies on its contractual relationships with its healthcare provider partners and other strategic partners and alliances to generate revenues, expand into new markets and further penetrate existing markets. In recent years, DocGo has entered into strategic business relationships with, among others, healthcare providers and hospital systems, to take advantage of commercial opportunities across its operations, but particularly in its medical transportation services segment. The structure of DocGo's relationships with its healthcare provider partners is a novel model in DocGo's industry and because there is little precedent for this approach, there can be no assurances that it will be operationally or financially successful in the long term.

DocGo's contractual relationships with its healthcare provider partners and its reliance on revenues generated pursuant to these arrangements carry commercial and other risks and uncertainties that are different from those underlying DocGo's other revenue streams, including the opportunity cost of not pursuing other ventures independently or with other partners. For example, strategic partners may have business or economic interests that are inconsistent with those of DocGo and may take actions contrary to DocGo's interests. While DocGo typically manages the day-to-day operations, DocGo's partners have certain consent rights, including certain decisions such as the annual budget and the hiring and firing of key management personnel for the venture, and they may not agree with decisions that DocGo believes are appropriate or are otherwise in the venture's or its best interests. This structure can also lead to disputes with partners, which could require DocGo's management to commit additional time and resources to resolve any disagreements or, in some instances, may lead to arbitration or litigation. Contractual relationships like these typically carry termination rights and one or more of DocGo's partners may choose to exit the relationship prematurely and, in certain arrangements, the partner may have the option to sell its interest in the venture to DocGo or acquire DocGo's stake at a predetermined price, even if the venture is beneficial to DocGo and in DocGo's interest to continue the venture. If one of DocGo's ventures or any of its strategic partners is subject to a regulatory investigation or legal dispute or is otherwise the subject of any negative publicity, DocGo may be associated with the matter and be similarly harmed, regardless of whether the specific partnership or DocGo itself had any connection to the underlying matters. In addition, DocGo may, in certain circumstances, be liable for the actions of its partners. Contractual relationships such as these can also raise fraud and abuse issues. For example, the Office of Inspector General (the "OIG") of the U.S. Department of Health and Human Services ("HHS") has taken the position that certain contractual relationships between a party which makes referrals and a party which receives referrals for a specific type of service may violate the federal Anti-Kickback Statute if not appropriately structured. Any of the foregoing risks or other risks related to DocGo's reliance on its strategic partners and other relationships could have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo incurs significant up-front costs in its client relationships and any inability to maintain and grow these client relationships over time or to recover these costs could adversely affect its business.***

DocGo's business strategy depends heavily on achieving economies of scale because its initial up-front investment is costly and the associated revenue is recognized on a ratable basis. DocGo devotes significant resources to establish relationships with its clients and implement its solutions. DocGo typically incurs higher variable costs for labor and medical and other supplies in the initial stages of a project, as the focus at that stage is on ensuring that the projects are staffed and stocked properly, even at the risk of temporarily overstaffing the project until revenue achieves the anticipated scale. These risks are heightened when the client is a large enterprise, such as DocGo's healthcare provider or government partners. Accordingly, DocGo's results of operations depend, in substantial part, on its ability to maintain and grow its relationships with customers over time, allowing DocGo to build economies of scale and recoup up-front costs. Additionally, as DocGo's business grows, its client acquisition costs could outpace its build-up of recurring revenue, and DocGo may be unable to successfully manage its total operating costs to achieve profitability, or if achieved, to maintain profitability. If DocGo fails to achieve appropriate economies of scale or if it fails to manage or anticipate demand, its business, financial condition and results of operations could be materially adversely affected.

***The growth of DocGo's business depends, in part, on its ability to execute on its acquisition strategy.***

A significant portion of DocGo's historical growth has occurred through acquisitions, such as its acquisitions in 2022 of Government Medical Services, Ryan Brothers Ambulance, Exceptional Ambulance and Community Ambulance Services, and it anticipates continued growth through acquisitions in the future. DocGo's growth strategy is primarily focused on geographic expansion, often as part of growing its relationship with an existing healthcare provider partner, and DocGo expects acquisitions to be its primary means of obtaining the infrastructure, licenses or other resources necessary to enter new markets in the future. DocGo evaluates, and expects to continue to evaluate on a regular basis, a variety of possible acquisition transactions.

DocGo cannot predict the timing of any contemplated transactions, and there can be no assurances that DocGo will be able to identify suitable acquisition opportunities in the geographies into which it expects to grow or, if it does, that any transaction can be consummated on terms acceptable to it, if at all. DocGo also competes for acquisitions with other potential acquirers, some of which may have greater financial or operational resources than DocGo. A significant change in DocGo's business; macroeconomic factors, including inflationary pressures, rising interest rates and recessionary fears; unexpected decreases in cash flows, tightening of the capital markets or any restrictions imposed by DocGo's debt obligations may limit its ability to obtain the necessary capital for acquisitions or otherwise impede its ability to complete an acquisition. Certain proposed acquisitions or dispositions may also trigger regulatory review by governmental agencies, including the U.S. Department of Justice (the "DOJ") and the U.S. Federal Trade Commission (the "FTC"), under their respective regulatory authority. Any delay, prohibition or modification required by regulatory authorities for competitive purposes or otherwise could adversely affect the terms of a proposed acquisition or could require DocGo to modify or abandon an otherwise attractive acquisition opportunity. The failure to identify suitable transaction partners and to consummate transactions on acceptable terms, or at all, could adversely affect DocGo's business, financial condition and results of operations.

***DocGo's acquisition strategy exposes it to significant risks and additional costs.***

Acquisitions involve risks that the businesses acquired will not perform as expected or provide sufficient infrastructure and other resources necessary to operate in a given geography, and DocGo's judgments regarding the values, strengths and weaknesses and profitability of acquired businesses may prove to be wrong. DocGo may be held liable for certain unforeseen pre-acquisition liabilities of an acquired business, including, among others, tax liabilities, environmental liabilities, liabilities for regulatory violations and liabilities for employment practices, and these liabilities could be significant. In addition, an acquisition could result in the impairment of client relationships and other acquired assets, such as goodwill. DocGo may also incur costs and experience inefficiencies to the extent an acquisition expands the services, markets or geographies in which it operates. Acquisitions may require that DocGo incur additional debt to finance the transaction, which could be substantial and limit its operating flexibility or, alternatively, acquisitions may require that DocGo issue shares of its Common Stock as consideration, which could dilute share ownership. Acquisitions can also involve post-transaction disputes regarding a number of matters, including a purchase price or working capital adjustment, earn-out or other contingent payments, environmental liabilities or other obligations. DocGo's recent growth and its acquisition strategy have placed, and will continue to place, significant demands on management's time, which may divert their attention from DocGo's day-to-day business operations and may lead to significant due diligence and other expenses regardless of whether DocGo pursues or consummates any potential acquisition. DocGo also may not be able to manage its growth resulting from acquisitions due to the number, diversity and geographic disparity of the businesses it may acquire or for other reasons. These and other risks related to acquisitions could adversely affect DocGo's business, financial condition and results of operations.

*Any inability to successfully integrate acquisitions or realize their anticipated benefits could adversely affect DocGo's business.*

Acquisitions require that DocGo integrate separate companies that have historically operated independently or as part of another, larger organization, and that have different systems, processes and cultures. DocGo may not be able to successfully integrate any business it has acquired or may acquire, or may not be able to do so in a timely, efficient or cost-effective manner. Risks related to the successful integration of an acquired business include:

- diverting the attention of DocGo's management and that of the acquired business;

- merging or linking different accounting and financial reporting systems and systems of internal controls and, in some instances, implementing new controls and procedures;

- merging computer, technology and other information networks and systems, including enterprise resource planning systems and billing systems;

- assimilating personnel, human resources, billing and collections, and other administrative departments and potentially contrasting corporate cultures;

- disrupting relationships with or losses of key clients and suppliers of DocGo's business or the acquired business;

- interfering with, or loss of momentum in, DocGo's ongoing business or that of the acquired company;

- failure to retain DocGo's key personnel or that of the acquired company; and

- delays or cost-overruns in the integration process.

DocGo's inability to manage its growth through acquisitions, including its inability to manage the integration process, and to realize the anticipated benefits of an acquisition could have a material adverse effect on its business, financial condition and results of operations.

**Risks Related to DocGo's Business and Industry**

*The COVID-19 pandemic has materially impacted DocGo's business.*

The COVID-19 pandemic and related direct and indirect impacts have adversely affected, and may continue to adversely affect, the DocGo healthcare transportation segment, and has also heightened various risks related to DocGo's business.

For example, should there be an outbreak of COVID-19 among DocGo's employees in one or more of its markets, in response, DocGo may need to significantly reduce or cease operations in that market. DocGo's cost structure has also been adversely impacted by the pandemic. A number of DocGo's suppliers have been negatively impacted by the COVID-19 pandemic and there have been significant disruptions in its supply chains, particularly with respect to the personal protective equipment, or PPE, that DocGo's healthcare professionals require to do their jobs. At times, sufficient levels of PPE have not been available and these shortages have limited DocGo's ability to meet demand and provide its services to customers in a timely manner. Further, the demand for PPE in the healthcare industry and the public at large caused by the pandemic has significantly increased the cost of PPE and DocGo may not be able to recover these increased costs in the rates it charges for its services, which could adversely affect DocGo's profitability. Limitations on the availability or increases in the price of PPE have and could in the future continue to adversely affect DocGo's business and results of operations.

However, the pandemic also significantly increased the demand for DocGo's remote and mobile testing and vaccination services during the second half of 2020 and throughout 2021 and the first half of 2022 and many of these contracts were on a short-term basis, often spanning only a number of weeks or months. Much of DocGo's revenue, employee and operations growth has occurred during recent years, which has been partially driven by significant COVID-related impacts. For example, the Company estimates that mass COVID testing relating revenue for 2022 was approximately $75 million. DocGo's ability to forecast its future operating results is limited and subject to a number of uncertainties, including its ability to predict revenue and expense levels, and plan for and model future growth. Moreover, at least with respect to COVID-19-related testing and vaccination, particularly as the pandemic reaches endemic stages and demand subsides, there can be no assurances that DocGo will be able to find alternative revenue streams to compensate for the loss. We have witnessed a significant reduction in COVID testing activity since the second half of 2022 and expect that this activity will continue to decline.

The pandemic has adversely affected many industries as well as the economies and financial markets of many countries, including the United States, causing a significant deceleration of economic activity. This slowdown has reduced production, decreased demand for a broad variety of goods and services, diminished trade levels, and led to widespread corporate downsizing, causing a sharp increase in unemployment. There has also been disruption to and extreme volatility in the global capital markets, which could increase the cost of, or entirely restrict access to, capital. The long-term impact of this pandemic on the U.S. and world economies remains uncertain, and even at times when the pandemic is largely contained, these adverse impacts could worsen, impacting all segments of the global economy, and result in a significant recession or worse.

The degree to which COVID-19 impacts DocGo's business operations, strategy, financial condition and results of operations will depend on future developments, which are highly uncertain, continuously evolving and unpredictable, including, but not limited to, the severity of any new outbreaks, resurgences and variants, actions taken to contain resurgences or variants or to address their impact, and other effects. As the COVID-19 pandemic reaches endemic stages, the future impacts to DocGo of COVID-19 remain uncertain, but such impacts could have a material adverse impact on our business, strategy and financial condition.

***The high level of competition in DocGo's industry could adversely affect its business.***

The medical transportation industry is highly competitive. In its healthcare transportation segment, DocGo competes with governmental entities, including cities and fire districts, hospitals, local and volunteer private providers, as well as other regional and local private companies. The industry also includes several large national and regional providers such as Rural/Metro Corporation, Falck, American Medical Response (AMR), Southwest Ambulance, Paramedics Plus and Acadian Ambulance. Key competitive factors in the medical transportation services industry include the ability to improve customer service, such as on-time performance and efficient call intake; to provide comprehensive clinical care; and to recruit, train and motivate employees, particularly ambulance crews who have direct contact with patients and healthcare personnel. Pricing, billing and reimbursement expertise are also very important.

While the mobile health/telehealth market is in an early stage of development, it is also competitive and DocGo expects it to become increasingly competitive in the future, which could make it difficult for DocGo to succeed. The major competitors in the industry include much larger, national or regional telehealth providers such as Dispatch Health, Teladoc, Amwell, and One Medical (acquired by Amazon in February 2023) that generally provide telehealth on behalf of self-insured employers and insurance plans. These competitors, however, generally do not provide direct patient care or last-mile care on behalf of the provider organization. DocGo also believes there are several smaller, private organizations providing in-home or in-site care utilizing different, higher cost healthcare providers. Non-traditional providers and others such as large health systems or payors, some of which may be DocGo customers or partners, may enter the space using consumer-grade video conferencing platforms such as Zoom and Twilio or develop innovative technologies or business activities that could be disruptive to the industry. Competition could also increase from large technology companies such as Apple, Amazon, Facebook, Verizon, or Microsoft, who may develop their own telehealth solutions or acquire existing industry participants, such as Amazon's acquisition of One Medical in February 2023, as well as from large retailers like Walmart, which see an opportunity in the surge in interest in telehealth in connection with the COVID-19 pandemic. Competition in the telehealth industry is primarily based on scale; ease of use, convenience and accessibility; brand recognition; breadth, depth, and efficacy of telehealth services; technology; clinical quality; customer support; cost; reputation; and customer satisfaction and value.

DocGo may not be successful in maintaining or growing its competitive position in one or more of its existing markets or in those into which it may expand. Some of DocGo's competitors may have access to greater financial or other resources than it does, which may afford them greater power, efficiency, financial flexibility, geographical reach or capital resources for growth. In addition, some of DocGo's competitors are vertically integrated and can leverage this structure to their advantage. DocGo may fail to identify optimal service or geographic markets, focus its attention on suboptimal service or geographic markets or fail to execute an appropriate business model in certain service or geographic markets. DocGo's competitors may develop new services or technologies that are superior to DocGo's, develop more efficient or effective methods of providing services or adapt more quickly, efficiently or effectively than DocGo to new technologies and opportunities. DocGo's competitors may be positioned to provide better services or influence customer requirements, or more quickly respond to changing customer requirements, and thereby establish stronger customer relationships. DocGo's competitors may offer their services at lower prices because, among other things, they may possess the ability to provide similar services more efficiently, as part of a bundle with other services or generally at a lower cost. These pricing pressures could require DocGo to lower its prices to at or below its costs, requiring DocGo to sacrifice margins or incur losses. Alternatively, DocGo may choose to forgo entering certain markets or exit other markets, which could limit its growth and competitive reach. Any failure by DocGo to compete or to generally maintain and improve its competitive position could adversely affect its business, financial condition and results of operations.

***DocGo's revenue could be adversely affected if it loses some or all of its business under existing contracts.***

A significant portion of DocGo's revenue growth has historically resulted from increases in the business and related fees it collects under existing contracts and the addition of new contracts. DocGo's contracts with healthcare providers and other customers generally have terms of one to three years, and most of its contracts are terminable by either of the parties upon notice of as little as 30 days. Even if DocGo has an existing contract with a healthcare provider, the contract does not create any exclusive relationship and even if DocGo is given preferred status, the customer often still does business with one or more of DocGo's competitors. For example, execution under DocGo's medical transportation services contracts requires that an ambulance or other necessary fleet vehicle be available and within a certain proximity and the time of need and, if one is not available, the customer can and will seek alternative options. Furthermore, certain of DocGo's contracts will expire during each fiscal period, and DocGo may be required to seek renewal of these contracts through a formal bidding process. Even if DocGo is successful in renewing the contract, the contract may contain terms that are not as favorable to DocGo as its current contracts. There can be no assurances that DocGo will successfully retain its existing contracts and any loss of contracts or reduction in services provided thereunder or under any renewal could have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo's reliance on government contracts could adversely affect its business.***

In recent years, DocGo's government contract work has represented a substantial portion of its overall revenue, representing approximately 64% and 65% of DocGo's revenue for the years ended December 31, 2022 and 2021, respectively, and maintaining and continuing to grow this revenue stream is an important part of DocGo's growth strategy. However, government contract work is subject to significant risks and uncertainties. For example, only eligible parties can bid on and service most government contracts, which requires DocGo to comply with various statutes, rules, regulations and other governmental policies, including those related to wages, benefits, overtime, working conditions, equal employment opportunity, affirmative action and drug testing. If DocGo fails to comply with any of these requirements, it may be suspended or barred from government work or subject to various administrative sanctions and civil and criminal penalties and fines. Government contract work subjects DocGo to government audits, investigations, and proceedings, which could also lead to DocGo being barred from government work or subjected to fines if it is determined that a statute, rule, regulation, policy or contractual provision has been violated. Audits can also lead to adjustments to the amount of contract costs DocGo believes are reimbursable or to the ultimate amount DocGo may be paid under the agreement.

In addition, government contracts typically include strict provisions relating to service level agreements ("SLAs"), involving specific operating performance metrics with which the provider must comply. Failure to comply with these SLAs could result in DocGo receiving reduced revenues from these contracts, DocGo being removed from the project in favor of another provider or DocGo's programs ceasing entirely.

Additionally, governments are typically under no obligation to maintain funding at any specific level, and funds for government programs can be eliminated with little or no notice. Given the currently uncertain general economic outlook, whereby a recession could lead to a reduction in a government's tax revenues, as well as potential changes in the controlling political party in these municipalities, who might be less favorably inclined toward government spending on health care and other social services, the long-term outlook for funding for certain government programs is uncertain. As a result, contracts with government agencies may only be partially funded or may be terminated, and DocGo may not realize all of the potential revenue from those contracts. Government contracts typically can be paused or canceled entirely at any time, in whole or in part, at the government's convenience or the government can default with little or no prior notice. Under these circumstances, the contractor typically receives payment only for the lesser of the work completed or the amount authorized under the contract, but not the anticipated revenue and profit that could have been earned had the contract been completed. A temporary stoppage or delay or the complete cancellation of a project can create inefficiencies, such as leaving portions of DocGo's fleet idle for a significant period of time, cause DocGo to lose some or all of its investment in the project or result in financial and other damages that DocGo may not be able to recover from the government. The timing of project awards, including expansions of existing projects, is also unpredictable and can involve complex and lengthy negotiations and competitive bidding processes. Other risks associated with government contracting include more extended collection cycles and heightened or unlimited indemnification obligations. Any failure to maintain and grow DocGo's government contract revenues for one or more of these or any other reasons could adversely affect DocGo's business, financial condition and results of operations.

***A significant portion of DocGo's recent revenue growth is derived from a small number of large customers.***

A significant portion of DocGo's revenues and income growth in 2022 was derived from a from a limited number of customers. For the year ended December 31, 2022, one customer accounted for approximately 35% of total sales, while no other customer accounted for as much as 10% of total revenue. This customer is a public benefit corporation, operating and provisioning services on behalf of a variety of municipal agencies. DocGo's services for this customer are provided under several different contracts, spanning a variety of projects. These contracts are not guaranteed and are terminable at will by the customer. However, termination of any one of those particular contracts does not necessarily indicate a greater likelihood of termination of any of the customer's other contracts, as these contracts are awarded on a per project basis, with each project running independently of the others. DocGo cannot assure you that this customer or other large customers will continue to do business with it on terms or at rates currently in effect, if at all, or will not elect to do business with DocGo's competitors or otherwise perform their own services themselves. The loss of one of DocGo's top customers, if not offset by revenues from new or other existing customers, could have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo may enter into a large-scale deployment of resources in response to a national emergency as a subcontractor to FEMA or other similar entities, which may adversely affect DocGo's business.***

DocGo does not believe that a FEMA deployment would adversely affect its ability to service its customers, and DocGo is not contractually obligated to respond to FEMA requests. However, if management elects to participate in response to a national emergency, any significant FEMA deployment would require significant management attention and could reduce DocGo's ability to pursue other opportunities, including to pursue geographic expansion and its growth strategies, which could have an adverse effect on DocGo's business, financial condition and results of operations.

17

**Risks Related to DocGo's Limited Operating History**

***DocGo's limited operating history may make it difficult to evaluate its business, which may be unsuccessful.***

DocGo has a limited operating history since its inception in 2015. As such, there is limited information on which to base an evaluation of its business and prospects. DocGo's operations are subject to all of the risks inherent in the establishment of a recently formed business, including adding management personnel, managing general expenditures, and managing the timing of payments to vendors and cash receipts from customers, and its success may be limited by unexpected expenses, difficulties, inefficiencies, complications and delays, including the need for additional financing, challenges with the successful commercialization of its services and its geographic expansion, market and customer acceptance of its services and technologies, unexpected issues with federal or state regulatory authorities, competition from larger operations, uncertain intellectual property protection, fluctuations in expenses and dependence on corporate partners and collaborators. Any failure to successfully address these and other risks and uncertainties commonly associated with early-stage companies could seriously harm DocGo's business and prospects, and it may not succeed given the challenges it faces in the markets in which it operates or may choose to expand into in the future. Additionally, DocGo's strategy of providing healthcare transportation services with significant reliance on a mobile platform is novel, the telehealth industry is nascent and still evolving and there are no well-established companies offering the "last-mile" telehealth solutions that DocGo offers, all of which carry its own unique risks, including market and consumer acceptance and adoption. Any evaluation of DocGo's business and its prospects must be considered in light of these factors and the other risks and uncertainties frequently encountered by companies in this early stage of development. No assurance can be given that DocGo will be able to successfully navigate these issues or implement any of its growth strategies in a timely or effective manner, which could negatively impact DocGo's business, financial condition and results of operations.

Much of DocGo's revenue, employee and operations growth has occurred during the past three years, which has been partially driven by significant COVID-related impacts. The Company estimates that COVID testing related revenue for 2021 was approximately $110 million and $75 million in 2022. However, as the COVID-19 pandemic has reached endemic levels and demand for COVID-related products has subsided, DocGo's COVID testing-related revenues have declined, and at the end of 2022 represented an insignificant proportion of the Company's overall revenues. DocGo's future growth will be driven by its ability to continue to replace these COVID-testing-related revenues with other revenue streams. DocGo's ability to forecast its future operating results is limited and subject to a number of uncertainties, including its ability to predict revenue and expense levels, and plan for and model future growth.

***DocGo has a history of losses, expects its operating expenses to increase significantly in the foreseeable future and may not achieve or sustain profitability.***

From inception to 2021, DocGo recorded a net loss each fiscal year. Fiscal year 2021 was the first year in which DocGo recorded net income, and DocGo recorded net income of $22.8 million in fiscal year 2022. Prior to 2021, when DocGo recorded $19.2 million in net income, DocGo had experienced a net loss in each year since inception, including a net loss of $14.8 million for the fiscal year ended December 31, 2020. As of December 31, 2022, DocGo had an accumulated deficit of $36.6 million. While DocGo has recently been able to generate revenues and believes its business strategy provides for predictable revenue streams in future periods, its revenues may not increase in future periods, and it may resume incurring net losses for some time as it continues to grow. Even if DocGo generates net income in a given year, there remains the likelihood that the Company could incur net losses in any given quarter, given the fluctuating nature of revenues and expenses, particularly given the significant costs that are incurred during the beginning stages of new projects, coupled with marketing and personnel costs incurred for developing potential new business lines. It is difficult for DocGo to predict its future results of operations, and it expects its operating expenses to increase significantly over the next several years as it continues to expand its operations and infrastructure, acquire additional vehicles, hire additional personnel, make and integrate future acquisitions and invest in technology and research and development. In addition to the costs to grow its business, DocGo also expects to incur significant additional legal, accounting and other expenses as a public company. If DocGo fails to increase its revenue to offset the increases in its operating expenses, DocGo may not achieve or sustain profitability in the future.

18

*If DocGo is unable to effectively manage its growth, its financial performance and future prospects will be adversely affected.*

Since DocGo's inception in 2015, it has experienced rapid growth in the United States and more recently, internationally in the United Kingdom, and it expects to continue to grow in the future. For example, DocGo's revenues have grown from $30.9 million in the year ended December 31, 2017 to $440.5 million in the year ended December 31, 2022, and DocGo's employee base has grown to nearly 3,000 employees (exclusive of independent contractors and agency employees) in just over seven years. This growth has placed, and may continue to place, significant strain on DocGo's management, its operational and financial infrastructure and its controls and procedures, which may not be adequate to support this growth or sustain further expansion in the future.

DocGo's ability to effectively manage its growth has required, and will continue to require, it to expand and improve its operational and financial infrastructure, including its controls and procedures, and to retain, attract, train, motivate and manage employees, including qualified medical professionals, operations personnel and financial and accounting staff. Additionally, DocGo has needed to, and will continue to need to, integrate new technologies and acquisitions into its existing business and establish consistent policies across regions and functions. Achieving these goals has required DocGo to commit substantial financial, operational and technical resources, and DocGo expects these demands to persist, and very likely to increase, as it continues to grow in the future.

The expansion and increasing complexity of DocGo's business has placed significant strain on its operations, personnel and systems and further growth in the future could restrict DocGo's ability to develop and improve its operational, financial and management controls and enhance its reporting systems and procedures. If DocGo is not able to effectively manage this expansion in its operations and attract, train and retain additional qualified personnel in an efficient manner, DocGo's operations and services will be adversely affected and its customers may choose one or more of its competitors. Additionally, DocGo's failure to maintain or upgrade its technology infrastructure effectively to support its growth or otherwise maintain its technological competitive advantage could result in unanticipated system disruptions, slow response times, or an unsatisfactory customer experience, any of which could cause DocGo to no longer be in compliance with the minimum service levels required by certain customer contracts. An inability to maintain effective management, financial and reporting systems, controls and procedures could adversely affect DocGo's ability to provide timely and accurate financial information or result in a misstatement of account balances or disclosures. If DocGo is unable to effectively manage its recent or future growth, its operations, business, financial condition and results of operations could be adversely affected.

*DocGo is currently an "emerging growth company" and it cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make the Common Stock less attractive to investors.*

DocGo is currently an "emerging growth company" as defined in the JOBS Act. As an emerging growth company, DocGo is only required to provide two years of audited financial statements and only two years of related selected financial data and management discussion and analysis of financial condition and results of operations disclosure. In addition, DocGo is not required to obtain auditor attestation of its reporting on internal control over financial reporting, has reduced disclosure obligations regarding executive compensation and is not required to hold non-binding advisory votes on executive compensation. In addition, the JOBS Act provides that an emerging growth company can take advantage of an extended transition period to comply with new or revised accounting standards. This allows an emerging growth company to delay the adoption of these accounting standards until they would otherwise apply to private companies. DocGo has elected to take advantage of such extended transition period. DocGo cannot predict whether investors will find its Common Stock to be less attractive as a result of its reliance on these exemptions. If some investors find its Common Stock to be less attractive as a result, there may be a less active trading market for the Common Stock and the price of the Common Stock may be more volatile than the historical trading market.

DocGo will remain an emerging growth company until the earliest of: (i) the end of the fiscal year in which DocGo has total annual gross revenue of $1.07 billion; (ii) the last day of DocGo's fiscal year following the fifth anniversary of the Initial Public Offering (or December 31, 2025); (iii) the date on which DocGo issues more than $1.0 billion in non-convertible debt during the preceding three-year period; or (iv) the end of the fiscal year in which the market value of the Common Stock held by non-affiliates exceeds $700 million as of the last business day of its most recently completed second fiscal quarter.

Further, there is no guarantee that the exemptions available under the JOBS Act will result in significantly lower compliance costs. To the extent that DocGo chooses not to use exemptions from various reporting requirements under the JOBS Act, or if it is no longer an emerging growth company, it will incur additional compliance costs, which may impact DocGo's financial condition.

**Risks Related to Information Technology**

*DocGo relies on data center providers, Internet infrastructure, bandwidth providers, third-party computer hardware and software, other third parties and DocGo's own systems for providing services to DocGo's clients and consumers, and any failure or interruption in the services provided by these third parties or DocGo's own systems could expose DocGo to disputes, litigation and negatively impact DocGo's relationships with clients, adversely affecting DocGo's brand and DocGo's business. Such disputes and litigation could cause DocGo to incur significant additional legal and other expenses.*

DocGo serves its clients and consumers from two geographically dispersed data centers, one in the United States and one in the United Kingdom. While DocGo controls and has access to its servers, DocGo does not control the operation of these facilities. The owners of DocGo's data center facilities have no obligation to renew their agreements with DocGo on commercially reasonable terms, or at all. If DocGo is unable to renew these agreements on commercially reasonable terms, or if one of DocGo's data center operators is acquired, DocGo may be required to transfer its servers and other infrastructure to new data center facilities, and DocGo may incur significant costs and possible service interruption in connection with doing so. Problems faced by DocGo's third-party data center locations with the telecommunication network providers with whom DocGo or they contract, or with the systems by which DocGo's telecommunications providers allocate capacity among their clients, including us, could adversely affect the experience of our clients and consumers. DocGo's third-party data center operators could decide to close their facilities without adequate notice. In addition, any financial difficulties, such as bankruptcy faced by DocGo's third-party data center operators or any of the service providers with whom DocGo or they contract may have negative effects on our business, the nature and extent of which are difficult to predict.

Additionally, if DocGo's data centers are unable to keep up with DocGo's growing needs for capacity, this could have an adverse effect on DocGo's business. For example, a rapid expansion of DocGo's business could affect the service levels at DocGo's data centers or cause such data centers and systems to fail. Any changes in third-party service levels at DocGo's data centers or any disruptions or other performance problems with DocGo's solution could adversely affect DocGo's reputation and may damage DocGo's clients' and consumers' stored files or result in lengthy interruptions in DocGo's services. Interruptions in DocGo's services may reduce DocGo's revenue, cause us to issue refunds to clients for prepaid and unused subscriptions, as well as penalties related to service level credits and uptime, subject to potential liability or adversely affect client renewal rates.

In addition, our ability to deliver DocGo's Internet-based services depends on the development and maintenance of the infrastructure of the Internet by third parties. This includes maintenance of a reliable network backbone with the necessary speed, data capacity, bandwidth capacity and security. Our services are designed to operate without interruption in accordance with DocGo's service level commitments. However, DocGo has experienced, including during the period immediately following the beginning of the COVID-19 pandemic, and expect that DocGo may experience in the future interruptions and delays in services and availability from time to time. In the event of a catastrophic event with respect to one or more of DocGo's systems, DocGo may experience an extended period of system unavailability, which could negatively impact DocGo's relationship with clients and customers. To operate without interruption, both DocGo and its service providers must guard against:

- damage from fire, power loss, natural disasters and other force majeure events outside DocGo's control;

- communications failures;

- software and hardware errors, failures and crashes;

- security breaches, computer viruses, hacking, denial-of-service attacks, and similar disruptive problems; and

- other potential interruptions.

DocGo also relies on computer hardware purchased and software licensed from third parties in order to offer its services. These licenses are generally commercially available on varying terms. However, it is possible that this hardware and software may not continue to be available on commercially reasonable terms, or at all. Any loss of the right to use any of this hardware or software could result in delays in the provisions of DocGo's services until equivalent technology is either developed by DocGo or, if available from third parties, is identified, obtained and integrated.

DocGo exercises limited control over third-party vendors, which increases DocGo's vulnerability to problems with technology and information services they provide. Interruptions in DocGo's network access and services may in connection with third-party technology and information services reduce DocGo's revenues, cause DocGo to issue refunds to clients, subject DocGo to potential liability and adversely affect client renewal rates. Although DocGo maintains a security and privacy damages insurance policy, the coverage under DocGo's policies may not be adequate to compensate DocGo for all losses that may occur related to the services provided by DocGo's third-party vendors. In addition, DocGo may not be able to continue to obtain adequate insurance coverage at an acceptable cost, if at all.

DocGo's ability to rely on these services of third-party vendors could be impaired as a result of the failure of such providers to comply with applicable laws, regulations and contractual covenants, or as a result of events affecting such providers, such as power loss, telecommunication failures, software or hardware errors, computer viruses, cyber incidents and similar disruptive problems, fire, flood and natural disasters. Any such failure or event could adversely affect DocGo's relationships with its clients and damage its reputation. This could materially and adversely impact DocGo's business, financial condition and operating results.

***DocGo's proprietary software may not operate properly, which could damage DocGo's reputation, give rise to claims against DocGo or divert application of DocGo's resources from other purpose, any of which could harm DocGo's business, financial condition and results of operations.***

DocGo's platform provides consumers the ability to, among other things, register for DocGo's services; complete, view and edit medical history; request a visit (either scheduled or on demand); and conduct a visit (via video or phone). Proprietary software development is time-consuming, expensive and complex, and may involve unforeseen difficulties. DocGo encounters technical obstacles from time to time, and it is possible that DocGo may discover additional problems that prevent its proprietary applications from operating properly or in accordance with its contractual obligations to its customers. If DocGo's solution does not function reliably or fails to achieve client expectations in terms of performance, clients could assert claims against DocGo or attempt to cancel their contracts with DocGo. This could damage DocGo's reputation, lead to a loss of revenues and impair its ability to attract or maintain clients.

Moreover, data services are complex and those DocGo offers have in the past contained, and may in the future develop or contain, undetected defects or errors. Material performance problems, defects or errors in DocGo's existing or new software-based products and services may arise in the future and may result from interface of our solution with systems and data that DocGo did not develop and the function of which is outside of DocGo's control or undetected in our testing. These defects and errors, and any failure by DocGo to identify and address them, could result in loss of revenue or market share, diversion of development resources, harm to DocGo's reputation and increased service and maintenance costs. Defects or errors may discourage existing or potential clients from purchasing our solution from DocGo. Correction of defects or errors could prove to be impossible or impracticable. The costs incurred in correcting any defects or errors may be substantial and could have a material adverse effect on DocGo's financial condition and results of operations.

DocGo invested in and implemented upgraded information systems and processes in 2022. While DocGo expects these investments to provide incremental advantages, DocGo cannot assure you that all enhancements will be completed in a timely manner, within DocGo's budget or that such enhancements will be sufficient to meet the expectations of DocGo's current and prospective customers.

***If DocGo cannot implement its solution for clients or resolve any technical issues in a timely manner, DocGo may lose clients and its reputation may be harmed.***

DocGo's clients utilize a variety of data formats, applications and information systems and our solution must support clients' data formats and integrate with complex enterprise applications and information systems. If DocGo's enterprise software does not currently support a client's required data format or appropriate integrate with a client's applications and information systems, then DocGo must configure its enterprise software to do so, which increases DocGo's expenses. Additionally, DocGo does not control its clients' implementation schedules. As a result, if DocGo's clients do not allocate the internal resources necessary to meet their implementation responsibilities, or if DocGo faces unanticipated implementation difficulties, the implementation may be delayed. If the client implementation process is not executed successfully or if execution is delayed, DocGo could incur significant costs, clients could become dissatisfied and decide not to increase utilization of DocGo's solution or not to implement DocGo's solution beyond an initial term of commitment or, in some cases, revenue recognition could be delayed. In addition, competitors with more efficient operating models with lower implementation costs could jeopardize DocGo's client relationships.

DocGo's clients depend on DocGo's support services to resolve any technical issues relating to DocGo's solution and services, and DocGo may be unable to respond quickly enough to accommodate short-term increases in member demand for support services, particularly as DocGo increases the size of its client, member and patient bases. DocGo may also be unable to modify the format of its support services to compete with changes in support services provided by competitors. It is difficult to predict member demand for technical support services, and if member demand increases significantly, DocGo may be unable to provide satisfactory support services to its consumers. Further, if DocGo is unable to address consumers' needs in a timely fashion or further develop and enhance its solution, or if a client or member is not satisfied with the quality of work performed by DocGo or with the technical support services rendered, then DocGo could incur additional costs to address the situation or be required to issue credits or refunds for amounts related to unused services, and DocGo's profitability may be impaired and clients' dissatisfaction with DocGo's solution could damage its ability to expand the number of software-based products and services purchased by such clients. These clients may not renew their contracts, seek to terminate their relationship with DocGo or renew on less favorable terms. Moreover, negative publicity related to DocGo's client relationships, regardless of its accuracy, may further damage its business, by affecting its reputation or ability to compete for new business with current or prospective clients. If any of these were to occur, DocGo's revenue may decline and its business, financial condition and results of operations could be adversely affected.

***DocGo's reliance on third-party software could adversely affect its business.***

DocGo's success depends in part on its integrations and relationships with third-party software providers, particularly with the development and expansion of DocGo's offerings and technologies. DocGo also relies on third-party encryption and authentication technologies licensed from third parties that are designed to securely transmit electronic medical records and other personal patient information. DocGo uses third-party software internally as well, including for communication purposes. If these third parties cease to provide access to the software that DocGo uses, if it is not available on terms that DocGo believes to be reasonable, or it is not available in the most current version, DocGo may be required to seek comparable software from other sources, which may be more expensive or inferior, or may not be available at all. Some of DocGo's technology partners may also take actions which disrupt the utility of the software to DocGo or the interoperability of DocGo's platform with their own products or services, or exert strong business influence on DocGo's ability to and the terms on which it operates and distributes its platform. Additionally, third-party services and products are constantly evolving, and DocGo may not be able to modify its operations or platform to assure its compatibility with that of other third parties following development changes. DocGo's third-party licenses are typically non-exclusive and its competitors may obtain the right to use any of the technology covered by these licenses to compete directly with it. If any of DocGo's technology partners limits access or modifies their products, standards or terms of use in a manner that degrades the functionality or performance of DocGo's platform, that is otherwise unsatisfactory or adverse to DocGo, or that gives preferential treatment to competitive products or services, DocGo's business, financial condition and results of operations could be adversely affected.

22

*Some of DocGo's software and systems contain open-source software, which may pose particular risks to DocGo's proprietary software, technologies, products and services in a manner that could harm its business.*

DocGo uses software licensed to DocGo by third-party developers under "open source" licenses in connection with the development or deployment of its proprietary software and expects to continue to use open-source software in the future. Some open-source licenses contain express requirements, which may be triggered under certain circumstances, that licensees make available source code for modifications or derivative works created or prohibit such modifications or derivative works from being licensed for a fee. Although DocGo monitors its use of any open-source software to avoid subjecting its platform to such requirements, the terms of many open-source licenses have not been interpreted by U.S. or foreign courts, and there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on DocGo's ability to develop or use its proprietary software. DocGo may face claims from third parties demanding the release or license of the open-source software or derivative works that DocGo developed from such software (which could include its proprietary source code) or otherwise seeking to enforce the terms of applicable open-source licenses. These claims could result in litigation and could require DocGo to publicly release portions of its proprietary source code or cease distributing or otherwise using the implicated solutions unless and until DocGo can re-engineer them.

In addition, DocGo's use of open-source software may present greater risks than use of other third-party commercial software, as open-source licensors generally do not provide support, warranties, indemnification or other contractual protections regarding infringement claims or the quality of the code. To the extent that DocGo's platform depends upon the successful operation of open-source software, any undetected errors or defects in open-source software that DocGo uses could prevent the deployment or impair the functionality of its systems and injure its reputation. In addition, the public availability of such software may make it easier for others to compromise its platform. Any of these risks could be difficult to eliminate or manage and, if not addressed, could have an adverse effect on DocGo's business, financial condition and results of operations.

*Security breaches, loss of data and other disruptions could compromise sensitive business, customer or patient information or prevent DocGo from accessing critical information and expose it to liability, which could adversely affect DocGo's business.*

DocGo is highly dependent on information technology networks and systems, including on-site systems, managed data center systems and cloud-based computing center systems, to securely process, transmit and store sensitive data and information, such as protected health information ("PHI") and other types of personal data or personally identifiable information ("PII") relating to its employees, customers, patients and other confidential or proprietary business information. Computer malware, viruses, spamming, and phishing attacks have become more prevalent, have occurred on DocGo's systems in the past, and may occur on DocGo's systems in the future. Various other factors may also cause system failures, including power outages, catastrophic events, inadequate or ineffective redundancy, issues with upgrading or creating new systems or platforms, flaws in third-party software or services, errors or intentional acts by DocGo's employees or third-party service providers, or breaches in the security of these systems or platforms. These and other issues can create system disruptions, shutdowns or unauthorized access to or disclosure or modifications of such sensitive data or information, including PHI or PII. DocGo also utilizes third-party service providers for important aspects of the collection, storage, processing and transmission of this sensitive information and therefore is dependent on these third parties to similarly manage cybersecurity risks.

Because of the sensitivity of PHI, other PII and other sensitive information that DocGo and its service providers collect, store, transmit, and otherwise process, the security of DocGo's technology platform and other aspects of its services, including those provided or facilitated by DocGo's third-party service providers, are important to DocGo's operations and business strategy. DocGo takes certain administrative, physical and technological safeguards to address these risks, such as by requiring contractors and other third-party service providers who handle this PHI, other PII and other sensitive information to enter into agreements that contractually obligate them to use reasonable efforts to safeguard such PHI, other PII, and other sensitive information. DocGo is also in the process of upgrading its systems to be ISO 27001 and Service Organization Controls (SOC) 2 compliant. Measures taken to protect DocGo's systems, those of its contractors or third-party service providers, or the PHI, other PII, or other sensitive information DocGo or contractors or third-party service providers process or maintain, may not adequately protect DocGo from the risks associated with the collection, storage, processing and transmission of such sensitive information. Additionally, updates or upgrades to systems, including those currently underway with respect to ISO 27001 and SOC 2 compliance, are time-consuming and costly, and they may not be effective in preventing data breaches or operate as designed, and they could create new inefficiencies or vulnerabilities. DocGo may also be required to expend significant capital and other resources to address problems caused by security breaches. Despite DocGo's implementation of security measures, cyberattacks are becoming more sophisticated and frequent. As a result, DocGo or its third-party service providers may be unable to anticipate these techniques or to implement adequate protective measures. If DocGo is unable to earn and maintain necessary certifications, including ISO 27001 and SOC 2 compliance, it could result in reputational harm and customer churn, and adversely affect DocGo's ability to provide its services.

A security breach or privacy violation that leads to disclosure or unauthorized use or modification of, or that prevents access to or otherwise impacts the confidentiality, security, or integrity of, patient information, including PHI or other PII, or other sensitive information that DocGo or its contractors or third-party service providers maintain or otherwise process, could harm DocGo's reputation, compel it to comply with breach notification laws, cause it to incur significant costs for remediation, fines, penalties, notification to individuals, measures intended to repair or replace systems or technology and to prevent future occurrences, cause potential increases in insurance premiums, and require DocGo to verify the accuracy of database contents, resulting in increased costs or loss of revenue. If DocGo is unable to prevent or mitigate such security breaches or privacy violations or implement satisfactory remedial measures, or if it is perceived that DocGo has been unable to do so, its operations or the functionality of its innovative technology could be disrupted; it may be unable to provide access to its systems; it could lose customers; it could see negative repercussions to its reputation, adverse impacts on customers, loss of customer and investor confidence, financial loss; and it could be subject to governmental investigations or other actions, regulatory or contractual penalties, and other claims and liabilities. In addition, security breaches and other inappropriate access to, or acquisition or processing of, information can be difficult to detect, and any delay in identifying such incidents or in providing any notification of such incidents may lead to increased harms.

Any such breach or interruption of DocGo's systems or those of any of its third-party service providers could compromise DocGo's networks or data security processes and sensitive information could be made inaccessible or could be accessed by unauthorized parties, publicly disclosed, lost or stolen. Any such interruption in access, improper access, disclosure or other loss of information could result in legal claims or proceedings, liability under laws and regulations that protect the privacy of member information or other personal information, such as the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH"), and their implementing regulations and related rules (collectively, "HIPAA"), and regulatory penalties. Unauthorized access, loss or dissemination could also disrupt DocGo's operations, including its ability to perform its services, access customer and patient health information, collect, process, and prepare company financial information, and provide information about DocGo's current and future services. Any such breach could also compromise DocGo's trade secrets and other proprietary information, which could adversely affect DocGo's business and competitive position. While DocGo maintains insurance covering certain data security and privacy damages and claim expenses, it may not carry insurance or maintain coverage sufficient to compensate for all liabilities and even if covered, it would not address the reputational damage that could result from a security incident.

As of the date of this filing, DocGo has not been impacted by any security breaches to its technology platform, including its on-site systems, managed data center systems and cloud-based computing center systems.

**Risks Related to DocGo's Operations**

*DocGo's success depends on its key management personnel.*

DocGo's success depends to a significant degree upon the contributions of certain key management personnel. The loss of any of DocGo's key personnel could affect its ability to run its business effectively. DocGo's success will depend on its ability to retain its current management and to develop, attract, and retain qualified personnel in the future. Competition for senior management personnel is intense with increasingly aggressive compensation packages, and DocGo cannot assure you that it can retain its key personnel or that its succession planning will prove effective. The loss of a member of senior management requires the remaining executive officers and the Board of Directors of DocGo (the "Board") to divert immediate and substantial attention to seeking a replacement. The inability to fill vacancies in DocGo's key personnel positions, including executive positions, on a timely basis could adversely affect its ability to implement its business strategy, which would negatively impact its results of operations.

*DocGo's labor costs are significant and any inability to control those costs could adversely affect its business.*

Labor expenses (which includes both directly employed personnel as well as subcontracted labor) are DocGo's largest cost, representing approximately 69% and 60% of its 2022 and 2021 revenues, respectively. DocGo competes, in a highly competitive labor market, with other healthcare providers to attract healthcare professionals, including EMTs, paramedics and nurses, to support its operations. In some markets in which DocGo operates, the lack of availability of clinical personnel has become a significant operating issue that all healthcare providers face. This labor shortage has, and could continue in the future, require DocGo to increase wages and benefits to recruit and retain qualified personnel or to identify and contract with more expensive temporary personnel. DocGo also depends on the available labor pool of technology-skilled workers in certain of the markets in which it operates.

If DocGo's labor costs increase, and it is unable to raise rates to offset these increased costs, DocGo's results of operations and cash flows will likely be adversely affected. In particular, because a significant percentage of DocGo's revenue consists of fixed, prospective payments, its ability to pass along increased labor costs is limited. If labor costs rise at an annual rate greater than its revenues, DocGo's results of operations and cash flows will likely be adversely affected.

Any union activity that may occur within DocGo's workforce in the future could contribute to increased labor costs. Certain proposed changes in federal labor laws and the National Labor Relations Board's modification of its election procedures could increase the likelihood of employee unionization attempts. Although none of DocGo's employees are currently represented by a collective bargaining agreement, to the extent a significant portion of its employee base unionizes, it is possible DocGo's labor costs could increase materially. DocGo's failure to recruit and retain qualified healthcare professionals, or to control labor costs, could have a material adverse effect on DocGo's business, financial condition and results of operations.

*DocGo's inability to successfully recruit, train and retain qualified healthcare professionals could adversely affect its business.*

The pool of qualified healthcare professionals, including EMTs, paramedics, LPNs and nurses, available to staff DocGo's broad spectrum of contracts and customer needs is limited and DocGo invests significant resources to attract, train and retain these professionals. There is a relatively high rate of turnover in healthcare professional positions and, with DocGo's expansion, its requirements in these positions have increased significantly. A significant number of employees have joined DocGo in recent years as it has grown, and DocGo's success is dependent on its ability to maintain and instill its culture, align its talent with its business needs, engage its employees and inspire them to be open to change, to innovate and to maintain a customer-driven focus when delivering its services. As such, DocGo's ability to recruit, train and retain a sufficient number of qualified healthcare professionals has a direct impact on its operations.

DocGo has, from time to time, experienced, and it expects to continue to experience, difficulty in hiring and retaining healthcare professionals with appropriate qualifications, a difficulty that is amplified by the scope of the geographic and demographic diversity of the markets in which DocGo operates or may expand into in the future. In the U.S., this difficulty is exacerbated by the currently tight labor market. Moreover, DocGo's customers, including the healthcare providers with which it partners, have increasingly demanded a greater degree of specialized skills, training and experience in the healthcare professionals providing services under their contracts, which also decreases the number of healthcare professionals who may be qualified to staff certain of DocGo's contracts. DocGo competes with other companies to recruit and retain these qualified healthcare professionals, including DocGo's direct competitors, government and private emergency and first responders as well as healthcare providers, including DocGo's partners and customers. Competition to fill these positions can be even greater in certain geographic regions, including more rural or economically depressed areas. In addition, the COVID-19 pandemic has significantly increased the demand for healthcare professionals in all regards, which makes it more difficult for DocGo to attract and retain the necessary qualified professionals. If DocGo is unable to attract, train and retain highly qualified healthcare professions, or if turnover rates are higher than it anticipates, it could have an adverse effect on DocGo's business, financial condition and results of operations.

### *DocGo's employees may work in challenging environments.*

DocGo operates in a highly regulated environment with constantly evolving legal and regulatory frameworks. Consequently, the Company is subject to heightened risk of legal claims or other regulatory enforcement actions. Although the Company has implemented policies and procedures designed to ensure compliance with existing laws and regulations, there can be no assurance that our team members, contractors, or agents will not violate our policies and procedures. Moreover, a failure to maintain effective control processes could lead to violations, unintentional or otherwise, of laws and regulations and may put our employees and others in close proximity to potentially harmful environments or situations. These potentially harmful environments or situations may result in injuries to DocGo's employees, which could result in liability to DocGo or delay the completion or commencement of DocGo's services.

Unsafe work sites also have the potential to lead to claims, litigation or other liability, or increase employee turnover, increase costs, damage DocGo's reputation and brand and raise its operating and insurance costs. Any of the foregoing could result in, among other things, financial losses, litigation or other liability or reputational harm, which could have a material adverse effect on DocGo's business, financial condition and results of operations.

### *DocGo's inability to collect on its customer receivables or unfavorable shifts in payor mix could adversely affect its business.*

The general practice in DocGo's industry is to provide healthcare services in advance of payment and, in many cases, prior to any assessment of the patient's insurance coverage and his or her ability to pay in the event insurance coverage is not available. DocGo ultimately bills a number of different payors, including private insurance, Medicare and Medicaid, the healthcare provider or facility and self-pay patients. These different payors typically have different billing, coding, documentation and other compliance requirements that DocGo must satisfy and any procedural deficiencies or incorrect or incomplete information could result in delays or partial or complete non-payment for the services DocGo has rendered. Changes in payor mix, particularly those that increase the percentage of patients covered by lower paying government programs as compared to private insurance or that increase the percentage of self-pay patients, can reduce the amount DocGo receives for its services and adversely affect DocGo's ability to collect on its receivables. The ability to bill and collect on certain accounts may also be limited by statutory, regulatory and investigatory initiatives, such as restrictions on charges for out-of-network services or by private lawsuits, including those directed at healthcare charges and collection practices for uninsured and underinsured patients. Other factors that can adversely affect DocGo's billing and collection efforts include general macroeconomic conditions, disputes between payors as to which party is responsible for payment, variation in coverage for similar services among various payors and the ability of individual patients to pay. These and other risks and uncertainties that impact DocGo's ability to timely bill and collect on its receivables or the amount DocGo can charge for its services could adversely affect DocGo's business, financial condition or results of operations.

26

***DocGo may not accurately assess the costs it will incur under new revenue opportunities.***

DocGo must accurately assess the costs it will incur in providing its services in order to realize adequate profit margins and otherwise meet its financial and strategic objectives, particularly with respect to the expansion of its mobile health business. However, increasing pressures from healthcare payors to restrict or reduce reimbursement rates at a time when the costs of providing medical services continue to increase, in particular due to labor shortages and other factors, make assessing the costs associated with the pricing of new contracts, maintenance of existing contracts, and pricing new services that DocGo has not previously offered, more difficult. Starting new contracts and service offerings has typically resulted in a temporary negative impact to cash flow as DocGo absorbed various expenses before it was able to bill and collect revenue associated with the new contracts or services. In addition, integrating new contracts, particularly those in new geographic locations, could prove more costly, and could require more management time than DocGo anticipates. Any failure to accurately predict costs or the timing of payments from customers or to negotiate an adequate profit margin could have a material adverse effect on DocGo's business, financial condition and results of operations.

***If DocGo is unable to successfully develop new offerings and technologies, or adapt to rapidly changing technology and industry standards or changes to regulatory requirements, DocGo's business could be adversely affected.***

Technology, including the mobile technologies DocGo utilizes on its innovative platform, is characterized by rapid change, changing consume requirements, short product lifecycles, and evolving industry standards and changing regulatory requirements. DocGo's continued success and growth depend in part upon its ability to enhance its solutions with next-generation technologies and to develop or to acquire and market new services to access new consumer populations. As DocGo's operations grow, DocGo must continuously improve and upgrade its systems and infrastructure while maintaining or improving the reliability and integrity of its infrastructure as the cost of technology increases. DocGo's future success also depends on its ability to adapt its systems and infrastructure to meet rapidly evolving consumer trends and demands while continuing to improve the performance, features, and reliability of its solutions in response to competitive services and offerings. DocGo may not be able to maintain its existing systems or replace or introduce new technologies and systems as quickly as DocGo would like or in a cost-effective manner.

There is no guarantee that DocGo will possess the resources, either financial or personnel, for the research, design, and development of new applications or services, or that DocGo will be able to utilize these resources successfully and avoid technological or market obsolescence. Further, there can be no assurance that technological advances by one or more of DocGo's competitors or future competitors will not resolute in DocGo's present or future applications and services becoming uncompetitive or obsolete. If DocGo is unable to enhance its offerings and network capabilities to keep pace with rapid technological and regulatory change, or if new technologies emerge that are able to deliver competitive offerings at lower prices, more efficiently, more conveniently, or more securely than DocGo's offerings, its business, financial condition, and results of operations could be adversely affected.

DocGo's success will also depend on the availability of its mobile apps in app stores and in "super-app" environments, and the creations, maintenance and development of relationships with key participants in related industries, some of which may also be DocGo's competitors. In addition, if accessibility of various apps is limited by government actions, the full functionality of devices may not be available to its members. Moreover, third-party platforms, services, and offerings are constantly evolving, and DocGo may not be able to modify its platform to assures its compatibility with those third parties. If DocGo loses such interoperability, DocGo experiences difficulties or increased costs in integrating its offerings into alternative devices or systems, or manufacturers or operating systems elect not to include DocGo's offerings, make changes that degrade the functionality of its offerings, or give preferential treatment to competitive products, the growth of DocGo's business, financial condition, and results of operations could be materially adversely affected. This risk may be exacerbated by the frequency with which individuals change or upgrade their devices. In the event individuals choose devices that do not already include or supports DocGo's platform or do not install DocGo's mobile apps when they change or upgrade their devices, member engagement may be harmed.

*DocGo's marketing efforts to help grow its business, including its recent rebrand, may not be effective.*

Promoting awareness of DocGo's brand, innovative technology and services is important to its ability to grow its business, to attract and retain customers and to gain market acceptance of its products and services, and these efforts can be costly. DocGo believes that much of the growth in its business is in part attributable to its marketing initiatives. DocGo's marketing initiatives may become increasingly expensive and generating a meaningful return on those initiatives may be difficult. Even if DocGo successfully increases revenue as a result of its paid marketing efforts, it may not offset the additional marketing expenses it incurs. Any factor that diminishes DocGo's reputation or that of its brands, including adverse publicity or failing to meet the expectations of customers, could make it substantially more difficult for DocGo to attract new customers. If these marketing efforts are not successful, DocGo's business, financial condition and results of operations could be adversely affected.

*DocGo's insurance coverage, including the reserves DocGo establishes with respect to its insurable losses, could adversely affect its business.*

In connection with DocGo's insurance programs, management establishes reserves for losses and related expenses within its self-insured retention limits, which represent estimates involving actuarial and statistical projections, at a given point in time, of DocGo's expectations of the ultimate resolution and administration costs of losses it has incurred in respect of its liability risks. Insurance reserves inherently are subject to uncertainty. DocGo's reserves are based on historical claims, demographic factors, industry trends, severity and exposure factors and other actuarial assumptions. DocGo uses these actuarial estimates to determine appropriate reserves, and DocGo's reserves could be significantly affected if current and future occurrences differ from historical claim trends and expectations. While DocGo monitors claims closely when it estimates reserves, the complexity of the claims and the wide range of potential outcomes may hamper timely adjustments to the assumptions DocGo uses in these estimates. Actual losses and related expenses may deviate, individually and in the aggregate, from the reserve estimates reflected in DocGo's Consolidated Financial Statements. If DocGo determines that its estimated reserves are inadequate, it would be required to increase reserves at the time of the determination, which would reduce DocGo's earnings in the period in which the deficiency is determined and could have a material adverse effect on DocGo's business, financial condition and results of operations.

Some of DocGo's insurance coverage is through third-party insurers. To the extent DocGo holds policies to cover certain groups of claims or relies on insurance coverage obtained by third parties to cover such claims, DocGo may still be responsible for losses. This could occur for a variety of reasons, including if DocGo or such third parties did not obtain sufficient insurance limits, did not buy an extended reporting period policy, where applicable, or the issuing insurance company is unable or unwilling to pay such claims. Furthermore, for DocGo's losses that are insured or reinsured through commercial insurance companies, it is subject to the "credit risk" of those insurance companies. In addition, professional liability insurance is expensive and insurance premiums may increase significantly in the future, particularly as DocGo expands the geographies in which it does business. As a result, adequate professional liability insurance may not be available to it in the future at acceptable costs or at all. While DocGo believes its commercial insurance company providers are creditworthy, there can be no assurance that such insurance companies will remain so in the future, and any failure of DocGo's insurance coverage to adequately cover any losses could have a material adverse effect on DocGo's business, financial condition and results of operations.

28

***DocGo is required to make capital expenditures in order to remain competitive.***

DocGo's capital expenditure requirements primarily relate to maintaining, growing and upgrading its vehicle fleet and medical equipment to serve its customers and remain competitive. The aging of DocGo's ambulance fleet requires DocGo to make regular capital expenditures, including to lease newer replacement ambulances to maintain its current level of service. DocGo's net capital expenditures totaled $3.2 million and $4.7 million in the years ended December 31, 2022 and 2021, respectively, representing acquisitions of property and equipment, less the proceeds from disposals of property and equipment. In addition, changing competitive conditions or the emergence of any significant advances in medical technology could require DocGo to invest significant capital in additional equipment or capacity in order to remain competitive. DocGo may also commit significant capital to acquiring new infrastructure to expand into new geographies. If DocGo is unable to fund any such investment, due to macroeconomic factors such as rising inflation, lack of access to the capital markets, rising interest rates or otherwise, or otherwise fails to invest in new ambulances, medical equipment or other infrastructure, its business, financial condition or results of operations could be materially and adversely affected.

***DocGo's international operations subject it to additional risks that could adversely affect its business.***

DocGo currently provides healthcare transportation services in the United Kingdom and intends to further expand its operations and services internationally, which subjects DocGo to regulatory, macroeconomic, geopolitical and other events and uncertainties in these foreign jurisdictions. In addition to the risks discussed elsewhere herein that are common to DocGo's operations more generally, DocGo faces additional risks specific to its international operations, including but not limited to:

- geopolitical, social, macroeconomic and financial instability, including wars, civil unrest, acts of terrorism and other conflicts, such as the war in Ukraine and rising tensions in the Taiwan Strait; pandemics and endemics; and an inflationary environment, rising interest rates and recessionary fears;

- difficulties and increased costs in developing, staffing and simultaneously managing a large number of varying foreign operations, including as a result of distance, language, cultural differences and labor shortages and expenses;

- restrictions and limitations on the transfer or repatriation of funds;

- fluctuations in currency exchange rates;

- costs and challenges associated with complying with varying legal and regulatory environments in multiple foreign jurisdictions, including privacy laws such as the E.U. General Data Protection Regulation;

- laws and business practices that favor local competitors or prohibit foreign ownership of certain businesses;

- potential for privatization and other confiscatory actions; and

- other dynamics in international jurisdictions, any of which could result in substantial additional legal or compliance costs, liabilities or obligations for DocGo or could require it to significantly modify its current business practices or even exit a given market.

Foreign operations bring increased complexity and the costs of managing or overseeing foreign operations, including adapting and localizing services or systems to specific regions and countries can be material. Further, international operations carry inherent uncertainties regarding the effect of local or domestic actions, such as the unpredictable impact of the United Kingdom's exit from the European Union (Brexit) and the uncertainty regarding how the agreements reached will operate, any of which could be material. International operations also carry financial risks such as those related to fluctuations in foreign currency exchange rates and disparate tax laws. These and other risks related to DocGo's existing or future foreign operations, or the associated costs or liabilities, could have a material adverse effect on DocGo's business, financial condition and results of operations.

29

*DocGo's business could be materially and adversely affected by natural disasters, other catastrophic events, acts of war or terrorism, cybersecurity incidents, and/or other acts by third parties.*

DocGo and its customers depend on the ability of its business to run smoothly, including the ability of its fleet of ambulances, which are often needed in times of emergency, to transport patients. Any material disruption caused by natural disasters, including, fires, floods, hurricanes, volcanoes, and earthquakes (in each case, including due to climate change or otherwise) power loss or shortages; environmental disasters; telecommunications or business information systems failures; acts of war or terrorism; viral outbreaks and other similar epidemics; cybersecurity incidents; and other actions by third parties and other similar disruptions could cause DocGo to lose critical data and services and otherwise adversely affect DocGo's ability to conduct business. Even with disaster recovery arrangements, DocGo's services could be interrupted and DocGo's insurance coverage may not compensate it for losses that may occur in the wake of such events. If any disruption results in the destruction of some or all of DocGo's fleet, significant disruption to DocGo's business, contributes to a general decrease in local, regional or global macroeconomic activity or otherwise impairs DocGo's ability to meet customer demands, or if DocGo is not able to develop or execute on an adequate recovery plan in such circumstances, DocGo's business, financial condition and results of operations could be materially adversely affected.

*Rising inflation may negatively impact DocGo's business and financial results.*

The inflation rate in the U.S., as measured by the Consumer Price Index (CPI) has generally trended up since early 2021. This data is reported monthly, showing year-over-year changes in prices across a basket of goods and services. For 2021, inflation increased from the 1.4%-2.6% range in the first quarter, to 4.2% in April, and was in the 5.0%-6.0% range through the end of the third quarter of 2021, before increasing to the 6.0%-7.0% range in the fourth quarter. For the full year, the inflation rate was 4.7% in 2021, the highest annual rate since the 5.4% rate recorded in 1990. The inflation rate continued to increase in early 2022, reaching approximately 9.1% in June 2022, 8.2% in September 2022, and declining to 6.5% in December 2022. In an attempt to dampen inflation, the U.S. Federal Reserve implemented seven interest rate increases in 2022, raising its benchmark rate (the "federal funds rate") from near 0.00% at the beginning of the year to a level of 4.25% to 4.50% as of the end of December 2022, and as of the date of the filing of this Annual Report, it has so far implemented one interest rate increase in 2023, to the current level of 4.50% - 4.75%. Looking into 2023, DocGo anticipates a moderation of the inflation rate, as a result of these recent rate increases, but DocGo expects that inflation will remain well above the levels seen in the previous 10 years, when the annual inflation rate ranged from 0.1% to 2.4%. If inflation is above the levels that the Company anticipates, gross margins could be below plan and DocGo's business, operating results and cash flows may be adversely affected.

## Risks Related to DocGo's Intellectual Property

*DocGo's failure to protect or enforce its intellectual property rights could impair our ability to protect our technology and our brand.*

DocGo's success depends in part on its ability to enforce and protect its intellectual property rights and technology, including its code, information, data, processes and other forms of information, know-how and technology. DocGo relies on a combination of copyrights, trademarks, service marks, trade secret laws and contractual restrictions to establish and protect its intellectual property and other proprietary rights. DocGo also enters into confidentiality and invention assignment agreements with its employees and consultants and enters into confidentiality agreements with certain of its third-party providers and strategic partners. These laws, procedures and restrictions provide only limited protection and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed, or misappropriated.

Some of DocGo's intellectual property protections do not prevent competitors or others from independently developing technologies that are substantially equivalent or superior to DocGo's offerings. Further, it may still be possible for competitors and other unauthorized third parties to copy DocGo's technology and use its proprietary information to create or enhance competing platforms, solutions and services. DocGo also enters into strategic relationships, joint development and other similar agreements with third parties where intellectual property arising from such relationships may be jointly owned or may be transferred or licensed to the counterparty. These arrangements may limit DocGo's ability to protect, maintain, enforce or commercialize such intellectual property rights, including requiring agreement with or payment to the joint development partners before protecting, maintaining, licensing or initiating enforcement of such intellectual property rights, and may allow such joint development partners to register, maintain, enforce or license such intellectual property rights in a manner that may affect the value of the jointly owned intellectual property or DocGo's ability to compete in the market. As DocGo expands its international activities, its exposure to unauthorized use, copying, transfer and disclosure of proprietary information will likely increase as the laws of some countries do not provide the same level of intellectual property protection as do the laws of the United States, and effective intellectual property protections may not be available or may be limited and harder to enforce in some jurisdictions.

30

DocGo may be required to spend significant resources in order to establish, monitor and protect its intellectual property rights. DocGo may not always detect infringement of its intellectual property rights, and defending or enforcing its intellectual property rights, even if successfully detected, prosecuted, enjoined, or remedied, could result in the expenditure of significant financial and managerial resources. Any enforcement efforts, and litigation in particular, could be costly, time-consuming and distracting to management and could result in the impairment or loss of portions of DocGo's intellectual property. DocGo's efforts to enforce its intellectual property rights may also be met with defenses, counterclaims and countersuits attacking the validity and enforceability of its intellectual property rights. An adverse determination of any litigation proceedings could put DocGo's patents at risk of being invalidated or interpreted narrowly and could put DocGo's related pending patent applications at risk of not issuing. DocGo's inability to protect its proprietary technology against unauthorized copying or use, as well as any costly litigation or extensive enforcement activities, could impair the functionality of DocGo's platform, delay introductions of enhancements to the platform, result in DocGo's substituting inferior or more costly technologies, harm DocGo's reputation or brand and otherwise have a material adverse effect on its business, financial condition and results of operations.

***Claims by others that DocGo infringed their proprietary technology or other intellectual property rights could adversely affect DocGo's business.***

In recent years, there has been significant litigation in the United States involving patents and other intellectual property rights. Companies in the internet and technology industries are increasingly bringing and becoming subject to suits alleging infringement of proprietary rights, particularly patent rights, and our competitors and other third parties may hold or have pending patent applications, which could be related to our business. These risks have been amplified by the increase in third parties, which DocGo refers to as non-practicing entities, whose sole primary business is to assert such claims. Regardless of the merits of any other intellectual property litigation, DocGo may be required to expend significant management time and financial resources on the defense of such claims, and any adverse outcome of any such claim could have a material adverse effect on DocGo's business, financial condition, and results of operations.

Given the competitive landscape and pervasiveness of litigation in DocGo's industry, from time to time, third parties may assert claims of infringement of intellectual property rights against DocGo. In addition, third parties have previously sent DocGo correspondence regarding various allegations of intellectual property infringement. DocGo incorporates technology from third parties into its platform and, as such, it cannot be certain that these licensors are not infringing the intellectual property rights of others or that the suppliers and licensors have sufficient rights to the technology in all jurisdictions in which DocGo may operate. As DocGo gains an increasingly higher public profile, DocGo expects the possibility of these and other types of intellectual property rights claims against it will grow. Although DocGo believes that it has meritorious defenses, there can be no assurance that DocGo will be successful in defending against these and future allegations or in reaching a business resolution that is acceptable to DocGo.

Many potential litigants, including some of DocGo's competitors and non-practicing entities, have the ability to dedicate substantial resources to assert their intellectual property rights. Any claim of infringement by a third party, even those without merit, could be costly, time-consuming and a significant distraction to management. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, DocGo could risk compromising its confidential information during this type of litigation. In addition, in some instances, DocGo may agree to indemnify our clients against certain third-party claims, which may include claims that DocGo's solutions infringe the intellectual property rights of such third parties. DocGo's business could be adversely affected by any significant disputes between DocGo and its clients as to the applicability or scope of DocGo's indemnification obligations to them. With respect to any intellectual property rights litigation or indemnification obligation, DocGo may need to negotiate a license to continue operations if found to be in violation of a third party's rights, and these licenses may not be available on favorable or commercially reasonable terms, or at all. DocGo may be required to pay substantial damages, royalties or other fees in connection with a claimant securing a judgment against it, DocGo may be subject to an injunction or other restrictions that prevent it from using the relevant intellectual property, or DocGo may determine it is prudent to agree to a settlement that restricts DocGo's operations or its use of certain intellectual property, any of which could adversely affect DocGo's business, financial condition and results of operations.

31

**Risks Related to DocGo's Legal and Regulatory Environment**

***DocGo could be subject to lawsuits for which it does not have sufficient reserves, which could have a material adverse effect on DocGo's business, financial condition and results of operations.***

Healthcare providers and other participants in the healthcare industry have become subject to an increasing number of lawsuits alleging medical malpractice and related legal theories such as negligent hiring, supervision and credentialing. Similarly, healthcare transportation services can result in lawsuits related to vehicle collisions and personal injuries, patient care incidents or mistreatment and employee job-related injuries. Moreover, in the normal course of DocGo's business, it has been and may continue to be involved in lawsuits, claims, audits and investigations, including those arising out of its billing practices, employment disputes, contractual claims and other business disputes for which DocGo may have no insurance coverage, and which are not subject to actuarial estimates. Some of these lawsuits may involve large claim amounts and substantial defense costs.

Adverse outcomes with respect to litigation or any of these legal proceedings may result in significant settlement costs or judgments, penalties and fines, which may or may not be covered by DocGo's existing insurance or may require DocGo to modify its services or require it to stop serving certain customers or geographies, all of which could negatively impact its existing business and its ability to grow. DocGo may also become subject to periodic audits, which would likely increase its regulatory compliance costs and may require it to change its business practices or the scope of its operations. Managing legal proceedings, litigation and audits, even if DocGo achieves favorable outcomes, is time-consuming and diverts management's attention from DocGo's day-to-day business. The outcome of these matters or future claims and disputes are difficult to predict and determining reserves for pending litigation and other legal, regulatory and audit matters requires significant judgment. There can be no assurance that DocGo's expectations will prove correct, and even if these matters are resolved in its favor or without significant cash settlements, these matters, and the time and resources necessary to litigate or resolve them, could have a material effect on DocGo's results of operations in the period when it identifies the matter, and could have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo is subject to a variety of federal, state and local laws and regulatory regimes, including a variety of labor laws and regulations, and changes to or the failure to comply with these laws and regulations could adversely affect DocGo's business.***

DocGo is subject to various federal, state, and local laws and regulations including the Employee Retirement Income Security Act of 1974 ("ERISA") and regulations promulgated by the Internal Revenue Service ("IRS"), the U.S. Department of Labor and the Occupational Safety and Health Administration. DocGo is also subject to a variety of federal and state employment and labor laws and regulations, including the Americans with Disabilities Act, the federal Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, and other regulations related to working conditions, wage-hour pay, overtime pay, family leave, employee benefits, antidiscrimination, termination of employment, safety standards and other workplace regulations. Compliance with these and other applicable laws and regulations can be time-consuming and costly. Failure to properly adhere to these and other applicable laws and regulations could result in investigations, the imposition of penalties or adverse legal judgments by public or private plaintiffs. Changes to these laws and regulations can also increase costs and require DocGo to commit additional resources to comply with these laws. For example, the raising of the federal minimum wage or the minimum wage within a state where DocGo has significant operations, which has been and continues to be a subject of ongoing discussions in Washington, D.C. and other U.S. state capitals, could significantly increase DocGo's selling, general and administrative expenses. Changes to or any failure to comply with applicable laws and regulations could also have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo's ability to utilize its net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2022 and 2021, DocGo had aggregate federal net operating loss carryforwards of approximately $53.6 million and $56.6 million, respectively. As of December 31, 2022 and 2021, the Company had state net operating loss carryforwards of approximately $74.2 million and $67.2 million, respectively. As of December 31, 2022 and 2021, DocGo had approximately $903 and $202,965 respectively, of foreign net operating loss carryforwards. The federal net operating loss carryforwards generated after December 31, 2017, of approximately $62.2 million carry forward indefinitely, while the remaining federal net carryforwards of approximately $11.7 million begin to expire in 2037. State and foreign net operating loss carryforwards generated in the tax years from 2017 to 2020 will begin to expire, if not utilized, by 2039. DocGo's unused losses generally carry forward to offset future taxable income, if any, until such unused losses expire. DocGo may be unable to use these losses to offset income before such unused losses expire. However, U.S. federal net operating losses generated in 2019 and forward are not subject to expiration and, if not utilized by fiscal 2021, are only available to offset 80% of taxable income each year due to changes in tax law attributable to the passage of Tax Cuts and Jobs Act. In addition, if DocGo undergoes an "ownership change" — generally defined as a greater than 50% cumulative change in the equity ownership of certain shareholders over a rolling three-year period — under Section 382 of the Internal Revenue Code, DocGo's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes to offset future taxable income or taxes may be limited. Although the Merger did not constitute such an ownership change, DocGo may experience ownership changes in the future as a result of changes in its stock ownership, some of which may not be within DocGo's control, which could materially reduce or eliminate DocGo's ability to use these losses or tax attributes to offset future taxable income or tax and have an adverse effect on its business, financial condition and results of operations.

***Changes in tax laws or unanticipated tax liabilities could adversely affect DocGo's effective income tax rate and profitability.***

DocGo is subject to income taxes in the United States (federal and state) and various foreign jurisdictions. DocGo's effective income tax rate could be adversely affected in the future by a number of factors, including changes in the valuation of deferred tax assets and liabilities, changes in tax laws and regulations or their interpretations and application, and the outcome of income tax audits in various jurisdictions around the world. In particular, the Biden administration has proposed increases to the U.S. corporate income tax rate from 21% to 28% and made other proposals. If any of these (or similar) proposals are ultimately enacted into law, in whole or in part, they could have a negative impact on DocGo's effective tax rate. DocGo cannot predict the likelihood, timing or substance of U.S. tax proposals and will continue to monitor the progress of such proposals, as well as other global tax reform initiatives.

DocGo continues to monitor changes in tax laws in the U.S. and the impact of proposed and enacted legislation in the various foreign jurisdictions in which it operates. In August 2022, the Inflation Reduction Act of 2022 was enacted, which, among other things, includes a new 15% alternative minimum tax on the adjusted financial statement income of certain large corporations for tax years beginning after December 31, 2022. President Biden has also provided informal guidance on tax law changes he may support. Among other things, proposed changes would raise the rate on both domestic and foreign income. If any of these proposals are ultimately enacted into legislation, they could materially impact DocGo's tax provision, cash tax liability and effective tax rate.

***Changes in accounting rules, assumptions or judgments could materially and adversely affect DocGo.***

Accounting rules and interpretations for certain aspects of DocGo's financial reporting are highly complex and involve significant assumptions and judgment. These complexities could lead to a delay in the preparation and dissemination of DocGo's financial statements. Furthermore, changes in accounting rules and interpretations or in DocGo's accounting assumptions or judgments, such as asset impairments and contingencies, are likely to significantly impact its financial statements. In some cases, DocGo could be required to apply a new or revised standard retroactively, resulting in restating financial statements from prior period(s). Any of these circumstances could have a material adverse effect on DocGo's business, financial condition and results of operations. For additional information, see the financial statements of DocGo and related footnotes included elsewhere in this Annual Report on Form 10-K.

***DocGo's internal control over financial reporting may not be effective and its independent registered public accounting firm may not be able to certify as to their effectiveness, which could adversely affect DocGo's business.***

As a public company, DocGo has significant requirements for enhanced financial reporting and internal controls, including the SEC's rules implementing Sections 302 and 404 of the Sarbanes-Oxley Act, which require management to certify financial and other information in its quarterly and annual reports and provide an annual management report on the effectiveness of internal control over financial reporting. DocGo has made, and will continue to make, changes to its internal controls and procedures for financial reporting and accounting systems to meet its reporting obligations as a public company. The process of designing and implementing effective internal controls is a continuous effort that requires DocGo to anticipate and react to changes in its business and the economic and regulatory environments and to expend significant resources to maintain a system of internal controls that is adequate to satisfy its reporting obligations as a public company. The measures DocGo takes may not be sufficient to satisfy its obligations as a public company and if DocGo is unable to establish or maintain appropriate internal financial reporting controls and procedures, it could cause DocGo to fail to meet its reporting obligations on a timely basis, result in material misstatements in its Consolidated Financial Statements and harm its results of operations. DocGo is an emerging growth company and, as such, its independent registered public accounting firm will not be required to formally attest to the effectiveness of its internal control over financial reporting pursuant to Section 404 until the date DocGo is no longer an emerging growth company. At such time, DocGo's independent registered public accounting firm may issue a report that is adverse in the event that it is not satisfied with the level at which DocGo's controls are documented, designed or operating, or it may not issue an unqualified report.

To comply with the requirements of being a public company, DocGo may need to undertake various actions, such as implementing additional internal controls and procedures and hiring additional accounting or internal audit staff. The rules governing the standards that must be met for DocGo's management to assess its internal control over financial reporting are complex and require significant documentation, testing and possible remediation. Testing and maintaining internal controls can divert management's attention from other matters that are important to the operation of DocGo's business. In connection with the implementation of the necessary procedures and practices related to internal control over financial reporting, DocGo may identify deficiencies that it may not be able to remediate in time to meet the deadline imposed by the Sarbanes-Oxley Act for compliance with the requirements of Section 404. DocGo's testing, or the subsequent testing (if required) by its independent registered public accounting firm, may reveal deficiencies in its internal controls over financial reporting that are deemed to be material weaknesses. Any material weaknesses could result in a material misstatement of DocGo's annual or quarterly Consolidated Financial Statements or disclosures that may not be prevented or detected. If DocGo identifies material weaknesses in its internal control over financial reporting or is unable to comply with the requirements of Section 404 or assert that its internal control over financial reporting is effective, or if DocGo's independent registered public accounting firm is unable to express an opinion as to the effectiveness of its internal control over financial reporting when such disclosure is required, investors may lose confidence in the accuracy and completeness of DocGo's financial reports and the market price of its common stock could be negatively affected, and DocGo could become subject to investigations by the SEC or other regulatory authorities, any of which could have an adverse effect on DocGo's business, financial condition and results of operations.

*DocGo conducts business in the heavily regulated healthcare industry and any failure to comply with these laws and government regulations could require DocGo to make significant changes to its operations and could have a material adverse effect on its business, financial condition, and results of operations.*

The U.S. healthcare industry is heavily regulated and closely scrutinized by federal and state governments. Comprehensive statutes and regulations govern the manner in which DocGo provides and bills for its services and collects reimbursement from governmental programs and private payors, its relationship with its providers, vendors and clients, its marketing activities and other aspects of its operations. Of particular importance are:

- the federal False Claims Act that imposes civil and criminal liability on individuals or entities that knowingly submit false or fraudulent claims for payment to the government or knowingly make, or cause to be made, a false statement in order to have a false claim paid, including qui tam or whistleblower suits;

- the federal Civil Monetary Penalties Law, which prohibits, among other things, the offering or transfer of remuneration to a Medicare or state healthcare program beneficiary if the person knows or should know it is likely to influence the beneficiary's selection of a particular provider, practitioner or supplier of services reimbursable by Medicare or a state healthcare program, unless an exception applies;

- reassignment of payment rules that prohibit certain types of billing and collection practices in connection with claims payable by the Medicare or Medicaid programs;

- a provision of the Social Security Act that imposes criminal penalties on healthcare providers who fail to disclose or refund known overpayments;

- federal and state laws that prohibit providers from billing and receiving payment from Medicare and Medicaid for services unless the services are medically necessary, adequately and accurately documented, and billed using codes that accurately reflect the type and level of services rendered;

- the criminal healthcare fraud provisions of HIPAA that prohibit knowingly and willfully executing a scheme or artifice to defraud any healthcare benefit program or falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. HIPAA also imposes certain regulatory and contractual requirements regarding the privacy, security and transmission of PHI. Similar to the federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation;

- federal and state laws and policies that require healthcare providers to maintain licensure, certification or accreditation to provide professional healthcare services, to enroll and participate in the Medicare and Medicaid programs, to report certain changes in their operations to the agencies that administer these programs, as well as state insurance laws;

- the federal Anti-Kickback Statute that prohibits the knowing and willful offer, payment, solicitation or receipt of any bribe, kickback, rebate or other remuneration for referring an individual, in return for ordering, leasing, purchasing or recommending or arranging for or to induce the referral of an individual or the ordering, purchasing or leasing of items or services covered, in whole or in part, by any federal healthcare program, such as Medicare and Medicaid. Remuneration has been interpreted broadly to be anything of value, and could include compensation, discounts or free marketing services. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In addition, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act;

- similar state law provisions pertaining to false claims, self-referral and anti-kickback issues, some of which may apply to items or services reimbursed by any third-party payor, including commercial insurers or services paid out-of-pocket by patients;

- the federal physician self-referral law under Section 1877 of the Social Security Act, commonly referred to as the Stark Law, that, unless one of the statutory or regulatory exceptions applies, prohibits physicians from referring Medicare or Medicaid patients to an entity for the provision of certain "designated health services" if the physician or a member of such physician's immediate family has a direct or indirect financial relationship (including an ownership interest or a compensation arrangement) with the entity, and prohibits the entity from billing Medicare or Medicaid for such designated health services. Failure to refund amounts received as a result of a prohibited referral on a timely basis may constitute a false or fraudulent claim and may result in civil penalties and additional penalties under the federal False Claims Act noted below;

- state laws that prohibit general business corporations, such as DocGo, from practicing medicine, controlling physicians' medical decisions or engaging in some practices such as splitting fees with physicians;

- the Federal Trade Commission Act and federal and state consumer protection, advertisement and unfair competition laws, which broadly regulate marketplace activities and activities that could potentially harm consumers; and

- laws that regulate debt collection practices.

35

DocGo's ability to provide its services internationally is subject to the similar laws and regulations in those jurisdictions and the interpretation of these laws is evolving and varies significantly from country to county. As in the United States, many of these laws and regulations are enforced by governmental, judicial and regulatory authorities with broad discretion. Although similar to their U.S. counterparts in the subject matters addressed, these foreign laws may be very different in what is required of the business and how they regulate the underlying activities. DocGo cannot be certain that its interpretation of such laws and regulations are correct in how its structures its operations, its arrangements with its healthcare provider partners, services agreements and customer arrangements.

Many of these laws and regulations are complex, broad in scope and have few or narrowly structured exceptions and safe harbors. Often DocGo is required to fit certain activities within one of the statutory exceptions and safe harbors available and it is possible that some of DocGo's current or future business activities could be subject to challenge under one or more of such laws. Achieving and sustaining compliance with these laws can be time-consuming, requires the commitment of significant resources and may prove costly. The risk of DocGo being found in violation of these laws and regulations is increased by the fact that many of these laws and regulations have not been fully interpreted by the regulatory authorities or the courts, and their provisions are sometimes open to a variety of interpretations. DocGo's failure to accurately anticipate the application of these laws and regulations to its current or future business or any other failure or alleged failure to comply with legal or regulatory requirements could create liability for DocGo and negatively affect its business. Any action against DocGo for violation of these laws or regulations, even if DocGo successfully defends against it, could cause DocGo to incur significant legal expenses, divert management's attention from the operation of the business and result in adverse publicity.

Enforcement officials have a number of mechanisms to combat regulatory compliance, fraud and abuse, and if DocGo fails to comply with applicable laws and regulations, it could be liable for civil or criminal penalties, including fines, damages, recoupment of overpayments, loss of licenses needed to operate, loss of enrollment status and approvals necessary to participate in Medicare, Medicaid and other government and private third-party healthcare and payor programs, and exclusion from participation in Medicare, Medicaid and other government healthcare programs. Investors, officers and managing employees associated with entities found to have committed healthcare fraud may also be excluded from participation in government healthcare programs. In addition, because of the potential for large monetary exposure, criminal liability and negative publicity, healthcare providers often resolve allegations without admissions of liability for significant and material amounts to avoid the uncertainty of damages that may be awarded in litigation proceedings. Such settlements often contain additional compliance and reporting requirements as part of a consent decree, settlement agreement or corporate integrity agreement.

DocGo believes that its business operations materially comply with applicable healthcare laws and regulations. However, some of the healthcare laws and regulations applicable to DocGo are subject to limited or evolving interpretations, and a review of DocGo's business or operations by a court, law enforcement or a regulatory authority might result in a determination of non-compliance. Any failure to comply with applicable legal and regulatory requirements and the consequences of such non-compliance, including those discussed above, could have a significant adverse effect on DocGo's business, financial condition and results of operations.

***DocGo is required to comply with laws governing the transmission, security and privacy of health information and personally identifiable information.***

Numerous state and federal laws and regulations govern the collection, dissemination, use, privacy, confidentiality, security, availability, integrity and other processing of personal health information ("PHI") and personal identifiable information ("PII"), including HIPAA. HIPAA establishes a set of national privacy and security standards for the protection of PHI by health plans, healthcare clearinghouses and certain healthcare providers, referred to as "covered entities," and the business associates with whom such covered entities contract for services. HIPAA requires covered entities such as DocGo and their business associates to develop and maintain policies and procedures with respect to PHI that is used or disclosed, including the adoption of administrative, physical and technical safeguards to protect this information. HIPAA also implemented the use of standard transaction code sets and standard identifiers that covered entities must use when submitting or receiving certain electronic healthcare transactions, including activities associated with the billing and collection of healthcare claims.

HIPAA also authorizes state attorneys general to file suit on behalf of their residents. Courts may award damages, costs and attorneys' fees related to violations of HIPAA in these cases. While HIPAA does not create a private right of action allowing individuals to sue DocGo in civil court for violations of HIPAA, its standards have been used as the basis for duty of care in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI. In addition, HIPAA mandates that the Secretary of the U.S. Department of Health and Human Services ("HHS") conduct periodic compliance audits of covered entities and business associates for compliance with the HIPAA privacy and security requirements. HIPAA also tasks HHS with establishing a methodology whereby harmed individuals who were the victims of breaches of unsecured PHI may receive a percentage of the fine paid by the violator under the Civil Monetary Penalties Law.

36

HIPAA further requires that patients be notified of any unauthorized acquisition, access, use or disclosure of their unsecured PHI that compromises the privacy or security of such information, with certain exceptions related to unintentional or inadvertent use or disclosure by employees or authorized individuals. HIPAA specifies that such notifications must be made "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." If a breach affects 500 patients or more, it must be reported to HHS without unreasonable delay, and HHS will post the name of the breaching entity on its public web site. Breaches affecting 500 patients or more in the same state or jurisdiction must also be reported to a prominent media outlet serving the state or jurisdiction in which the breach occurred. If a breach involves fewer than 500 people, the covered entity must record it in a log and notify HHS within 60 days after the end of the calendar year during which the breach was discovered.

In addition to HIPAA, numerous other federal and state laws and regulations protect the confidentiality, privacy, availability, integrity and security of PHI and other types of PII. State statutes and regulations vary from state to state, and these laws and regulations in many cases are more restrictive than, and may not be preempted by, HIPAA. These laws and regulations are often uncertain, contradictory and subject to change or differing interpretations, and DocGo expects new laws, rules and regulations regarding privacy, data protection and information security to be proposed and enacted in the future. By way of example, the California Consumer Privacy Act (CCPA), which went into effect on January 1, 2020 and was amended by the California Privacy Rights Act (CPRA), a ballot measure approved by California voters in November 2020 that went into effect January 1, 2023, has had a profound impact on the privacy and data security landscape. As the first comprehensive consumer privacy legislation in the U.S., the CCPA created where applicable (some information may be exempt from most of CCPA's/CPRA's requirements if subject to HIPAA, for example), which were further expanded by the CPRA. Other states, including Colorado, Connecticut and Utah, have followed suit, and others may in the future, creating a patchwork of overlapping but different state laws and thus complicating compliance efforts.

As existing data security laws evolve and new ones are implemented, DocGo may not be able to comply with such requirements in a timely manner, or such requirements may not be compatible with its current processes. Changing DocGo's processes could be time-consuming and expensive, and failure to implement required changes within the applicable timeframe could subject DocGo to liability for non-compliance. Some states may afford private rights of action to individuals who believe their PII has been misused. This complex, dynamic legal landscape regarding privacy, data protection and information security creates significant compliance issues for DocGo and potentially restricts its ability to collect, use and disclose data and can expose it to additional expense, adverse publicity and liability.

There is ongoing concern from privacy advocates, regulators and others regarding data protection and privacy issues, and the number of jurisdictions with data protection and privacy laws has been increasing. In addition, the scope of protection afforded to data subjects by many of these data protection and privacy laws has been increasing. There are also ongoing public policy discussions regarding whether the standards for deidentified, anonymous or pseudonymized health information are sufficient, and whether the risk of re-identification is sufficiently small to adequately protect patient privacy. These trends may lead to further restrictions on the use of this and similar categories of information. These initiatives or future initiatives could compromise DocGo's ability to access and use data or to develop or market current or future services.

While DocGo has implemented data privacy and security measures in an effort to comply with applicable laws and regulations relating to privacy and data protection, some PHI and other PII or confidential information is transmitted to or from DocGo by third parties, who may not implement adequate security and privacy measures, and it is possible that laws, rules and regulations relating to privacy, data protection or information security may be interpreted and applied in a manner that is inconsistent with DocGo's practices or those of third parties who transmit PHI and other PII or confidential information to DocGo. Additionally, as a business associate under HIPAA, DocGo may also be liable for privacy and security breaches of PHI and certain similar failures of DocGo's subcontractors. Even though DocGo contractually requires its subcontractors to safeguard protected health information as required by law, DocGo has limited control over their actions and practices. If DocGo or these third parties are found to have violated such laws, rules or regulations, it could result in government-imposed fines, orders requiring that DocGo or these third parties change its or their practices, or criminal charges, which could adversely affect DocGo's business. Complying with these various laws and regulations could cause DocGo to incur substantial costs or require it to change its business practices, systems and compliance procedures in a manner adverse to its business.

DocGo publishes statements to its patients and partners that describe how it handles and protects PHI. If federal or state regulatory authorities or private litigants consider any portion of these statements to be untrue, DocGo may be subject to claims of deceptive practices, which could lead to significant liabilities and consequences, including, without limitation, costs of responding to investigations, defending against litigation, settling claims and complying with regulatory or court orders.

DocGo also sends short message service, or SMS, text messages to potential end users who are eligible to use its service through certain customers and partners. While DocGo obtains consent from or on behalf of these individuals to send text messages, federal or state regulatory authorities or private litigants may claim that the notices and disclosures DocGo provides, form of consents it obtains or its SMS texting practices, are not adequate. These SMS texting campaigns are potential sources of risk for class action lawsuits and liability for DocGo. An increased number of class action suits under federal and state laws have been filed in the past year against companies who conduct SMS texting programs, which have resulted in or may result in multimillion-dollar settlements to the plaintiffs. Any future such litigation against DocGo could be costly and time-consuming to defend.

Any failure to comply with HIPAA or similar laws and regulations and the consequences of such non-compliance could have a material adverse impact on DocGo's business, financial condition and results of operations.

*If DocGo does not effectively adapt to changes in the healthcare industry, including changes to laws and regulations regarding telehealth, DocGo's business may be harmed.*

The unpredictability of the healthcare regulatory landscape means that sudden changes in laws, rules, regulations and policy are possible. Federal, state and local legislative bodies frequently pass legislation and promulgate regulations that affect the healthcare industry. As has been the trend in the past decade with healthcare reform, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future, particularly in times of changing political, regulatory and other influences. DocGo cannot provide any assurances regarding the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on its business. It is possible that future legislation enacted by Congress or state legislatures, or regulations promulgated by regulatory authorities at the federal or state level, could adversely affect DocGo's current or future business. The extent to which a jurisdiction considers particular actions or relationships to comply with the applicable legal requirements is also subject to evolving interpretations by medical boards and state attorneys general, among others, each with broad discretion. It is possible that the changes to the Medicare, Medicaid or other governmental healthcare program reimbursements may serve as precedent to possible changes in other payors' reimbursement policies in a manner adverse to DocGo. Similarly, changes in private payor reimbursements could lead to adverse changes in Medicare, Medicaid and other governmental healthcare programs.

As one example, the telehealth industry is still relatively young and DocGo's ability to provide its telehealth solutions is directly dependent upon the development and interpretation of the laws governing remote healthcare, the practice of medicine and healthcare delivery in the applicable jurisdictions and more broadly. A few states have imposed different, and, in some cases, additional, standards regarding the provision of services via telehealth. State medical boards have also established new rules or interpreted existing rules in their respective states in a manner that has limited the way telehealth services can be provided. Although the Covid-19 pandemic has led to the relaxation of certain Medicare, Medicaid and state licensure restrictions on the delivery of telehealth services, it is uncertain how long the relaxed policies will remain in effect, particularly with the Public Health Emergency ("PHE") expected to end on May 11, 2023. There can be no guarantee that upon expiration of the PHE such restrictions will not be reinstated or changed in a way that adversely affects DocGo's current or future telehealth offerings.

Accordingly, DocGo must monitor its compliance with law in every jurisdiction in which it operates, on a regular basis. While DocGo believes that it has structured its contracts and operations in material compliance with applicable healthcare laws and regulations, the healthcare laws and regulations applicable to DocGo may be amended or interpreted in new or different ways that are adverse to DocGo and new laws and regulations adverse to DocGo's current or future business may be adopted in the future. There can be no assurance that DocGo will be able to successfully address changes in the current regulatory environment or new laws and regulations that may be implemented in the future, or that practices which are compliant now will continue to be so in the future. Any failure to comply with any changes to or new developments in the healthcare regulatory environment could have a material adverse effect on DocGo's business, financial condition and results of operations.

*DocGo must be properly enrolled in governmental healthcare programs before it can receive reimbursement for services, and there may be delays in the enrollment process.*

Each time DocGo expands into a new market, whether organically or by way of acquisition, DocGo must enroll the new operations under DocGo's applicable group identification number for Medicare and Medicaid programs and for certain managed care and private insurance programs before DocGo is eligible to receive reimbursement for services rendered to beneficiaries of those programs. The estimated time to receive approval for the enrollment is sometimes difficult to predict.

With respect to Medicare, providers can retrospectively bill Medicare for services provided 30 days prior to the effective date of the enrollment. In addition, the enrollment rules provide that the effective date of the enrollment will be the later of the date on which the enrollment application was filed and approved by the Medicare contractor, or the date on which the provider began providing services. If DocGo is unable to complete the enrollment process within the 30 days after the commencement of services, DocGo will be precluded from billing Medicare for any services which were provided to a Medicare beneficiary more than 30 days prior to the effective date of the enrollment. With respect to Medicaid, new enrollment rules and whether a state will allow providers to retrospectively bill Medicaid for services provided prior to submitting an enrollment application varies by state. Failure to timely enroll could reduce DocGo's total revenues and have a material adverse effect on the business, financial condition or results of operations.

The Affordable Care Act, as currently structured, added additional enrollment requirements for Medicare and Medicaid, which have been further enhanced through implementing regulations and increased enforcement scrutiny. Every enrolled provider must revalidate its enrollment at regular intervals and must update the Medicare contractors and many state Medicaid programs with significant changes on a timely basis. If DocGo fails to provide sufficient documentation as required to maintain its enrollment, Medicare and Medicaid could deny continued future enrollment or revoke DocGo's enrollment and billing privileges.

The requirements for enrollment, licensure, certification and accreditation may include notification or approval in the event of a transfer or change of ownership or certain other changes. Other agencies or payors with which DocGo has contracts may have similar requirements, and some of these processes may be complex. Failure to provide required notifications or obtain necessary approvals may result in the delay or inability to complete an acquisition or transfer, loss of licensure, lapses in reimbursement or other penalties. While DocGo makes reasonable efforts to substantially comply with these requirements, it cannot assure you that the agencies that administer these programs or have awarded DocGo contracts will not find that DocGo has failed to comply in some material respects. A finding of non-compliance and any resulting payment delays, refund demands or other sanctions could have a material adverse effect on DocGo's business, financial condition or results of operations.

***Reductions in Medicare reimbursement rates or changes in the rules governing the Medicare program could have a material adverse effect on DocGo.***

DocGo generates a significant amount of revenues from Medicare, either directly or through Medicare Advantage ("MA") plans, particularly in its healthcare transportation segment. Medicare revenues represent approximately 6.6% and 7.6% of DocGo's revenues for the years ended December 31, 2021 and 2022, respectively.  In addition, many private payors base their reimbursement rates on the published Medicare rates or are themselves reimbursed by Medicare for the services DocGo provides. As a result, DocGo's results of operations are, in part, dependent on government funding levels for Medicare programs and any changes that limit or reduce MA or general Medicare reimbursement levels, such as reductions in or limitations of reimbursement amounts or rates under programs, reductions in funding of programs, expansion of benefits without adequate funding or elimination of coverage for certain benefits or for certain individuals, could have a material adverse effect on DocGo's business, financial condition and results of operations.

The Medicare program and its reimbursement rates and rules are subject to frequent change. These include statutory and regulatory changes, rate adjustments (including retroactive adjustments), administrative or executive orders and government funding restrictions, all of which may materially adversely affect the rates at which Medicare reimburses DocGo for its services. Budget pressures often cause the federal government to reduce or place limits on reimbursement rates under Medicare. Implementation of these and other types of measures could result in substantial reductions in DocGo's revenues and operating margins. For example, due to the federal sequestration, an automatic 2% reduction in Medicare spending took effect beginning in April 2013. Although temporarily paused/reduced from May 1, 2020 through June 30, 2022 due to The Cares Act, which was signed into law on March 27, 2020, and designed to provide financial support and resources to individuals and business affected by the COVID-19 pandemic, the 2% reduction was reimposed as of July 1, 2022.

Each year, the Centers for Medicare and Medicaid Services ("CMS") issues a final rule to establish the MA benchmark payment rates for the following calendar year. Reductions to MA rates impacting DocGo may be greater than the industry average rate and the final impact of the MA rates can vary from any estimate DocGo may have. In addition, CMS may change the rules governing the Medicare program, including those governing reimbursement. Reductions in reimbursement rates or the scope of services being reimbursed could have a material adverse effect on DocGo's business, financial condition and results of operations.

***State and federal efforts to reduce Medicaid spending could adversely affect DocGo.***

Certain of DocGo's customers who are individuals are dual-eligible, meaning their coverage comes from both Medicare and Medicaid. As a result, a small portion of DocGo's revenue comes from Medicaid, accounting for approximately 1.1% and 1.8% of revenue for the years ended December 31, 2021 and 2022, respectively.  Medicaid is a joint federal-state program purchasing healthcare services for the low income and indigent as well as certain higher income individuals with significant health needs. Under broad federal criteria, states establish rules for eligibility, services and payment. Medicaid is a state-administered program financed by both state funds and matching federal funds. Medicaid spending has increased rapidly in recent years, becoming a significant component of state budgets. This, combined with slower state revenue growth, has led both the federal government and many states to institute measures aimed at controlling the growth of Medicaid spending, and in some instances reducing aggregate Medicaid spending.

For example, a number of states have adopted or are considering legislation designed to reduce their Medicaid expenditures, such as financial arrangements commonly referred to as provider taxes. Under provider tax arrangements, states collect taxes from healthcare providers and then use the revenue to pay the providers as a Medicaid expenditure, which allows the states to then claim additional federal matching funds on the additional reimbursements. Current federal law provides for a cap on the maximum allowable provider tax as a percentage of the provider's total revenue. There can be no assurance that federal law will continue to provide matching federal funds on state Medicaid expenditures funded through provider taxes, or that the current caps on provider taxes will not be reduced. Any discontinuance or reduction in federal matching of provider tax-related Medicaid expenditures could have a significant and adverse effect on states' Medicaid expenditures, and as a result could have an adverse effect on DocGo's business, financial condition and results of operations.

Also, as part of the movement to repeal, replace or modify the Health Care Reform Law and as a means to reduce the federal budget deficit, there are renewed congressional efforts to move Medicaid from an open-ended program with coverage and benefits set by the federal government to one in which states receive a fixed amount of federal funds, either through block grants or per capita caps, and have more flexibility to determine benefits, eligibility or provider payments. If those changes are implemented, DocGo cannot predict whether the amount of fixed federal funding to the states will be based on current payment amounts, or if it will be based on lower payment amounts, which would negatively impact those states that expanded their Medicaid programs in response to the Health Care Reform Law.

DocGo expects these state and federal efforts to continue for the foreseeable future. The Medicaid program and its reimbursement rates and rules are subject to frequent change at both the federal and state level. These include statutory and regulatory changes, rate adjustments (including retroactive adjustments), administrative or executive orders and government funding restrictions, all of which may materially adversely affect the rates at which DocGo's services are reimbursed by state Medicaid plans.

***DocGo could become the subject of federal and state investigations and compliance reviews.***

Companies in the broader healthcare industry are subject to a high level of scrutiny by various governmental agencies and their agents. Both federal and state government agencies have heightened and coordinated civil and criminal enforcement efforts as part of numerous ongoing investigations of healthcare companies, as well as their executives and managers. These investigations relate to a wide variety of topics, including referral and billing practices. For example, to enforce compliance with the federal laws, the U.S. Department of Justice and the Office of Inspector General have established national enforcement initiatives that focus on specific billing practices or other suspected areas of abuse. Given the significant size of actual and potential settlements, it is expected that the government will continue to devote substantial resources to investigating healthcare providers' compliance, including compliance with the healthcare reimbursement rules and fraud and abuse laws. DocGo is also required to conduct periodic internal audits in connection with its third-party relationships and, in the ordinary course of business receives repayment demands from third-party payors based on allegations that its services were not medically necessary, were billed at an improper level or otherwise violated applicable billing requirements that require investigation. Further, DocGo periodically conducts internal reviews of its regulatory compliance. To date no investigation or audit of DocGo, its executives or its managers has occurred, whether by the government and its agents, a third-party or DocGo itself. However, should such an investigation or audit occur, it could result in significant expense to DocGo in addition to adverse publicity and diversion of the management's attention from DocGo's business regardless of the outcome. Any adverse findings against DocGo could result in significant fines, penalties and other sanctions, any of which could have a material adverse effect on DocGo's business, financial condition and results of operations.

***DocGo's business practices may be found to constitute illegal fee-splitting or corporate practice of medicine, which may lead to penalties and could adversely affect DocGo's business.***

Many states have laws that prohibit business corporations such as DocGo from practicing medicine, employing physicians, exercising control over medical judgments or decisions of physicians or other health care professionals (such as EMTs and nurses), or engaging in certain business arrangements such as fee-splitting, with each of the foregoing activities collectively referred to as the "corporate practice of medicine." In some states these prohibitions are expressly stated in a statute or regulation, while in other states the prohibition is a matter of judicial or regulatory interpretation. Many of the states in which DocGo currently operates generally prohibit the corporate practice of medicine, and other states may as well, including those into which DocGo may expand in the future.

The state laws and regulations and administrative and judicial decisions that enumerate the specific corporate practice of medicine rules vary considerably from state to state and have been subject to limited judicial or regulatory interpretations. These laws and regulations are enforced by both the courts and government agencies, each with broad discretion. Courts, government agencies or other parties, including physicians, may assert that DocGo is engaged in the unlawful corporate practice of medicine. While penalties for violations of the corporate practice of medicine vary from state to state, as a result of such allegations, DocGo could be subject to civil and criminal penalties, its contracts could be found legally invalid and unenforceable, in whole or in part, or DocGo could be required to restructure its contractual arrangements entirely. If found to be engaged in the corporate practice of medicine, DocGo may not be able to restructure its operations or its contractual arrangements on favorable terms or at all. Any failure to comply with these laws and regulations regarding the corporate practice of medicine and the consequences of such non-compliance could have a material adverse impact on DocGo's business, financial condition and results of operations.

DocGo believes its business is structured to comply with the applicable regulations governing fee-splitting and the corporate practice of medicine in the states where it generates revenue; however, in many cases and as noted above, these laws and regulations applicable to DocGo are subject to limited or evolving interpretations, and there can be no assurances that a review of DocGo's business or operations by a court, law enforcement or a regulatory authority might result in a determination of non-compliance.

40

**Risks Related to DocGo's Indebtedness**

*DocGo's future indebtedness could require that it dedicate a portion of its cash flows to debt service obligations and reduce the funds that would otherwise be available for other general corporate purposes and other business opportunities, which could adversely affect DocGo's operating performance, growth, profitability and financial condition, which in turn could make it more difficult for it to generate cash flow sufficient to satisfy all of its obligations under its future indebtedness.*

As of December 31, 2022, DocGo did not have any amounts outstanding under a credit agreement (the "Credit Agreement"), dated as of November 1, 2022, among DocGo, the lender parties thereto, and Citibank, N.A., as administrative agent (the "Agent"). The Credit Agreement provides for a revolving credit facility in the initial aggregate principal amount of $90 million (the "Revolving Facility"). Borrowings under the Revolving Facility bear interest at a per annum rate equal to: (i) at DocGo's option, the (x) the base rate or (y) the adjusted term SOFR rate, plus (ii) the applicable margin. DocGo is also required to pay a commitment fee to the lenders under the Revolving Facility in respect of any unutilized commitments thereunder. DocGo's future indebtedness, including future borrowings under the Credit Agreement or similar future arrangements, could require that it dedicate a portion of its cash flows to debt service payments.

DocGo's future indebtedness could reduce the funds that would otherwise be available for operations, future business opportunities and payments of its future debt obligations and could limit its ability to:

- obtain additional financing, if necessary, for working capital and operations, or such financing may not be available on favorable terms;

- make needed capital expenditures;

- make strategic acquisitions or investments or enter into joint ventures;

- react to changes or withstand a future downturn in its business, the industry or the economy in general;

- meet expected demand growth, budget targets and forecasts of future results;

- engage in business activities, including future opportunities that may be in its interest; and

- react to competitive pressures or compete with competitors with less debt.

These limitations could adversely affect its operating performance, growth, profitability and financial condition, which would make it more difficult for it to generate cash flow sufficient to satisfy its obligations under its future indebtedness.

DocGo's future ability to make scheduled payments on its future debt obligations also depends on its then-current financial condition, results of operations and capital resources, which are subject to, among other things: the business, financial, economic, industry, competitive, regulatory and other factors discussed in these risk factors, and on other factors, some of which are beyond its control, including: the level of capital expenditures it makes, including those for acquisitions, if any; its debt service requirements; fluctuations in its working capital needs; its ability to borrow funds and access capital markets; and restrictions on debt service payments and its ability to make working capital borrowings for future debt service payments contained in the Credit Agreement.

If DocGo is unable to generate sufficient cash flow to permit it to meet its future debt obligations under the Credit Agreement or any future arrangements, then it would be in default and, in the case of the Credit Agreement, the Agent could accelerate repayment of all amounts outstanding under the Credit Agreement. If its future indebtedness were to be accelerated, there can be no assurance that DocGo would have, or be able to obtain, sufficient funds to repay such future indebtedness in full. In addition, under the Credit Agreement, in the event of a default, the Agent could seek foreclosure of the Agent's lien on the assets of DocGo and its subsidiary guarantors and exercise other customary secured creditor rights.

***DocGo might incur future debt, which could further increase the risks to its financial condition described above.***

DocGo may incur significant additional indebtedness in the future, including off-balance sheet financings, trade credit, contractual obligations and general and commercial liabilities. Although the Credit Agreement contains certain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the additional indebtedness incurred in compliance with these restrictions could be substantial. These restrictions also would not prevent DocGo from incurring obligations that do not constitute indebtedness, and additionally it has its borrowing capacity under the Revolving Facility, which as of December 31, 2022, did not have any borrowings outstanding, and had an available borrowing capacity of approximately $90 million (which is subject to customary borrowing conditions). DocGo may be able to increase the commitments under the Revolving Facility by an additional aggregate principal amount of up to $50 million. DocGo's future debt levels could further exacerbate the related risks to DocGo's financial condition that it now faces.

***If DocGo is unable to generate sufficient cash to service its future indebtedness, it may be forced to take other actions to fund the satisfaction of its obligations under its future indebtedness, which may not be successful.***

If DocGo's cash flow is insufficient to fund its future debt service obligations, it could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to dispose of material assets or operations, raise additional debt or equity capital or restructure or refinance its future indebtedness. DocGo may not be able to implement any such alternative measures on commercially reasonable terms or at all and, even if successful, those alternative actions may not allow DocGo to meet its future debt service obligations. Even if new financing were available, it may be on terms that are less attractive to DocGo than its then-existing indebtedness or it may not be on terms that are acceptable to DocGo. In addition, the Credit Agreement restricts DocGo's ability to dispose of assets and use the proceeds from those dispositions. Thus, DocGo may not be able to consummate those dispositions or to obtain proceeds in an amount sufficient to meet any debt service obligations then due.

If DocGo cannot generate sufficient cash flow to permit it to meet future payment requirements on its debt, then, under the Credit Agreement, it would be in default and the Agent could accelerate repayment of all amounts outstanding under the Credit Agreement. If DocGo's future indebtedness were to be accelerated, there can be no assurance that it would have, or be able to obtain, sufficient funds to repay such future indebtedness in full. In addition, in the case of the Credit Agreement, in the event of a default, the Agent could seek foreclosure of the Agent's lien on the assets of DocGo and its subsidiary guarantors and exercise other customary secured creditor rights, and DocGo could be forced into bankruptcy or liquidation.

***The terms of DocGo's Credit Agreement and potential future debt arrangements could restrict its current and future operations, particularly its ability to respond to changes or to take certain actions.***

The Credit Agreement imposes significant operating and financial restrictions on DocGo and may limit its ability to engage in acts that may be in its best interest, including restrictions on DocGo's ability to:

- incur or guarantee additional indebtedness;

- pay dividends and make other distributions on, or redeem or repurchase, capital stock;

- make certain investments;

- incur certain liens;

- enter into transactions with affiliates;

- merge or consolidate; and

- transfer or sell assets.

Additionally, the Credit Agreement also requires DocGo to maintain a certain interest coverage ratio and a net leverage ratio. DocGo's ability to comply with the covenants and restrictions contained in the Credit Agreement may be affected by events beyond its control. If market or other macroeconomic conditions deteriorate, its ability to comply with these covenants and restrictions may be impaired.

A breach of the covenants could result in an event of default under the Credit Agreement, which, if not cured or waived, could have a material adverse effect on DocGo's business, results of operations and financial condition, including the acceleration of payments as described above. If DocGo's then-existing indebtedness were to be accelerated, there can be no assurance that it would have, or be able to obtain, sufficient funds to repay such indebtedness in full. In addition, in the event of a default, the Agent could seek foreclosure of the Agent's lien on the assets of DocGo and its subsidiary guarantors and exercise other customary secured creditor rights, and DocGo could be forced into bankruptcy or liquidation. Any future debt arrangements that DocGo may enter into could also impose similar restrictions.

***DocGo's variable rate indebtedness could subject it to interest rate risk, which could cause its debt service obligations to increase significantly.***

Borrowings under the Revolving Facility are at variable rates of interest and DocGo's future borrowings under the Revolving Facility could expose DocGo to interest rate risk. If interest rates increase, DocGo's debt service obligations on its future variable rate indebtedness could increase even though the amount borrowed will remain the same, and DocGo's net income and operating cash flows, including cash available for servicing its indebtedness, would correspondingly decrease.

***If the financial institutions that are lenders under the Revolving Facility fail to extend credit under the facility, DocGo's liquidity and results of operations may be adversely affected.***

Each financial institution that is a lender under the Revolving Facility is responsible on a several but not joint basis for providing a portion of the loans to be made under the facility. If any participant or group of participants with a significant portion of the commitments under the Revolving Facility fails to satisfy its or their respective obligations to extend credit under the facility and DocGo is unable to find a replacement for such participant or participants on a timely basis (if at all), DocGo's liquidity may be adversely affected. In addition, the lenders under the Revolving Facility may terminate or reduce the Revolving Facility in certain circumstances, which could adversely impact DocGo's liquidity and results of operations.

**Risks Relating to Ownership of Common Stock**

***Nasdaq may delist DocGo's securities from trading on its exchange, which could limit investors' ability to make transactions in its securities and subject DocGo to additional trading restrictions.***

DocGo's Common Stock is listed on Nasdaq under the symbol "DCGO." DocGo is required to meet continued listing requirements for its securities to continue to be listed on Nasdaq, including having a minimum number of public securities holders and a minimum stock price. DocGo cannot assure you that it will continue to meet those listing requirements in the future.

If Nasdaq delists DocGo's securities from trading on its exchange and DocGo is not able to list its securities on another national securities exchange, DocGo expects its securities could be quoted on an over-the-counter market. If this were to occur, it could face significant material adverse consequences, including:

- a limited availability of market quotations for its securities;

- reduced liquidity for its securities;

- a determination that the Common Stock is a "penny stock" which will require brokers trading in Common Stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for its securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***Because there are no current plans to pay cash dividends on Common Stock for the foreseeable future, you may not receive any return on investment unless you sell your Common Stock for a price greater than that which you paid for it.***

DocGo intends to retain future earnings, if any, for future operations, expansion and debt repayment and there are no current plans to pay any cash dividends for the foreseeable future. The declaration, amount and payment of any future dividends on shares of Common Stock will be at the sole discretion of the Board. The Board may take into account general and economic conditions, DocGo's financial condition and results of operations, DocGo's available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax, and regulatory restrictions, implications on the payment of dividends by DocGo to its stockholders or by its subsidiaries to it and such other factors as the Board may deem relevant. In addition, DocGo's ability to pay dividends is limited by covenants of DocGo's existing and outstanding indebtedness and may be limited by covenants of any future indebtedness DocGo incurs. As a result, you may not receive any return on an investment in Common Stock unless you sell Common Stock for a price greater than that which you paid for it.

***If securities analysts do not publish research or reports about DocGo's business or if they downgrade the Common Stock or DocGo's sector, DocGo's stock price and trading volume could decline.***

The trading market for Common Stock relies in part on the research and reports that industry or financial analysts publish about DocGo or its business. DocGo does not control these analysts. In addition, some financial analysts may have limited expertise with DocGo's model and operations. Furthermore, if one or more of the analysts who do cover DocGo downgrade its stock or industry, or the stock of any of its competitors, or publish inaccurate or unfavorable research about its business, the price of Common Stock could decline. If one or more of these analysts cease coverage of DocGo or fail to publish reports on it regularly, DocGo could lose visibility in the market, which in turn could cause its stock price or trading volume to decline.

***Future sales, or the perception of future sales, by DocGo or its stockholders in the public market could cause the market price for Common Stock to decline.***

The sale of shares of Common Stock in the public market, or the perception that such sales could occur, by senior executives, directors and significant stockholders could harm the prevailing market price of shares of Common Stock. These sales, or the possibility that these sales may occur, also might make it more difficult for DocGo to sell equity securities in the future at a time and at a price that it deems appropriate.

In addition, the shares of Common Stock reserved for future issuance under DocGo's equity incentive plans will become eligible for sale in the public market once those shares are issued, subject to provisions relating to various vesting agreements and, in some cases, limitations on volume and manner of sale applicable to affiliates under Rule 144, as applicable. The number of shares of Common Stock reserved for future issuance under its equity incentive plans, including Substitute Options, represents approximately 11.5% of outstanding Common Stock as of December 31, 2022. The compensation committee of the Board may determine the exact number of shares to be reserved for future issuance under its equity incentive plans at its discretion. DocGo has filed a Form S-8 under the Securities Act to register shares of Common Stock and securities convertible into or exchangeable for shares of Common Stock issued pursuant to DocGo's equity incentive plan and may file additional registration statements on Form S-8 in the future. Any such Form S-8 registration statements will automatically become effective upon filing. Accordingly, shares registered under such registration statements will be available for sale in the open market.

In the future, DocGo may also issue its securities in connection with investments or acquisitions. The amount of shares of Common Stock issued in connection with an investment or acquisition could constitute a material portion of DocGo's then-outstanding shares of Common Stock. Any issuance of additional securities in connection with investments or acquisitions may result in additional dilution to DocGo's stockholders.

***DocGo's share repurchase program may subject it to certain risks.***

DocGo has adopted a share repurchase program to repurchase shares of its Common Stock; however, any future decisions to reduce or discontinue repurchasing its common stock pursuant to its share repurchase program could cause the market price for its Common Stock to decline.

Although the Board has authorized the share repurchase program, any determination to execute its share repurchase program will be subject to, among other things, its financial position and results of operations, available cash and cash flow, capital requirements and other factors, as well as its board of director's continuing determination that the repurchase program is in the best interests of its stockholders and is in compliance with all laws and agreements applicable to the repurchase program. DocGo's share repurchase program does not obligate it to acquire any common stock. If it fails to meet any expectations related to share repurchases, the market price of its Common Stock could decline, and could have a material adverse impact on investor confidence. Additionally, price volatility of its Common Stock over a given period may cause the average price at which DocGo repurchases its Common Stock to exceed the stock's market price at a given point in time.

DocGo may further increase or decrease the amount of repurchases of its Common Stock in the future. Any reduction or discontinuance by DocGo of repurchases of its Common Stock pursuant to its current share repurchase program could cause the market price of its Common Stock to decline. Moreover, in the event repurchases of DocGo's common stock are reduced or discontinued, its failure or inability to resume repurchasing Common Stock at historical levels could result in a lower market valuation of its Common Stock.

***Anti-takeover provisions in DocGo's organizational documents could delay or prevent a change of control.***

Certain provisions of the Certificate of Incorporation (as the same may be amended and/or restated from time to time) and the Bylaws (as the same may be amended and/or restated from time to time) may have an anti-takeover effect and may delay, defer or prevent a merger, acquisition, tender offer, takeover attempt or other change of control transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by DocGo's stockholders.

These provisions provide for, among other things:

- A classified board of directors;

- the ability of the Board to issue one or more series of preferred stock;

- advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at DocGo's annual meetings;

- certain limitations on convening special stockholder meetings;

- limiting the ability of stockholders to act by written consent;

- supermajority provisions to amend the bylaws and certain sections of the certificate of incorporation; and

- the Board with express authority to make, alter or repeal the Bylaws.

These anti-takeover provisions could make it more difficult for a third party to acquire DocGo, even if the third party's offer may be considered beneficial by many of DocGo's stockholders. As a result, DocGo's stockholders may be limited in their ability to obtain a premium for their shares. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause DocGo to take other corporate actions you desire. See "*Description of Securities.*"

***The certificate of incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by stockholders, which could limit stockholders' ability to obtain a favorable judicial forum for disputes with DocGo or its directors, officers, employees or stockholders.***

The certificate of incorporation provides that, unless DocGo, in writing, selects or consents to the selection of an alternative forum: (a) the sole and exclusive forum for any complaint asserting any internal corporate claims, to the fullest extent permitted by law, and subject to applicable jurisdictional requirements, is the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have, or declines to accept, jurisdiction, another state court or a federal court located within the State of Delaware) and (b) the sole and exclusive forum for any complaint asserting a cause of action arising under the Securities Act, to the fullest extent permitted by law, shall be the federal district courts of the U.S.; provided however, these provisions of the certificate of incorporation will not apply to suits brought to enforce a duty or liability created by the Exchange Act (as explained below).

As a result, (1) derivative action or proceeding brought on behalf of DocGo, (2) action asserting a claim of breach of a fiduciary duty owed by any director, officer, stockholder or employee to DocGo or its stockholders, (3) action asserting a claim arising pursuant to any provision of the DGCL or the certificate of incorporation or the Bylaws, or (4) action asserting a claim governed by the internal affairs doctrine shall, to the fullest extent permitted by law, be exclusively brought in the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have, or declines to accept, jurisdiction, another state court or a federal court located within the State of Delaware). Any person or entity purchasing or otherwise acquiring any interest in shares of DocGo's capital stock shall be deemed to have notice of and to have consented to the provisions of the certificate of incorporation described above. This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with DocGo or its directors, officers or other employees, which may discourage such lawsuits against DocGo and its directors, officers and employees. Alternatively, if a court were to find these provisions of the certificate of incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, DocGo may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect DocGo's business and financial condition.

The certificate of incorporation provides that the exclusive forum provision is applicable to the fullest extent permitted by applicable law, subject to certain exceptions. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision does not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction.

***The market price and trading volume of Common Stock may be volatile.***

Stock markets, including Nasdaq, have from time-to-time experienced significant price and volume fluctuations. The market price of DocGo's Common Stock, has been and may continue to be volatile and could decline significantly, whether such price changes are related to matters specific to DocGo, or due to general market conditions. In addition, the trading volume in Common Stock may fluctuate and cause significant price variations to occur. If the market price of the Common Stock declines significantly, you may be unable to resell your shares of Common Stock at or above the market price of Common Stock. DocGo cannot assure you that the market price of Common Stock will not fluctuate widely or decline significantly in the future in response to a number of factors, including, among others, the following:

- the realization of any of the risk factors presented in this Annual Report;

- actual or anticipated differences in DocGo's estimates, or in the estimates of analysts, for DocGo's revenues, results of operations, level of indebtedness, liquidity or financial condition;

- additions and departures of key personnel;

- failure to comply with the requirements of the Nasdaq;

- failure to comply with the Sarbanes-Oxley Act or other laws or regulations;

- future issuances, sales or resales, or anticipated issuances, sales or resales, of Common Stock;

- DocGo's inability to execute its stock repurchase program as planned, including failure to meet internal or external expectations around the timing or price of stock repurchases, and any reductions or discontinuances of repurchases thereunder;

46

- perceptions of the investment opportunity associated with Common Stock relative to other investment alternatives;

- the performance and market valuations of other similar companies;

- future announcements concerning DocGo's business or its competitors' businesses;

- broad disruptions in the financial markets, including sudden disruptions in the credit markets;

- speculation in the press or investment community;

- actual, potential or perceived control, accounting or reporting problems;

- changes in accounting principles, policies and guidelines; and

- general macroeconomic and geopolitical conditions, such as the effects of the COVID-19 or other pandemic outbreaks, recessionary fears, rising interest rates, and inflationary environment local and national elections, fuel prices, international currency fluctuations, corruption, political instability, including the conflict in Ukraine and rising tensions in the Taiwan Strait and acts of war or terrorism.

In the past, securities class-action litigation has often been instituted against companies following periods of volatility in the market price of their securities. This type of litigation could result in substantial costs and divert DocGo's management's attention and resources, which could have a material adverse effect on DocGo.

***Future issuances of debt securities and equity securities may adversely affect DocGo, including the market price of Common Stock and may be dilutive to existing stockholders.***

There is no assurance that DocGo will not incur debt or issue equity ranking senior to Common Stock. Those securities will generally have priority upon liquidation. Such securities also may be governed by an indenture or other instrument containing covenants restricting its operating flexibility. Additionally, any convertible or exchangeable securities that DocGo issues in the future may have rights, preferences and privileges more favorable than those of Common Stock. Separately, additional financing may not be available on favorable terms, or at all. Because DocGo's decision to issue debt or equity in the future will depend on market conditions and other factors, it cannot predict or estimate the amount, timing, nature or success of DocGo's future capital raising efforts. As a result, future capital raising efforts may reduce the market price of Common Stock and be dilutive to existing stockholders.

***The JOBS Act permits "emerging growth companies" like DocGo to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies.***

DocGo qualifies as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the JOBS Act. As such, DocGo can take advantage of certain exemptions from various reporting requirements for as long as it continues to be an emerging growth company, including (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements and (iii) reduced disclosure obligations regarding executive compensation in DocGo's periodic reports and proxy statements. As a result, DocGo's stockholders may not have access to certain information they deem important. DocGo will remain an emerging growth company until the earliest of (i) the last day of the fiscal year (a) following the fifth anniversary of its Initial Public Offering, (b) in which DocGo has a total annual gross revenue of at least $1.07 billion or (c) in which DocGo is deemed to be a large accelerated filer, which means the market value of the Common Stock held by non-affiliates exceeds $700 million as of the last business day of its second fiscal quarter, and (ii) the date on which DocGo has issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as it is an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. DocGo has elected to avail itself of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, DocGo, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of DocGo's financial statements with another public company that is neither an emerging growth company nor an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

DocGo cannot predict if investors will find its Common Stock less attractive because it relies on these exemptions. If some investors find the Common Stock less attractive as a result, there may be a less active trading market for the Common Stock and more stock price volatility.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

*Facilities*

Our principal executive offices are located in New York City, where we occupy approximately 6,000 square feet under a lease that expires in 2026. We use this facility for administration, sales and marketing, and general corporate activities. In addition to our headquarters, to support our local operations, as of December 31, 2022, we owned or leased 30 office locations elsewhere in the United States (seven in New York, six in Wisconsin, four in New Jersey, three in Texas, two each in California, Colorado and Delaware, one each in Alabama, New Mexico, Pennsylvania and Tennessee. These local facilities are used principally for ambulance basing, garaging and maintenance, as well as for administrative activities and general oversight. Outside of the United States, we currently lease seven facilities in England. These facilities are used for administrative functions and ambulance basing. Our leases for our local facilities expire at various dates through 2029. We believe our existing facilities are adequate to meet our current requirements, and we anticipate that suitable space will be readily available if needed. We intend to procure additional, similar facilities as we expand geographically.

*Vehicle Fleet*

As of December 31, 2022, we operated 643 vehicles in the United States, including 384 ambulances, 88 wheelchair vans and 171 basic transportation or support vehicles. Approximately 47% of our fleet is leased and 53% is owned. We replace ambulances based upon age and usage, generally every eight to ten years. The average age of our existing active ambulance fleet is approximately four years. We generally prefer to lease vehicles, but we have purchased vehicles in the past when deemed appropriate. Most of our owned vehicles were acquired in connection with business acquisitions.

As of December 31, 2022, we operated another 395 vehicles in the United Kingdom, including 18 First Response Ambulances, 11 Mental Health Transport vehicles, 52 High Dependency Units, 288 Patient Transport vehicles and 26 support vehicles. Approximately 67% of our fleet is owned and 33% is leased.

We use a combination of commercial and in-house maintenance services to maintain our fleet. In those geographies where quality external commercial maintenance services are able to meet our quality standards, we will utilize those commercial maintenance services. We continue to explore ways to decrease our overall maintenance expenditures for vehicles, including major refurbishing and overhaul of our vehicles to extend their useful life.

**Item 3. Legal Proceedings.**

We are subject to legal proceedings, claims and litigation arising in the ordinary course of our business. The information set forth in Note 20 of the Notes to the Consolidated Financial Statements is incorporated herein by reference.

From time to time, in the ordinary course of our business, we, like others in our industry, receive requests for information from government agencies in connection with their regulatory or investigational authority. These requests can include subpoenas or demand letters for documents to assist the government in audits or investigations. We review such requests and notices and take what we believe to be appropriate action. We have been subject to certain requests for information and investigations in the past and could be subject to such requests for information and investigations in the future.

**Item 4. Mine Safety Disclosures.**

Not applicable.