UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ————————————————— x | | |
| JOE NACLERIO, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:23-cv-09476-KPF |
|  | : | <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
|  | : | PLAINTIFF'S CONSOLIDATED |
| vs. | : : | OPPOSITION TO DEFENDANTS DOCGO INC., VASHOVSKY, AND |
| DOCGO INC., STAN VASHOVSKY, ANTHONY CAPONE, and ANDRE OBERHOLZER, | : : : : | OBERHOLZER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL |
|  | : : | SECURITIES LAWS AND DEFENDANT ANTHONY CAPONE'S MOTION TO |
| Defendants. | : | DISMISS, JOINDER TO DOCGO INC., STAN VASHOVSKY AND ANDRE |
| ————————————————— x | | OBERHOLZER'S MEMORANDUM OF LAW, AND ADDITIONAL STATEMENT IN SUPPORT OF MOTION TO DISMISS[1] |

---

[1]    Plaintiff is permitted to file a "consolidated opposition not to exceed the total pages of Defendants' motions to dismiss."  ECF 59.

4868-2917-0138.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION AND FACTUAL BACKGROUND ........................................................1

II. LEGAL STANDARD ...................................................................................................4

III. ARGUMENT ..............................................................................................................4

    A. The Complaint Adequately Pleads Violations of Section 10(b)(5)(B) ....................4

        1. The Complaint Pleads Material Misstatements and Omissions ...................4

            a. Defendants Repeatedly Misled Investors Regarding Capone's Credentials ........................................................................5

            b. Each of the Defendants Made False and Misleading Education Statements .........................................................................8

            c. Capone Misled Investors Regarding the Size of the CBP Contract and DocGo's Ability to Secure It .......................................9

            d. Capone Misled Investors About DocGo's Payor Vertical .............13

        2. Statements and Misconduct Prior to April 29, 2022 Are Actionable ........14

        3. The Complaint Pleads a Strong Inference of Scienter .............................15

            a. Defendants Knew or Recklessly Disregarded the Truth Regarding Capone's Education .......................................................16

                (1) Capone Knew He Fabricated His Credentials ...................16

                (2) Capone's Scienter Is Imputed to DocGo ...........................16

                (3) Vashovsky and Oberholzer Acted with at Least Recklessness ..................................................................19

            b. Scienter Is Pled for Capone's Statements Regarding the CBP Contract and DocGo's Medicaid Enrollments ......................20

        4. The Complaint Adequately Alleges Loss Causation ................................23

    B. Defendants Are Liable for Participating in a Scheme to Defraud ........................25

    C. The Complaint Adequately Pleads Violations of Section 20(a) ...........................26

IV. CONCLUSION ...........................................................................................................28

4868-2917-0138.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................4

*Barrett v. PJT Partners Inc.*,
2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)...........................................................18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................................5, 7

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ..............................................................12

*Blank v. TriPoint Glob. Equities, LLC*,
338 F. Supp. 3d 194 (S.D.N.Y. 2018)......................................................................17

*Bond v. Clover Health Invs., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)..................................................................15

*Camelot Event Driven Fund v. AltaMesa Res., Inc.*,
2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) .........................................................15

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001).....................................................................................12

*City of Warren Police & Fire Ret. Sys. v.*
*World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)......................................................................21

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).......................................................................................4

*Glob. Network Commc'ns, Inc. v. N.Y.C.*,
458 F.3d 150 (2d Cir. 2006).......................................................................................4

*Greenhouse v. MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004) ......................................................................................8

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)......................................................................27

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)......................................................................11

4868-2917-0138.v1

**Page**

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................................................19

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)............................................................................7

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)......................................................................................20

*In re Barclays PLC Sec. Litig.*,
  2024 WL 757385 (S.D.N.Y. Feb. 23, 2024)..................................................................5, 14, 19

*In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)......................................................................................21

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017).....................................................................................7, 17

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................................27

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................................................4

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  2013 WL 11319408 (S.D.N.Y. Dec. 12, 2013) .......................................................................10

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012),
  *aff'd*, 525 F. App'x 16 (2d Cir. 2013)........................................................................................8

*In re Initial Pub. Offering Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004)........................................................................................6

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) .........................................................................27

*In re Marsh & McLennan Cos., Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)......................................................................................17

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................................27

4868-2917-0138.v1

**Page**

*In re Mullen Auto. Sec. Litig.*,
2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) .........................................................................15

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)..........................................................................16

*In re Petrobras Sec. Litig.*,
150 F. Supp. 3d 337 (S.D.N.Y. 2015).....................................................................................24

*In re Pfizer Inc. Sec. Litig.*,
2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ............................................................................9

*In re ShengdaTech, Inc. Sec. Litig.*,
2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)..........................................................................27

*In re Smith Barney Transfer Agent Litig.*,
884 F. Supp. 2d 152 (S.D.N.Y. 2012).......................................................................................8

*In re Sotheby's Holdings, Inc.*,
2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..........................................................................16

*In re Stillwater Cap. Partners Inc. Litig.*,
858 F. Supp. 2d 277 (S.D.N.Y. 2012).......................................................................................8

*In re Tower Auto. Sec. Litig.*,
483 F. Supp. 2d 327 (S.D.N.Y. 2007).....................................................................................27

*In re Tronox, Inc. Sec. Litig.*,
2010 WL 2835545 (S.D.N.Y. June 28, 2010) ...................................................................27, 28

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)................................................................................11, 12

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)......................................................................................................5

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)..........................................................................4

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003).....................................................................................28

*In re WRT Energy Sec. Litig.*,
1999 WL 178749 (S.D.N.Y. Mar. 31, 1999)...........................................................................17

4868-2917-0138.v1

**Page**

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
    2024 WL 451691 (S.D.N.Y. Feb. 5, 2024)....................................................................28

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020).........................................................................................17

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...................................................................................................3, 8

*Lemen v. Redwire Corp.*,
    2023 WL 2598402 (M.D. Fla. Mar. 22, 2023) ...........................................................15

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).......................................................................................23

*Levy v. Young Adult Inst., Inc.*,
    103 F. Supp. 3d 426 (S.D.N.Y. 2015)..................................................................25, 26

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)...................................................................................................3, 25

*Lucescu v. Zafirovski*,
    2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018)............................................................27

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus.*,
    54 F.4th 82 (2d Cir. 2022) .........................................................................................15

*Microbot Med., Inc. v. Mona*,
    2020 WL 8671943, at *14 (S.D.N.Y. Dec. 17, 2020),
    *report & recommendation adopted*,
    2021 WL 1192110 (S.D.N.Y. Mar. 30, 2021) ...........................................................11

*Moradpour v. Velodyne Lidar, Inc.*,
    2022 WL 2391004 (N.D. Cal. July 1, 2022)..............................................................15

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ...................................................................................4

*Pension Plan v. KE Holdings Inc.*,
    2024 WL 775195 (S.D.N.Y. Feb. 26, 2024)...............................................................23

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..........................................................................................16

4868-2917-0138.v1

**Page**

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ........................................................................................22

*SEC v. Carter*,
2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ..................................................................9

*SEC v. Farnsworth*,
692 F. Supp. 3d 157 (S.D.N.Y. 2023).............................................................................26

*SEC v. Lek Sec. Corp.*,
276 F. Supp. 3d 49 (S.D.N.Y. 2017)..........................................................................26, 28

*SEC v. Mercury Interactive, LLC*,
2011 WL 5871020 (N.D. Cal. Nov. 22, 2011) .................................................................9

*SEC v. Mudd*,
885 F. Supp. 2d 654 (S.D.N.Y. 2012).............................................................................20

*SEC v. Takeyasu*,
2018 WL 2849777 (S.D.N.Y. June 11, 2018) ................................................................20

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y 2015)................................................................................16

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
346 F. Supp. 3d 473 (S.D.N.Y. 2018).............................................................................22

*Steamfitters Loc. 449 Pension Fund v. Alter*,
2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ..................................................................9

*Teamsters Loc. 445 Freight Div. Pension Fund v.
Dynex Cap.*,
531 F.3d 190 (2d Cir. 2008)............................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).................................................................................................16, 22

*United Indus. Workers Pension Plan v.
Waste Mgmt., Inc.*,
2024 WL 1312593 (S.D.N.Y. Mar. 27, 2024) .................................................................4

*Wang v. Cloopen Grp. Holding Ltd.*,
2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ................................................................19

4868-2917-0138.v1

**Page**

*Xu v. Gridsum Holding Inc.*,
 624 F. Supp. 3d 352 (S.D.N.Y. 2022)...................................................................................9

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
 §77z-1 .................................................................................................................................4
 §78u-4(b)(2).......................................................................................................................15
 §78u-5(c)(1) .......................................................................................................................11
 §78u-5(c)(2) .......................................................................................................................11

Federal Rules of Civil Procedure
 Rule 9(b) .............................................................................................................................4
 Rule 12(b)(6).......................................................................................................................4

17 C.F.R.
 §240.10b-5 .....................................................................................................................4, 25
 §240.10b-5(b)......................................................................................................................4

4868-2917-0138.v1

## I.    INTRODUCTION AND FACTUAL BACKGROUND

This is a case about faithless fiduciaries who misled shareholders about the central strengths critical to their Company's success.[2]  DocGo is a healthcare transportation and mobile health services company.  In an industry where companies "tend[ed] not to make any money," Defendants led investors to believe DocGo's "key differentiator" was its AI technology platform. ¶¶34, 76.  At a time when the AI healthcare market was projected to skyrocket and companies were finding it hard to recruit employees with AI experience, DocGo had an ace in the hole – Anthony Capone.  ¶¶32-35.

Capone's origin story and key strength, which he unceasingly touted to investors, as well as to potential DocGo customers, was his education.  Impressively, Capone had earned **_triple summa cum laude_** undergraduate degrees in computer science, philosophy, and law from SUNY Potsdam.  *See* ¶¶37, 45.  Thereafter, Capone earned a master's degree in computational learning theory (a subset of AI) from Clarkson University.  *E.g.*, ¶¶37, 45, 72, 75.  According to Capone, it was his education and, in particular, his "grad degree . . . in computational learning theory" that provided the backbone of the Company's unique technological prowess.  *See* ¶¶73-76, 80-83, 85.

In addition, toward the end of the Class Period, while reeling from criticism regarding a controversial $432 million no-bid contract with the HPD to provide migrant services, Capone sought to reassure investors the Company was not facing a "revenue cliff" after the HPD contract ended but rather had a bright future.  ECF 62-6 at 3; ¶¶59, 89-82.  First, DocGo was positioned to win a **_$4 billion_** contract with the CBP – an amount almost ten times larger than any of its prior government contract wins.  ¶¶59, 66, 89.  Second, DocGo had proved it could generate long-term

---

[2]    Unless otherwise noted, all capitalized terms used herein have the same meanings as defined in the Amended Complaint for Violations of the Federal Securities Laws (ECF 43) ("Complaint").  Additionally, all "¶_" and "¶¶_" references are to the Complaint.

4868-2917-0138.v1

revenue streams from its short-term government contracts by transitioning patients from the Company's government vertical (providing care for underserved populations) to its payor vertical (providing long-term care to patients through Medicaid) without incurring any customer acquisition costs.  ¶¶60-61, 91.

These statements, and the picture they painted of DocGo's unique strengths, were a façade. On September 10, 2023, the *Times Union* published an article reporting the "'over $4 billion'" contract with CBP was worth far below $4 billion and was in fact worth under $2 billion.  ¶94. The *Times Union* also reported Capone's statements about signing migrants onto New York State Medicaid were false.  *Id.*  On September 14, 2023, the *Times Union* published an article titled: "DocGo CEO Anthony Capone admits he didn't earn graduate degree."  ¶96.  In that article, Capone admitted he did "'not have a master's degree from Clarkson University, nor from any other institution.'"  *Id.*  On September 15, 2023, DocGo filed a Form 8-K announcing Capone's resignation, purportedly for "personal reasons."  ¶97.  DocGo's stock price declined significantly following these revelations, causing tens of millions of dollars in damages to shareholders.

As set forth herein, Defendants' Motions[3] provide no basis whatsoever for dismissal.

*First*, while there is no dispute Capone made false statements with scienter, Defendants advance specious materiality contentions.  This is perhaps most evident from the fact that Defendants cannot even bring themselves to mention the words "artificial intelligence" or "computational learning theory," which provide the critical context – emphasized over and over again in the Complaint and by Defendants themselves – for understanding the importance of

---

[3]    "Motions" refers collectively to Defendants DocGo Inc., Vashovsky, and Oberholzer's Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint for Violation of the Federal Securities Laws (ECF 61) ("Motion to Dismiss" or "MTD") and Defendant Anthony Capone's Motion to Dismiss, Joinder to DocGo Inc., Stan Vashovsky and Andre Oberholzer's Memorandum of Law, and Additional Statement in Support of Motion to Dismiss (ECF 63) ("Joinder" or "CMTD").

- 2 -

Defendants' misstatements.  Having failed to even engage with Plaintiff's core allegations, Defendants' materiality contentions are woefully deficient.  *See infra* §III.A.1.a.

*Second*, while Vashovsky and Oberholzer would understandably like to distance themselves from the litany of false statements regarding Capone's fabricated education now that they have been exposed as false, they too were "makers" of false statements under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Because their statements were made with at least recklessness, the claims against them are properly pled.  *See infra* §III.A.1.b.

*Third*, Capone's statements regarding the value of the CBP contract, and DocGo's payor vertical, were materially false and misleading, as demonstrated by his own words and the Company's later admissions, and none is protected by the safe harbor.  Capone's access to information that contradicted his statements, as well as a holistic evaluation of the Complaint's allegations, are more than sufficient to plead scienter as to these statements as well.  *See infra* §III.A.3.

*Fourth*, the Complaint pleads a scheme in accordance with *Lorenzo v. SEC*, 587 U.S. 71 (2019), and *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022).  While Plaintiff previewed the basis for its theory of scheme liability in its response to Defendants' pre-motion letter, Defendants fail to address the Complaint's actual allegations, waiving any such contentions on reply.  *See infra* §III.B.

*Finally*, the Complaint alleges that all Defendants are liable as controlling persons under §20(a).  While the contours of "culpable participation" are unresolved in this Circuit, the Complaint adequately pleads claims under any interpretation of the standard.  *See infra* §II.C.

Because the Complaint's claims are all adequately alleged, the Motions should be denied.

4868-2917-0138.v1

## II.    LEGAL STANDARD

In ruling on a Rule 12(b)(6) motion, the court must accept as true the facts alleged and draw all reasonable inferences in the nonmoving party's favor. *See Glob. Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 154 (2d Cir. 2006).  A plaintiff need only allege "'enough facts to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 697 (2009).[4] The Court's function is "'not to weigh the evidence . . . but merely to determine whether the complaint itself is legally sufficient.'"  *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 456 (S.D.N.Y. 2017).[5]

## III.    ARGUMENT

### A.    The Complaint Adequately Pleads Violations of Section 10(b)(5)(B)

Under §10(b)(5)(B) and Rule 10b-5(b), "a plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

#### 1.    The Complaint Pleads Material Misstatements and Omissions

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact."  17 C.F.R. §240.10b-5(b).  "'A statement is misleading if a reasonable investor would have received a false impression from the statement.'"  *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *9 (S.D.N.Y. Sept. 30, 2021).  "A statement or omission is material when 'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available' to the market."  *United Indus. Workers Pension Plan v. Waste Mgmt., Inc.*, 2024 WL 1312593, at *4 (S.D.N.Y.

---

[4]    Unless otherwise noted, all emphasis is added and citations are omitted.
[5]    *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("'Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation.'").

Mar. 27, 2024). At the pleading stage, a plaintiff need not establish that each of the alleged misstatements or omissions "is [materially] misleading in and of itself"; rather, a plaintiff must only allege that "'the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016).

> Because materiality is a mixed question of law and fact, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

*In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at \*10 (S.D.N.Y. Feb. 23, 2024).

### a.    Defendants Repeatedly Misled Investors Regarding Capone's Credentials

Defendants concede the falsity of their statements regarding Capone's educational background. *See* MTD at 2. Indeed, Capone did not have a graduate degree in computational learning theory (or in any other field), nor had he earned a triple *summa cum laude* undergraduate degree from SUNY Potsdam. ¶45.

Defendants' false statements regarding Capone's education were material. A plaintiff pleads materiality by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* at 231-32.

Defendants' false statements concerning Capone's graduate degree in AI "significantly altered the total mix of information" available to investors. Defendants' suggestion that Capone's falsified credentials – which he highlighted on at least ten different occasions – would be ""so obviously unimportant to a reasonable investor that reasonable minds could not differ on the

- 5 -

question of [its] importance"'" is absurd, and courts in this District have held exactly the opposite on weaker allegations. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) (rejecting contention that a board member's falsified resume claiming a computer engineering degree was immaterial).

Though Defendants cannot bring themselves to say the words "artificial intelligence" or "computational learning theory" in their Motions, AI is central to materiality. Throughout the Class Period, DocGo touted a proprietary AI platform, purportedly developed by Capone himself, as the Company's largest differentiator in the industry, ¶34, and it was AI that DocGo touted as key to the Company achieving profit margins in the notoriously challenging medical transportation business. As Capone explained on October 19, 2022:

> So the only thing you really can do to make more money as an ambulance company, is to do more – you run more trips on your shift. Well we built out our own software. It's called Dara, which entirely focuses on utilization, it's routing optimization, it really leverages that AI. ***It's kind of the intellectual reason I guess that I joined the company was that I had the ability to apply my academic training to a very practical circumstance of how do we have the ability to make sure the ambulances are running***?

¶76. Indeed, Capone repeatedly connected his nonexistent graduate degree in AI to the foundation and technological capability of DocGo:

> So we decided right off the bat that the ability to route our own ambulances, to stack them, to create all of the technology necessary to actually handle the transportation we needed to build out. That's where I came in.
>
> So Stan came in. Clinical background: paramedic for 28 years, had been in health care for almost that entire time. My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer. ***My graduate degree is in computational learning theory, which was a subset of artificial intelligence***. And so we brought those two together. We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.

- 6 -

4868-2917-0138.v1

¶73. On August 9, 2023, Capone *again* highlighted the significance of his background to DocGo's ability to create efficiency, stating:

> While we can do so with high degrees of efficiency and generating good returns for the investors that have taken risks on DocGo is because of our technology, and that's where I really came in originally.
>
> We started the company. ***I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence*** and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

¶85.

"[W]hen a company makes repeated representations on the same topic, even where those representation[s] would otherwise be puffery, the repetition itself communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'" *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) (quoting *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79, 80 (S.D.N.Y. 2017)) ("[W]e cannot ignore the fact that defendants allegedly made these representations . . . over and over and over."). Capone's own incessant touting of his nonexistent graduate degree in AI demonstrates its materiality.

Defendants' materiality assertions fail. First, they misstate the relevant standard. MTD at 2 ("[N]o reasonable investor would have decided to invest in DocGo based on Mr. Capone's degrees."). The correct inquiry is whether Capone's misstatements "'significantly altered the "total mix" of information.'" *Basic*, 485 U.S. at 231-32. For a Company that touted a purportedly sophisticated technological backbone developed in large part by Capone himself, the answer is yes.

4868-2917-0138.v1

Defendants' out-of-circuit authority does not support their contentions. *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 658 (4th Cir. 2004) ("[W]e do not hold as a matter of law that a key manager's education could never be material."). *Greenhouse* limited its holding to the facts before it, emphasizing that materiality is fact specific. *Id.* at 656-59. Indeed, in *Greenhouse*, the false representation concerning the CEO's bachelor's degree only appeared in one SEC filing, unlike here, where Capone relentlessly misled investors. Citing *Greenhouse*, Defendants contend investors would value "[Capone's] years of management in [healthcare and technology] institutions" more than his educational background. *Id.* at 658. This too is belied by the fact that Capone chose to repeatedly tout his nonexistent degree in computational learning theory to investors, ***not*** his "years of management in [healthcare and technology] institutions." *Id.*

**b.    Each of the Defendants Made False and Misleading Education Statements**

Defendants' *Janus* contentions fail. Though they concede Capone "made" misstatements, they wrongly contend that Vashovksy and Oberholzer did not.[6]

In *Janus*, the Supreme Court held: "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. at 142. "[A]n executive may be held accountable where the executive . . . ***signed the company's statement***." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012).

Vashovsky was the "maker" of the false proxy that bore his signature. ¶¶72, 84; *In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2012) (defendant was

---

[6]    Defendants assert: "Plaintiff conceded in its pre-conference letter that Mr. Capone alone made" the statements at the Canaccord Conference. MTD at 8, 23. "Conceded" is a misnomer as Plaintiff never alleged Vashovsky or Oberholzer made those statements in the first place. *See* ¶¶89-92.

- 8 -

maker of statements in proxy he signed); *SEC v. Mercury Interactive, LLC*, 2011 WL 5871020, at *2 (N.D. Cal. Nov. 22, 2011) (defendant was maker of statements in proxy where she signed a notice to shareholders on first page). Oberholzer was the "maker" of the false statements in the Form 8-K he signed. ¶77; *SEC v. Carter*, 2011 WL 5980966, at *3 (N.D. Ill. Nov. 28, 2011) (CEO's signature on Form 8-K indicated the statements were "made" by the CEO Defendant).

Defendants' reliance on *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352 (S.D.N.Y. 2022), is misplaced – Vashovsky's and Oberholzer's signatures were not "purely ministerial." MTD at 9. In *Xu*, plaintiffs "d[id] not allege that any of the Individual Defendants signed, ratified, or approved the press release" at issue. *Xu*, 624 F. Supp. 3d at 360. Here, Plaintiff alleges that Oberholzer both oversaw and signed the false November 7, 2022 Form 8-K. ¶¶7, 77; *see In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 n.3 (S.D.N.Y. Mar. 22, 2012); *see also Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011) ("Courts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents."). Vashovsky not only signed the Notices to which the proxy statements were attached, the proxies were also solicited by the entire Board, of which Vashovsky was Chairman throughout the entire Class Period. ¶¶16, 72, 84.

### c. Capone Misled Investors Regarding the Size of the CBP Contract and DocGo's Ability to Secure It

On August 9, 2023, Capone presented at the Canaccord Genuity Growth Conference. ¶89. Less than seven minutes after lying to investors about his AI degree, Capone was asked whether he had confidence that DocGo would not "see a revenue cliff" after the HPD contract ended. ECF 62-6 at 3. Capone said he had a "high degree of confidence," *id.* at 4, because immigration legislation was unlikely to pass and DocGo now had the "credibility to win the border patrol RFP,

which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth." ¶89.

Capone's statements were false when made. ¶90. The CBP contract was not worth over $4 billion; it was worth only $2 billion. ¶¶67, 90(a). Additionally, due to DocGo's poor performance with the HPD contract, as well as the intense public scrutiny that had resulted and was then known to DocGo and Capone, Capone did not believe, and had no reasonable basis to believe, that the HPD contract gave DocGo "all of the credibility to win the border patrol RFP." ¶¶89, 90(b). None of Defendants' falsity contentions are persuasive.

**The Size of the CBP Contract**: Defendants contend Capone's statement about the size of the CBP contract was forward looking and covered by the safe harbor. MTD at 17-18. It was not. Whether the CBP contract was worth $4 billion was "readily capable of verification" and therefore was not forward looking. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 11319408, at *23 (S.D.N.Y. Dec. 12, 2013). Indeed, it was readily verified to be false by the *Times Union*, which contacted "multiple sources familiar with the ongoing bidding process," as well as sources within the CBP, and reported the contract was in fact worth only $2 billion at best. ¶67.

Defendants also appear to suggest falsity is inadequately pled because the "contract was in flux" and never "confirmed to be valued at less than $4 billion" at the time of Capone's statement. MTD at 14. To the extent the value of the contract "was in flux," it was at values far lower than $4 billion. ¶67. Moreover, when asked to provide evidence of Capone's claim that the CPB contract had *ever* been valued at $4 billion, DocGo *refused to do so*. *See* Declaration of Christopher M. Wood in Support of Plaintiff's Consolidated Opposition ("Wood Decl."), Exhibit ("Ex.") 1 at 2.

- 10 -

**DocGo's Ability to Win the CPB Contract**: Defendants contend Capone's statement about DocGo's ability to win the CPB contract was puffery. MTD at 15. It was not. *See infra* §III.A.1.c.

Nor was it covered by the safe harbor, which requires an oral forward-looking statement be

> accompanied by a cautionary statement (1) identifying the particular oral statement as forward-looking, (2) stating that the actual results could differ materially from the forward-looking statement[,] and (3) identifying a readily-available written document that identifies factors that might cause actual results to differ materially from the forward-looking statement.

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004). Capone's misstatements satisfy none of these criteria. His oral statements were not accompanied by any cautionary statements ***whatsoever***, let alone one satisfying 15 U.S.C. §78u-5(c)(2)'s criteria. Defendants fail to even cite the correct portion of the safe harbor dealing with oral forward-looking statements (MTD at 17), and their case law almost exclusively addresses written forward-looking statements subject to 15 U.S.C. §78u-5(c)(1), not 15 U.S.C. §78u-5(c)(2).

The closest Defendants come to citing relevant authority is *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164 (S.D.N.Y. 2022). There, the Court held forward-looking statements made during conference calls included adequate cautionary language, quoting language appearing in "[t]ranscripts of the calls," similar to the language on which Defendants here rely. *Id.* at 215. *Turquoise Hill* is distinguishable, however, because defendants there "would start by referring listeners to the 'forward-looking language included in our press release and MD&A.'" *Id.* Courts in this district have found such language sufficient to satisfy the safe harbor. *Microbot Med., Inc. v. Mona*, 2020 WL 8671943, at *14 (S.D.N.Y. Dec. 17, 2020), *report & recommendation adopted*, 2021 WL 1192110 (S.D.N.Y. Mar. 30, 2021) (collecting cases). Here,

4868-2917-0138.v1

Capone's oral statements contained no such references or warnings.[7]  Because the Complaint pleads Capone had actual knowledge, safe harbor protection is unavailable.  *See infra* §III.A.3.b.

The Complaint adequately pleads Capone's misstatements regarding the CPB contract were material.  ¶66.  "When contingent or speculative [future] events are at issue, the materiality of those events depends on """a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of . . . company activity."""  *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001).  Capone himself stated there was a high degree of probability that DocGo would secure the CPB contract, stating there was a "***high degree of confidence***," DocGo would ***not*** be facing a revenue cliff in light of the prospect of continued asylum business from NYC, and "***even more confidence***" because of the CPB contract.  ¶59; ECF 62-6 at 4.

Moreover, the """"magnitude of the event in light of the totality of . . . company activity"""" was astronomical.  *Castellano*, 257 F.3d at 180.  The $4 billion CBP contract, had it existed, would have been, ***by a factor of nearly ten***, DocGo's largest government contract win.  ¶66.  Clearly the prospect of a contract of this magnitude would be material to investors, and it cannot be said that Capone's statements were """"so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."""  *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *6 (S.D.N.Y. Jan. 5, 2023); ¶¶63-65.

In any case, Defendants do not challenge the materiality of these misstatements.  *See* MTD at 17 (not contesting materiality), and they have waived any opportunity to do so on reply.

---

[7]    *Turquoise Hill* therefore does not state that boilerplate risk warnings added by a transcription company into a subsequent written transcript of an oral statement are sufficient alone to satisfy the safe harbor.  Such a reading would also appear to conflate written and oral statements.

4868-2917-0138.v1

### d.       Capone Misled Investors About DocGo's Payor Vertical

Earlier at the Canaccord Conference, less than three minutes after lying to investors about his AI degree, Capone highlighted the importance of DocGo's ability to transition patients from the Company's government vertical (providing care for underserved populations) to its payor vertical (providing long-term care to patients through Medicaid) without incurring customer acquisition costs:

> Just in the one program that I mentioned, which was part of the reason why we raised our earnings was a migrant contract, that we have with New York City. We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare.
>
> *       *       *
>
> United has that managed Medicaid contract with New York State.  And so we have the ability to enroll [asylum seekers] in United's managed care program.  But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis.  So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it.  And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost.

¶91.  This statement was false and misleading.  In fact, DocGo was later forced to admit that it did "'not enroll anyone in Medicaid programs,'" and a UnitedHealthcare representative confirmed that UnitedHealthcare did not have a contract with DocGo in New York.  ¶68.

Defendants contend a reasonable investor would have understood that Capone must have meant that DocGo only "facilitated Medicaid sign-ups" and "had the potential to earn future business from patients it previously served under the HPD contract."  MTD at 15-16.  Not so.

DocGo had raised its fiscal year 2023 revenue and adjusted EBITDA guidance, and Capone was responding to a question about the "***the biggest takeaway*** from the second quarter and updated guidance as we enter . . . 3Q[23]."  ECF 62-6 at 3.  The ***biggest takeaway***, according to Capone, was DocGo's ability to acquire long-term customers "***at no cost***" by enrolling them "in United's

- 13 -

managed care program [and] in doing so, . . . becom[ing] their attributed [primary care provider]." ¶91.  This purported ability to generate long-term revenue opportunities from short-term contracts, such as the HPD contract, was critical to assuage investors' concerns about potential revenue cliffs, ECF 62-6 at 3, as Capone acknowledged: "[T]his is the first time we're really showing how the municipal sector has long term revenue opportunity in our payor vertical because it gives member attribution at no cost."  ¶91.  Indeed, analysts reacted positively to his misstatements.  ¶62.

DocGo's later admissions that it did not "enroll anyone in Medicaid programs," and UnitedHealthcare's statement that it *did not even have a contract with DocGo in New York* – a fact the Motion ignores – is not a disagreement about "semantics," but fundamentally undermines the *biggest takeaway* from DocGo's 2Q23 performance and guidance.  Moreover, Capone's own words about the importance of growing the Company's payer vertical belie any suggestion his misstatements were "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *Barclays*, 2024 WL 757385, at *10.

### 2.    Statements and Misconduct Prior to April 29, 2022 Are Actionable

Defendants contend that statements made prior to April 29, 2022 are not actionable and must be dismissed because DocGo did not exist, and courts consistently "dismiss statements made about a private company before a de-SPAC transaction."  MTD at 10.  Not so.[8]

Defendants' contention that "DocGo did not yet exist" prior to the Class Period is not true. MTD at 10.  DocGo (then known as Motion Acquisition Corp.) completed its IPO on October 19, 2020.  ¶¶26-30.  That DocGo was known by a different name prior to the de-SPAC does not mean it did not exist.

---

[8]    Vashovsky's and Capone's submission of the falsified Proposal is not alleged to be a false statement for purposes of §10(b)(5)(b) liability.  *See* Complaint §V (not including the Proposal).  It is, however, relevant to Plaintiff's scheme claims.  *See infra* §III.B.

- 14 -

4868-2917-0138.v1

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus.*, 54 F.4th 82, 84 (2d Cir. 2022), does not change this analysis. *Frutarom* held, not in the context of a de-SPAC, that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." *Id.* at 88. That holding is inapplicable as Plaintiff is not bringing claims against Ambulnz for statements Ambulnz made about itself prior to the de-SPAC. It is bringing claims against Capone for statements he made "in connection with the purchase or sale of" DocGo securities – a claim *Frutarom* allows.[9] 54 F.4th at 85 n.3, 88 ("Plaintiffs may be able to sue entities other than the issuer of a security if those entities made material misstatements about the security, as long as the plaintiffs purchased or sold the securities about which the misstatements were made.").[10]

### 3.    The Complaint Pleads a Strong Inference of Scienter

At the pleading stage, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. §78u-4(b)(2). A "strong" inference is one that "a reasonable person would deem . . . cogent and at least as compelling as any

---

[9]    Defendants' contention that Capone's statements were not "in connection with the purchase or sale of DocGo securities," MTD at 10, is wrong because DocGo did exist at that time. By September 9, 2021, Capone had been identified in Motion/DocGo's SEC filings as management of DocGo following the de-SPAC. *See* Wood Decl., Ex. 3 at 5.

[10]    While the allegations satisfy *Frutarom*, many courts outside the Second Circuit have refused to apply *Frutarom*, finding it incompatible with Supreme Court precedent. *E.g.*, *In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *5-*6 (C.D. Cal. Sept. 28, 2023). These cases, and the *Frutarom* concurrence, suggest, at the very least, that *Frutarom* should be construed narrowly. In addition, courts regularly deny motions to dismiss §10(b) claims for statements made by officers of a target company when those statements were made before the merger was effectuated. *E.g.*, *Lemen v. Redwire Corp.*, 2023 WL 2598402, at *5 (M.D. Fla. Mar. 22, 2023) (upholding statements concerning management's prowess made prior to de-SPAC transaction that management continued emphasizing as a public company); *Moradpour v. Velodyne Lidar, Inc.*, 2022 WL 2391004, at *13, *19 (N.D. Cal. July 1, 2022) (upholding pre-merger statements regarding co-founder and chairman's continued role in post de-SPAC Velodyne); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 680 (M.D. Tenn. 2022) (upholding pre-merger statements made by Clover's president and CTO and Clover's CEO); *Camelot Event Driven Fund v. AltaMesa Res., Inc.*, 2021 WL 1416025, at *36 (S.D. Tex. Apr. 14, 2021) (upholding statements that CEO of AltaMesa made preceding merger with shell company).

4868-2917-0138.v1

[plausible] opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but only "as compelling as any opposing inference." *Id.*; *see also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 101-02 (S.D.N.Y 2015).

"Allegations that defendants had actual knowledge that their statements were false or misleading are sufficient to plead scienter." *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000). Scienter can also be pled by alleging "'either (1) . . . motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *14 (S.D.N.Y. Aug. 11, 2021). "Recklessness" is "'conduct that is "highly unreasonable", representing "an extreme departure from the standards of ordinary care."'" *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000).

### a. Defendants Knew or Recklessly Disregarded the Truth Regarding Capone's Education

#### (1) Capone Knew He Fabricated His Credentials

As to Capone, Defendants concede scienter. MTD at 3; CMTD at 3. Plainly, Capone had actual knowledge he did not have a graduate degree in AI or a triple *summa cum laude* degree from SUNY Potsdam, yet he lied to investors over and over and over again. ¶¶70, 73-76, 80-83, 85. Nothing more is required to plead Capone's scienter. *Sotheby's*, 2000 WL 1234601, at *8.

#### (2) Capone's Scienter Is Imputed to DocGo

Where a defendant is a corporation, adequately pleading scienter requires pleading facts that give rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap.*, 531 F.3d 190, 195 (2d Cir. 2008). "[T]he 'most straightforward' way to raise a strong inference

- 16 -

of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). "'*[S]cienter by management-level employees is generally sufficient to attribute scienter to corporate defendants*.'" *BHP Billiton*, 276 F. Supp. 3d at 90; *see also In re Marsh & McLennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("Courts have readily attributed the scienter of management-level employees to corporate defendants."). As President and then CEO of DocGo, Capone made innumerable false statements seeking to bolster the Company's credibility with the investment community and win contracts for the Company. ¶¶70, 73-76, 80-83, 85, 89, 91. Capone's scienter is therefore imputed to DocGo.

Defendants' contentions that Capone's scienter cannot be imputed to DocGo are not credible. MTD at 22-23. First, the facts in *In re WRT Energy Sec. Litig.*, 1999 WL 178749, at *10 (S.D.N.Y. Mar. 31, 1999), are inapposite. In *WRT*, the plaintiff tried to impute the knowledge of a former employee, Miller, to his employer, Oppenheimer, for purposes of alleging Oppenheimer's scienter. However, Miller's knowledge of the alleged misconduct could not have been gained until "at least two months *after* the Senior Notes Offering [at issue]. Furthermore, there is no allegation that Miller had anything to do with the preparation of any of the [misleading] Oppenheimer research reports." *Id*. The standard articulated in *WRT*, while perhaps relevant to the facts there, is irreconcilable with the decades of subsequent case law addressing corporate scienter under the circumstances at issue here. *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 215 (S.D.N.Y. 2018). This is perhaps best demonstrated by Defendants' bizarre assertion that "Mr. Capone certainly did not gain knowledge of his own education by working at DocGo, so his statements cannot be attributed to the Company." MTD at 22. To be clear, Capone did not gain knowledge of his own education *anywhere* because he made it up, and the standard proposed by

- 17 -

Defendants does not articulate or apply a plausible legal framework by which to evaluate the facts at issue here or the many other possible factual scenarios where defendants simply concoct misinformation out of thin air.

Second, "the adverse-interest exception" does not apply to these facts, as *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at \*7-\*8 (S.D.N.Y. Sept. 8, 2017), upon which Defendants rely, demonstrates. *PJT* was a shareholder lawsuit against an investment bank whose stock price declined after it was revealed that a partner, Caspersen, in one of its operating units, had defrauded his family, clients, and PJT of $38 million by marketing nonexistent investment opportunities. *Id. at* \*1-\*2. Holding the adverse-interest exception was "a narrow exception that applies only 'where the fraud is committed against a corporation rather than on its behalf,'" the court found it applied where: (i) Caspersen made no statements to PJT investors; and (ii) PJT did not benefit "from Caspersen concealing from PJT the fact that he was defrauding PJT and its clients." *Id*. at \*8. The facts here could not be more different, and Defendants' assertion that Capone did not lie about his education to "attract investors and customers," MTD at 23, is contradicted by the allegations that Capone did lie about his education in order to attract new customers, as well as time and time again at investor conferences seeking to promote the Company and its prospects. ¶¶36-37, 70, 73-76, 80-83, 85.

Finally, Defendants fail to explain how the fact that "DocGo swiftly announced Mr. Capone's resignation the day after the *Times Union* reported on his educational credentials" is relevant to corporate scienter. *See* MTD at 23. If anything, it supports corporate scienter as DocGo could have terminated Capone if it did not condone his misstatements instead of: (i) allowing him to resign; (ii) misleading investors *yet again* by saying it was for "personal reasons," ¶97; and (iii) then *rehiring him as a consultant less than a month later*! Wood Decl., Ex. 2.

- 18 -

4868-2917-0138.v1

### (3)    Vashovsky and Oberholzer Acted with at Least Recklessness

Vashovsky co-founded DocGo and served as its CEO until January 2023. ¶16. Vashovsky served as the Chairman of DocGo's Board between 2015 and March 2024. *See id.* In those roles, Vashovsky would have: (i) worked closely with Capone for years; (ii) made misstatements regarding Capone's credentials; and (iii) as Chairman of DocGo's Board, appointed Capone to succeed him as CEO, saying the Company was "very fortunate to have someone with Anthony's skill set and track record to take the reigns [sic] as CEO next year." ¶¶7, 16, 37-40, 72, 84.

On these facts, Plaintiff submits there are only two possible inferences to be drawn. First, that Vashovsky would have had actual knowledge of Capone's falsified credentials. Second, that Vashovsky acted with reckless disregard of Capone's falsified credentials. Recklessness can be shown when defendants "'failed to check information they had a duty to monitor.'" *Barclays*, 2024 WL 757385, at *16. Here, a jury could easily find, with discovery and appropriate expert testimony, that Vashovsky's failure to check Capone's credentials, *especially* when appointing Capone as CEO of a large public company, and particularly when a simple background check – ubiquitous these days in almost all employment situations – would have revealed the truth, and constituted "'conduct which is highly unreasonable and . . . an extreme departure from the standards of ordinary care.'" *Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at *14 (S.D.N.Y. Mar. 16, 2023); *see* ¶41.

Oberholzer was likewise at least reckless in announcing Capone's appointment as CEO and making false statements regarding Capone's credentials. Oberholzer was also a longtime DocGo executive, serving as CFO of Ambulnz or DocGo from 2015 until January 2023, and was involved in the day-to-day operations of the Company. ¶18. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 497 (S.D.N.Y. 2004) (holding it reasonable to

- 19 -

impute knowledge to a signatory of SEC filings directly involved in the day-to day operations of a company).  It would have taken far less than a "reasonable investigation" – for example, a routine background check – for either Vashovsky or Oberholzer to discover Capone did not hold the degrees he claimed to hold, if Vashovsky or Oberholzer were not already fully aware of such facts. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 666 (S.D.N.Y. 2017).

### b.    Scienter Is Pled for Capone's Statements Regarding the CBP Contract and DocGo's Medicaid Enrollments

There is a strong inference of scienter with respect to Capone's misstatements regarding the CBP contract, as well as DocGo's purportedly then-existing practices of signing up asylum seekers for Medicaid and becoming their PCP.

"'Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.'" *SEC v. Takeyasu*, 2018 WL 2849777, at *16 (S.D.N.Y. June 11, 2018); *SEC v. Mudd*, 885 F. Supp. 2d 654, 661 (S.D.N.Y. 2012) ("A 'strong inference' of scienter may arise where the complaint sufficiently alleges that the defendants: 'knew facts or had access to information suggesting that their public statements were not accurate.'").

There is a strong inference Capone knew or had access to information indicating the CPB contract was worth far less than the $4 billion he represented to investors.  Capone admitted DocGo had been "working on [the RFP] *for seven to eight months*," ¶59, when he made his statement, and it is implausible to suggest he would not have known the actual size of the contract on which DocGo was bidding.  Indeed, it took a reporter, who was not involved in bidding on the contract, mere weeks, if that, to confirm the CBP contract was worth just half of what Capone represented. ¶67.  Then, when given an opportunity to provide evidence the CBP contract had *ever* been worth

- 20 -

$4 billion, the Company refused to do so. *See* Wood Decl., Ex. 1 at 2. Confronted with accusations that Capone misled investors about a multi-billion-dollar contract, it is implausible to suggest DocGo would not have provided exculpatory evidence if any actually existed; the only plausible inference is that it did not. The inference of scienter is especially strong here in light of the importance of the CBP contract to DocGo's prospects. *See In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) ("'enormous amounts at stake coupled with the detailed allegations'" created strong inference of scienter); *see City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 136 (S.D.N.Y. 2020) (finding scienter adequately pled with respect to "important contract" and admissions by those individuals regarding that contract). The purported $4 billion CBP contract would have been, *by a factor of nearly ten*, DocGo's largest government contract win. ¶66. Thus the scale of the contract about which Capone dissembled supports a strong inference of scienter.

For these same reasons, there is a strong inference Capone knew or had access to information indicating his statements about the Company's ability to sign up asylum seekers for Medicaid and becoming their PCP were false. ¶¶91-92. Again, the prospect of generating long-term revenue opportunities from short-term contracts *at no cost* was emphatically stressed by Capone himself as "*the biggest takeaway* from the second quarter and [DocGo's] updated guidance," *see supra* §III.A.1.d, yet his statements were almost immediately admitted to be false by the Company's spokesperson just weeks later when inquiring reporters questioned the basis for Capone's comments. ¶¶68, 94. Nothing more is required to plead scienter. *World Wrestling Ent. Inc.*, 477 F. Supp. 3d at 136.

Finally, there is a strong inference Capone had actual knowledge DocGo did not have the "'credibility to win the border patrol RFP,'" which DocGo indeed ultimately failed to secure. ¶¶5,

- 21 -

67.  As with recklessness, "circumstantial evidence can be sufficient to support a finding of actual knowledge." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018). Here, overwhelming circumstantial evidence points to Capone's knowledge the HPD contract was, if anything, ***undermining*** the Company's credibility, including: (i) immediate criticisms of DocGo's execution of the HPD contract, ¶56; (ii) prominent complaints of "threats," "broken promises," and reports DocGo provided "dubious work eligibility and residency letters on what appeared to be a fake [New York City] letterhead," ¶57; and (iii) a press conference by political leaders just one day before the Canaccord Conference lambasting DocGo's performance under the HPD contract, with one Albany County assembly member asking pointedly: "What in God's name is DocGo doing?"  ¶58.  Further, it would later be reported that the New York State Attorney General had launched an investigation into DocGo's practices.  ¶57 n.2.

While Defendants contend Capone could not have "misled investors by expressing an opinion that was supposedly inconsistent with public scrutiny observable by anyone," MTD at 15, the record reflects that at least the analyst hosting Capone at the August 9, 2023 conference was not even aware the CBP contract was still available and therefore could not possibly have formed any opinion about DocGo's prospects of securing it.  ECF 62-6 at 4 ("Wasn't the border patrol [contract] already awarded at some point last year?").

Finally, when evaluating Capone's scienter, it bears emphasizing "that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326; *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[F]ederal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."). Considered holistically, the Complaint indisputably demonstrates that Capone habitually lied to both customers and investors over a

period of years through SEC filings, responses to RFPs, and even directly to investors' faces at in-person conferences.  ¶¶37, 70, 73-75, 80-83, 85, 87, 89-92.  Indeed, at the August 9, 2023 conference itself, Capone's misstatements regarding his education, the CBP contract, and DocGo's payor vertical were all made within a span of just ***seven minutes***.  Like the boy who cried wolf, the Court should afford Capone no benefit of the doubt whatsoever regarding his scienter.  Considering the allegations holistically, scienter is adequately pled for all of Capone's alleged misstatements.

### 4.      The Complaint Adequately Alleges Loss Causation

"'A plaintiff's burden to plead loss causation is "not a heavy one."'"  *Saskatchewan Healthcare Emps.' Pension Plan v. KE Holdings Inc.*, 2024 WL 775195, at *32 (S.D.N.Y. Feb. 26, 2024).  "[T]o establish loss causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005).

The Complaint alleges that on September 10, 2023, the *Times Union* published an article titled: "DocGo CEO's comments on migrant contracts appear inaccurate."  ¶94.  The *Times Union* reported the "'over $4 billion'" CBP contract referenced by Capone during the August 9, 2023, Canaccord Conference was in fact worth far below $4 billion, according to a spokeswoman from CBP, and was in fact worth under $2 billion, according to multiple sources familiar with the bidding process.  *Id.*  The *Times Union* also reported Capone's statements to investors about how "the 'municipal sector has long-term revenue opportunity in our payer vertical'" were also false. *Id.*  While Capone had told investors DocGo had "'already signed up over 3,000 asylum seekers onto New York State Medicaid through UnitedHealthcare'" and DocGo "now ha[d] the ability to become their primary care provider and . . . eventually get this per member, per month

- 23 -

reimbursement," the *Times Union* quoted a DocGo spokesperson confirming, in fact: "'DocGo does not enroll anyone in Medicaid . . . and assignment as a primary care provider is not a "byproduct" of this process.'" *Id.* The article further stated a UnitedHealthcare representative reported DocGo did not even have a contract with UnitedHealthcare in New York. *Id.* On this news, the price of DocGo common stock declined by 10.76%, from a close of $7.06 per share on September 8, 2023 to a low of $6.30 per share on September 11, 2023. ¶95.

On September 14, 2023, the *Times Union* published an article titled: "DocGo CEO Anthony Capone admits he didn't earn graduate degree." ¶96. In the article, Capone admitted he did "'not have a master's degree from Clarkson University, nor from any other institution.'" *Id.*

On September 15, 2023, DocGo filed a Form 8-K with the SEC announcing Capone's immediate resignation, purportedly for "personal reasons." ¶97. That same day, the *Times Union* published an article titled: "DocGo CEO resigns following report he lied about college degree." *Id.* The article questioned whether Capone had an undergraduate degree from SUNY Potsdam, noting Capone stated only that he had an undergraduate degree from an "'accredited university'" and his spokesman "declined to respond to questions about whether he graduated from SUNY Potsdam." *Id.* On this news, the price of DocGo common stock declined by more than 25%, from a high of $6.53 per share on September 14, 2023 to a low of $4.88 per share on September 18, 2023. ¶98.

"On a motion to dismiss, all that is required is 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343 (S.D.N.Y. 2015). The Complaint provides far more than "some indication."

Defendants apparently agree. While they purported to challenge Plaintiff's loss causation allegations in their letter motion, ECF 44 at 3, they abandoned such arguments in their Motion to

4868-2917-0138.v1

Dismiss, relegating their loss causations contentions to a two-sentence footnote solely about the disclosure of Capone's falsified education, which is insufficient to even preserve the issue.  MTD at 13 n.4; *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 441 (S.D.N.Y. 2015).

### B.    Defendants Are Liable for Participating in a Scheme to Defraud

In addition to prohibiting false and misleading statements, §10(b) and Rule 10b-5 make it unlawful to: (i) "'employ any device, scheme, or artifice to defraud'"; or (ii) "'engage in any act, practice, or course of business'" that "'operates . . . as a fraud or deceit.'"  *Lorenzo*, 587 U.S. at 71.  In *Lorenzo*, the Supreme Court confirmed that false and misleading statements can also form the basis for scheme liability.  *Id.* at 72.  *Rio Tinto* held scheme liability requires a plaintiff to "allege something beyond misstatements and omissions."  41 F.4th at 53.  The Second Circuit declined to weigh in on what that "something extra" might be beyond noting "dissemination" of misstatements or omissions could suffice, as was the case in *Lorenzo*.  *Id.* at 53-54.

Included within a prominent section of the Complaint entitled: "Defendants' ***Fraudulent Scheme*** and Wrongful Course of Business," Plaintiff alleges Vashovsky and Capone submitted falsified proposals to potential customers in an effort to procure more business for DocGo.  ¶¶4, 36-37, 96.  As an example, the Complaint reproduces the "Educational Experience" section of Capone's resume in Vashovsky and Capone's Proposal for vaccine administration services.  ¶37.

**EDUCATIONAL EXPERIENCE**

**Masters of Computational Learning Theory -** Clarkson University - May 2014
**Bachelor of Science (CS)** – SUNY College at Potsdam, Graduated Sum Cum Laude - May 2009
**Bachelor of Arts (Philosophy) -** SUNY College at Potsdam, Graduated Sum Cum Laude - May 2009
**Bachelor of Arts (Law) -** SUNY College at Potsdam, Graduated Sum Cum Laude - May 2009
**Dale Carnegie School of Business Communication -** Graduated August 2005

4868-2917-0138.v1

His resume was a fabrication. *SEC v. Farnsworth*, 692 F. Supp. 3d 157 (S.D.N.Y. 2023), is instructive. There, this Court found allegations that MoviePass's CEO, Farnsworth, had engaged in customer-oriented misconduct – deceptive efforts to decrease ticket usage – sufficient to allege scheme liability: "deceptive activity directed towards customers – when done in order to manipulate key metrics that would be relevant to investors – presents an adequate scheme allegation." *Id.* at 189-90. The same is true here. The submission of deceptive proposals to customers to bolster DocGo's chances of winning lucrative government contracts would obviously be relevant to investors. ¶¶4, 36-37, 96. Indeed, Capone repeatedly emphasized the importance of pursuing and winning RFPs to the Company's future success. ¶¶51-54. Nothing more is required.

Defendants have also waived challenge to Plaintiff's scheme allegations. Despite putting Defendants on notice of the "something extra," which constituted the alleged scheme, ECF 47 at 1-2, the Motion to Dismiss contains mere sentences inaccurately contending that "Plaintiff does nothing more to support its claim than mechanically recite the word 'scheme.'" MTD at 10. Defendants' "drastically underdeveloped" contentions are waived. *Levy*, 103 F. Supp. 3d at 441.

### C. The Complaint Adequately Pleads Violations of Section 20(a)

There are two components to a control person claim under §20(a): "(1) a primary violation by a controlled person and (2) direct or indirect control of the primary violator by the defendant." *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017). The Complaint pleads both.

First, the Complaint pleads a primary violation of §10(b) against each Defendant. *See supra* §III.A.-B. Second, the Complaint also pleads control as to each of the Individual Defendants. To plead control, "a plaintiff must show that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the

4868-2917-0138.v1

ownership of voting securities, by contract, or otherwise.'" *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013). "'[C]orporate officers usually are presumed to possess the ability to control the actions of their employees [and] *[d]irectors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents*.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015).

Capone, Vashovsky, and Oberholzer controlled DocGo. As senior members of DocGo's management team, each made false statements concerning Capone's education. Capone made false and misleading statements concerning his education, including in his capacity as CEO of the Company. ¶¶70, 73-76, 80-83, 85, 89. Vashovsky, as Chairman of the Board, signed and solicited the false Proxy Statements on behalf of the Board. ¶¶72, 84. Oberholzer, as CFO of DocGo, signed the false and misleading Form 8-K. ¶77. Allegations that a defendant signed a false document are sufficient to allege control. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 175 (S.D.N.Y. 2021).

Defendants contend the Complaint fails to plead "culpable participation" because it fails to plead scienter. MTD at 25. The Complaint does plead scienter. *See supra* §III.A.3. Even if it did not, "culpable participation" is not the same as scienter. Indeed, "'scienter is not an essential element of a Section 20(a) claim.'" *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010); *see also In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 351 (S.D.N.Y. 2007); *Lucescu v. Zafirovski*, 2018 WL 1773134, at *9 (S.D.N.Y. Apr. 11, 2018).

To be sure, courts in this District are split on this issue. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *7 (S.D.N.Y. Mar. 23, 2018) ("disagreement among courts in this District" about whether a plaintiff must plead scienter); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10 n.1 (S.D.N.Y. Aug. 12, 2014) (same). Plaintiff submits that because the plain

4868-2917-0138.v1

text of §20(a) contains no scienter requirement, but rather the opportunity for a controlling person to assert the affirmative defense that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action," culpable participation is better understood as the "degree of control which is sufficient to render a person liable under §20(a)." *Lek*, 276 F. Supp. 3d at 63. Therefore, "plaintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003).

Capone, Vashovsky, and Oberholzer "were each a 'decision-making official who made an allegedly fraudulent statement about [DocGo].'" *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *14 (S.D.N.Y. Feb. 5, 2024). While Defendants may ultimately seek to "'exculpate themselves by proving either good faith or due diligence,'" this cannot be resolved on a motion to dismiss, and Plaintiff's §20(a) claims are adequately pled. *See Tronox*, 2010 WL 2835545, at *15.

## IV.    CONCLUSION

The Motions should be denied. If the Court finds otherwise, Plaintiff requests leave to amend.

DATED:  August 20, 2024                Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD (admitted *pro hac vice*)
HENRY S. BATOR (admitted *pro hac vice*)


                          s/ Christopher M. Wood
                          CHRISTOPHER M. WOOD

- 28 -

4868-2917-0138.v1

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
hbator@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiff

VANOVERBEKE, MICHAUD
   & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

- 29 -

4868-2917-0138.v1