UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENESEE COUNTY EMPLOYEES' RETIREMENT
SYSTEM, *individually and on behalf of all others
similarly situated*,

                Plaintiff,

             -v.-

DOCGO INC., STAN VASHOVSKY, ANTHONY
CAPONE, and ANDRE OBERHOLZER,

                Defendants.

23 Civ. 9476 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

A CEO's boastful statements to prospective investors — several of which
were indisputably false — are at the heart of this litigation. Lead Plaintiff
Genesee County Employees' Retirement System ("Lead Plaintiff," "Plaintiff," or
"Genesee"),[1] on behalf of itself and other similarly situated shareholders,
brought this securities class action against Defendants DocGo Inc. ("DocGo" or
the "Company"), as well as DocGo executives Stan Vashovsky ("Vashovsky"),
Anthony Capone ("Capone"), and Andre Oberholzer ("Oberholzer," and
collectively, "Defendants"). Plaintiff's claims are twofold: Plaintiff alleges, and
Defendants do not dispute, that Capone made a series of false statements
regarding his educational background. Plaintiff also asserts that Capone made
misstatements about DocGo's business development efforts during a live
interview on August 9, 2023. Both sets of statements, which prompted

---

[1]      The Clerk of Court is directed to modify the caption of this case as reflected above.

negative media attention, allegedly caused the value of DocGo's stock to plummet.

Plaintiff brought securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants now move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) for failure to state a claim. For the reasons set forth in this Opinion, the Court grants in part and denies in part Defendants' motion to dismiss the Amended Complaint.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Parties

Genesee is a public pension fund based in Flint, Michigan, with assets of about $250 million managed for the benefit of more than 1,000 participants.

---

[2]    This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #43)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See* *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

For ease of reference, the Court refers to Defendants DocGo, Vashovsky, and Oberholzer's memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #61); to Defendant Capone's joinder to the motion to dismiss as "Capone Br." (Dkt. #63); to Plaintiff's memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #65); to Defendants DocGo, Vashovsky, and Oberholzer's reply memorandum of law in further support of their motion as "Def. Reply" (Dkt. #68); and to Defendant Capone's joinder to the reply brief as "Capone Reply" (Dkt. #72). The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Jason J. Mendro ("Mendro Decl., Ex. [ ]" (Dkt. #62)), submitted in concert with Defendants DocGo, Vashovsky, and Oberholzer's motion to dismiss, as well as certain exhibits attached to the Declaration of Christopher M. Wood ("Wood Decl., Ex [ ]" (Dkt. #65-1)), submitted in concert with Plaintiff's opposition to the motion to dismiss.

Nearly all documents relied upon in the Court's analysis, including the aforementioned exhibits, are either documents incorporated by reference in the Amended Complaint or documents required by law to be filed — and actually filed — with the U.S. Securities and Exchange Commission (the "SEC"). *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d

(AC ¶ 14). Genesee allegedly purchased DocGo common stock between November 5, 2021, and September 15, 2023 (the "Class Period"). (*Id.*).

Defendant DocGo is a Delaware corporation with its principal place of business in New York, New York. (AC ¶ 15). DocGo offers medical transportation and mobile health services in the United States and the United Kingdom. (*Id.*). As of December 31, 2023, DocGo had 104,055,168 shares of common stock outstanding. (*Id.*). DocGo's common stock trades on NASDAQ under the ticker symbol "DCGO." (*Id.*).

Defendant Vashovsky is the co-founder of DocGo, and served as DocGo's CEO until January 2023. (AC ¶ 16). He has served as the Chairman of DocGo's Board of Directors (the "Board") since 2015. (*Id.*).[3]

Defendant Capone joined Ambulnz, Inc. ("Ambulnz") in 2017, where he served as President, Chief Technology Officer, and Chief Product Officer until Ambulnz's merger with Motion Acquisition Corp. ("Motion"), to form DocGo, in 2021. (AC ¶ 17). Capone served as DocGo's President until January 2023, and thereafter as its CEO until his resignation in September 2023. (*Id.*).

---

104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference in the complaint); *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (explaining that a court may take judicial notice of documents "required by law to be filed, and actually filed, with the SEC"). The exception is Exhibit 5 to the Declaration of Jason J. Mendro. However, the Court finds that it can still take judicial notice of the document because it is a screenshot from an official government website. *See, e.g.*, *Rynasko* v. *New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) ("When considering a motion made pursuant to Rule 12(b)(6)[,] we may take judicial notice of documents from official government websites." (quotation marks omitted)); *PK Music Performance, Inc.* v. *Timberlake*, No. 16 Civ. 1215 (VSB), 2018 WL 4759737, at *5 (S.D.N.Y. Sept. 30, 2018) (taking judicial notice of screenshots from websites when neither party questioned their authenticity).

[3]    According to Defendants, Vashovsky has retired and stepped down as director and Chairman of the Board, effective March 31, 2024. (Def. Br. 4 n.2).

Defendant Oberholzer served as DocGo's Chief Financial Officer ("CFO") from 2015 until January 2023.  (AC ¶ 18).  In January 2023, Oberholzer became DocGo's Treasurer and Executive Vice President of Capital Markets and Strategy.  (*Id.*).

### 2.    DocGo's Formation and Business Development

DocGo began as Motion, a blank check company generated from a collaboration between executives in the transportation software and technology sectors.  (AC ¶ 26).  As is common for blank check companies, Motion did not initially have its own operations or business, but rather was used as a vehicle to raise money from investors ahead of an initial public offering ("IPO"), the proceeds of which Motion intended to use to acquire a business or operational assets.  (*Id.*).  Motion completed its IPO on October 19, 2020.  (*Id.* ¶ 27).

On January 6, 2021, Motion signed a letter of intent to combine with Ambulnz, which was then a private company.  (AC ¶ 28).  On March 8, 2021, Motion and Ambulnz entered into a business combination agreement, which was announced on March 9, 2021.  (*Id.*).  Several months later, on October 14, 2021, Motion filed a final proxy for the merger with the SEC, which proxy recommended that shareholders vote in favor of the business combination. (*Id.*).  Motion's shareholders approved the plan the following month, and the business combination's completion was announced via press release on November 5, 2021.  (*Id.* ¶¶ 28-29).  The upshot of these transactions was that Ambulnz was merged with and into a subsidiary of Motion, with Motion as the surviving entity, and Motion's name changed to DocGo Inc.  (*Id.* ¶ 29).  Motion,

in turn, assumed the business and operations of Ambulnz, allowing Ambulnz to become publicly traded as DocGo.  (*Id.*).

Once formed, DocGo provided healthcare transportation and mobile services for hospitals and health systems, health plans, governments, and municipalities in the United States and the United Kingdom.  (AC ¶ 25).  DocGo is comprised of two operating segments: (i) Transportation Services, which includes emergency response and non-emergency transport services; and (ii) Mobile Health Services ("Mobile Health"), which includes "services performed at home and offices, testing, vaccinations, and event services."  (*Id.* ¶ 2).

From its formation, DocGo sought to promote itself as a company positioned at the intersection of healthcare and technology.  (AC ¶ 31). Simultaneous with DocGo's development, the market was beginning to recognize artificial intelligence ("AI") capabilities as an important differentiator among companies.  (*Id.* ¶¶ 32-33).  DocGo sought to capitalize on this momentum by emphasizing its own technological "backbone," which included a "proprietary central AI system that managed the logistics behind DocGo's scheduling, patient interactions, and resource allocation."  (*Id.* ¶ 34).  DocGo also represented itself as one of the few public companies committed to bringing healthcare to underserved populations.  (*Id.* ¶ 3).

DocGo's growth — and, particularly, the growth of its Mobile Health and Government segments (or "verticals") — was initially aided by the surge of testing and other services related to the COVID-19 pandemic.  (AC ¶ 50). However, as the pandemic wound down in late 2022 and early 2023, DocGo

sought to transition its Mobile Health division away from COVID-19-centric business and into a broader array of population health services.  (*Id.*).  One way that DocGo did so was by seeking government contracts.  (*Id.*).  In May 2023, this effort bore fruit, as DocGo was awarded a $432 million no-bid contract with the New York City Department of Housing Preservation and Development (the "HPD") to provide services to asylum-seeking migrants in conjunction with New York City's practice of relocating such migrants.  (*Id.* ¶ 55).  This was the largest contract DocGo had ever received from a government body and nearly matched the Company's total reported revenue for 2022.  (*Id.*).

Soon after the HPD contract began, however, reports surfaced of "DocGo's disruptive behavior in the communities in which the Company had relocated migrants."  (AC ¶ 56).  As a result, DocGo began receiving negative media attention.  For instance, on July 18, 2023, the *Times Union* reported that hotel guests at a Super 8 in Rotterdam, New York, had been abruptly cleared out of their rooms without notice before DocGo transported migrants there.  (*Id.*).  And *The New York Times* reported on July 30, 2023, about issues with DocGo's relocation program.  (*Id.* ¶ 57).  This media attention fueled public scrutiny of DocGo, and on August 8, 2023, elected officials in Albany called on DocGo to improve its operations.  (*Id.* ¶ 59).

### 3.    The Alleged Misrepresentations

The Amended Complaint alleges that Defendants made a series of misstatements during DocGo's formation and development that negatively

impacted shareholders.  The Court briefly outlines each category of alleged misstatements.

### a.    The Education Statements

The first set of alleged misrepresentations relate to Capone's educational background (the "Education Statements").  Even before DocGo was created, Capone claimed to have earned a "Masters of Computational Learning Theory from Clarkson University," and to have graduated *summa cum laude* from SUNY College at Potsdam with degrees in computer science, philosophy, and law.  (AC ¶ 37).  However, Capone had earned no such graduate degree from Clarkson University — in fact, he had not earned a graduate degree from any university in any subject.  (*Id.* ¶ 45).  Nor had Capone graduated with a "triple *summa cum laude* undergraduate degree from SUNY Potsdam."  (*Id.*).

Despite never attending graduate school, Capone routinely touted his non-existent graduate degree in computer science to prospective investors, thereby seeking to tie his experience (and, by extension, DocGo's) with the burgeoning AI movement.  The first such instance described in the Amended Complaint occurred on June 16, 2021, prior to the formation of DocGo.  While working at Ambulnz, Capone submitted a "Proposal to the New Jersey Department of Health Office of the Commissioner" on the company's behalf.  (AC ¶ 37).  This proposal included Capone's resume, which stated that Capone had earned a Masters of Computational Learning Theory from Clarkson University in May 2014 and graduated triple *summa cum laude* from SUNY Potsdam in May 2009.  (*Id.*).  Also prior to the formation of DocGo, Capone had

7

appeared on the "AI in Action" podcast, which was broadcast on YouTube on September 9, 2021.  (*Id.* ¶ 70).  During his interview, Capone discussed his longtime interest in coding, and explained that his academic career culminated in his "graduate degree in computational learning theory."  (*Id.*).

Once at DocGo, Capone continued to perpetuate the falsehoods concerning his academic credentials.  (AC ¶ 69).  In particular, Capone touted his graduate degree in computational learning theory to investors, customers, and the public in service of his efforts to "boost DocGo's prospects and capabilities."  (*Id.* ¶ 36).  For example, on September 13, 2022, Capone presented at the H.C. Wainwright Global Investment Conference.  When describing his background, he stated that his "graduate degree is in computational learning theory, which was a subset of artificial intelligence." (*Id.* ¶ 73).  The next day, when presenting at the Morgan Stanley Global Healthcare Conference, Capone reiterated this falsehood as part of his introductory remarks.  (*Id.* ¶ 74).  And on October 19, 2022, Capone participated in one of Impetus Digital's Fireside Chats and, when speaking about DocGo, stated:

> Well we built out our own software.  It's called Dara, which entirely focuses on utilization, it's routing optimization, it really leverages that AI.  ***It's kind of the intellectual reason I guess that I joined the company was that I had the ability to apply my academic training to a very particular circumstance of how do we have the ability to make sure the ambulances are running?***

(*Id.* ¶¶ 75-76 (emphasis in original)).

These false statements persisted well into 2023, as Capone continued to emphasize his non-existent degree(s) at various conferences, including: (i) the JPMorgan Healthcare Conference, held on January 12, 2023; (ii) the Cowen Healthcare Conference, held on March 7, 2023; (iii) the Oppenheimer Healthcare Conference, held on March 15, 2023; and (iv) the Canaccord Genuity Growth Conference, held on August 3, 2023.  (AC ¶¶ 80-83, 85). Capone's statements at the Oppenheimer Healthcare Conference are illustrative of the general tenor of these remarks:

> DocGo, when you look at its heart, is really a technology company.  From day one when we built the company, that was going to be our focus.  And that's actually my background.   My degree is in artificial intelligence. That's what I went to graduate school for.  And from day one, we built out all of our own technology in-house, and not just technology that sometimes you say I need to have as a service company.

(*Id.* ¶ 83).  As indicated by the quoted passages, Capone's statements were frequently interwoven with comments about DocGo's founding or the uniqueness of the Company's technology.  (*See, e.g.*, *id.* ¶¶ 80-83).

Capone's misstatements also found their way into documents filed by DocGo with the SEC.  (AC ¶ 72).  For example, on April 29, 2022, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2022 annual meeting of stockholders.  (*Id.*).  The proxy statement included biographical information for each executive officer at the company, including Capone.  Specifically, the document stated: "Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University."  (*Id.*).

On November 7, 2022, DocGo filed with the SEC a Current Report on Form 8-K, reporting that Vashovsky was retiring and announcing that Capone had been appointed by the Board to succeed Vashovsky as CEO. (*Id.* ¶ 77). The Form 8-K discussed Capone's background, including his academic credentials, and once again represented that he earned a "M.S." from Clarkson University. Finally, on April 26, 2023, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2023 annual meeting of stockholders, which statement included the same false biographical information. (*Id.* ¶ 84).

### b.    The Interview Statements

The Amended Complaint also alleges that Capone made a series of false and misleading statements at the Canaccord Genuity Growth Conference, which was held on August 9, 2023. (AC ¶ 89). The first of these statements dealt with a U.S. Customs and Border Protection ("CBP") contract that DocGo wished to obtain (the "CBP Statements"). In the course of the interview, Capone stated:

> But even more confidence in the existing lines of business with just New York, New York City with multiple asylum seeking programs, we did this in large part because it gave us all of the credibility to win the border patrol RFP, which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth. And that one allows us to treat all the asylum seekers as soon as they come across the border and that 72 hour st[i]nt, and we've been working on that for a very long time.

(*Id.* (emphasis omitted)). The Amended Complaint alleges that this statement was false for multiple reasons, including: (i) the contract with CBP was not

valued at "o[ve]r $4 billion"; and (ii) given the criticism of DocGo regarding its administration of the HPD contract, Capone did not believe and had no reason to believe that the HPD contract gave DocGo "all of the credibility to win the border patrol RFP." (*Id.* ¶ 90).

At the same conference, Capone is also alleged to have made false representations regarding DocGo's efforts to sign migrants up for New York State Medicaid (the "Medicaid Statements"). In particular, he stated: "We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare." (AC ¶ 91).[4] Capone went on to explain that "United Healthcare" has a contract with New York State, and so DocGo has "the ability to enroll [asylum seekers] in United's managed care program." (*Id.*). Capone underscored the significance of these enrollments, and of the contract with UnitedHealthcare, to DocGo's post-pandemic business strategy:

> And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care.
>
> United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector

---

[4]    Though the company's name is UnitedHealthcare, it is presented in several forms in the relevant documents.

has long term revenue opportunity in our payer vertical
because it gives member attribution at no cost.

(*Id.* ¶¶ 60-61).  Plaintiff alleges that these statements were false because DocGo did not enroll anyone in New York State Medicaid programs, nor did DocGo have a contract with UnitedHealthcare in New York whereby it could enroll asylum seekers in UnitedHealthcare's managed care program.  (*Id.* ¶ 92).

Of potential note, the Canaccord Genuity Growth Conference was held on August 9, 2023, only one day after Albany legislators had held a press conference in which they publicly criticized DocGo's operations.  (AC ¶ 59). The Amended Complaint accordingly alleges that "[r]eeling from" the mounting public criticisms of DocGo, "Capone sought to reassure investors about the Company's performance and future prospects" by inflating the value of the CBP contract and by making false statements about DocGo's ability to sign asylum seekers up for Medicaid.  (*Id.* ¶¶ 59, 66-68).

Capone's public statements, it turns out, had the opposite effect:  In the wake of the conference, the *Times Union* published an article on September 10, 2023, titled: "DocGo CEO's comments on migrant contracts appear inaccurate."  (AC ¶ 8).  This article alleged that the CBP contract was worth far less than Capone had represented.  (*Id.*).  The *Times Union* also reported that Capone's statements to investors about signing migrants onto Medicaid were false.  (*Id.*).  On that point, the article contained statements from: (i) representatives of DocGo's own public relations firm, which confirmed that "DocGo does not enroll anyone in Medicaid programs, nor do we make any determinations regarding who qualifies for Medicaid programs," and, further,

that "DocGo does not 'sign up' anyone for Medicaid and assignment as a primary care provider is not a 'byproduct' of this process";

(ii) UnitedHealthcare, which confirmed that the company had no contract with DocGo in New York; and (iii) the New York State Department of Health, which confirmed that "a provider can only receive a per-member, per-month reimbursement from Medicaid through a contractual agreement with a managed care plan," which DocGo lacked with UnitedHealthcare.  (Mendro Decl., Ex. 4 at 3; *see also id.* ¶¶ 8, 68, 94).  After the article was published, the price of DocGo's common stock declined by more than 10%, from a close of $7.06 on September 8, 2023, to a low of $6.30 on September 11, 2023.  (AC ¶ 95).

On September 14, 2023, the *Times Union* published another article, this one titled: "No record that DocGo CEO Anthony Capone earned graduate degree."  (AC ¶ 96).  In this article, Capone admitted that he did "not have a master's degree from Clarkson University, nor from any other institution." (*Id.*).  On September 15, 2023, after the markets closed, DocGo filed a Current Report on Form 8-K with the SEC announcing Capone's immediate resignation for "personal reasons."  (*Id.* ¶ 97).  Upon this news, the price of DocGo common stock declined by more than 25%, from a high of $6.53 on September 14, 2023, to a low of $4.88 on September 18, 2023.  (*Id.* ¶ 98).  This action followed shortly thereafter, alleging securities fraud that resulted in losses for those who purchased DocGo common stock between November 5, 2021, and September 15, 2023.  (*Id.* ¶ 1).

### B.    Procedural Background

The initial complaint in this action was filed on October 27, 2023, by Joe Naclerio, individually and on behalf of all others similarly situated.  (Dkt. #1). On November 3, 2023, this Court ordered that Naclerio advise in writing the date and manner in which he published notice of his suit, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (Dkt. #7 (citing 15 U.S.C. § 78u-4(a)(3)(A))).  Naclerio filed a response on November 16, 2023. (Dkt. #8).

The Court thereafter ordered that any motions to serve as lead plaintiffs be filed by December 26, 2023, and that any opposition to any motion for appointment of lead plaintiff be served and filed by January 11, 2024.  (Dkt. #9, 10).  In accordance with the Court's schedule, on December 26, 2023, Naclerio and Genesee filed motions seeking appointment as lead plaintiff and approval of their selection of lead counsel.  (Dkt. #11, 15).  On January 11, 2024, Naclerio filed a notice of non-opposition in response to Genesee's motion. (Dkt. #20).  In light of Naclerio's notice of non-opposition, the Court appointed Genesee as lead plaintiff and approved of its selection of lead counsel, determining that Genesee had satisfied the requirements for appointment of lead plaintiff pursuant to Section 21D(a)(3)(B)(iii) of the PSLRA.  (Dkt. #29, 30). The parties proceeded to submit a proposed briefing schedule on Defendants' anticipated motion to dismiss, which schedule the Court endorsed.  (Dkt. #33).

In accordance with the parties' briefing schedule, Plaintiff filed the Amended Complaint, the operative pleading in this action, on March 20, 2024.

14

(Dkt. #43).  On June 21, 2024, Defendants DocGo, Vashovsky, and Oberholzer filed their motion to dismiss the Amended Complaint.  (Dkt. #60-62). Defendant Capone filed a motion joining Sections I(B), II, III(B), and IV of his co-defendants' memorandum of law in support of their motion to dismiss. (Dkt. #63).  Plaintiff filed their opposition on August 20, 2024.  (Dkt. #65).  And on September 19, 2024, Defendants DocGo, Vashovsky, and Oberholzer filed their reply brief in further support of their motion to dismiss.  (Dkt. #68). Defendant Capone also filed a reply in further support of his motion to dismiss and joined Sections I(B), I(C), I(D), II (except for the paragraphs captioned "Education Statements"), III, and IV of his co-defendants' reply brief.  (Dkt. #72).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Under Rule 12(b)(6)

Generally speaking, when considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must (i) accept all of the complaint's factual allegations (but not legal conclusions) as true, and (ii) determine whether it states a "plausible" claim for relief.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  In doing so, the court must "draw all reasonable inferences in [the non-movant's] favor."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation and internal quotation

marks omitted).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

At the motion to dismiss stage, a court may consider only "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *accord Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016).  However, "where a document is not incorporated by reference, the [c]ourt may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  Further, when faced with a motion to dismiss a securities class action, the court "may take judicial notice of the contents of the relevant public disclosure documents required to be filed with the SEC[.]"  *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC[.]").

## 2.   Pleading Requirements Specific to Securities Fraud Claims

Significantly, a complaint alleging securities fraud faces additional, heightened pleading requirements — beyond those enumerated above — absent which it cannot survive a motion to dismiss.  *See ATSI Commc'ns, Inc.* v.

*Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also IWA Forest Indus. Pension Plan* v. *Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021).  Before Congress enacted the PSLRA, these heightened requirements were circumscribed by Federal Rule of Civil Procedure Rule 9(b).  *Compare* Fed. R. Civ. P. 8 (describing "General Rules of Pleading"), *with* Fed. R. Civ. P. 9(b) (setting forth requirements of "alleging fraud or mistake"); *see also Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).  Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting [the] fraud."  Fed. R. Civ. P. 9(b).  In the context of a civil action alleging securities fraud, this means that a plaintiff must "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent."  *ATSI*, 493 F.3d at 99 (citation omitted).  While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to "allege[ ] generally" any requisite state of mind, *e.g.*, "[m]alice, intent, [or] knowledge[.]"  Fed. R. Civ. P. 9(b).

With the enactment of the PSLRA, a plaintiff bringing a securities fraud claim must proffer even more factual detail to survive a motion to dismiss.  15 U.S.C. § 78u-4(b); *see Lewy* v. *SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *7 (S.D.N.Y. Sept. 10, 2012) ("Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA.").  The PSLRA requires a plaintiff to "do more than say that [a defendant's] statements ... were false and misleading; they must demonstrate with

specificity why and how that is so." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *7 (S.D.N.Y. Dec. 14, 2009). In particular, they must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA also establishes a more stringent rule for claims that a defendant acted with a particular state of mind. *See* 15 U.S.C. § 78u-4(b)(2)(A). For a plaintiff bringing a Section 10(b) or Rule 10b-5 claim — for which the requisite state of mind is scienter, *i.e.*, an intent to deceive, manipulate or defraud — the higher PSLRA standard applies to allegations of scienter. *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). "[S]ection [78u-4(b)(2)(A)] of the PSLRA ... requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with [scienter].'" *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)) (citation omitted). A "strong" inference is one that "a reasonable person would deem ... cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324; *see generally Saraf* v. *Ebix, Inc.*, No. 23-1182-cv, 2024 WL 1298246, at *1-3 (2d Cir. Mar. 27, 2024) (summary order).

### 3.    Liability Under Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  Section 10(b)'s implementing rule, Rule 10b-5, expounds upon the statute, making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Under the Supreme Court's interpretation of these provisions, a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5 consists of six elements: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 157 (2008); *see also Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).

### 4.    Liability Under Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act renders "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" to also be held liable, jointly and severally, "with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]"  15 U.S.C. § 78t(a).  Of course, "[a]ny claim

19

for 'control person' liability under [Section] 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010).  Section 20(a) also provides a safety valve for any "controlling person [who] acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  Accordingly, "[t]o state a claim of control person liability under [Section] 20(a), 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108).

## B.    Analysis

### 1.    The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss Plaintiff's Section 10(b) Claims

As previously discussed, to state a *prima facie* case for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege six elements: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation."  *Stoneridge Inv. Partners*, 552 U.S. at 157.  Defendants challenge the sufficiency of Plaintiff's pleading as to three of these elements: element (i), the materiality of any misrepresentation by Defendants; element (ii), scienter; and element (iii), the connection between

certain statements made before April 29, 2022 (*i.e.*, the date of DocGo's proxy statement filing in advance of the Company's 2022 annual meeting of stockholders), and the purchase or sale of a security.  The Court addresses each challenge in turn and concludes that Plaintiff has alleged a *prima facie* case of securities fraud against Defendants DocGo and Capone, but only with respect to the Education Statements and the Medicaid Statements made during the Class Period.  The remainder of the claims, including all claims against Vashovsky and Oberholzer, are dismissed.

### a.    Material Misrepresentations

The Court begins by analyzing the materiality of the proffered misrepresentations.  Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] … a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  The materiality of a misstatement depends on whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JPMorgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 240 (1988)).  At the pleading stage, a plaintiff need not establish that each of the alleged misstatements or omissions "is [materially] misleading in and of itself"; rather, a plaintiff must only allege that "the defendant's representations, *taken together and in context*, would have misled a reasonable investor."  *In re Vivendi, S.A.*

*Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis in original) (internal quotation marks omitted).

Because materiality is a mixed question of law and fact, "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (alterations adopted) (internal quotation marks omitted); *accord Litwin* v. *Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011). Making this determination requires a "fact-specific inquiry" that "necessarily depends on all relevant circumstances." *ECA*, 553 F.3d at 197.

### i. Plaintiff Sufficiently Alleges Materiality as to the Education Statements

Defendants concede that Capone made inaccurate statements regarding his academic credentials. (Def. Br. 2, 11). However, Defendants maintain that these statements are not actionable under Section 10b-5 because a "reasonable investor would not view the details of Mr. Capone's academic pedigree as 'significantly alter[ing] the total mix of information already made available about DocGo.'" (*Id.* at 12 (quoting *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013))). The Court disagrees.

In arguing that Capone's statements are immaterial, Defendants emphasize that "[t]here is not a single allegation that DocGo misrepresented the quality of its technology"; at most, they claim, the evidence shows only that Capone misspoke about his educational background. (Def. Reply 4). This

background, according to Defendants, would not be of importance to a reasonable investor. (*Id.*). The wrinkle here — and the reason why Defendants' arguments ultimately fail — is that Capone strove to tether his educational background directly to DocGo's technological capabilities. (*See, e.g.*, AC ¶¶ 35, 38-40, 42-44). That is, Capone not only misrepresented his credentials, but used his supposed "graduate degree" in "computational learning theory" to bolster his assertions that he was a trustworthy steward of the "technology side" of DocGo. (*Id.* ¶¶ 42, 80). Similarly, Capone exploited his specialized educational background to differentiate DocGo from its competitors, particularly in its ability to capitalize on emerging AI trends:

> I was our Chief Technology Officer, *my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence* and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, *all of that is done with high sophistication, with our AI systems in order to need as little people as possible*.

(*Id.* ¶ 85 (emphases added)). Because Capone repeatedly tied his educational background to the Company's capabilities, it is plausible that a "reasonable investor" would view this information as altering the "total mix" of information available. *ECA*, 553 F.3d at 197 (quoting *Levinson*, 485 U.S. at 240).

Conversely, the Court finds Defendants' reliance on *Greenhouse* v. *MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004), to be misplaced in the specific factual circumstances of this case. In *Greenhouse*, the defendant held himself

out as having earned a bachelor's degree in economics from Syracuse University. *Id.* at 653. In actuality, however, the defendant attended Syracuse for three years and studied economics, but left before obtaining his degree. *Id.* at 654. The Fourth Circuit upheld the district court's determination that the defendant's misrepresentation of his academic background was immaterial because the appellants "advanced no credible theory as to why a reasonable investor would consider what [defendant] did (or, as the case may be, did not do) during what would have been his fourth year at Syracuse to constitute something so important that it would alter th[e] large body of [other] information" available to investors. *Id.* at 658. In doing so, however, the Fourth Circuit cautioned that it was "*not* hold[ing] as a matter of law that a key manager's education could *never* be material." *Id.* (emphases in original).

In the instant matter, Plaintiff has advanced a "credible theory" as to why Capone's statements may have altered the total mix of information available about DocGo. The nature of Capone's statements went beyond mere embellishment of his resume; instead, the Amended Complaint alleges that Capone incorporated the misstatements into his pitch about his ability to guide DocGo's technological development in line with emerging trends in the industry. Other courts, in situations such as these, have found analogous misstatements to be sufficiently material. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004) (finding a misrepresentation that a defendant got a degree from Stanford University to be material under Section 11 of the Securities Act of 1933, "given the cachet

associated with a computer engineering degree" from that institution); *see also S.E.C.* v. *Reys*, 712 F. Supp. 2d 1170, 1177-78 (W.D. Wash. 2010) (finding defendant's statements about work history and qualifications to be material). The Court joins them here.

### ii. Plaintiff Sufficiently Alleges Materiality as to Some, But Not All, of the CBP Statements

Defendants go on to argue that the statements made by Capone during the August 9, 2023 interview are not actionable. Rather than arguing that these statements are immaterial, however, Defendants largely argue that they were not false or misleading when made. (Def. Br. 13).

Beginning first with the CBP Statements, Plaintiff alleges that these statements were material misrepresentations for two reasons: (i) there were published criticisms of Capone's valuation of the contract at the time he made the statements; and (ii) Capone "had no reasonable basis to believe" that the New York contracts gave DocGo the "credibility to win the" CBP contract. (Def. Br. 14 (citing AC ¶ 90)). Defendants challenge Plaintiff on both fronts, arguing that Plaintiff has not pleaded "a single fact to suggest that at the time Mr. Capone made this statement the contract was confirmed to be valued at less than $4 billion." (*Id.*). And even if he had, they reason, his statements were protected by the PSLRA's safe harbor for forward-looking statements. (*Id.* at 17). Defendants also argue that Capone's expressions of optimism about DocGo's credibility are generalized aspirational statements that cannot support a claim for securities fraud. (*Id.* at 15). As set forth below, Defendants' arguments are met with mixed success.

25

Contrary to Defendants' arguments, the Court finds that Plaintiff *has* provided sufficient support to allow a finding that Capone's statements regarding the value of the CBP contract were false or misleading when made. It is true that the Second Circuit has repeatedly stated that plaintiffs must do more than merely assert a statement is false — "[plaintiffs] must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174; *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[F]alsity is a failure to be truthful — it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." (internal quotation marks omitted)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (summary order). However, Plaintiff has done so sufficiently here, at least at this stage of the litigation. *See In re Alstom SA*, 406 F. Supp. 2d 433, 455 (S.D.N.Y. 2005) (finding plaintiffs alleged facts sufficient to show statements were misleading when reading the pleadings "in the light most favorable to [p]laintiffs"). In particular, the Amended Complaint relies on an article from the *Times Union*, which states that "the five-year contract to provide medical services at the southern border for the U.S. Customs and Border Protection [wa]s far below the $4 billion Capone cited in his comments to investors, according to a spokeswoman for the agency." (Mendro Decl., Ex. 4 at 1). According to the article, "multiple sources familiar with the ongoing bidding process ... valued [the contract] at $2 billion." (*Id.* at 2).

Defendants' most forceful argument against falsity is the September 19, 2023 BTIG Report, which, when discussing the CBP contract, states "[w]hat

starts off as a ~$1-$2B deal, could turn into ~$4B over ~5+ years, in our view."
(Mendro Decl., Ex. 2 at 2).  However, even this report does not necessarily
validate Capone's statement, which focused not on the potential long-term
value of the contract, but rather the contract's current worth at "o[ve]r $4
billion," or "[a]lmost $1 billion a year."  (AC ¶ 59).[5]  *See Peifa Xu* v. *Gridsun
Holdings Inc.*, No. 18 Civ. 3655 (ER), 2020 WL 1508748, at *13 (S.D.N.Y.
Mar. 30, 2020) (finding plaintiffs adequately alleged falsity when the facts
"leave room for the reality" supporting defendants' view, but "leave the same
amount of room for a reality" supporting plaintiffs' theory).  Plaintiff has
sufficiently alleged falsity as to Capone's statements about the estimated value
of the CBP contract.

Moreover, the Court finds that these statements are not protected under
the PSLRA's safe harbor provision, which, subject to certain limited exceptions,
bars private securities fraud claims based on "any forward-looking statement,
whether written or oral."  15 U.S.C. § 78u-5(c)(1).  Under the PSLRA, a
defendant is not liable for a forward-looking statement if (i) "the forward-
looking statement is identified and accompanied by meaningful cautionary
language," (ii) the forward-looking statement "is immaterial," or (iii) "the
plaintiff fails to prove that [the forward-looking statement] was made with
actual knowledge that it was false or misleading."  *Slayton* v. *Am. Exp. Co.*, 604
F.3d 758, 766 (2d Cir. 2010).  The issue here, however, is that Capone's

---

[5]        As discussed *infra*, however, the BTIG Report does impact the Court's scienter analysis.

statement regarding the value of the CBP contract was *not* a forward-looking statement. Rather, it was assertion about the current worth of an RFP on which DocGo had bid. It is true that the general statements about DocGo's ability to win this contract (discussed below) may have been forward-looking, but "[m]ixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (internal quotation marks omitted); *cf. Iowa Pub. Emps. Ret. Sys.* v. *Merrill Lynch*, 620 F.3d 137, 144 (2d Cir. 2010) ("[A] statement of confidence in a firm's operations may be forward-looking — and thus insulated by the bespeaks-caution doctrine — even while statements or omissions as to the operations in place (and present intentions as to future operations) are not."). Accordingly, Capone's statement that the CBP contract was worth $4 billion is material and thus potentially actionable.

While Capone's statements regarding the value of the contract are actionable, his statements regarding DocGo's "credibility" are inactionable puffery. Under this Circuit's precedent, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA*, 553 F.3d at 206). That is because, "[u]p to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a

gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business they manage.'" *Rombach*, 355 F.3d at 174 (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994)).

While Plaintiff argues that because of the public scrutiny DocGo received, Capone "did not believe, and had no reasonable basis to believe," that the HPD contract gave DocGo credibility (AC ¶ 90), his expressions of optimism regarding DocGo's performance under the contact remain "generalized aspirational statements," *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 402 (S.D.N.Y. 2012). Moreover, Capone's statements regarding DocGo's perception and reputation in the market were sufficiently vague that no reasonable investor would find them to be dispositive in the total mix of information available in deciding what stocks to purchase. As such, the Court finds no materiality as to the credibility portion of the CBP Statements, and will dismiss Plaintiff's claims to the extent they are based on those allegations.

### iii. Plaintiff Sufficiently Alleges Materiality as to the Medicaid Statements

Finally, Defendants contest whether Capone's second set of interview statements — in which Capone stated that DocGo "signed up" migrants for "New York State Medicaid through United Healthcare" — would "mislead a reasonable investor." (Def. Br. 15 (quoting *Rombach*, 355 F.3d at 173)). Defendants posit that a reasonable investor would have understood that Capone was merely explaining that DocGo *facilitated* Medicaid sign-ups "through United Healthcare." (Def. Br. 16). However, the Court disagrees, and

find that the Amended Complaint supports an inference that the Medicaid Statements were false or misleading when made.

As discussed, "[a] violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends* v. *Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023). Moreover, "plaintiffs must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174. Here, Capone's Medicaid Statements emphasized that DocGo had "signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare." (AC ¶ 91). And Capone made these statements while emphasizing DocGo's ability to transition patients from the Company's government vertical to its payer vertical "at no [additional] cost." (*Id.*). Indeed, Capone framed this fact as central to DocGo's future business opportunities. (*Id.*; *see also id.* ¶ 60 ("And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care.")). In point of fact, DocGo's own representatives admitted within a few weeks of Capone's statements that the Company (i) had no such ability to sign migrants up for Medicaid; (ii) did not enroll or sign up anyone for Medicaid; and (iii) had no ability to obtain assignment as a primary care provider through this

(apparently non-existent) signup process.  (*Id.* ¶ 68; Mendro Decl., Ex. 4).

UnitedHealthcare then administered the *coup de grâce* by stating that it had no

contract in New York with DocGo.  (Mendro Decl., Ex. 4).  Under these

circumstances, the Court cannot say that these misstatements were "so

obviously unimportant to a reasonable investor that reasonable minds could

not differ on the question of their importance."  *In re Morgan Stanley Info. Fund

Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (quoting *ECA*, 553 F.3d at 197);

*see also In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 265 (S.D.N.Y. 2023)

(finding interview statements to be false or misleading when made).

Accordingly, the Court finds materiality as to the Medicaid Statements.

> **b.**    **Scienter**

The Court next examines whether those alleged misrepresentations that

have surmounted the materiality bar were made with the requisite scienter.

The Court finds that Plaintiff has sufficiently alleged scienter as to Defendants

Capone and DocGo, but not as to Vashovsky and Oberholzer.  Even then,

Plaintiff has only sufficiently alleged scienter for Capone and DocGo as to the

Education Statements and the Medicaid Statements.

As previously noted, at the pleading stage, the PSLRA requires a plaintiff

to "state with particularity facts giving rise to a strong inference that the

defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(2).  A "strong" inference

is one that "a reasonable person would deem … cogent and at least as

compelling as any plausible opposing inference one could draw from the facts

alleged."  *Tellabs*, 551 U.S. at 324.  Where, as here, one of the defendants is a

corporation, to establish corporate scienter, a plaintiff must plead facts that give rise to "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex*, 531 F.3d at 195. "[T]he most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement" or from "the other officers or directors who were involved in the dissemination of the fraud." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (internal quotation marks omitted).

Moreover, to establish the requisite "strong inference" that a defendant acted with scienter, a plaintiff must plead particularized facts either (i) "showing that the defendant[ ] had both motive and opportunity to commit the fraud" (the "motive and opportunity" approach) or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness" (the "circumstantial evidence" approach). *ATSI*, 493 F.3d at 99. In order to provide scienter under the circumstantial evidence approach, "the strength of the circumstantial allegations [that a defendant consciously or recklessly misbehaved] must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). "Recklessness" specifically "must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care," *Rothman* v. *Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks omitted), "not merely a heightened form of negligence," *Novak* v. *Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (internal quotation marks omitted). *See also Medis Inv. Grp.* v. *Medis Techs., Ltd.*, 586 F.

32

Supp. 2d 136, 142 (S.D.N.Y. 2008) ("To properly allege recklessness, the plaintiff must plead a state of mind approximating actual intent[.]" (internal quotation marks omitted)), *aff'd*, 328 F. App'x 754 (2d Cir. 2009) (summary order).  "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants [i] benefited in a concrete and personal way from the purported fraud; [ii] engaged in deliberately illegal behavior; [iii] knew facts or had access to information suggesting that their public statements were not accurate; or [iv] failed to check information they had a duty to monitor."  *ECA*, 553 F.3d at 199 (internal quotation marks omitted).  And where there are multiple defendants, a plaintiff "must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 664 (S.D.N.Y. 2017) (internal quotation marks omitted).

> ### i.    Plaintiff Fails to Allege Scienter as to Vashovsky and Oberholzer

To begin, Plaintiff asserts that Vashovsky and Oberholzer acted with the requisite scienter because they acted with "at [l]east [r]ecklessness."  (Pl. Opp. 19).  Plaintiff's argument in this regard purports to be twofold, although both arguments rely on the "conscious misbehavior or recklessness" prong of the scienter pleading standard.  *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020) (citation omitted) (explaining that scienter can be alleged through either "motive and opportunity to commit fraud" or "conscious misbehavior or recklessness").  *First*, Plaintiff argues that

Vashovsky and Oberholzer worked closely with Capone between 2015 and
March 2024 (for Vashovsky), and between 2015 and January 2023 (for
Oberholzer), and thus had actual knowledge of Capone's fabricated credentials.
(Pl. Opp. 19).  *Second*, and alternatively, both executives supposedly acted with
reckless disregard for Capone's misstatements by "fail[ing] to check information
they had a duty to monitor."  (*Id.* (internal quotation marks and citation
omitted)).  The Court finds both arguments unpersuasive.

    With regards to actual knowledge of the misstatements, Plaintiff has
pleaded no facts to suggest that Vashovsky and Oberholzer had any awareness
that Capone was lying about his academic background.  (*See generally* AC).
Instead, Plaintiff states in a conclusory manner that actual knowledge must
have existed because the men worked together over a lengthy period.  (Pl.
Opp. 19).  This is not enough.  Viewing the allegations holistically, the
Amended Complaint's threadbare assertions are insufficient to give rise to a
"*strong* inference that [ ] [D]efendant[s] acted with the required state of mind."
*ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)); *In re Molycorp, Inc. Sec.
Litig.*, No. 13 Civ. 5697 (PAC), 2015 WL 1097355, at *13 (S.D.N.Y. Mar. 12,
2015) (dismissing claims based on "actual knowledge" when "[p]laintiffs'
allegations of [d]efendants' knowledge [we]re both speculative and conclusory").

    Plaintiff argues in the alternative that Vashovsky and Oberholzer were
reckless because they failed conduct a background check into Capone's
credentials.  (Pl. Opp. 19).  In particular, Plaintiff points out that Vashovsky
failed to check Capone's credentials when appointing him CEO of DocGo.  (*Id.*).

For Oberholzer's part, he was allegedly involved in the "day-to-day operations" of the Company, and thus also should have conducted a background check into Capone. (*Id.* at 19-20). The Court finds this argument untenable — under such a theory, any corporate executive could be liable for securities fraud for failing to conduct a background check into their colleagues. And the circumstances here offer no limiting principle. There are no facts alleged that suggest that Vashovsky and Oberholzer had any reason to doubt Capone's credentials, or willfully blinded themselves to the possibility of their falsity. (*See* Def. Reply 8). As such, Vashovsky and Oberholzer's failure to conduct a background check of Capone does not constitute "conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks omitted); *see also Harris* v. *AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 176 (S.D.N.Y. 2015) (finding that amended complaint failed to plead an inference of scienter because plaintiffs "failed to specifically identif[y] … reports or statements that would have come to light in a reasonable investigation [or] that would have demonstrated the falsity of the alleged misleading statements" (internal quotation marks omitted)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (summary order). Because Plaintiff has failed to plead sufficient facts to give rise to a strong inference of scienter, the Court dismisses Count I as against Vashovsky and Oberholzer.[6]

---

[6]     Because the Court holds that Plaintiff has not adequately alleged scienter as to Vashovsky and Oberholzer, it declines to reach the question of whether Vashovsky — by signing the Notice of the Annual Meeting of the Shareholders attached to the April 29,

ii.    **Plaintiff Sufficiently Alleges Scienter for Capone and DocGo as to the Education Statements and the Medicaid Statements**

With regards to the Education Statements, Defendants do not contest that Capone acted with the requisite level of scienter because Capone clearly knew the Education Statements were inaccurate.  (Def. Br. 8, 21; *see generally* Capone Br.).  The question that remains, however, is whether Capone's statements regarding his education can be imputed to DocGo.  Where a defendant is a corporation, adequately pleading scienter requires pleading facts that give rise to a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.  Moreover, "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009); *see also Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund* v. *Olo Inc.*, No. 22 Civ. 8228 (JSR), 2023 WL 4744197, at *6 (S.D.N.Y. July 25, 2023) ("The scienter of [two officers of the corporation] can be imputed to the corporation

---

2022 and April 26, 2023 proxy statements — and Oberholzer — by signing the Form 8-K form filed on November 7, 2022 — were the "makers" of actionable statements for purposes of *Janus Capital Group Inc.* v. *First Derivative Traders*, 564 U.S. 135 (2011). *Compare In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509 (ES) (CLW), 2020 WL 3026564, at *14 (D.N.J. June 5, 2020) ("The[ ] cases … suggest that the signer of a Forms 8-K may be liable for misstatements contained in attachments to the Forms 8-K when they allegedly have at least some authority over the misleading statements."), *and In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 163-64 (S.D.N.Y. 2012) ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b)."), *with Xu* v. *Gridsum Holdings Inc.*, 624 F. Supp. 3d 352, 363 (S.D.N.Y. 2022) ("That Zhang signed the Form 6-K — the cover page — attached to the press release does not mean he is the 'maker' of the press release.").

because they are management-level employees that made the alleged
misstatements.").

To refute the claim that Capone's scienter can be imputed to DocGo,
Defendants argue that Capone did not acquire the knowledge regarding the
Education Statements "while acting within the scope of employment." (Def.
Br. 22). Under this theory, because Capone "learned the facts contradictory to
the Education Statements long before his DocGo employment, that knowledge
cannot be imputed to the Company." (Def. Reply 7). While it is true that
Capone made false statements about his education prior to joining DocGo, this
fact does not prevent the imputation of scienter to DocGo. This is so because,
once Capone began working for DocGo, Capone repeated these lies while
explicitly tying them to the Company's development. *See supra* B.1.a.

Moreover, Capone was plainly acting within the "scope of his
employment" when speaking on behalf of the DocGo at various conferences and
corporate events. Because Capone made the Education Statements while
presenting in his official capacity as DocGo's President and CEO, his scienter
can be imputed to the company. (Pl. Opp. 17). *See also In re BHP Billiton Ltd.
Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) ("There is no formulaic
method or seniority prerequisite for employee scienter to be imputed to the
corporation, but scienter by management-level employees is generally sufficient
to attribute scienter to corporate defendants." (internal quotation marks
omitted)); *Bos. Ret. Sys.* v. *Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 132 (D.

Conn. 2021) (finding scienter requirement satisfied as to a corporate defendant when the corporation's CEO acted with scienter).

Perhaps recognizing the shortcomings of their argument, Defendants assert in the alternative that the "adverse-interest exception" applies, reasoning that Capone was only "speaking for himself" when he made the Education Statements.  (Def. Br. 23).  Here too, however, Defendants' arguments fail. "The adverse interest exception is an exception to the general rule that the acts and knowledge of an agent acting within the scope of his employment or with apparent authority are imputed to the principal for cases where 'an agent acts adversely to the principal.'"  *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 53 (2d Cir. 2025) (quoting RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006)). However, the adverse interest exception is "the 'most narrow of exceptions,' requir[ing] that 'the fraud is committed *against* a [principal] rather than on its behalf,' and is inapplicable where 'the agent act[s] both for himself and for the principal.'"  *Id.* (quoting *Republic of Iraq* v. *ABB AG*, 768 F.3d 145, 166 (2d Cir. 2014)).  In this case, Capone repeatedly lied about his academic credentials at investor conferences and circumstances where he was seeking to promote DocGo.  (*See, e.g.*, AC ¶¶ 35, 38-40, 42-44).  And Capone did so to enhance the public's perception of his ability to lead DocGo's technological development. These allegations are sufficient at this stage of the litigation to allow the inference that the misstatements were made for the benefit not only of Capone, but DocGo as well.  *See In re Shanda Games*, 128 F.4th at 53 ("If both the corporation and the rogue agent benefited, the adverse interest exception does

not apply."); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382 (S.D.N.Y. 2015) (finding that adverse interest exception did not apply where fraud operated on the public, not on the corporation).  Accordingly, the Court finds that Plaintiff has adequately alleged scienter as to Capone and DocGo for the Education Statements.

The same scienter analysis holds true for the Medicaid Statements.  As explained above, in seeking to convince prospective investors that DocGo had not fumbled the HPD contract, Capone explained that DocGo was using the HPD contract "to transition patients in DocGo's population health vertical into the Company's payer vertical by signing migrants up for New York State Medicaid through UnitedHealthcare."  (AC ¶ 60).  Importantly for scienter purposes, this plan was not presented as theoretical but as actual: Capone asserted that DocGo had "already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare."  (*Id.*).  What is more, by enrolling the migrants through UnitedHealthcare, which had a managed Medicaid contract with New York State, DocGo was positioning itself to become the migrants' attributed primary care physician, a status that would allow DocGo "to provide care for them on a long-term basis," and — more importantly for the Company's investors — to "see long term revenue streams that come from it."  (*Id.* ¶ 61).

Within a month, each of these statements had been revealed as false — mostly by DocGo itself.  The Company's public relations representative stated clearly that DocGo does not, and did not, "enroll anyone in Medicaid programs,

nor do we make any determinations regarding who qualifies for Medicaid programs." (Mendro Decl., Ex. 4 at 3; *see also* AC ¶ 68). By extension, therefore, DocGo could not and did not become anyone's primary care provider through any Medicaid enrollment process. (*See* Mendro Decl., Ex. 4 at 3; *but cf. id.* (noting limited instances in which DocGo could become a primary care provider for individuals enrolled in Medicaid)). Similarly, Capone's suggestion of a symbiotic relationship with UnitedHealthcare was equally false, as the latter company disclaimed any contractual relationship with DocGo in New York. (*Id.*). Capone had to know, at the time he made these statements, that they were false; at the very least, he had access to the information that would have proven them false. He made them anyway, to improve DocGo's prospects with investors in the face of negative publicity concerning the Company's work under the HPD contract. And the specificity with which the Medicaid Statements were made puts the lie to Defendants' current argument that investors would have understood that Capone was tongue-tied, and was merely explaining how DocGo "facilitated Medicaid sign-ups with UnitedHealthcare." (Def. Br. 16). The allegations in the Amended Complaint give rise to the strong inference of scienter necessarily to sustain Plaintiff's claims against Capone and DocGo for the Medicaid Statements.

### iii.    Plaintiff Fails to Sufficiently Allege Scienter for Capone and DocGo as to the CBP Statements

The Court reaches a different conclusion regarding Capone's, and thus DocGo's, scienter when considering the CBP Statements. Here again, Plaintiff argues that the Amended Complaint has sufficiently alleged scienter under the

"strong circumstantial evidence" prong.  *ECA*, 553 F.3d at 198.  Specifically,

Plaintiff alleges that the circumstantial evidence supports an inference that

"defendants knew facts or had access to non-public information contradicting

their public statements" about the value of the CBP contract.  (Pl. Opp. 20

(quoting *S.E.C.* v. *Takeyasu*, No. 17 Civ. 4866 (GHW), 2018 WL 2849777, at

*16 (S.D.N.Y. June 11, 2018))).  Plaintiff takes particular note of Capone's

statement that DocGo had been "working on [the RFP] *for seven to eight*

*months*" when he made his statements, extrapolating that he must then have

known the actual size of the contract on which DocGo was bidding.  (*Id.*

(quoting AC ¶ 59)).

　　　While the Court does not find this argument to be unreasonable, it

nonetheless finds that Plaintiff has failed to plead facts giving rise to a "strong"

inference of scienter as to the CBP Statements, when taking into account

"plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  Plaintiff does not

identify the information that Capone supposedly had regarding the contract or

any additional context that speaks to Capone's awareness of the contract's true

value, beyond the length of DocGo's efforts to procure the contract.  *See*

*Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020) ("To the

extent that plaintiffs assert that defendants had access to contrary facts, the

complaint must 'specifically identify the reports or statements containing this

information.'" (quoting *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 659

(S.D.N.Y. 2012))); *Schwab* v. *E*Trade Fin. Corp.*, 258 F. Supp. 3d 418, 432

(S.D.N.Y. 2017) ("The plaintiff rests his claims on the theory that [defendant]

must have known the best execution promises were going to be unfulfilled …
by virtue of his position as CEO, but boilerplate allegations that defendants
knew or should have known of fraudulent conduct based solely on their board
membership or executive positions are insufficient to plead scienter." (internal
quotation marks omitted)); *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F.
Supp. 2d 168, 184 (S.D.N.Y. 2012) ("An allegation that a defendant merely
ought to have known is not sufficient to allege recklessness.").

    As such, the Amended Complaint simply fails to allege with the required
particularly that Capone acted with scienter at the time his CBP Statements
were made.  What is more, as Defendants point out, there appeared to be
ambiguity surrounding the contract's true value (Mendro Decl., Ex. 2 at 1
(stating that the CBP opportunity "could turn into ~$4B over ~5+ years")),
which undermines the allegation that Capone acted with "an intent to deceive,
manipulate, or defraud," *Kalnit,* 264 F.3d at 138 (internal quotation marks and
citation omitted).  Because "[r]ecklessness in the scienter context cannot be
merely enhanced negligence," *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp.
2d 595, 624 (S.D.N.Y. 2005), the Court finds that Plaintiff has failed to allege
scienter as to Capone, and thus necessarily DocGo, for purposes of the CBP
Statements.

### c.    Liability for Statements Made Before April 29, 2022

    Separately, Defendants argue that the Court should foreclose liability for
any statements made by Capone before April 29, 2022, because such
statements did not relate to the purchase or sale of DocGo securities.  (Def.

Br. 10-11).  In particular, the two misrepresentations in the Amended

Complaint that are alleged to have occurred before April 29, 2022, are

(i) Capone's statements in a June 2021 proposal to the New Jersey Department

of Health Office of the Commissioner and (ii) Capone's statements on a podcast

in September 2021.  (*See* AC ¶¶ 37, 70).

The Court agrees with Defendants that these statements cannot support

liability in this action.  To recover damages for violations of Section 10(b) and

Rule 10b-5, a plaintiff must prove a connection between the misrepresentation

or omission, and the purchase or sale of a security.  17 C.F.R. § 240.10b-5;

*Blue Chip Stamps* v. *Manor Stores*, 421 U.S. 723, 731 (1975) (holding that "the

plaintiff class in a Rule 10b-5 action was limited to actual purchasers and

sellers").  A statement made "in connection with" the purchase or sale of

security occurs only if it "concern[s] the value of the securities purchased or

sold, or the consideration received in return."  *Hoffman* v. *TD Waterhouse Inv.*

*Servs., Inc.*, 148 F. Supp. 2d 289, 290 (S.D.N.Y. 2001).  The statements at issue

here must be dismissed for the simple reason that Plaintiff has failed to show

any connection between Capone's pre-class statements and DocGo's securities.

In fact, the statements could not have related to DocGo's shares because

DocGo had not been formed at the time the misstatements were made.  (Def.

Br. 10).  Moreover, neither the June 2021 statement in Ambulnz's contract

proposal nor the September 2021 statement in the AI podcast is alleged to have

touched on the prospective merger between Ambulnz, then a private company,

and Motion.  (*Id.*).  *See In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 78

(S.D.N.Y. 2023) ("Plaintiffs provide no explanation as to why, as a legal matter, the post-merger entity can be considered interchangeable with the pre-merger, privately held company.").

The Court's conclusion is bolstered by the Second Circuit's decision in *Menora Mivtachim Insurance Ltd.* v. *Frutarom Industries Ltd.*, 54 F.4th 82 (2d Cir. 2022). The allegations in *Frutarom* revolved around a merger between a U.S.-based seller of fragrance products, International Flavors & Fragrances Inc. ("IFF"), and an Israeli firm, Frutarom Industries Ltd. ("Frutarom"). Under the terms of the merger, Frutarom became a wholly-owned subsidiary of IFF. *Id.* at 84-85. Plaintiffs, a putative class of investors who acquired IFF securities, alleged that leading up to the consummation of the merger, Frutarom made materially misleading statements about its compliance with anti-bribery laws and the sources of its business growth. *Id.* at 84. The Second Circuit found that the plaintiffs lacked standing to bring a securities claim for these earlier statements because "[t]he purchaser-seller rule requires plaintiffs to have bought or sold securities about which a misstatement was made in order to have standing to sue under Section 10(b)." *Id.* at 86. That is, "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." *Id.* at 88; *accord Ontario Pub. Serv. Emps. Union Pension Tr. Fund* v. *Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004). Applying the reasoning of *Menora* to this case, purchasers of a security from DocGo, formerly named Motion, do not have

44

standing to sue for comments made by Capone while he was the president of
Ambulnz, an entirely separate entity.  The fact that Ambulnz was later merged
into a subsidiary of Motion does not alter this analysis.  *See In re CarLotz, Inc.*,
667 F. Supp. 3d at 78-79 (finding that *Menora* foreclosed plaintiffs from
bringing claims because "[a]ll of the challenged pre-merger statements … were
made by Pre-Merger CarLotz about itself, not Acamar").  Accordingly, the Court
will not consider securities fraud claims predicated on statements predating
April 29, 2022.

### 2.    Plaintiff Fails to Sufficiently Allege a Claim for Scheme Liability

The Court next considers whether Plaintiff has plausibly alleged scheme
liability under the federal securities laws.  "To state a claim for scheme liability
[under Subsections (a) and (c) of Rule 10b-5], a plaintiff must present facts
showing '[i] that the defendant committed a deceptive or manipulative act, [ii]
in furtherance of the alleged scheme to defraud, [iii] with scienter, and [iv]
reliance.'"  *Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577
(S.D.N.Y. 2016) (quoting *Alstom*, 406 F. Supp. 2d at 474).  "Generally, scheme
liability is triggered where the defendant 'performed an inherently deceptive act
that was distinct from an alleged misstatement: *i.e.*, sham agreements, sham
transactions, sham companies, or undisclosed payments to doctors who
appeared independent.'"  *S.E.C.* v. *Farnsworth*, 692 F. Supp. 3d 157, 189
(S.D.N.Y. 2023) (quoting *Turquoise Hill*, 625 F. Supp. 3d at 253)).  Because the
"three subsections of Rule 10b-5 are distinct," courts must "scrutinize
pleadings to ensure that misrepresentation or omission claims do not proceed

45

under the scheme liability rubric." *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012); *S.E.C.* v. *Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) ("Courts have not allowed subsections (a) and (c) of Rule 10b-5 to be used as a back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5." (internal quotation marks omitted))

Here, Plaintiff argues that Defendants are liable for participating in a scheme to defraud because "Vashovsky and Capone submitted falsified proposals to potential customers in an effort to procure more business for DocGo." (Pl. Opp. 25). Notably, the one example Plaintiff cites as support occurred prior to the Class Period, and this Court has already dismissed this particular misstatement. *See supra* B.1.c. However, even if the Court could consider this allegation, it would not find that Plaintiff has adequately pleaded scheme liability. Plaintiff wholly fails to allege that Defendants actively participated in "customer-oriented misconduct" sufficient to constitute scheme liability. (Pl. Opp. 26). Instead, Plaintiff focuses "only on the[ ] [D]efendants' alleged misstatements or omissions, and therefore fail[s] to state that they committed an 'inherently deceptive act that is distinct from an alleged misstatement.'" *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 471 (S.D.N.Y. 2017) (quoting *Kelly*, 817 F. Supp. 2d at 344). Accordingly, Plaintiff's claims for scheme liability are dismissed.[7]

---

[7]    The Court briefly notes its disagreement with Plaintiff's assertion that Defendants waived their ability to argue for dismissal of the scheme liability claims. Defendants included a statement regarding scheme liability in their opening brief (Def. Br. 10), and

### 3. Plaintiff Has Sufficiently Alleged Some, But Not All, of Its Section 20(a) Claims

The Court now turns to Plaintiff's Section 20(a) claims, which Plaintiff asserts against the individual Defendants. (AC ¶¶ 121-127).[8] As previously noted, Section 20(a) liability is derivative of Section 10(b) liability. *See, e.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 631 (S.D.N.Y. 2014) (finding that, in the absence of a primary violation under Section 10(b), "control person" liability under Section 20(a) cannot exist). And, "[t]o state a claim of control person liability under [Section] 20(a), 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108). Having concluded that Plaintiff sufficiently alleges a primary violation of Section 10(b) against DocGo — and thus satisfies the first prong of this test — the Court's analysis focuses on the second and third prongs.

---

as such, their arguments are not waived, *see Knipe* v *Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) (stating that "[a]rguments may not be made *for the first time* in a reply brief" (emphasis added)).

[8]    The Amended Complaint states that Plaintiff is pursuing Section 20(a) claims against "All Defendants," which would include DocGo. (AC, Count II). However, in Plaintiff's opposition to the motion to dismiss, Plaintiff abandons any assertion that DocGo may be liable under Section 20(a) and instead focuses on arguing that "Capone, Vashovsky, and Oberholzer controlled DocGo." (Pl. Opp. 27). Plaintiff's decision is a wise one, as the Amended Complaint provides no support for the proposition that DocGo controlled any of the individual defendants. (*See generally* AC). Rather, it is Capone as DocGo's President and then CEO who exerted control over the Company. Further, "[c]onclusory allegations of control are insufficient as a matter of law." *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005). Accordingly, the Court finds that the claims in Count II must be dismissed against Vashovsky, Oberholzer, and DocGo.

The Court begins by analyzing the claim as to Vashovsky and Oberholzer. As it found with the Section 10(b) claims, the Court finds that Plaintiff's allegations are plainly insufficient to state a claim under Section 20(a) against these defendants. In conducting Section 20(a) analyses, "courts have held that officer or director status alone does not constitute control for the purposes of Section 20(a) liability." *Alstom*, 406 F. Supp. 2d at 487. Thus, Vashovsky and Oberholzer's positions at DocGo are insufficient to demonstrate control for purposes of Section 20(a) liability.

However, because both Vashovsky and Oberholzer signed documents containing the Education Statements (Pl. Opp. 27), it is possible "that control as to the financial statements" could be sufficiently pleaded, *Alstom*, 406 F. Supp. at 487. Nevertheless, the Court finds that is not the case here, because regardless of whether Vashovsky and Oberholzer exercised control over these documents, Plaintiff does not meet the third prong of the control person test. That is, Plaintiff has failed to show that these individuals were "in some meaningful sense, a culpable participant in the [primary violator]'s fraud." *Carpenters*, 750 F.3d at 236 (internal quotation marks omitted). As discussed with regard to the Section 10(b) claims, Plaintiff alleges no real "involvement [by Vashovsky or Oberholzer] in [the] alleged wrongdoing … beyond just 'being there.'" *Alstom*, 406 F. Supp. at 490; *supra* B.1.b.i. As such, Plaintiff's Section 20(a) claims against Vashovsky and Oberholzer necessarily fail.

The Court reaches a different result, yet again, when assessing control person liability for Capone. "While a party cannot be held liable for both a

48

primary violation and as a control person, alternative theories of liability are permissible at the pleading stage." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534-35 (S.D.N.Y. 2010); *Suez Equity Invs.* v. *Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("Controlling-person liability under § 20 of the Securities Exchange Act is a separate inquiry from that of primary liability and provides an alternative basis of culpability." (internal quotation marks omitted)).  Because the Court has found a primary violation of Section 10(b), the first element of the control person standard is satisfied.  With respect to the second factor, to demonstrate control, "[t]he Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." *Floyd* v. *Liechtung*, No. 10 Civ. 4254 (PAC), 2013 WL 1195114, at *6 (S.D.N.Y. Mar. 25, 2013) (emphasis omitted).  In this case, Capone plausibly exercised control over DocGo because he possessed "the power to direct or cause the direction of the management and policies" of the Company.  *S.E.C.* v. *First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996); *see also Stadium Cap. LLC* v. *Co-Diagnostics, Inc.*, No. 22 Civ. 6978 (AS), 2024 WL 456745, at *7 (S.D.N.Y. Feb. 5, 2024) (declining to dismiss a Section 20(a) claim because "the CEO and CFO of the company had the power to direct … the management and policies of that [c]ompany" (internal quotation marks omitted)); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 253 (S.D.N.Y. 2018) (finding that a complaint adequately pleaded Section 20(a) liability against a defendant that was the "chief executive officer, president, and a director" of the company").  And

Capone certainly had "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007). Turning to the final factor, for the reasons set forth previously, Plaintiff has sufficiently pleaded that Capone was a culpable participant in the alleged fraud. *See supra* B.1.b.ii. Accordingly, Plaintiff has plausibly stated a claim under Section 20(a) against Capone.

## CONCLUSION

In accordance with the foregoing analysis, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. The Court dismisses all claims against Defendants Vashovsky and Oberholzer. Moreover, the Court dismisses certain of Plaintiff's Section 10(b) claims against Defendants Capone and DocGo, but leaves in place Plaintiff's claims as to these Defendants pertaining to the Education Statements and the Medicaid Statements that were made during the Class Period. Finally, the Court dismisses the Section 20(a) claim against DocGo. The Clerk of Court is directed to terminate the pending motions at docket entries 60 and 63, and to modify the caption as presented above.

Defendants Capone and DocGo are ordered to file answers on or before **April 25, 2025**.  The parties remaining to this litigation are also ordered to meet and confer, and to submit a proposed case management plan on or before **May 2, 2025.**

SO ORDERED.

Dated:    March 28, 2025
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge