UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

GENESEE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and
on Behalf of All Others Similarly Situated,

            Plaintiff,

   -against-

DOCGO INC. and ANTHONY CAPONE,

            Defendants.

-----------------------------------------------------

Civil Action No. 1:23-cv-09476-KPF

<u>CLASS ACTION</u>

DOCGO INC.'S ANSWER TO
AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

 

Defendant DocGo Inc. ("DocGo"), by and through its undersigned counsel, answers the Amended Complaint for Violations of the Federal Securities Laws ("Complaint") filed by Lead Plaintiff Genesee County Employees' Retirement System ("Lead Plaintiff") in *Genessee County Employees' Retirement System v. DocGo Inc.*, et al, Civil Action No. 1:23-cv-09476-KPF, and states[*]:

## GENERAL DENIAL

Except as otherwise expressly stated herein, DocGo denies each and every claim, theory, and allegation asserted in the Complaint, and specifically denies liability under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder. Pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure, averments in the Complaint to which no responsive pleading is required shall be deemed denied. DocGo expressly reserves the right to amend and/or supplement this Answer as may be necessary.

---

[*] Mr. Vashovsky and Mr. Oberholzer were dismissed from this case and are under no obligation to answer the Complaint. *See* ECF No. 77 at 50.

**RESPONSE TO HEADINGS AND FOOTNOTES**

The Complaint contains several headings, which DocGo has included in this Answer. The headings are not properly pleaded allegations requiring a response, and DocGo does not adopt the characterizations set forth in those headings. To the extent any headings contain allegations requiring a response, DocGo denies the allegations set forth therein.  DocGo has also included Lead Plaintiff's allegations to assist the Court's review, but DocGo's responses are limited to the language labeled as "Response."  Finally, DocGo has included the footnotes from Lead Plaintiff's Complaint to assist this Court's review, but DocGo denies the allegations, except where it notes otherwise.

**RESPONSE TO INDIVIDUAL PARAGRAPHS**

**I.     INTRODUCTION**

1.     This is a securities fraud class action brought on behalf of those who purchased DocGo Inc. ("DocGo" or the "Company") common stock between November 5, 2021 and September 15, 2023, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

**Response:**

DocGo need not respond to the allegations in Paragraph 1 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent the allegations in Paragraph 1 assert legal conclusions, no response is required.  To the extent Paragraph 1 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Lead Plaintiff purports to bring a shareholder class action on behalf of all persons who transacted in DocGo common stock between November 5, 2021, and September 15, 2023, asserting the specified claims against the specified Defendants.  DocGo denies that the lawsuit has any merit, denies the suit may proceed as a class action, and denies that the Class Period is appropriate.

2.      DocGo is a healthcare company that provides medical transportation and mobile health services in the United States and the United Kingdom. DocGo has two operating segments: Transportation Services, which include emergency response and non-emergency transport services; and Mobile Health Services ("Mobile Health"), which include services performed at home and offices, testing, vaccinations, and event services.

**Response:**

DocGo admits that it is a healthcare company, that it provides medical transportation and

mobile health services in the United States and United Kingdom, and that its business segments

include Transportation Services, which provides efficient transfers between clinical settings and

access to clinical services, and Mobile Health Services, which facilitates care for a diverse group

of customers including municipalities, hospitals and health systems, insurers, physician practices,

businesses and employers.  DocGo otherwise denies the allegations in Paragraph 1.

3.      During the Class Period, DocGo positioned itself as a technology company and one of the few public companies committed to bringing healthcare to underserved populations. DocGo touted a proprietary artificial intelligence ("AI") platform technology, purportedly developed in large part by its President and eventual Chief Executive Officer ("CEO") Anthony Capone ("Capone"), as the Company's largest differentiator in the field of medical transportation and mobile health. DocGo and Capone also touted the Company's ability to win government contracts and leverage existing contracts into future business, including a purported $4 billion contract with U.S. Customs and Border Protection ("CBP"), which Capone told investors DocGo was well situated to win. The truth, however, was very different from what defendants led investors to believe.

**Response:**

DocGo need not respond to the allegations in Paragraph 3 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To

the extent the allegations in Paragraph 3 assert legal conclusions, no response is required.  To the

extent the allegations in Paragraph 3 contain factual allegations requiring a response, DocGo

denies the allegations, except that it admits that DocGo is committed to bringing healthcare to

underserved populations and uses artificial intelligence as part of its technology platform.

4.      First, Capone fabricated his educational background. While Capone pathologically touted his background in computer science and graduate degree in computational

learning theory, a subset of AI, to investors and customers, Capone had never even enrolled in, let alone graduated from, any graduate program in AI or any other field of study.

**Response:**

DocGo need not respond to the allegations in Paragraph 4 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 4 asserts legal conclusions, no response is required. To the extent Paragraph 4 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone publicly stated that he did not receive a graduate degree in computational learning theory.

5.      Second, as an integral part of defendants' efforts to transition the Company's Mobile Health business away from COVID-19 services, DocGo increasingly sought to win non-COVID-19 medical services contracts with government agencies. In May 2023, DocGo was awarded a controversial $432 million no-bid contract with the New York City Department of Housing Preservation and Development (the "HPD") to provide services to migrants in conjunction with New York City's practice of relocating migrants. Reeling from intense scrutiny regarding DocGo's poor execution and mismanagement of the HPD contract, Capone sought to placate investors by falsely inflating the value of a future purported contract with CBP, which Capone stated DocGo was positioned to win, telling investors that the contract was worth $4 billion. In fact, the contract was worth no more than half that amount, and DocGo failed to secure any portion of it.

**Response:**

DocGo need not respond to the allegations in Paragraph 5 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 5 asserts legal conclusions, no response is required. To the extent Paragraph 5 asserts factual allegations requiring a response, DocGo denies the allegations, except that it admits that in May 2023, it won a contract not to exceed $432 million with the New York City Department of Housing Preservation and Development.

6.      Also during the Class Period, Capone stated to investors that DocGo had signed up thousands of migrants for the New York State Medicaid Managed Care Plan offered through UnitedHealthcare, with the ability to parlay such sign ups into future business in the Company's Mobile Health segment. In fact, DocGo did not sign up any migrants for Medicaid programs.

**Response:**

To the extent Paragraph 6 asserts legal conclusions, no response is required. To the extent Paragraph 6 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that managed care companies and other approved enrollment entities were welcomed at the sites DocGo managed for the New York City Department of Housing Preservation and Development to meet with asylum seekers, determine their eligibility, and directly enroll asylees who qualified for coverage.

7.      Each of the Individual Defendants (defined herein) was directly involved in the misconduct. Stan Vashovsky ("Vashovsky"), as DocGo's Chairman and CEO, and Andre Oberholzer ("Oberholzer"), as the Company's Chief Financial Officer ("CFO"), oversaw and made misstatements regarding Capone's hiring and appointment as DocGo's President and CEO. Defendants repeatedly discussed the strengths of DocGo's purported AI technology and Capone's integral role in developing the Company's AI technology and his graduate degree in computational learning theory throughout the Class Period, when in fact Capone did not have a graduate degree in computational learning theory. Vashovsky, Capone, and Oberholzer also oversaw the preparation of DocGo's false and misleading proxy statements and Company releases. As CEO of DocGo, Capone directly oversaw the Company's operations and had access to information concerning the value of contracts in DocGo's pipeline, as well as information concerning the Company's ability to sign up individuals for Medicaid programs.

**Response:**

DocGo need not respond to the allegations in Paragraph 7 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 7 asserts legal conclusions, no response is required. To the extent Paragraph 7 asserts factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone served as President and CEO during a portion of the class period and that Mr. Capone publicly stated that he did not receive a graduate degree in computational learning theory.

8.      In September 2023, when defendants could no longer sustain their scheme and wrongful course of business, the true state of affairs at DocGo began to be revealed. On September 10, 2023, the *Times Union* published an article titled: "DocGo CEO's comments on migrant contracts appear inaccurate." In the article, the *Times Union* reported the "'over $4

billion'" contract with CBP was worth far below $4 billion and was in fact worth under $2 billion, according to multiple sources familiar with the bidding process. The *Times Union* also reported Capone's statements to investors about signing migrants onto New York State Medicaid were false. A UnitedHealthcare representative informed the *Times Union* that DocGo did not even have a contract with UnitedHealthcare in New York.

**Response:**

DocGo need not respond to the allegations in Paragraph 8 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 8 asserts legal conclusions, no response is required.  To the extent Paragraph 8 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the *Times Union* published an article titled "DocGo CEO's comments on contracts appear inaccurate," the content of which speaks for itself.  To the extent the allegations in Paragraph 8 purport to quote or characterize this article, DocGo denies that the quotes or characterizations fully or accurately reflect the content of the article, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the article.

9.      On September 14, 2023, the *Times Union* published an article titled: "No record that DocGo CEO Anthony Capone earned graduate degree," which was later updated to: "DocGo CEO Anthony Capone admits he didn't earn graduate degree." In the article, Capone admitted he did "'not have a master's degree from Clarkson University, nor from any other institution.'" On September 15, 2023, after the markets closed, DocGo filed a Form 8-K with the SEC announcing Capone's immediate resignation, purportedly for "personal reasons." That same day, the *Times Union* published an article titled: "DocGo CEO resigns following report he lied about college degree."

**Response:**

To the extent Paragraph 9 asserts legal conclusions, no response is required.  To the extent Paragraph 9 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the *Times Union* published an article titled "No record that DocGo CEO Anthony Capone earned graduate degree," the content of which speaks for itself, and that DocGo filed a Form 8-K on September 15, 2023, the content of which speak for itself.  To the extent the

allegations in Paragraph 9 purport to quote or characterize either the *Times Union* article or

DocGo's September 15, 2023 Form 8-K filing, DocGo denies that the quotes or characterizations

fully or accurately reflect the content of the article or Form 8-K, and DocGo respectfully refers

the Court to the full the article and the Form 8-K filing for a complete and accurate account of

the documents.

10.     As defendants' misconduct reached the market, DocGo's stock price collapsed, declining more than 56% from its Class Period high of $11.41 on October 11, 2022 to just $4.88 on September 18, 2023. The decline in the price of DocGo's common stock caused tens of millions of dollars in losses to DocGo investors, who suffered economic harm as the truth about DocGo, its operations, and its prospects began to be revealed. This action seeks to recover these losses suffered by Lead Plaintiff and the Class (defined herein).

**Response:**

To the extent Paragraph 10 asserts legal conclusions, no response is required.  To the

extent Paragraph 10 contains factual allegations requiring a response, DocGo denies the

allegations.

## II.    JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

**Response:**

The allegations in Paragraph 11 state legal conclusions to which no response is required.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b). A substantial number of the statements, acts, and omissions giving rise to the claims at issue occurred in this District. DocGo is headquartered in this District, and defendants are subject to personal jurisdiction in this District.

**Response:**

To the extent Paragraph 12 asserts legal conclusions, no response is required. To the

extent Paragraph 12 contains factual allegations requiring a response, DocGo denies the

allegations, except that it admits that it is headquartered in this District.

13.     In connection with the statements, acts, and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the Nasdaq Capital Market (the "NASDAQ").

**Response:**

To the extent Paragraph 13 asserts legal conclusions, no response is required. To the

extent Paragraph 13 contains factual allegations requiring a response, DocGo denies the

allegations.

### III.    PARTIES

14.     Lead Plaintiff Genesee County Employees' Retirement System ("Lead Plaintiff" or the "Retirement System") is a public pension fund based in Flint, Michigan with assets of over $250 million for the benefit of more than 1,000 participants. As set forth in its certification under the Private Securities Litigation Reform Act of 1995, which was previously filed with the Court and is incorporated herein by reference, the Retirement System purchased DocGo common stock at artificially inflated prices during the Class Period and was damaged thereby. *See* ECF 17-3.

**Response:**

To the extent Paragraph 14 asserts legal conclusions, no response is required. DocGo is

without knowledge or information sufficient to form a belief as to Lead Plaintiff's stock

purchases, and on that basis denies those allegations. DocGo otherwise denies the allegations in

Paragraph 14.

15.     Defendant DocGo is a Delaware corporation with principal executive offices located at 35 West 35th Street, Floor 6, New York, New York 10001. DocGo offers medical transportation and mobile health services in the United States and the United Kingdom. As of December 31, 2023, DocGo had 104,055,168 shares of common stock outstanding. DocGo's common stock trades in an efficient market on the NASDAQ under the ticker symbol "DCGO."

**Response:**

To the extent Paragraph 15 asserts legal conclusions, no response is required. To the extent Paragraph 15 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that DocGo's common stock is listed on the NASDAQ under the ticker symbol "DCGO," and that on December 31, 2023, DocGo had 104,055,168 shares of common stock outstanding.

16.     Defendant Vashovsky co-founded DocGo and served as DocGo's CEO until January 2023. Vashovsky has served as the Chairman of DocGo's Board of Directors (the "Board") since 2015.

**Response:**

DocGo need not respond to the allegations in Paragraph 16 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 16 asserts legal conclusions, no response is required. To the extent Paragraph 16 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Vashovsky served as DocGo's CEO until January 2023.

17.     Defendant Capone joined Ambulnz, Inc. ("Ambulnz") in 2017 and served as Ambulnz's President, Chief Technology Officer ("CTO"), and Chief Product Officer from 2017 until DocGo's Business Combination[1] in 2021. Capone served as DocGo's President until January 2023. Capone served as DocGo's CEO from January 2023 until his abrupt resignation in September 2023.

**Response:**

To the extent paragraph 17 asserts legal conclusions, no response is required. To the extent Paragraph 17 contains factual allegations requiring a response, DocGo denies the allegations in Paragraph 17, except that it admits that Mr. Capone became Chief Technology Officer of Ambulnz in 2017, that Mr. Capone served as Chief Product Officer before DocGo's

---

[1] "Business Combination" refers to Ambulnz's merger with and into a blank check company later renamed DocGo Inc. and further defined below in ¶¶26-29.

Business Combination in 2021, that Mr. Capone served as President of DocGo from July 2019 until January 2023, and that Mr. Capone served as CEO of DocGo from January 2023 to September 2023.

18.     Defendant Oberholzer served as DocGo's CFO from 2015 until January 2023. In January 2023, Oberholzer became DocGo's Treasurer and Executive Vice President of Capital Markets and Strategy.

**Response:**

DocGo need not respond to the allegations in Paragraph 18 inasmuch they relate to claims that the Court dismissed in its March 28, 2025 order, on that basis denies them.  To the extent Paragraph 18 asserts legal conclusions, no response is required.  To the extent Paragraph 18 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Oberholzer served as DocGo's CFO from November 2021 until January 2023, served as DocGo's Treasurer and Executive Vice President of Capital Markets and Strategy from January 2023 until September 2023, and has served as Executive Vice President of Strategy since September 2023.

19.     Defendants Vashovsky, Capone, and Oberholzer are collectively referred to herein as the "Individual Defendants." The Individual Defendants, together with DocGo, are referred to herein as "defendants." Defendants are liable under §§10(b) and 20(a) of the 1934 Act for DocGo's false and misleading Class Period statements.

**Response:**

DocGo need not respond to the allegations in Paragraph 19 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 19 asserts legal conclusions, no response is required.  To the extent Paragraph 19 contains factual allegations requiring a response, DocGo denies the allegations.

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of DocGo, were privy to confidential, proprietary information concerning DocGo, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse nonpublic information concerning

DocGo, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to nonpublic information about its finances, business, markets, products, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, via attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**Response:**

DocGo need not respond to the allegations in Paragraph 20 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 20 asserts legal conclusions, no response is required. To the extent Paragraph 20 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone had access to DocGo's confidential, proprietary information while he was CEO of DocGo.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of DocGo's business.

**Response:**

DocGo need not respond to the allegations in Paragraph 21 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 21 asserts legal conclusions, no response is required. To the extent Paragraph 21 contains factual allegations requiring a response, DocGo denies the allegations.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the ability and authority to control the contents of DocGo's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the

ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

**Response:**

DocGo need not respond to the allegations in Paragraph 22 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 22 asserts legal conclusions, no response is required. To the extent Paragraph 22 contains factual allegations requiring a response, DocGo denies the allegations.

23.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to DocGo's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of DocGo stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**Response:**

DocGo need not respond to the allegations in Paragraph 23 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 23 asserts legal conclusions, no response is required. To the extent Paragraph 23 contains factual allegations requiring a response, DocGo denies the allegations.

24.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of DocGo securities. The scheme: (a) deceived the investing public regarding DocGo's business, operations, and management and the intrinsic value of DocGo securities; and (b) caused Lead Plaintiff and members of the Class to purchase DocGo securities at artificially inflated prices.

**Response:**

DocGo need not respond to the allegations in Paragraph 24 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 24 asserts legal conclusions, no response is required. To the extent Paragraph 24 contains factual allegations requiring a response, DocGo denies the allegations.

## IV.    DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

25.    DocGo provides healthcare transportation and mobile services for hospitals and health systems, health plans, governments, and municipalities in the United States and the United Kingdom. DocGo markets itself as a technology company and a leading provider of mobile healthcare services.

**Response:**

To the extent Paragraph 25 asserts legal conclusions, no response is required. To the extent Paragraph 25 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that it provides healthcare transportation and mobile medical services for hospitals and health systems, health plans, governments, and municipalities in the United States and the United Kingdom.

26.    DocGo began as Motion Acquisition Corp. ("Motion"), a blank check company formed by business executives in the transportation software and technology sector. A blank check company is sometimes referred to as a special purpose acquisition company, or "SPAC," and does not initially have any operations or business of its own. Rather, it raises money from investors in an initial public offering ("IPO") and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results.

**Response:**

To the extent Paragraph 26 asserts legal conclusions, no response is required. To the extent Paragraph 26 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that **"SPAC"** stands for **"special purpose acquisition company"** and that SPACs generally can make acquisitions from the proceeds of a stock offering.

27.     Motion completed its IPO on October 19, 2020. Motion's business objective, as stated in its IPO offering documents, was "to identify, acquire and operate a business in the telematics industry," an interdisciplinary field encompassing telecommunications, vehicular technologies, electrical engineering, and computer science.

**Response:**

To the extent Paragraph 27 asserts legal conclusions, no response is required.  To the extent Paragraph 27 contains factual allegations requiring a response, DocGo admits that Motion's IPO offering documents stated Motion's business objective as "to identify, acquire and operate a business in the telematics industry," and otherwise deny the allegations.  DocGo respectfully refers the Court to Motion's IPO offering documents for a complete and accurate account of their contents.

28.     On January 6, 2021, Motion signed a letter of intent to combine with Ambulnz, which was then a private company. On March 9, 2021, Motion and Ambulnz announced they had entered into the Business Combination agreement on March 8, 2021. On October 14, 2021, Motion filed with the SEC a final proxy for the merger recommending shareholders vote in favor of the Business Combination (the "Proxy"). On November 2, 2021, Motion shareholders approved the Business Combination.

**Response:**

To the extent Paragraph 28 asserts legal conclusions, no response is required.  To the extent Paragraph 28 contains factual allegations requiring a response, DocGo otherwise admits the allegations in this Paragraph.

29.     On November 5, 2021, Motion and Ambulnz issued a release announcing the completion of the Business Combination. Ambulnz was merged with and into a subsidiary of Motion, with Motion as the surviving entity, and Motion's named changed to DocGo Inc. Motion also assumed the business and operations of Ambulnz, allowing Ambulnz to become publicly traded as DocGo.

**Response:**

To the extent Paragraph 29 asserts legal conclusions, no response is required.  To the extent Paragraph 29 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on November 5, 2021, Motion and Ambulnz issued a release

- 14 -

announcing the formation of DocGo, the content of which speak for itself, that Ambulnz merged with Motion, which changed its name to DocGo Inc., and that Motion assumed the business and operations of Ambulnz.

30.     During the Class Period, DocGo had two business segments: Transportation Services and Mobile Health. DocGo's Transportation Services segment provided emergency response and nonemergency transportation services offered under the Ambulnz brand (a wholly-owned subsidiary of DocGo after the Business Combination). DocGo's Mobile Health segment provided healthcare at home and offices, testing, vaccinations, and event services, including onsite healthcare support at sporting events and concerts. The Company's mobile health services included onsite evaluation, diagnostics, triage, and treatment.

**Response:**

To the extent Paragraph 30 asserts legal conclusions, no response is required.  To the extent Paragraph 30 contains factual allegations requiring a response, DocGo denies those allegations, except that it admits that its business segments include Transportation Services and Mobile Health, that DocGo's Transportation Services segment provides emergency response and nonemergency transportation services, and that its Mobile Health segment provides healthcare at home, businesses, or other designated locations.

### A.     Defendants Misled Investors and Customers About Capone's Educational Background

31.     Throughout and prior to the Class Period, DocGo promoted itself as a technology company positioned at the intersection of healthcare and technology. According to Capone: "DocGo, when you look at its heart, is really a technology company. From day one when we built the company, that was going to be our focus." Critical to DocGo's messaging on technology was AI.

**Response:**

To the extent Paragraph 31 asserts legal conclusions, no response is required.  To the extent Paragraph 31 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on March 15, 2023, Mr. Capone spoke at the Oppenheimer Healthcare Conference, the transcript of which contains the quoted language and speaks for itself.

To the extent the allegations in Paragraph 31 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

32.    While DocGo was promoting itself as a technology company, AI experience and capabilities were increasingly being recognized as important differentiators, particularly for high growth and startup companies. According to a September 27, 2021 *Harvard Business Review* article titled: "AI Adoption Skyrocketed Over the Last 18 Months," startups were "targeting established industries by employing the latest data-driven technologies to enter new markets with new solutions." And growth in the AI healthcare market was projected to skyrocket. As noted in a July 11, 2023 IBM.com article titled: "How can artificial intelligence benefit healthcare?," the AI healthcare market, "valued at $11 billion in 2021, is projected to be worth $187 billion in 2030. That massive increase means we will likely continue to see considerable changes in how medical providers, hospitals, pharmaceutical and biotechnology companies, and others in the healthcare industry operate."

**Response:**

To the extent Paragraph 32 asserts legal conclusions, no response is required.  To the extent Paragraph 32 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the *Harvard Business Review* published an article on September 27, 2021, titled "AI Adoption Skyrocketed Over the Last 18 Months," and that IBM.com published an article on July 11, 2023, titled "How can artificial intelligence benefit healthcare?," with the quoted content.  DocGo respectfully refers the Court to both articles for a complete and accurate account of their contents.

33.    At the same time, many companies were finding it hard to attract employees with necessary AI experience. According to a McKinsey article titled: "The state of AI in 2022 – and a half decade in review":

> Unfortunately, the tech talent shortage shows no sign of easing, threatening to slow that shift for some companies. A majority of respondents report difficulty in hiring for each AI-related role in the past year, and most say it either wasn't any easier or was more difficult to acquire this talent than in years past. AI data scientists remain particularly scarce, with the largest share of respondents rating data scientist as a role that has been difficult to fill . . . .

**Response:**

To the extent Paragraph 33 asserts legal conclusions, no response is required. To the extent Paragraph 33 contains factual allegations requiring a response, DocGo admits that McKinsey published an article titled "The state of AI in 2022 – and a half decade in review," with the quoted language. DocGo respectfully refers the Court to this article for a complete and accurate account of its contents.

34.    Against this backdrop, DocGo sought to capitalize on the growing AI wave. DocGo's "technology backbone" purportedly was a proprietary central AI system that managed the logistics behind DocGo's scheduling, patient interactions, and resource allocation. Based on the Company's representations, analysts believed DocGo's AI technology platform to be the Company's largest differentiator in ambulance services and mobile health. Needham & Company, which covered DocGo during the Class Period, described DocGo's proprietary AI platform as the Company's "secret sauce." On June 21, 2023 Canaccord Genuity, which also covered DocGo during the Class Period, wrote: "To be clear, the technology platform is the largest differentiator for DocGo with management emphatically defining itself as a technology company." On August 18, 2023, BTIG, which also covered DocGo during the Class Period, wrote:

> DCGO's underlying advanced proprietary technology is the core of the company and drives DCGO's value. Its platform is also the key differentiator that gives it an edge over competitors.

*    *    *

> DCGO has framed itself as a tech company that is at the cross-section between healthcare and technology.

**Response:**

To the extent Paragraph 34 asserts legal conclusions, no response is required. DocGo has insufficient knowledge to form a belief as to the state of mind of analysts, and denies the allegations in Paragraph 34 on that basis. To the extent Paragraph 34 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on May 18, 2022, Needham & Company wrote the quoted language attributed to it, that on June 21, 2023, Canaccord Genuity wrote the quoted statement attributed to it, and that on August 18, 2023, BTIG

wrote the quoted statements attributed to it. DocGo respectfully refers the Court to these articles for a complete and accurate account of their contents.

35.    Critical to the Company's purported technology platform were Capone and his education in AI. For example, on March 15, 2023, at an Oppenheimer Healthcare Conference, Capone specifically linked DocGo's "technology backbone" to his personal background:

> Now, again, the whole piece that we have is on top of our technology backbone. That technology backbone allows for the procurement, the dispatching, the automation of our services. And to emphasize again, DocGo's technology is at the same level [a]s the best technology companies in the world. Although we are a services company where we deliver, we derive nearly all of our revenue from services, clinical services provided in the field. The technology that we have is of the same caliber of some of the true technology companies that sell technology, that is what they make their money from.

> Part of that's due to the fact that that's my background. That's kind of where I'm heavily weighted towards. And so, every solution – every problem that we have, we answer with a technology solution. We deploy code [to] production six to seven times every single day, millions and millions of lines of code doing highly sophisticated AI-based solutions that do all the routing, the dispatching, and the predictive analytics to know who you dispatch to, where, and why.

**Response:**

To the extent Paragraph 35 asserts legal conclusions, no response is required. To the extent Paragraph 35 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on March 15, 2023, Mr. Capone spoke at the Oppenheimer Healthcare Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 35 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

36.    Indeed, throughout and prior to the Class Period, Capone repeatedly highlighted his purported graduate degree in computational learning theory to investors, customers, and the public in an effort to boost DocGo's prospects and capabilities.

**Response:**

To the extent Paragraph 36 asserts legal conclusions, no response is required.  To the extent Paragraph 36 contains factual allegations requiring a response, DocGo has insufficient knowledge to form a belief as to the veracity of the allegations and therefore denies them.

37.    On June 16, 2021, Vashovsky and Capone submitted a "Proposal to the New Jersey Department of Health Office of the Commissioner (the "Proposal") on behalf of Ambulnz, DocGo's medical transportation subsidiary. The Proposal included Capone's résumé, which stated that Capone had earned a Masters of Computational Learning Theory from Clarkson University in May 2014. The Proposal also represented Capone had earned a Bachelor of Science in Computer Science, a Bachelor of Arts in Philosophy, and a Bachelor of Arts in Law – each "*Sum Cum Laude*" – from SUNY Potsdam in May 2009:

**EDUCATIONAL EXPERIENCE**

**Masters of Computational Learning Theory** – Clarkson University – May 2014

**Bachelor of Science (CS)** – SUNY College at Potsdam, Graduated Sum Cum Laude – May 2009

**Bachelor of Arts (Philosophy)** – SUNY College at Potsdam, Graduated Sum Cum Laude – May 2009

**Bachelor of Arts (Law)** – SUNY College at Potsdam, Graduated Sum Cum Laude – 2009

**Dale Carnegie School of Business Communication** – Graduated August 2005

**Response:**

DocGo need not respond to the allegations in Paragraph 37 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 37 asserts legal conclusions, no response is required.  To the extent Paragraph 37 contains allegations requiring a response, DocGo denies the allegations, except that it admits that Ambulnz submitted a proposal to the New Jersey Department of Health Office of the Commissioner on June 16, 2021, that included Mr. Capone's resume with the educational experience listed in Paragraph 37.

38.    Capone frequently highlighted his supposed academic pedigree when speaking to investors, expressly connecting his advanced degree in AI to the foundational strengths of the

Company. For example, on September 13, 2022, while President of DocGo, Capone stated at an H.C. Wainwright Global Investment Conference:

> So Stan [Vashovsky] came in. Clinical background: paramedic for 28 years, had been in health care for almost that entire time. My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer. My graduate degree is in computational learning theory, which was a subset of artificial intelligence. And so we brought those two together. We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.

**Response:**

To the extent Paragraph 38 asserts legal conclusions, no response is required.    DocGo admits that on September 13, 2022, Mr. Capone spoke at H.C. Wainwright Global Investment Conference, the transcript of which speaks for itself.  To the extent the allegations in Paragraph 38 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.  DocGo otherwise denies the allegations in Paragraph 38.

39.    The next day, on September 14, 2022, at a Morgan Stanley Global Healthcare Conference, Capone again emphasized his graduate degree in computational learning theory to investors:

> My name is Anthony Capone, currently the President at DocGo. Originally, when we formed the company, I was our Chief Technology Officer. That's kind of where my background is in. My grad degree is in computational learning theory, which is a discrete subset of computer science, artificial intelligence.

**Response:**

To the extent Paragraph 39 asserts legal conclusions, no response is required.    DocGo admits that on September 14, 2022, Mr. Capone spoke at the Morgan Stanley Global Healthcare Conference, the transcript of which speaks for itself.  To the extent the allegations in Paragraph 39 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo

respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.  DocGo otherwise denies the allegations in Paragraph 39.

40.    On November 7, 2022, DocGo issued a release announcing Vashovsky was retiring as CEO. DocGo's Board appointed Capone as CEO, effective January 1, 2023. In the release, Vashovsky stated:

> "I am extremely proud of what we have been able to accomplish as a company these past seven years, introducing an entirely novel way of delivering quality care that is beneficial to both patients and payers alike. We are very fortunate to have someone with Anthony's skill set and track record to take the reigns [sic] as CEO next year, and I have every confidence in the continued growth and success of this company."

**Response:**

DocGo admits that on November 7, 2022, DocGo issued a press release with the statement quoted in Paragraph 40.  DocGo respectfully refers the Court to the full press release for a complete and accurate account of its contents.

41.    However, at no time before appointing Capone as CEO did Vashovsky or the rest of DocGo's Board bother to verify the accuracy of Capone's educational credentials.

**Response:**

DocGo need not respond to the allegations in Paragraph 41 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 41 asserts legal conclusions, no response is required.  To the extent Paragraph 41 contains factual allegations requiring a response, DocGo denies the allegations.

42.    After the Board appointed Capone as CEO, Capone continued to tout his credentials in the rapidly expanding field of AI to investors. For example on January 12, 2023, at a JPMorgan Healthcare Conference, Capone stated:

> My name is Anthony Capone, as introduced there. I'm Chief Executive Officer. We started the company about 6.5 years ago; I was our Chief Technology Officer. My background, my grad degree is in computational learning theory, which is a subset of AI. So I'm on the technology side. And as I'll go through, our founder is on the clinical side, and we bring the two together to deliver a true, true healthcare service that's built on top of very sophisticated technology backbone.

**Response:**

To the extent Paragraph 42 asserts legal conclusions, no response is required. To the extent Paragraph 42 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on January 12, 2023, Capone spoke at the JPMorgan Healthcare Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 42 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

43. Later in the same presentation at the JPMorgan Healthcare Conference, Capone again touted his academic credentials:

> Now one of the key parts, and I like to talk about this quite a lot because it's my background, my graduate degree is in computational learning theory, is our technology. Everybody says they have technology. Everybody has got some app that they like to have. This is not that.

**Response:**

DocGo admits that on January 12, 2023, Mr. Capone spoke at the JPMorgan Healthcare Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 43 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made. DocGo otherwise denies the allegations in Paragraph 43.

44. Capone also repeatedly inserted references to his credentials into messaging about the AI capabilities of DocGo. On August 9, 2023, at a Canaccord Genuity Growth Conference, Capone stated:

> We started the company. I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence and all of the tech that we have at DocGo whether that tech [is] to

distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

**Response:**

To the extent Paragraph 44 asserts legal conclusions, no response is required. To the extent Paragraph 44 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 44 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

45.     Unbeknownst to investors, however, Capone had not earned a graduate degree in computational learning theory or any other field of study from Clarkson University or any other institution. In fact, Capone had never even enrolled in any graduate program at Clarkson University. Nor had Capone earned a triple *summa cum laude* undergraduate degree from SUNY Potsdam. On September 14, 2023, Albany's *Times Union* published an article titled: "DocGo CEO Anthony Capone admits he didn't earn graduate degree." In the article, Capone admitted he had never earned any master's degree and refused to confirm that he even held an undergraduate degree from SUNY Potsdam, let alone a triple *summa cum laude* degree, as he had previously represented:

> This week, the *Times Union* found another discrepancy involving DocGo: Anthony Capone has said he went to the State University of New York at Potsdam for his undergraduate degree, according to his biography on the company's website.
>
> Capone's biography also says he received a graduate degree in artificial intelligence from Clarkson University, which has a campus in Potsdam. But a spokesman for Clarkson University said the school has no record of Anthony Capone enrolling in or completing a graduate degree at the university.
>
> Late Thursday, Capone responded through his spokesman and admitted in a statement the information is false.

"I want to address a serious issue concerning incorrect information about my educational background. Specifically, it has come to my attention that my public biography erroneously states that I hold a [master]'s degree from Clarkson University," Capone said. "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution. This inaccuracy should have been corrected, and I deeply apologize for this error. I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."

Capone added that he takes "full responsibility and am making immediate corrections to all official bios, profiles, and any other materials where this incorrect information appears."

**Response:**

To the extent Paragraph 45 asserts legal conclusions, no response is required. To the extent Paragraph 45 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on September 14, 2023, Albany's *Times Union* published an article titled: "DocGo CEO Anthony Capone admits he didn't earn graduate degree" with the quoted statement. To the extent the allegations in Paragraph 45 purport to quote or characterize that article, DocGo denies that the quotes or characterizations fully or accurately reflect the content of article, and DocGo respectfully refers the Court to the full article for a complete and accurate account of the article.

46.     Amazingly, Capone's admission that he had fabricated parts of his résumé was itself false and misleading as it suggested only that his "public biography" was erroneous when in fact Capone had systematically lied about his education time and again to investors, customers, and the public.

**Response:**

To the extent Paragraph 46 asserts legal conclusions, no response is required. To the extent Paragraph 46 contains factual allegations requiring a response, DocGo denies the allegations.

47.     The next day, on September 15, 2023, DocGo filed a Current Report on Form 8-K with the SEC, announcing Capone's "resignation."

**Response:**

To the extent Paragraph 47 asserts legal conclusions, no response is required. To the extent Paragraph 47 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that it filed a Current Report on Form 8-K on September 15, 2023, which speaks for itself. DocGo respectfully refers the Court to the full filing for a complete and accurate account of its contents.

### B.     Defendants Misled Investors About DocGo's Performance and Prospects

48.     Though DocGo originated as Ambulnz, with a focus on medical transportation, the Company's Mobile Health segment grew dramatically through 2020, 2021, and 2022. DocGo reported Mobile Health revenues of $234.4 million in 2021 and $325.9 million in 2022. By the first quarter of 2023, the Mobile Health segment comprised over 69% of the Company's business.

**Response:**

To the extent Paragraph 48 asserts legal conclusions, no response is required. To the extent Paragraph 48 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that DocGo reported Mobile Health revenues of $234.4 million in 2021 and $325.9 million in 2022.

49.     Within DocGo's Mobile Health segment, the Company had a number of different segments, or "verticals," including governments, payers, hospitals, and events. DocGo's government vertical was the Company's largest by a significant margin. As Capone stated at a March 7, 2023 Cowen Health Care Conference: "Our government vertical is the largest. That's over 60% of our revenue. And that's what we call population health. So we go to large municipalities. These are very large contracts when you win them."

**Response:**

DocGo need not respond to the allegations in Paragraph 49 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 49 asserts legal conclusions, no response is required. To the extent Paragraph 49 contains factual allegations requiring a response, DocGo denies the allegations,

except that it admits that Mr. Capone spoke on March 7, 2023, at the Cowen Health Care Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 49 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full article for a complete and accurate account of the statements made.

50.    The growth in DocGo's Mobile Health segment and government vertical had been aided by a surge in COVID-19 testing and other services related to COVID-19. For example, during the pandemic, municipalities and municipal healthcare systems such as New York City and NYC Health + Hospitals engaged DocGo to provide COVID-19 testing and vaccinations for the homeless population. With the pandemic winding down in late 2022 and early 2023, DocGo sought to transition its Mobile Health division away from a COVID-19 testing-centric business to cover a wider range of population health services. One way DocGo sought to do this was by seeking government contract opportunities by responding to Requests for Proposals ("RFPs").

**Response:**

DocGo need not respond to the allegations in Paragraph 50 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 50 asserts legal conclusions, no response is required. To the extent Paragraph 50 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that New York City Health and NYC Health + Hospitals engaged DocGo to provide COVID-19 testing and vaccinations for the homeless population, and that this work helped grown the company's Mobile Health segment.

51.    During the Class Period, defendants made multiple statements regarding DocGo's RFP process and DocGo's growing ability to pursue larger and more lucrative government contracts. For example, on January 12, 2023, Capone described "extreme acceleration" in DocGo's RFP channel at a JPMorgan Healthcare Conference:

> When we look into 2023 . . . the biggest growth is probably going to come from the fact we've seen extreme acceleration in our RFP channel, meaning that we're applying for more of these government awards. We're getting better at it, and the size of the awards are getting larger and larger. They used to be in the $2 million

- 26 -

to $10 million in annualized revenue. Now they're in the $10 million to sometimes multi-hundred million dollars in annualized revenue that we're applying for.

**Response:**

DocGo need not respond to the allegations in Paragraph 51 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 51 asserts legal conclusions, no response is required. To the extent Paragraph 51 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone spoke on January 12, 2023, at the JPMorgan Healthcare Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 51 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements and DocGo respectfully refers the Court to the full article for a complete and accurate account of the statements made.

52.     On March 13, 2023, DocGo hosted an earnings call, during which the Company announced its Q4 2022 results. Then-Chief Operating Officer Lee Bienstock ("Bienstock") discussed DocGo's pursuit of increasingly large RFP opportunities:

> The average size, we've increased significantly. We had originally started with the size that you just mentioned, around the $10 million mark, but we've increased that substantially to $30 million to $50 million, is our average submission at this point. So we're going after larger opportunities, and we're going after more opportunities.

**Response:**

DocGo need not respond to the allegations in Paragraph 52 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 52 asserts legal conclusions, no response is required. To the extent Paragraph 52 contains factual allegations requiring a response, DocGo denies the allegations.

53.     On May 8, 2023, DocGo hosted an earnings call in which it announced the Company's Q1 2023 results. Bienstock again highlighted the growth of DocGo's RFP channel:

So the number of RFP submissions outstanding has actually doubled since we last reported that number. The total contract value has increased from $1.1 billion to $1.5 billion. So just to clarify that. We're seeing really an increase across the board from federal deals to local municipal deals. We continue to evaluate RFP opportunities across the spectrum on the government side. So, really, it has included representation from the federal opportunities as well as the local and state – municipal opportunities.

**Response:**

DocGo need not respond to the allegations in Paragraph 53 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 53 asserts legal conclusions, no response is required. To the extent Paragraph 53 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on May 8, 2023, Mr. Bienstock spoke on the Q1 2023 earnings call, the transcript of which speaks for itself. To the extent the allegations in Paragraph 53 purport to quote or characterize Mr. Bienstock's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements and DocGo respectfully refers the Court to the full article for a complete and accurate account of the statements made.

54.    Analysts covering DocGo viewed DocGo's RFP efforts as a material component of the Company's future growth and upside. On April 4, 2023, Canaccord Genuity wrote: "We remain encouraged by the greater number of RFPs the company is bidding on and the increasing size of potential contract values that management has highlighted." On April 20, 2023, Cantor Fitzgerald commented that DocGo's "pace and scale of RFP bids and wins are increasing rapidly," and "[t]he pace of bids has increased to 2-3 per week from 2-3 per month, and the scale of RFPs to $10-200M+ from $2-10M." On May 9, 2023, Cantor Fitzgerald noted that DocGo's "RFP pipeline is now $1.5B, up from $1.1B in March, with the number of RFPs doubled."

**Response:**

DocGo need not respond to the allegations in Paragraph 54 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 54 asserts legal conclusions, no response is required. DocGo has insufficient

knowledge to form a belief as to the state of mind of analysts, and denies the allegations in

Paragraph 54 on that basis.  To the extent the allegations in Paragraph 54 contain factual

allegations requiring a response, DocGo denies the allegations, except that it admits that on April

4, 2023, Canaccord Genuity wrote: "We remain encouraged by the greater number of RFPs the

company is bidding on and the increasing size of potential contract values that management has

highlighted;" that on April 20, 2023, Cantor Fitzgerald commented that DocGo's "pace and scale

of RFP bids and wins are increasing rapidly," and "[t]he pace of bids has increased to 2-3 per

week from 2-3 per month, and the scale of RFPs to $10-200M+ from $2-10M"; and that on May

9, 2023, Cantor Fitzgerald noted that DocGo's "RFP pipeline is now $1.5B, up from $1.1B in

March, with the number of RFPs doubled."  To the extent the allegations in Paragraph 54 purport

to quote or characterize these statements, DocGo denies that the quotes or characterizations fully

or accurately reflect the content of those statements, and DocGo respectfully refers the Court to

the full transcripts for a complete and accurate account of the statements made.

55.      In spring 2023, DocGo won a no-bid $432 million contract with the HPD that
took effect in early May 2023. The HPD contract required DocGo to house migrants and provide
them with services including case management, medical care, food, transportation, lodging, and
around-the-clock security. The HPD contract was awarded in connection with New York City's
policy to relocate migrants outside its five boroughs, including to places such as Albany County,
Erie County, and Schenectady County. The HPD contract was the largest contract DocGo had
ever received from New York City (or any other state or local government) and nearly matched
the Company's total reported revenue in 2022 of $440.5 million.

**Response:**

DocGo need not respond to the allegations in Paragraph 55 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To

the extent Paragraph 55 asserts legal conclusions, no response is required.  To the extent the

allegations in Paragraph 55 contain factual allegations requiring a response, DocGo denies the

allegations, except that it admits that it entered into a contract with New York City Department

of Housing Preservation and Development that was not to exceed $432 million in the spring of 2023. To the extent the allegations in Paragraph 55 purport to characterize that contract, DocGo denies that the characterizations fully or accurately reflect the content of that contract and DocGo respectfully refers the Court to the full contract for a complete and accurate account of its contents.

56.    Soon after the HPD contract became effective in May 2023, reports surfaced of DocGo's disruptive behavior in the communities in which the Company had relocated migrants. On July 22, 2023, the *Times Union* reported that on the morning of July 18, 2023, hotel guests at a Super 8 in Rotterdam, New York had been abruptly cleared out of their rooms without notice before DocGo transported migrants there.

**Response:**

DocGo need not respond to the allegations in Paragraph 56 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 56 asserts legal conclusions, no response is required. To the extent Paragraph 56 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the *Times Union* published an article on July 22, 2023, the content of which speak for itself. To the extent the allegations in Paragraph 56 purport to characterize this article, DocGo denies that the characterization fully or accurately reflects the content of that article and DocGo respectfully refers the Court to the article for a complete and accurate account of its contents.

57.    Then, on July 30, 2023, *The New York Times* published an article reporting on a "rocky, at best" start to DocGo's migrant relocation efforts. *The New York Times* article reported that migrants complained of threats and "broken promises" after New York City awarded DocGo the HPD contract. Specifically, the article stated: "Local authorities have expressed frustration at the lack of coordination between DocGo and agencies that could provide services to the migrants; local security guards hired by DocGo have repeatedly threatened the migrants; and finding steady work has been nearly impossible."[2] The July 30, 2023 article reported that DocGo

---

[2] *The New York Times* would later follow up with another article on August 21, 2023, "Troubled Migrant Contractor Faces Investigation Into Possible Wrongdoing," reporting that the office of the New York State Attorney General had launched an investigation into DocGo "looking into

had given migrants "dubious work eligibility and residency letters on what appeared to be a fake [New York City] letterhead."

**Response:**

DocGo need not respond to the allegations in Paragraph 57 and footnote 2 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 57 and footnote 2 assert legal conclusions, no response is required. To the extent Paragraph 57 and footnote 2 contain factual allegations requiring a response, DocGo denies the allegations, except that it admits that on July 30, 2023, and August 21, 2023, the *New York Times* published articles on DocGo's contract with HPD, the content of which speaks for itself. To the extent the allegations in Paragraph 57 purport to characterize this article, DocGo denies that the characterization fully or accurately reflects the content of that article, and DocGo respectfully refers the Court to the article for a complete and accurate account of its contents.

58.    On August 8, 2023, City of Albany political leaders, including Albany Mayor Kathy Sheehan, County Executive Dan McCoy, and New York Assembly members, convened a press conference to express serious concerns regarding DocGo's performance under the HPD contract. In his introductory remarks, Albany County Executive Dan McCoy stated: "We need [New York City's] contractor, DocGo, to seriously improve their operations and be a better partner to those in the community and the migrants." Assembly Member John McDonald later asked during the same press conference: "The question is: What in God's name is DocGo doing?" Mayor Sheehan stated: "We're here because we are really concerned that there is a lack of accountability with respect to the contractor that Mayor Adams and New York City has hired to do this very important work."

**Response:**

DocGo need not respond to the allegations in Paragraph 58 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 58 asserts legal conclusions, no response is required. To the extent

---

allegations that the company gave inaccurate information to migrants about employment opportunities, made 'explicit or implicit threats,' and took 'other actions that may jeopardize migrants' ability to obtain asylum.'"

Paragraph 58 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 8, 2023, Albany city and county leaders held a press conference on migrants, the recording of which speaks for itself.  To the extent the allegations in Paragraph 58 purport to characterize this recording, DocGo denies that the characterization fully or accurately reflects the content of that recording, and DocGo respectfully refers the Court to the recording for a complete and accurate account of its contents.

59.    Reeling from mounting public scrutiny and negative media attention earned from DocGo's poor performance on the HPD contract, Capone sought to reassure investors about the Company's performance and future prospects. On August 9, 2023, the day after Albany leaders convened a press conference to rebuke DocGo, Capone presented at the Canaccord Genuity Growth Conference in Boston, Massachusetts. During the presentation, Capone highlighted a purported ***$4 billion contract*** in DocGo's pipeline with CBP to provide medical services for asylum seekers at the southern border, stating the HPD contract had given DocGo the credibility necessary to win it:

> But even more confidence in the existing lines of business with just New York, New York City with multiple asylum seeking programs, we did this in large part because it gave us [all] of the credibility to win the border patrol RFP, which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth. And that one allows us to treat all the asylum seekers as soon as they come across the border and that 72 hour st[i]nt, and we've been working on that for a very long time.

**Response:**

DocGo need not respond to the allegations in Paragraph 59 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 59 asserts legal conclusions, no response is required.  To the extent Paragraph 59 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference in Boston, Massachusetts, the transcript of which speaks for itself.  To the extent the allegations in Paragraph 59 purport to characterize Mr. Capone's remarks, DocGo denies that the

characterization fully or accurately reflects the content of those remarks, and DocGo respectfully refs the Court to the transcript for a complete and accurate account of its contents.

60. In the same conference, Capone also told investors DocGo could use the HPD contract to transition patients in DocGo's population health vertical into the Company's payer vertical by signing migrants up for New York State Medicaid through UnitedHealthcare:

> Just in the one program that I mentioned, which was part of the reason why we raised our earnings was a migrant contract, that we have with New York City. We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare.
>
> And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care.

**Response:**

To the extent Paragraph 60 asserts legal conclusions, no response is required. To the extent Paragraph 60 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference in Boston, Massachusetts, the transcript of which speaks for itself. To the extent the allegations in Paragraph 60 purport to characterize Mr. Capone's remarks, DocGo denies that the characterization fully or accurately reflects the content of those remarks and DocGo respectfully refers the Court to the transcript for a complete and accurate account of its contents.

61. Capone continued:

> United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost.

**Response:**

To the extent Paragraph 61 asserts legal conclusions, no response is required. To the extent Paragraph 61 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 61 purport to characterize Mr. Capone's remarks, DocGo denies that the characterization fully or accurately reflects the content of those remarks and DocGo respectfully refers the Court to the transcript for a complete and accurate account of its contents.

62.     Analysts covering DocGo commented positively on Capone's stated focus of growing DocGo's payer and corporate vertical, as these verticals provided increased stability for the Company. After the August 9, 2023 Canaccord Genuity Growth Conference, on August 18, 2023 BTIG noted:

> DCGO is increasingly prioritizing its payer and corporate vertical which remains small now, making up less than 10% of revenue, but is DCGO's fastest-growing customer base. We like DCGO's shift towards health plans because they are generally well-insulated from volatility, and have large existing membership bases to tap into. We like the recurring revenue nature of plans.

**Response:**

To the extent Paragraph 62 asserts legal conclusions, no response is required. To the extent Paragraph 62 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 18, 2023, BTIG published a report on DocGo, which speaks for itself. To the extent the allegations in Paragraph 62 purport to characterize BTIG's report, DocGo denies that the characterization fully or accurately reflects the content of that report and DocGo respectfully refers the Court to the report for a complete and accurate account of its contents.

63.     Analysts also took notice of the CBP contract in DocGo's RFP pipeline. On August 18, 2023, BTIG repeated Capone's reference to the substantial CBP medical services contract, noting: "DCGO is in the process of bidding on a multi-billion dollar contract related to migrant services on the border."

- 34 -

**Response:**

DocGo need not respond to the allegations in Paragraph 63 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 63 asserts legal conclusions, no response is required.  To the extent Paragraph 63 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 18, 2023, BTIG published a report on DocGo, which speaks for itself.  To the extent the allegations in Paragraph 63 purport to characterize BTIG's report, DocGo denies that the characterization fully or accurately reflects the content of that report and DocGo respectfully refers the Court to the report for a complete and accurate account of its contents.

64.    Capone's statements regarding the value of the CBP contract and DocGo's ability to leverage the HPD contract into the much larger CBP contract were also repeated in various news outlets. On September 1, 2023, the *Times Union* reported DocGo was "seeking to turn a $432 million migrant shelter contract with New York City into a $4 billion contract with [CBP] to provide health care for those crossing the border." The same day, *The New York Times* reported DocGo "is now seeking to land a federal contract worth billions of dollars, the company's chief executive officer, Anthony Capone, recently acknowledged."

**Response:**

DocGo need not respond to the allegations in Paragraph 64 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 64 asserts legal conclusions, no response is required.  To the extent Paragraph 64 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on September 1, 2023, the *New York Times* published an article with the quoted statements, and that on September 2, 2023, the *Times Union* published an article with the quoted statements.  Those articles speak for themselves.  To the extent the allegations in Paragraph 64 purport to characterize the *Times Union* or *New York Times* articles, DocGo denies

that the characterization fully or accurately reflects the content of those articles and DocGo respectfully refers the Court to the articles for a complete and accurate account of their contents.

65.    On September 6, 2023, *The New York Times* repeated Capone's August 9, 2023 assertion at the Canaccord Genuity Growth Conference "that the company had pursued the $432 million city contract largely to give it enough credibility to bid on a $4 billion contract with [CBP]."

**Response:**

DocGo need not respond to the allegations in Paragraph 65 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 65 asserts legal conclusions, no response is required. To the extent Paragraph 65 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on September 6, 2023, the *New York Times* published an article with the quoted statements, which speaks for itself. To the extent the allegations in Paragraph 65 purport to characterize the *New York Times* article, DocGo denies that the characterization fully or accurately reflects the content of that article and DocGo respectfully refers the Court to the article for a complete and accurate account of its contents.

66.    The purported $4 billion CBP contract would have been, by a factor of nearly ten, DocGo's largest government contract win in the Company's history. For reference, for the year ended December 31, 2022, DocGo reported total revenues of just $440.5 million. For the year ended December 31, 2021, DocGo reported total revenues of $318.7 million.

**Response:**

DocGo need not respond to the allegations in Paragraph 66 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 66 asserts legal conclusions, no response is required. To the extent Paragraph 66 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that DocGo reported total revenues of $440.5 million for the year ending December 31, 2022, and $318.7 million for the year ending December 31, 2021, and that if

DocGo had won the CBP contract, it would have been the largest contract to date that DocGo had secured.

67.    Unbeknownst to investors, however, Capone had falsely inflated the value of the CBP contract, which was not worth "o[ve]r $4 billion." In fact, the CBP contract was worth no more than $2 billion – half the amount Capone had led investors to believe at the Canaccord Genuity Growth Conference. On September 10, 2023, the *Times Union* published an article reporting: "[T]he five-year contract to provide medical services at the southern border for [CBP] is far below the $4 billion Capone cited in his comments to investors, according to a spokeswoman for the agency." The *Times Union* reported: "[A]ccording to multiple sources familiar with the ongoing bidding process, the border medical services contract is valued at $2 billion, up from its initial, but later contested, award to a company in October for $1 billion." Ultimately, DocGo failed to win any portion of the CBP contract.

**Response:**

DocGo need not respond to the allegations in Paragraph 67 inasmuch they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 67 asserts legal conclusions, no response is required.  To the extent paragraph 67 contains factual allegations requiring a response, DocGo denies the allegations, except admits that on September 10, 2023, the *Times Union* published an article with the quoted statements. DocGo respectfully refers the Court to the article for a complete and accurate account of its contents.

68.    Also unbeknownst to investors, Capone's statement that DocGo had "already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare" was also false. In the same September 10, 2023 article, the *Times Union* reported that a spokesperson for DocGo had walked back Capone's comments, admitting the Company "'does not enroll anyone in Medicaid programs.'" A UnitedHealthcare representative also confirmed to the *Times Union* that UnitedHealthcare did not have a contract with DocGo in New York.

**Response:**

To the extent Paragraph 68 asserts legal conclusions, no response is required.  To the extent Paragraph 68 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the *Times Union* published an article with the quoted language on September 10, 2023, which speaks for itself.  To the extent the allegations in

Paragraph 68 purport to characterize the *Times Union* article, DocGo denies that the characterization fully or accurately reflects the content of that article and DocGo respectfully refers the Court to the article for a complete and accurate account of its contents.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    False and Misleading Statements Regarding Capone's Educational Background

69.    Throughout and prior to the Class Period, defendants repeatedly chose to speak to investors and customers about Capone's academic credentials. Capone himself incessantly touted his nonexistent graduate degree in AI – a burgeoning field of technology that DocGo marketed to investors as the Company's largest differentiator and backbone.

**Response:**

To the extent Paragraph 69 asserts legal conclusions, no response is required.  To the extent Paragraph 69 contains factual allegations requiring a response, DocGo denies the allegations.

70.    Prior to the Class Period, Capone appeared on the "AI in Action" podcast, published on September 9, 2021 on YouTube. During the podcast, Capone discussed his background, stating:

> It's a long journey, I guess. Started young – I think 12, right before my 13th birthday is when my parents were I guess fortunate enough to get a coworker of theirs . . . to tutor me in ColdFusion and CFML, and after I learned a little CFML which is a for sure a little bit of a dead language now. I progressed and started building applications when I was 14, kind of for hire – little things here and there. National Independent Association of Lighting Distributors was my first account. I remember getting my first thousand dollar paycheck like it was yesterday and kept coding . . . through high school and into university and went to school, my undergrad, for computer science, **and then graduate degree in computational learning theory, it's like a subset of AI**.

**Response:**

DocGo need not respond to the allegations in Paragraph 70 because they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 70 contains factual allegations requiring a response, DocGo denies the allegations,

except that it admits that Mr. Capone spoke on the AI in Action podcast on September 9, 2021,

the content of which speak for itself.  DocGo respectfully refers the Court to the entire podcast

for a complete and accurate account of its contents.

71.     The statement referenced above in ¶70 remained alive and uncorrected during the
Class Period.

**Response:**

DocGo need not respond to the allegations in Paragraph 71 because they relate to claims

that the Court dismissed in its March 28, 2025 order, and on that basis denies them.

72.     On April 29, 2022, DocGo filed a proxy statement on Schedule 14A with the SEC
in advance of the Company's 2022 annual meeting of stockholders. Vashovsky signed the Notice
of the 2022 Annual Meeting of Stockholders to which the proxy statement was attached, and the
proxy statement was solicited by the entire Board, including Vashovsky. The proxy statement
included biographical information for each executive officer of the Company. In the proxy
statement, DocGo and Vashovsky represented as follows:

> Mr. Capone has served as our President since November 2021. He is an operational
> lead for our COVID-19 response across the U.S., including our work with FEMA's
> New York State COVID-19 deployment. Mr. Capone previously served as
> Amb[ul]nz's President, Chief Technology Officer and Chief Product Officer from
> 2017 until our Business Combination. Prior to Ambulnz, Mr. Capone served as the
> Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase,
> an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served
> as the lead software engineer at Constant Contact, Inc., an online marketing
> company. Mr. Capone also founded the largest free developer conference in the
> U.S., Engineers4Engineers. ***Mr. Capone earned his undergraduate degree from
> the State University of New York College at Potsdam and his M.S. in Computer
> Science from Clarkson University***.

**Response:**

DocGo need not respond to the allegations in Paragraph 72 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To

the extent Paragraph 72 asserts legal conclusions, no response is required.  To the extent

Paragraph 72 contains factual allegations requiring a response, DocGo denies the allegations,

except that it admits that DocGo filed a proxy statement on Schedule 14A with the SEC on April

29, 2022, which speaks for itself. To the extent the allegations in Paragraph 72 purport to characterize the proxy statement, DocGo denies that the characterization fully or accurately reflects the content of proxy statement and DocGo respectfully refers the Court to the proxy statement for a complete and accurate account of its contents.

73.    On September 13, 2022, Capone presented at the H.C. Wainwright Global Investment Conference. During the presentation, Capone discussed his background, stating:

> So we decided right off the bat that the ability to route our own ambulances, to stack them, to create all of the technology necessary to actually handle the transportation we needed to build out. That's where I came in.
>
> So Stan came in. Clinical background: paramedic for 28 years, had been in health care for almost that entire time. My background: I originally – when we started the company, I'm our Chief – was our Chief Technology Officer. ***My graduate degree is in computational learning theory, which was a subset of artificial intelligence***. And so we brought those two together. We melded this need on the medical side with the understanding that I had on the computer science side, and, together, we built that.

**Response:**

To the extent Paragraph 73 asserts legal conclusions, no response is required. To the extent Paragraph 73 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone spoke at the H.C. Wainwright Global Healthcare Investment Conference on September 13, 2022, the transcript of which speaks for itself. To the extent the allegations in Paragraph 73 purport to characterize Mr. Capone's discussion at that conference, DocGo denies that the characterization fully or accurately reflects the content of his discussion and DocGo respectfully refers the Court to the transcript of the conference for a complete and accurate account of its contents.

74.    The next day, on September 14, 2022, Capone presented at the Morgan Stanley Global Healthcare Conference. During his introductory remarks, Capone discussed his background, stating:

> Sure. Sure. My name is Anthony Capone, currently the President at DocGo. Originally, when we formed the company, I was our Chief Technology Officer.

That's kind of where my background is in. ***My grad degree is in computational learning theory, which is a discrete subset of computer science, artificial intelligence***.

**Response:**

To the extent Paragraph 74 asserts legal conclusions, no response is required. To the extent Paragraph 74 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone spoke at the Morgan Stanley Global Healthcare Conference on September 14, 2022, the transcript of which speaks for itself. To the extent the allegations in Paragraph 74 purport to characterize Mr. Capone's discussion at that conference, DocGo denies that the characterization fully or accurately reflects the content of his discussion and DocGo respectfully refers the Court to the transcript of the conference for a complete and accurate account of its contents.

75.    On October 19, 2022, Capone participated in one of Impetus Digital's Fireside Chats, with Impetus Digital CEO & Co-Founder Natalie Yeadon ("Yeadon"). Yeadon introduced Capone in her introductory remarks, stating: "Anthony holds a graduate Computer Science degree in artificial intelligence from Clarkson University, as well as has over 20 years of software engineering experience." Capone, who was (virtually) present and attentive during the introduction, did not correct Yeadon.

**Response:**

To the extent Paragraph 75 asserts legal conclusions, no response is required. To the extent Paragraph 75 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone participated in an Impetus Digital Fireside Chat on October 19, 2022, the recording of which speaks for itself. To the extent the allegations in Paragraph 76 purport to characterize Mr. Capone's comments during the Impetus Digital Fireside Chat, DocGo denies that the characterization fully or accurately reflects the content of his discussion and DocGo respectfully refers the Court to the recording of the October 19, 2022 Impetus Digital Fireside Chat for a complete and accurate account of its contents.

76.    Later in the interview, Capone discussed his background, stating:

First thing, it comes down to utilization. We built the company originally on utilization. . . . [T]he reason why most ambulance companies when you get in tend not to make any money is because of low utilization. So when you get in, you say "well what can I do?" Well you can't pay people less because they're already usually making very close to minimum wage at a lot of companies, and you can't increase your revenue per transport because that is fixed by Medicare. So the only thing you really can do to make more money as an ambulance company, is to do more – you run more trips on your shift. Well we built out our own software. It's called Dara, which entirely focuses on utilization, it's routing optimization, it really leverages that AI. *It's kind of the intellectual reason I guess that I joined the company was that I had the ability to apply my academic training to a very practical circumstance of how do we have the ability to make sure the ambulances are running*?

**Response:**

To the extent Paragraph 76 asserts legal conclusions, no response is required.  To the extent Paragraph 76 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone participated in an Impetus Digital Fireside Chat on October 19, 2022, the recording of which speaks for itself.  To the extent the allegations in Paragraph 76 purport to characterize Mr. Capone's comments during the Impetus Digital Fireside Chat, DocGo denies that the characterization fully or accurately reflects the content of his discussion and DocGo respectfully refers the Court to the recording of the October 19, 2022 Impetus Digital Fireside Chat for a complete and accurate account of its contents.

77.    On November 7, 2022, DocGo filed with the SEC a Current Report on Form 8-K, reporting Vashovsky was retiring and announcing Capone was appointed by the Board to succeed Vashovsky as CEO. Oberholzer signed the Form 8-K. In the Form 8-K, DocGo and Oberholzer represented:

Mr. Capone, age 35, has served as the Company's President since November 2021. Mr. Capone previously held various positions at Ambulnz, Inc. between 2017 and 2021, including those of President, Chief Technology Officer and Chief Product Officer. Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. *Mr. Capone earned his undergraduate degree from the State University*

*of New York College at Potsdam and his M.S. in Computer Science from Clarkson University*.

**Response:**

To the extent Paragraph 77 asserts legal conclusions, no response is required. To the extent Paragraph 77 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on November 7, 2022 DocGo filed with the SEC a Current Report on Form 8-K with the quoted the language. To the extent the allegations in Paragraph 77 purport to characterize DocGo's November 7, 2022 Form 8-K, DocGo denies that the characterization fully or accurately reflects that filing, and DocGo respectfully refers the Court to the full filing for a complete and accurate account of its contents.

78.    Before being named CEO and while President of the Company, Capone's DocGo biography represented:

> Anthony Capone has served Ambulnz's executive team since 2017 and now serves DocGo as president, having previously served as DocGo CTO, and CPO. ***Mr. Capone holds a graduate CS degree in Artificial Intelligence from Clarkson University*** and has over 18 years of software engineering experience. His sterling record of entrepreneurial excellence includes leading three companies from start to successful exit. In addition to his roles at DocGo, Mr. Capone is a member of the Forbes Tech Council, writing on topics at the intersection of healthcare and AI.

**Response:**

To the extent Paragraph 78 asserts legal conclusions, no response is required. To the extent Paragraph 78 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone's biography on DocGo's website previously contained the quoted language.

79.    In January 2023, when Capone became CEO of DocGo, the Management section of the Company website represented as follows:

> Anthony Capone is CEO of DocGo. Mr. Capone has served DocGo in a number of roles since 2017, including president, CTO and CPO. ***Mr. Capone holds a graduate CS degree in Artificial Intelligence from Clarkson University*** and has over 18 years of software engineering experience. His sterling record of

entrepreneurial excellence includes leading three companies from start to successful exit. In addition to his roles at DocGo, Mr. Capone is a member of the Forbes Tech Council, writing on topics at the intersection of healthcare and AI.

**Response:**

To the extent Paragraph 79 asserts legal conclusions, no response is required. To the extent Paragraph 79 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the Management section on DocGo's website previously contained the quoted language.

80.    On January 12, 2023, Capone presented at the JPMorgan Healthcare Conference. During the presentation, Capone discussed his background, stating:

> My name is Anthony Capone, as introduced there. I'm Chief Executive Officer. We started the company about 6.5 years ago; I was our Chief Technology Officer. *My background, my grad degree is in computational learning theory, which is a subset of AI*. So I'm on the technology side. And as I'll go through, our founder is on the clinical side, and we bring the two together to deliver a true, true healthcare service that's built on top of very sophisticated technology backbone.

**Response:**

To the extent Paragraph 80 asserts legal conclusions, no response is required. To the extent Paragraph 80 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on January 12, 2023, Capone spoke at the JPMorgan Healthcare Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 80 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

81.    Later in the same JPMorgan Healthcare Conference, Capone again inserted his credentials into messaging about the Company's technology:

> Now one of the key parts, and I like to talk about this quite a lot *because it's my background, my graduate degree is in computational learning theory*, is

our technology. Everybody says they have technology. Everybody has got some app that they like to have. This is not that.

**Response:**

To the extent Paragraph 81 asserts legal conclusions, no response is required. To the extent Paragraph 81 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on January 12, 2023, Capone spoke at the JPMorgan Healthcare Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 81 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

82.     On March 7, 2023, Capone presented at the Cowen Health Care Conference. During the presentation, Capone discussed his background, stating:

> We believe that fee-for-service medicine is a – I'm a software guy. ***My graduate degree is in computational learning theory***. Sometimes I fall back to tech terms. But in tech, you would say that's an anti-pattern. The concept of fee-for-service medicine is flawed and should go away. It will eventually disappear in society because it does not make sense. It's a flawed – you have a perverse incentive model. So we don't believe in fee-for-service medicine and we – no material part of our business is in fee-for-service medicine.

**Response:**

To the extent Paragraph 82 asserts legal conclusions, no response is required. To the extent Paragraph 82 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone spoke on March 7, 2023, at the Cowen Health Care Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 82 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements and DocGo

respectfully refers the Court to the full article for a complete and accurate account of the statements made.

83.    On March 15, 2023, Capone presented at the Oppenheimer Healthcare Conference. During the presentation, Capone discussed his background, stating:

> When you look at the clinical delivery services that we have, it's significantly different than the way it works. DocGo, when you look at its heart, is really a technology company. From day one when we built the company, that was going to be our focus. ***And that's actually my background. My degree is in artificial intelligence. That's what I went to graduate school for***. And from day one, we built out all of our own technology in-house, and not just technology that sometimes you say I need to have as a service company.

**Response:**

To the extent Paragraph 83 asserts legal conclusions, no response is required.    To the extent Paragraph 83 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on March 15, 2023, Mr. Capone spoke at the Oppenheimer Healthcare Conference, the transcript of which speaks for itself.  To the extent the allegations in Paragraph 83 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of those statements, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the statements made.

84.    On April 26, 2023, DocGo filed a proxy statement on Schedule 14A with the SEC in advance of the Company's 2023 annual meeting of stockholders. Vashovsky signed the Notice of the 2023 Annual Meeting of Stockholders to which the proxy statement was attached, and the proxy statement was solicited by the entire Board of Directors, including Vashovsky. The proxy statement included biographical information for each executive officer of the Company. In the proxy statement, DocGo and Vashovsky represented as follows:

> Mr. Capone has served as our Chief Executive Officer since January 2023. He previously served as our President from November 2021 to December 2022, during which time, he was an operational lead for our COVID-19 response across the U.S., including our work with FEMA's New York State COVID-19 deployment. Mr. Capone previously served as Amb[ul]nz's President, Chief Technology Officer and Chief Product Officer from 2017 until our Business Combination. Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology

Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company. Mr. Capone also founded the largest free developer conference in the U.S., Engineers4Engineers. ***Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University***.

**Response:**

DocGo need not respond to the allegations in Paragraph 84 because they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 84 asserts legal conclusions, no response is required. To the extent Paragraph 84 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that DocGo filed a proxy statement on Schedule 14A with the SEC on April 26, 2023, which speaks for itself. To the extent the allegations in Paragraph 84 purport to characterize the proxy statement, DocGo denies that the characterization fully or accurately reflects the content of proxy statement and DocGo respectfully refers the Court to the proxy statement for a complete and accurate account of its contents.

85.    On August 9, 2023, Capone presented at the Canaccord Genuity Growth Conference. During the presentation, Capone discussed his background, stating:

> While we can do so with high degrees of efficiency and generating good returns for the investors that have taken risks on DocGo is because of our technology, and that's where I really came in originally.
>
> We started the company. ***I was our Chief Technology Officer, my graduate degree [is] in computational learning theory, which is a subset of artificial intelligence*** and all of the tech that we have at DocGo whether that tech [is] to distribute, dispersed, dispatch, thousands and thousands of people every single day to varying different settings across the entire globe, or whether that's the ability to pair together the medical necessity of a patient with a clinical competency of a provider, all of that is done with high sophistication, with our AI systems in order to need as little people as possible.

**Response:**

To the extent Paragraph 85 asserts legal conclusions, no response is required.  To the extent Paragraph 85 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference in Boston, Massachusetts, the transcript of which speaks for itself.  To the extent the allegations in Paragraph 85 purport to characterize Mr. Capone's remarks, DocGo denies that the characterization fully or accurately reflects the content of those remarks and DocGo respectfully refers the Court to the transcript for a complete and accurate account of its contents.

86.    The statements in ¶¶70-85 above were materially false and misleading when made. The facts, which were then known to or recklessly disregarded by DocGo, Vashovsky, Capone, and Oberholzer were as follows:

(a)    Capone did not hold a graduate degree in computational learning theory from Clarkson University (or any other university) and had fabricated his educational credentials; and

(b)    Capone's educational background was material to investors. As set forth in ¶¶31-44 above, Capone repeatedly emphasized the importance of his educational background, and specifically his graduate degree in computational learning theory, to the Company's technological capabilities. DocGo's purported technological capabilities were the Company's supposed competitive advantage in the traditional ambulance services business and the stated reason the Company could adapt to meet contract requirements and provide healthcare services to underserved populations.

**Response:**

To the extent Paragraph 86 asserts legal conclusions, no response is required.  To the extent Paragraph 86 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Mr. Capone did not receive a graduate degree in computational learning theory.

87.    On September 14, 2023, Capone was quoted by the Albany *Times Union* through his spokesperson, claiming that his "'***public biography erroneously states that I hold a [master]'s degree from Clarkson University***'":

"I want to address a serious issue concerning incorrect information about my educational background. Specifically, ***it has come to my attention that my public biography erroneously states that I hold a [master]'s degree from Clarkson University***," Capone said. "I must clarify immediately: I do not have a master's degree from Clarkson University, nor from any other institution. This inaccuracy should have been corrected, and I deeply apologize for this error. I do, however, have an undergraduate computer science degree with a focus in artificial intelligence from an accredited university."

**Response:**

To the extent Paragraph 87 asserts legal conclusions, no response is required. To the extent Paragraph 87 contains factual allegations requiring a response, DocGo denies the allegations in Paragraph 87, except that it admits that on September 14, 2023, Albany's *Times Union* published an article with the quoted language. To the extent the allegations in Paragraph 87 purport to quote or characterize Mr. Capone's statements, DocGo denies that the quotes or characterizations fully or accurately reflect the content of the article and DocGo respectfully refers the Court to the full article for a complete and accurate account of the statements made.

88.     The statement in ¶87 above was materially false and misleading when made. The facts, which were then known to or recklessly disregarded by DocGo and Capone, were that Capone's misstatements regarding his educational credentials were not limited to his public biography. Rather, as set forth in ¶¶31-44 above, Capone systematically misled investors about his educational credentials during investor conferences and interviews, as well as in written submissions, throughout and prior to the Class Period.

**Response:**

DocGo need not respond to allegations in Paragraph 88 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 88 asserts legal conclusions, no response is required. To the extent Paragraph 88 contains factual allegations requiring a response, DocGo has insufficient knowledge to form a belief as to the veracity of the allegations and therefore denies them.

89.     On August 9, 2023, Capone presented at the Canaccord Genuity Growth Conference. During the presentation, Capone discussed the CBP contract, stating:

But even more confidence in the existing lines of business with just New York, New York City with multiple asylum seeking programs, *we did this in large part because it gave us all of the credibility to win the border patrol RFP, which we've been working on for seven to eight months. And that's a five-year contract worth o[ve]r $4 billion that contract is. Almost $1 billion a year, that contract is worth*. And that one allows us to treat all the asylum seekers as soon as they come across the border and that 72 hour st[i]nt, and we've been working on that for a very long time.

**Response:**

DocGo need not respond to the allegations in Paragraph 89 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 89 asserts legal conclusions, no response is required. To the extent Paragraph 89 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference, the transcript of which speaks for itself. To the extent the allegations in Paragraph 89 purport to characterize Mr. Capone's remarks, DocGo denies that the characterization fully or accurately reflects the content of those remarks and DocGo respectfully refers the Court to the transcript for a complete and accurate account of its contents.

90.    The statement set forth in ¶89 was materially false and misleading when made. The facts, which were then known to or recklessly disregarded by DocGo and Capone, were as follows:

(a)    as set forth in ¶67, the contract with CBP was not valued at "o[ve]r $4 billion" or "$1 billion a year"; and

(b)    due to DocGo's poor performance with the HPD contract, and the intense public scrutiny that had resulted and was then known to DocGo and Capone, Capone did not believe, and had no reasonable basis to believe, that the HPD contract gave DocGo "all of the credibility to win the border patrol RFP."

**Response:**

DocGo need not respond to the allegations in Paragraph 90 inasmuch they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent

Paragraph 90 asserts legal conclusions, no response is required.  To the extent Paragraph 90 contains factual allegations requiring a response, DocGo denies the allegations.

91.    On August 9, 2023, Capone, at the same Canaccord Genuity Growth Conference presentation, discussed signing up migrants onto New York State Medicaid, stating:

> Just in the one program that I mentioned, which was part of the reason why we raised our earnings was a migrant contract, that we have with New York City. *We've already signed up over 3,000 asylum seekers onto New York State Medicaid through United Healthcare*.
>
> *And now because we sign them up, now we have the ability to become their primary care provider and treat the preventable diseases on a long-term basis, being able to eventually get this per-member, per-month reimbursement because we are now comprehensively taking their care*. And in that particular case, you know they're coming into the country with no primary care provider and they have no health plan. Of course they don't.
>
> \*        \*        \*
>
> *United has that managed Medicaid contract with New York State. And so we have the ability to enroll [asylum seekers] in United's managed care program. But in doing so, we become their attributed PCP and we can begin . . . to provide care for them on a long-term basis. So even post this municipal contract or this person's existence in that municipal contract, we can see long term revenue streams that come from it. And this is the first time we're really showing how the municipal sector has long term revenue opportunity in our payer vertical because it gives member attribution at no cost*.

**Response:**

To the extent Paragraph 91 asserts legal conclusions, no response is required.  To the extent Paragraph 91 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that on August 9, 2023, Mr. Capone spoke at the Canaccord Genuity Growth Conference, the transcript of which speaks for itself.  To the extent the allegations in Paragraph 91 purport to characterize Mr. Capone's remarks, DocGo denies that the characterization fully or accurately reflects the content of those remarks and DocGo respectfully refers the Court to the transcript for a complete and accurate account of its contents.

92.    The statements set forth in ¶91 were materially false and misleading when made. The facts, which were then known to or recklessly disregarded by DocGo and Capone, were as follows:

(a)    DocGo did not enroll anyone, including asylum seekers, in New York State Medicaid programs, as the Company later admitted (¶68);

(b)    DocGo did not have a contract with UnitedHealthcare in New York and did not have the ability to enroll asylum seekers in United Healthcare's managed care program, as DocGo later admitted (*id.*); and

(c)    DocGo's ability to grow its payer vertical was material to the Company's future growth and earnings (¶62).

**Response:**

To the extent Paragraph 92 asserts legal conclusions, no response is required.  To the extent

Paragraph 92 contains factual allegations requiring a response, DocGo denies the allegations.

## VI.    LOSS CAUSATION

93.    As detailed herein, defendants made materially false and misleading statements and/or omitted material information concerning Capone's credentials, as well as DocGo's financial prospects. Defendants' misstatements and omissions were designed to and did artificially inflate, maintain, and manipulate the price of DocGo common stock and deceived Lead Plaintiff and the Class, causing purchasers of DocGo common stock to suffer economic harm as the truth reached the market. When the truth began to come out, it caused the price of DocGo common stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchases of DocGo common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**Response:**

DocGo need not respond to the allegations in paragraph 93 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the

extent Paragraph 93 asserts legal conclusions, no response is required.  To the extent Paragraph 93

contains factual allegations requiring a response, DocGo denies the allegations.

94.    On September 10, 2023, the *Times Union* published an article titled: "DocGo CEO's comments on migrant contracts appear inaccurate." In the article, the *Times Union* reported the "'over $4 billion'" CBP contract referenced by Capone during the August 9, 2023, Canaccord Genuity Growth Conference was in fact worth far below $4 billion, according to a

spokeswoman from CBP, and was in fact worth under $2 billion, according to multiple sources familiar with the bidding process. The *Times Union* also reported Capone's statements to investors about how "the 'municipal sector has long-term revenue opportunity in our payer vertical'" were also false. While Capone had told investors DocGo had "'already signed up over 3,000 asylum seekers onto New York State Medicaid through UnitedHealthcare'" and DocGo "now ha[d] the ability to become their primary care provider and . . . eventually get this per member, per month reimbursement," the *Times Union* quoted a DocGo spokesperson confirming, in fact: "'DocGo does not enroll anyone in Medicaid . . . and assignment as a primary care provider is not a "byproduct" of this process.'" The *Times Union* also reported a UnitedHealthcare representative reported DocGo did not even have a contract with UnitedHealthcare in New York.

**Response:**

DocGo need not respond to the allegations in Paragraph 94 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 94 asserts legal conclusions, no response is required. To the extent Paragraph 94 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that the *Times Union* published an article titled "DocGo CEO's comments on contracts appear inaccurate," the content of which speaks for itself. To the extent the allegations in Paragraph 94 purport to quote or characterize this article, DocGo denies that the quotes or characterizations fully or accurately reflect the content of the article, and DocGo respectfully refers the Court to the full transcript for a complete and accurate account of the article.

95.    On this news, the price of DocGo common stock declined by more than 10% (10.76%), from a close of $7.06 on September 8, 2023 to a low of $6.30 on September 11, 2023.

**Response:**

To the extent Paragraph 95 asserts legal conclusions, no response is required. To the extent Paragraph 95 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits DocGo's stock closed at $7.06 on September 8, 2023.

96.    On September 14, 2023, the *Times Union* published an article titled: "No record that DocGo CEO Anthony Capone earned graduate degree," which was later updated to: "DocGo

- 53 -

CEO Anthony Capone admits he didn't earn graduate degree." In the article, Capone admitted he did "'not have a master's degree from Clarkson University, nor from any other institution.'" Capone's admission, however, was itself false and misleading as what he claimed to be an "'inaccuracy'" in his "'public biography'" was in fact a blatant fabrication Capone had repeated at least ten times seeking to bolster his and DocGo's credibility and prospects with investors and customers.

**Response:**

To the extent Paragraph 96 asserts legal conclusions, no response is required. To the

extent Paragraph 96 contains factual allegations requiring a response, DocGo denies the

allegations, except that it admits that the *Times Union* published an article titled "No record that

DocGo CEO Anthony Capone earned graduate degree," the content of which speaks for itself.

To the extent the allegations in Paragraph 96 purport to quote or characterize this article, DocGo

denies that the quotes or characterizations fully or accurately reflect the content of the article, and

DocGo respectfully refers the Court to the full transcript for a complete and accurate account of

the article.

97.     On September 15, 2023, after the markets closed, DocGo filed a Current Report on Form 8-K with the SEC announcing Capone's immediate resignation, purportedly for "personal reasons." That same day, the *Times Union* published an article titled: "DocGo CEO resigns following report he lied about college degree." The article questioned whether Capone had an undergraduate degree from SUNY Potsdam, noting Capone stated only that he had an undergraduate degree from an "'accredited university'" and his spokesman "declined to respond to questions about whether he graduated from SUNY Potsdam."

**Response:**

To the extent Paragraph 97 asserts legal conclusions, no response is required. To the

extent Paragraph 97 contains factual allegations requiring a response, DocGo denies the

allegations, except that it admits that DocGo filed a Form 8-K on September 15, 2023, the content

of which speak for itself. To the extent the allegations in Paragraph 97 purport to quote or

characterize DocGo's September 15, 2023 Form 8-K filing, DocGo denies that the quotes or

characterizations fully or accurately reflect the content of the Form 8-K, and DocGo respectfully refers the Court to the full Form 8-K filing for a complete and accurate account of its contents.

98.    On this news, the price of DocGo common stock declined by more than 25%, from a high of $6.53 on September 14, 2023 to a low of $4.88 on September 18, 2023.

**Response:**

To the extent Paragraph 98 asserts legal conclusions, no response is required. To the extent Paragraph 98 contains factual allegations requiring a response, DocGo denies the allegations.

99.    In total, between August 31, 2023 and September 18, 2023, DocGo's common stock declined from a high of $9.11 on September 1, 2023 to a low of $4.88 on September 18, 2023. David Larsen, a securities analyst with BTIG who followed the Company, directly attributed this decline to news of Capone's falsified credentials and misstatements regarding the size of the CBP contract, as well as news regarding security guard incidents with migrants:

> ***Misstatements and negative news articles are disappointing***. We are negatively surprised that former CEO Anthony Capone had previously indicated that he had earned a graduate degree from Clarkson University, when in reality the school has no record of him attending the institution. Other news articles have also reported that the size of the Southern Border contract that DCGO is currently bidding on is likely in the range of —$1-$2B over 5 years and not the —$4B+ highlighted by Mr. Capone. News articles have also highlighted various security guard incidents, with migrants. ***All of these unfavorable headlines have caused shares of DCGO to pull-in from —$9 per share at 8/31/23 to —$5 on 9/18/23***.

**Response:**

To the extent Paragraph 99 asserts legal conclusions, no response is required. To the extent Paragraph 99 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that David Larsen issued a report with the quoted language. To the extent the allegations in Paragraph 99 purport to quote or characterize Larsen's report, DocGo denies that the quotes or characterizations fully or accurately reflect the content of the report, and DocGo respectfully refers the Court to the full report for a complete and accurate account of its contents.

100.    The decline in the price of DocGo common stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of defendants' misrepresentations and omissions to investors and the market. The timing and magnitude of the price declines in DocGo common stock compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of defendants' misstatements and omissions and the subsequent significant decline in the value of DocGo common stock when defendants' misrepresentations and other fraudulent conduct were revealed.

**Response:**

To the extent Paragraph 100 asserts legal conclusions, no response is required.  To the

extent Paragraph 100 contains factual allegations requiring a response, DocGo denies the

allegations.

## VII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

101.    At all relevant times, the market for DocGo stock was an efficient market for the following reasons, among others:

(a)    DocGo stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, DocGo filed periodic public reports with the SEC and the NASDAQ;

(c)    DocGo regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    DocGo was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e)    DocGo's stock price reacted in response to new, material information about DocGo's business.

**Response:**

To the extent Paragraph 101 asserts legal conclusions, no response is required.  To the

extent Paragraph 101 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that DocGo stock meets the requirements for listing and is listed and traded on the NASDAQ, that DocGo files periodic reports with the SEC and the NASDAQ, and that DocGo communicates with investors via press releases and other similar reporting services.

102.    As a result of the foregoing, the market for DocGo stock promptly digested current information regarding DocGo from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of DocGo stock during the Class Period suffered similar injury through their purchase of DocGo stock at artificially inflated prices, and a presumption of reliance applies.

**Response:**

To the extent Paragraph 102 asserts legal conclusions, no response is required.  To the extent Paragraph 102 contains factual allegations requiring a response, DocGo denies the allegations.

103.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**Response:**

To the extent Paragraph 103 asserts legal conclusions, no response is required.  To the extent Paragraph 103 contains factual allegations requiring a response, DocGo denies the allegations.

## VIII.  CLASS ACTION ALLEGATIONS

104.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a "Class" consisting of all persons who purchased or otherwise acquired DocGo common stock during the Class Period. Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

**Response:**

To the extent Paragraph 104 asserts legal conclusions, no response is required. To the

extent Paragraph 104 contains factual allegations requiring a response, DocGo denies the

allegations, except that it admits that Lead Plaintiff purports to bring this action as a class action.

105. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DocGo shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by DocGo, its transfer agent, or securities' brokers and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

**Response:**

To the extent Paragraph 105 asserts legal conclusions, no response is required. To the

extent Paragraph 105 contains factual allegations requiring a response, DocGo denies the

allegations, except admits that DocGo shares were traded on the NASDAQ during the purported

class period.

106. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

**Response:**

To the extent Paragraph 106 asserts legal conclusions, no response is required. To the

extent Paragraph 106 contains factual allegations requiring a response, DocGo denies the

allegations.

107. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

**Response:**

To the extent Paragraph 107 asserts legal conclusions, no response is required. To the

extent Paragraph 107 contains factual allegations requiring a response, DocGo has insufficient

knowledge to form a belief as to the veracity of the allegations and therefore denies them.

108.    Common questions of law and fact exist as to all members of the Class and
predominate over any questions solely affecting individual members of the Class. Among the
questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as
alleged herein;

(b)    whether statements made by defendants to the investing public during the
Class Period misrepresented material facts about the business and operations of DocGo;

(c)    whether the price of DocGo stock was artificially inflated during the Class
Period; and

(d)    to what extent the members of the Class have sustained damages and the
proper measure of damages.

**Response:**

To the extent Paragraph 108 asserts legal conclusions, no response is required. To the

extent Paragraph 108 contains factual allegations requiring a response, DocGo denies the

allegations.

109.    A class action is superior to all other available methods for the fair and efficient
adjudication of this controversy since joinder of all members is impracticable. Further, as the
damages suffered by individual Class members may be relatively small, the expense and burden
of individual litigation make it impossible for members of the Class to individually redress the
wrongs done to them. There will be no difficulty in the management of this action as a class
action.

**Response:**

To the extent Paragraph 109 asserts legal conclusions, no response is required. To the

extent Paragraph 109 contains factual allegations requiring a response, DocGo denies the

allegations.

## IX.     CAUSES OF ACTION

### COUNT I

### Violations of §10(b) of the 1934 Act and SEC Rule 10b-5 (Against All Defendants)

110.     Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

**Response:**

In response to Paragraph 110, DocGo incorporates by reference its answers and responses to Paragraphs 1 through 109, respectively.

111.     This count is brought by Lead Plaintiff on behalf of itself and the Class.

**Response:**

To the extent Paragraph 111 asserts legal conclusions, no response is required.  To the extent Paragraph 111 contains factual allegations requiring a response, DocGo denies the allegations.

112.     This count is brought against all defendants.

**Response:**

DocGo need not respond to the allegations in Paragraph 112 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 111 asserts legal conclusions, no response is required.  To the extent Paragraph 111 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Lead Plaintiff purported to assert the count against all Defendants.

113.     During the Class Period, each of the defendants named in this Count disseminated or approved the statements as specified above in ¶¶69-92, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**Response:**

DocGo need not respond to the allegations in Paragraph 113 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To

the extent Paragraph 113 asserts legal conclusions, no response is required.   To the extent

Paragraph 113 contains factual allegations requiring a response, DocGo denies the allegations.

114.    Defendants named in this count violated §10(b) of the 1934 Act and SEC Rule
10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts
necessary in order to make the statements made, in light of the circumstances under which they
were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud
or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of
DocGo common stock during the Class Period.

**Response:**

DocGo need not respond to the allegations in Paragraph 114 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To

the extent Paragraph 114 asserts legal conclusions, no response is required.   To the extent

Paragraph 114 contains factual allegations requiring a response, DocGo denies the allegations.

115.    Defendants, individually and together, directly and indirectly, by the use, means
of instrumentalities of interstate commerce, and/or the mails, engaged and participated in a
continuous course of conduct to conceal the truth and/or adverse material information about
DocGo's business, operations, and financial condition as specified herein.

**Response:**

DocGo need not respond to the allegations in Paragraph 115 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To

the extent Paragraph 115 asserts legal conclusions, no response is required.   To the extent

Paragraph 115 contains factual allegations requiring a response, DocGo denies the allegations.

116.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or recklessly disregarded the true facts that were available to them.

**Response:**

DocGo need not respond to the allegations in Paragraph 116 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 116 asserts legal conclusions, no response is required.  To the extent Paragraph 116 contains factual allegations requiring a response, DocGo denies the allegations.

117.    As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of DocGo common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased or otherwise acquired DocGo common stock during the Class Period at artificially high prices and were damaged thereby.

**Response:**

DocGo need not respond to the allegations in Paragraph 117 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 117 asserts legal conclusions, no response is required.  To the extent Paragraph 117 contains factual allegations requiring a response, DocGo denies the allegations.

118.    Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for DocGo common stock and suffered losses when the relevant truth was revealed. Lead Plaintiff and the Class would not have purchased DocGo common stock at the prices they paid, or at all, if they had been aware the market prices had been artificially and falsely inflated by these defendants' misleading statements.

**Response:**

DocGo need not respond to the allegations in Paragraph 118 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To

the extent Paragraph 118 asserts legal conclusions, no response is required. To the extent

Paragraph 118 contains factual allegations requiring a response, DocGo denies the allegations.

119. As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in DocGo common stock.

**Response:**

DocGo need not respond to the allegations in Paragraph 119 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To

the extent Paragraph 119 asserts legal conclusions, no response is required. To the extent

Paragraph 119 contains factual allegations requiring a response, DocGo denies the allegations.

120. By reason of the foregoing, defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

**Response:**

DocGo need not respond to the allegations in Paragraph 120 inasmuch as they relate to

claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To

the extent Paragraph 120 asserts legal conclusions, no response is required. To the extent

Paragraph 120 contains factual allegations requiring a response, DocGo denies the allegations.

## COUNT II

### Violations of §20(a) of the 1934 Act (Against All Defendants)

121. Lead Plaintiff repeats and realleges every allegation contained above as if set forth herein.

**Response:**

In response to Paragraph 121, DocGo incorporates by reference its answers and

responses to Paragraphs 1 through 120, respectively.

122. This count is brought by Lead Plaintiff on behalf of itself and the Class.

**Response:**

To the extent Paragraph 122 asserts legal conclusions, no response is required. To the extent Paragraph 122 contains factual allegations requiring a response, DocGo denies the allegations.

123. This count is brought against all defendants.

**Response:**

DocGo need not respond to the allegations in Paragraph 123 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 123 asserts legal conclusions, no response is required. To the extent Paragraph 123 contains factual allegations requiring a response, DocGo denies the allegations, except that it admits that Lead Plaintiff purported to assert the count against all Defendants.

124. Each of the defendants named in this Count acted as a controlling person within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of DocGo, their ownership and contractual rights, participation in, and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the allegedly false and misleading statements.

**Response:**

DocGo need not respond to the allegations in Paragraph 124 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them. To the extent Paragraph 124 asserts legal conclusions, no response is required. To the extent Paragraph 124 contains factual allegations requiring a response, DocGo denies the allegations.

125. In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I and exercised that power.

**Response:**

DocGo need not respond to the allegations in Paragraph 125 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 125 asserts legal conclusions, no response is required.  To the extent Paragraph 125 contains factual allegations requiring a response, DocGo denies the allegations.

126.    As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period when the relevant truth was revealed.

**Response:**

DocGo need not respond to the allegations in Paragraph 126 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 126 asserts legal conclusions, no response is required.  To the extent Paragraph 126 contains factual allegations requiring a response, DocGo denies the allegations.

127.    By reason of the foregoing, defendants named in this Count violated §20(a) of the 1934 Act.

**Response:**

DocGo need not respond to the allegations in Paragraph 127 inasmuch as they relate to claims that the Court dismissed in its March 28, 2025 order, and on that basis denies them.  To the extent Paragraph 127 asserts legal conclusions, no response is required.  To the extent Paragraph 127 contains factual allegations requiring a response, DocGo denies the allegations.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A.    Determining this action is a proper class action by certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding injunctive and such other equitable relief as the Court may deem just and proper.

**Response:**

DocGo denies that Lead Plaintiff has any basis for judgment against DocGo.  DocGo further denies that Lead Plaintiff is entitled to any form of relief requested in Lead Plaintiff's prayer for relief.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

**Response:**

No response required.

\*       \*       \*

## DEFENSES

DocGo asserts the following affirmative and other defenses.  In asserting these defenses, DocGo does not assume the burden of proof with respect to any issue as to which applicable law places the burden of proof upon Lead Plaintiff and/or other putative class members.

### FIRST DEFENSE
### (Failure to State a Claim)

Lead Plaintiff fails to state a claim upon which relief can be granted.

### SECOND DEFENSE
### (Failure to Plead Misstatements or Omissions)

Lead Plaintiff fails to plead specific misstatements or omissions by DocGo, why any misstatement or omission is misleading, or particular facts sufficient to support allegations asserted on information and belief.  15 U.S.C. § 78u-4(b)(1).

**THIRD DEFENSE**
**(Failure to Plead Scienter with Particularity)**

Lead Plaintiff fails to plead fraud or scienter by DocGo with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Litigation Securities Reform Act of 1995.  15 U.S.C. § 78u-4(b)(2).

**FOURTH DEFENSE**
**(Lack of Standing)**

Lead Plaintiff's claims fail to the extent that Lead Plaintiff, or any persons on whose behalf they purport to act, did not purchase DocGo securities during the relevant period, and/or because they otherwise lack standing.

**FIFTH DEFENSE**
**(No False Statements)**

Lead Plaintiff's claims fail because DocGo did not make any untrue statement of material fact.

**SIXTH DEFENSE**
**(No Omissions)**

DocGo made full and accurate disclosures of all information required to be disclosed.

**SEVENTH DEFENSE**
**(No Materiality)**

Lead Plaintiff's claims fail to the extent that they are based on immaterial statements, including expressions of opinion and puffery.

**EIGHTH DEFENSE**
**(No Scienter)**

DocGo lacked the requisite scienter necessary to establish violations of the securities laws.

**NINTH DEFENSE**
**(No Imputation to DocGo)**

None of Mr. Capone's statements about his own education may be imputed to DocGo.

**TENTH DEFENSE**
**(Adverse Interest Exception)**

The adverse interest exception precludes DocGo's liability for statements Mr. Capone made about his own education.

**ELEVENTH DEFENSE**
**(No Reliance)**

Lead Plaintiff is not entitled to a presumption of reliance and did not reasonably rely on any allegedly misleading statement of material fact when purchasing DocGo securities.

**TWELFTH DEFENSE**
**(Lead Plaintiff's Knowledge of Allegedly Undisclosed Facts)**

Lead Plaintiff's claims fail to the extent that it knew or is deemed to have known of any allegedly undisclosed facts on which its claims are based.

**THIRTEENTH DEFENSE**
**(Loss Causation)**

No alleged act or omission of DocGo caused the loss for which Lead Plaintiff seeks to recover damages.  15 U.S.C. § 78u-4(b)(4).

**FOURTEENTH DEFENSE**
**(Damages are Speculative)**

Lead Plaintiff's claim for damages is speculative, and Lead Plaintiff incurred no recoverable damages.

**FIFTEENTH DEFENSE**
**(Assumption of Risk)**

Lead Plaintiff knowingly and/or recklessly assumed risks when purchasing the securities described in the Complaint.

## SIXTEENTH DEFENSE
### (DocGo Not Liable for Statements of Others)

Lead Plaintiff's claims fail because DocGo is not responsible (in law or in fact) for the alleged misleading statements or omissions by others on which Lead Plaintiff allegedly relied.

## SEVENTEENTH DEFENSE
### (Limitation on Damages)

Lead Plaintiff's claims fail to the extent that they seek damages exceeding the difference between the purchase price paid for the securities and the mean trading price of those securities during the 90-day period following the alleged corrective disclosure.

## EIGHTEENTH DEFENSE
### (Proportionate Liability)

Lead Plaintiff's claims against DocGo fail to the extent it seeks damages exceeding DocGo's proportionate liability.

## NINETEENTH DEFENSE
### (Additional Defenses)

DocGo has not knowingly and intentionally waived any applicable additional defenses and reserves the right to raise additional defenses as they become known through discovery in this matter. DocGo further reserves the right to amend its Answer and/or Additional Defenses accordingly and/or to delete defenses that it determines are not applicable during the course of subsequent discovery.

## PRAYER

WHEREFORE, DocGo respectfully requests that the Court:

A.  Deny class certification and strike all class allegations from the Complaint;

B.  Render judgment that Lead Plaintiff takes nothing by this suit;

C.  Dismiss Plaintiff's Complaint with prejudice;

D.  Award DocGo its costs of court and other fees; and

E.  Grant any other relief to which DocGo may be justly entitled, whether in law or in equity.

DATED: April 25, 2025                    Respectfully submitted,

                                         GIBSON, DUNN & CRUTCHER LLP

                                         /s/ Jason J. Mendro
                                         Jason J. Mendro


                                         JASON J. MENDRO
                                         LISSA M. PERCOPO (admitted *pro hac vice*)
                                         1700 M Street, N.W.
                                         Washington, D.C.  20036
                                         Telephone:  202-955-8500
                                         202-467-0539 (fax)
                                         jmendro@gibsondunn.com
                                         lpercopo@gibsondunn.com


                                         JEFF LOMBARD (admitted *pro hac vice*)
                                         310 University Avenue
                                         Palo Alto, CA 94301
                                         Telephone: 650-849-5300
                                         jlombard@gibsondunn.com

                                         Attorneys for Defendant DocGo Inc.