UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

                       Plaintiff,

     vs.

DOCGO INC. and ANTHONY CAPONE,

                    Defendants.

———————————————————— x

: Civil Action No. 1:23-cv-09476-KPF

: CLASS ACTION
:
: DECLARATION OF CHRISTOPHER M.
: WOOD IN SUPPORT OF: (I) LEAD
: PLAINTIFF'S MOTION FOR FINAL
: APPROVAL OF CLASS ACTION
: SETTLEMENT AND APPROVAL OF PLAN
: OF ALLOCATION; AND (II) LEAD
: COUNSEL'S MOTION FOR AN AWARD
: OF ATTORNEYS' FEES AND EXPENSES

4923-2230-1576.v1

I, CHRISTOPHER M. WOOD, declare as follows:

1. I am a partner at the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), counsel to Lead Plaintiff Genesee County Employees' Retirement System (the "Fund") in the above-captioned action (the "Action" or "Litigation"), and am admitted *pro hac vice* to practice before this Court.[1]

2. I submit this declaration, pursuant to Rule 23 of the Federal Rules of Civil Procedure, in support of: (i) Lead Plaintiff's motion for final approval of the all-cash settlement of $12,500,000 (the "Settlement Amount") and approval of the proposed Plan of Allocation; and (ii) Lead Counsel's motion for an award of attorneys' fees and expenses.

3. I was actively involved in the prosecution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision of, and participation in, all material aspects of the Action. If called upon, I could and would competently testify that the following facts are true and correct.

## I. INTRODUCTION AND OVERVIEW

4. The Settling Parties have entered into a settlement of Lead Plaintiff's claims alleged in this securities class action against defendants DocGo Inc. ("DocGo" or the "Company") and Anthony Capone (collectively, "Defendants").

5. The Settlement is a very favorable result for the Class. The Stipulation provides for the non-reversionary payment of $12,500,000 in cash to the Class in exchange for a release of the Released Plaintiff's Claims (as defined in the Stipulation) against the Released Defendant Parties (as defined in the Stipulation). As described herein, the Settlement is the product of Lead Plaintiff's and

---

[1] Unless otherwise defined herein, capitalized terms and acronyms have the meaning ascribed to them in the Stipulation of Settlement, filed on November 12, 2025 (ECF 101-1) ("Stipulation").

4923-2230-1576.v1

Lead Counsel's careful analysis and vigorous litigation of the claims, as well as extensive arm's-length settlement negotiations between the parties, which took place during and after a mediation session supervised by Miles Ruthberg, of Philips ADR (the "Mediator"), a mediator with extensive experience in securities class actions.

6.     The benefit to the Class must be weighed against the significant chance that it might obtain a much smaller recovery after years of protracted litigation – or none at all.  If at any stage of the Litigation, Defendants were to prevail on their various arguments disputing liability or seeking to reduce or eliminate the Class's damages, the Class would have been left with little or no recovery. The Settlement Amount represents a recovery of over 20% of reasonably recoverable damages.  The Settlement provides for a substantial monetary benefit to the Class now, and is an excellent recovery in light of the significant risks involved in continued litigation.

7.     As detailed herein, the Settlement is the product of a comprehensive investigation, detailed analysis, and extensive arm's-length negotiations by experienced counsel, which involved the assistance of an experienced mediator.  Lead Counsel, working closely with Lead Plaintiff, negotiated the Settlement with a thorough understanding of the strengths and weaknesses of the claims asserted against each of the Defendants.  This understanding was based on Lead Counsel's vigorous efforts, which included, *inter alia*: (a) successfully moving for the Fund's appointment as Lead Plaintiff; (b) undertaking an extensive investigation of the facts alleged in the Amended Complaint for Violations of the Federal Securities Laws (ECF 43) (the "Complaint"); (c) successfully opposing Defendants' motion to dismiss as to certain claims; (d) moving for class certification; (e) commencing fact discovery, including the review and analysis of more than 20,000 pages of documents produced by Defendants and numerous third parties; (f) responding to document requests propounded by Defendants; and (g) drafting a detailed mediation statement.  As a result of

- 2 -

4923-2230-1576.v1

these efforts, Lead Counsel and Lead Plaintiff were fully informed regarding the strengths and weaknesses of the case against each of the Defendants before agreeing to the Settlement.

8.　　As discussed herein, Lead Plaintiff faced serious risks in going forward with the Litigation. Lead Plaintiff faced the significant risk that Defendants could ultimately be successful in showing, among other things, that: (i) they did not make any actionable, material misstatements or omissions; (ii) they did not act with the requisite scienter with respect to certain claims; and (iii) certain of the Class's damages were caused by nonactionable factors unrelated to the alleged misstatements and omissions. Accordingly, while Lead Counsel believes that the Class's claims have merit, there was a significant chance that one or more of Defendants' arguments may have ultimately proved successful – and the Class may have ended up with little or no recovery. The significance of these risks was heightened by the prospect of continued, costly litigation, including imminent fact depositions, expert discovery, dispositive motions, a trial, and almost certain ensuing appeals. The Settlement avoids these and other risks while providing a substantial and immediate monetary benefit to the Class.

9.　　The other terms of the Settlement are the product of careful negotiations between the parties and are set forth in the Stipulation. For all of the reasons stated herein, Lead Counsel believes that the Settlement is fair, reasonable and adequate, is in the best interests of the Class, and should be approved. Furthermore, the Settlement has the full support of the Lead Plaintiff.

10.　　Lead Counsel seeks attorneys' fees of 33% of the Settlement Amount, plus litigation expenses of $183,676.18, with interest thereon earned at the same rate as the Settlement Fund. The fee request has Lead Plaintiff's full support. The requested fee amounts to a 2.86 multiple of Lead Counsel's collective "lodestar" (*i.e.*, Lead Counsel's hourly rates multiplied by the hours spent on prosecuting and settling this Action).

- 3 -

11.     Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice, dated November 18, 2025 (ECF 106) (the "Preliminary Approval Order"), the Postcard Notice was mailed or emailed to all Class Members who could be identified with reasonable effort, and the Summary Notice was published in *The Wall Street Journal* and over *Business Wire*.

12.     The Postcard Notice directed Class Members to the Notice, which advised all recipients of, among other things: (i) the terms of the Settlement; (ii) the definition of the Class; (iii) their right to exclude themselves from the Class; (iv) their right to object to any aspect of the Settlement, including the Plan of Allocation and Lead Counsel's request for attorneys' fees and expenses; and (v) the procedures and deadline for submitting a Proof of Claim and Release in order to be eligible for a payment from the proceeds of the Settlement.

13.     The Court-ordered deadline for filing objections to the Settlement is March 3, 2026, the same deadline for requesting exclusion from the Class.  No objections to any aspect of the Settlement have been filed, and to-date, no requests for exclusion from the Class have been received.

14.     Verita Global ("Verita"), which has been retained by Lead Counsel and approved by the Court as Claims Administrator, has advised that as of February 12, 2026, a total of 13,280 Postcard Notices have been mailed or emailed to potential Class Members and their nominees. Additionally, the Notice, Proof of Claim and Release, Stipulation, and Preliminary Approval Order have been posted on the website established for the Settlement: www.DocGo SecuritiesSettlement.com.

15.     The following is a summary of the principal events that occurred during the course of the Litigation and the legal services provided by Lead Counsel.

4923-2230-1576.v1

## II.    LEAD PLAINTIFF'S PROSECUTION OF THE CASE

### A.    The Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

16.    On October 27, 2023, the initial class action complaint in this Litigation was filed in the United States District Court for the Southern District of New York (the "Court") alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). ECF 1.

17.    In accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), notice of the pendency of the action was published, and on December 26, 2023, the Fund moved for appointment as lead plaintiff.  ECF 15.  On January 11, 2024, the only other lead plaintiff movant filed a notice of non-opposition.  ECF 20.  By Order dated January 17, 2024, the Court appointed: (i) the Fund as Lead Plaintiff; and (ii) its chosen counsel, Robbins Geller Rudman & Dowd LLP, as Lead Counsel.  ECF 30.

### B.    Lead Counsel's Investigation and Filing of the Complaint

18.    Lead Counsel conducted an extensive investigation prior to filing the Complaint. This investigation included, but was not limited to, a review and analysis of: (i) DocGo's public filings with the SEC; (ii) transcripts of DocGo's public conference calls; (iii) DocGo's press releases; (iv) reports of securities analysts following DocGo; (v) independent media and social media reports and posts regarding DocGo and its executives; (vi) economic analyses of DocGo's stock price movement and pricing and volume data; and (vii) other publicly available information.  As part of its investigation, Lead Counsel also contacted former employees of DocGo who might have had information relevant to Lead Counsel's investigation.

19.    Based on this investigation, Lead Counsel prepared a detailed amended Complaint on behalf of Lead Plaintiff and all persons, other than Defendants and other excluded individuals and

4923-2230-1576.v1

entities, who purchased the common stock of DocGo during the period from November 5, 2021 and September 15, 2023, inclusive (the "Class Period").  Lead Plaintiff filed the Complaint on March 20, 2024, asserting claims against Defendants and former defendants Stan Vashovsky and Andre Oberholzer ("Former Defendants") under §§10(b) and 20(a) of the Exchange Act.  ECF 43.

### C.     The Complaint and a Summary of the Class's Allegations

20.     The Complaint alleged that, in violation of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, defendants made materially false and misleading statements concerning DocGo's former CEO Capone's educational background, DocGo's purported involvement in signing migrants up for New York State Medicaid, and a purported $4 billion contract with U.S. Customs and Border Patrol ("CBP").

21.     The Complaint alleged that during the Class Period, DocGo and Capone falsely represented that Capone had earned a triple *summa cum laude* undergraduate degree from SUNY Potsdam and had earned a Masters of Computational Learning Theory from Clarkson University. Defendants touted Capone's purported educational background as a supposed competitive advantage in using artificial intelligence for traditional ambulance services and meeting the contract requirements to provide healthcare services to underserved populations.

22.     Additionally, as alleged in the Complaint, near the end of the Class Period, Capone misled investors by stating that: (i) DocGo was in the running to secure a five-year contract with CBP for over $4 billion to allow DocGo to treat asylum seekers after crossing the border; and (ii) DocGo had been working with UnitedHealthcare to sign up over 3,000 asylum seekers and counting onto New York State Medicaid.

23.     The Complaint alleged that the truth about these false and misleading statements began to be revealed on September 10, 2023, when the *Times Union* published an article casting

- 6 -

doubt on Capone's statements about the purported CBP contract and the New York contract. The articles quoted a spokeswoman from CBP to report that the CBP contract was worth under $2 billion, and reported via an individual from UnitedHealthcare that UnitedHealthcare did not have a contract with DocGo in New York. In response to this news, the price of DocGo common stock dropped over 10%, causing losses for Lead Plaintiff and other Class Members.

24.     Less than a week later, the *Times Union* published another article reporting that there was no record that Capone had earned a graduate degree. The *Times Union* updated the article the next day to report that Capone admitted he did not have a graduate degree. In response to this news, the price of DocGo common stock dropped over 25%, causing additional losses for Lead Plaintiff and other Class Members.

### D.     Defendants' Motion to Dismiss

25.     On June 21, 2024, DocGo and the Former Defendants moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the PSLRA. ECF 60-62.[2] Defendants and Former Defendants argued, among other things, that statements about Capone's education were not material to investors, that the Former Defendants did not have the requisite scienter for all claims, that Capone did not have scienter regarding the CBP contract statements, and that the New York healthcare claims were inactionable because investors would not have understood Capone to mean that DocGo was literally signing asylum seekers up for New York State Medicare, but rather that DocGo was facilitating signups through UnitedHealthcare.

26.     On August 20, 2024, Lead Plaintiff filed its memorandum of law in opposition to the motion to dismiss, contending that because Capone repeatedly touted his purported educational

---

[2]   Capone filed a motion to dismiss joining DocGo's and the Former Defendants' motion to dismiss, and making supplemental argument. ECF 63.

4923-2230-1576.v1

background as a competitive advantage to DocGo's business, these statements were material to investors. ECF 65. Lead Plaintiff also argued that Capone focused on DocGo's ability to sign up asylum seekers onto New York State Medicaid as a way to generate long term revenue to assuage investor concerns about potential revenue cliffs.

27.     Defendants and Former Defendants filed their respective replies on September 19, 2024. ECF 68, 72.

### E.     The Court Largely Sustains the Complaint

28.     On March 28, 2025, the Court issued an Opinion & Order granting in part and denying in part Defendants' motion to dismiss. ECF 77 (the "MTD Order"). In particular, the Court upheld the alleged misstatements about Capone's educational background and DocGo's ability to sign up asylum seekers onto New York State Medicaid against Capone and DocGo. *Id*. at 50. The Court rejected Defendants' argument that the misstatements about Capone's education were immaterial as a matter of law because "Capone strove to tether his educational background directly to DocGo's technological capabilities." *Id*. at 23. The Court also rejected Defendants' arguments about what investors would have understood Capone's statements about New York State Medicaid to mean, reasoning that "Capone made these statements while emphasizing DocGo's ability to transition patients from the Company's government vertical to its payer vertical 'at no [additional] cost.'" *Id*. at 30.[3]

29.     Regarding scienter, the Court found that "Defendants do not contest that Capone acted with the requisite level of scienter because Capone clearly knew the Education Statements were inaccurate." *Id*. at 36. The Court further found that Capone's scienter was imputed to DocGo.

---

[3]     The Court also found that certain of the CBP statements were material, but ultimately found that the Complaint did not adequately plead scienter for these statements. *Id*. at 25-29.

4923-2230-1576.v1

*Id*. at 37.  As to the New York State Medicaid statements, the Court found that the Complaint adequately alleged scienter as to Capone (and thus DocGo) because Capone presented to investors a plan for DocGo's business which "was not presented as theoretical but as actual." *Id*. at 39.[4]

30.      Defendants filed their Answers to the Complaint on April 25, 2025, which generally denied Lead Plaintiff's substantive allegations and set forth 41 separate affirmative defenses. ECF 84, 85.[5]

### F.      Fact Discovery

31.      As set forth herein, Lead Plaintiff diligently pursued fact discovery following the resolution of Defendants' motion to dismiss.  These efforts included requesting, negotiating for, obtaining and reviewing more than 20,000 pages of documents from Defendants and third parties; engaging in extensive meet and confers; obtaining an admission from Capone through a request for admission; and gathering and producing documents responsive to Defendants' discovery requests.

32.      By vigorously pursuing discovery, Lead Counsel developed evidence supporting elements of Lead Plaintiff's claims and sufficient to evaluate a potential resolution.

### 2.      Discovery Directed to Defendants

33.      Following entry of the Court's Opinion & Order, and the withdrawal of the mandatory discovery stay, Lead Counsel commenced formal discovery efforts.  On April 10, 2025, Lead Counsel met and conferred with counsel for Defendants pursuant to Federal Rule of Civil Procedure 26(f) concerning case management, pre-trial scheduling, and fact discovery.  Lead Counsel also negotiated and prepared a Proposed Civil Case Management Plan and Scheduling

---

[4]    The Court found that the Complaint did not adequately allege scienter for the Former Defendants and granted the motion to dismiss as to the Former Defendants.  *Id*. at 33-35.

[5]    Without admitting Lead Plaintiff's allegations, Capone admitted in his Answer that he did not have the educational background he claimed to have during the Class Period.  ECF 85.

4923-2230-1576.v1

Order, which the parties submitted to the Court on May 2, 2025.  ECF 86.  The parties exchanged Initial Disclosures pursuant to Fed. R. Civ. P. 26(a) on June 3, 2025.

34.    On April 11, 2025, Lead Plaintiff served requests for the production of documents on Defendants, consisting of 36 discrete requests germane to the claims and defenses asserted by the parties.  Defendants served their responses and objections to Lead Plaintiff's document requests on May 12, 2025, and May 27, 2025.  Thereafter, the Parties began negotiating the relevant topics for discovery, sources to be searched, relevant time period, custodians, and search terms.

35.    Lead Counsel also drafted a comprehensive protective order to govern the treatment of confidential evidence, and negotiated with Defendants' counsel over the terms of the proposed order.  The Parties filed a proposed Stipulated Protective Order on May 2, 2025, which the Court entered on May 5, 2025.  ECF 87, 89.

36.    The Parties quickly and continually met and conferred to negotiate the appropriate scope of fact discovery, and exchanged counterproposals through detailed written correspondence and telephonic conferences.  On May 29, 2025, Defendants began producing documents to Lead Plaintiff on a rolling basis, while the Parties continued to work to resolve their outstanding disagreements.

37.    In addition, Lead Plaintiff served interrogatories and a request for admission on Capone on April 11, 2025, and met and conferred with Capone concerning his responses and objections to the interrogatories and request for admission.

### 3.    Third-Party Discovery

38.    A significant amount of relevant information in this Litigation was in the possession, custody, or control of third parties.  Commencing on April 14, 2025, Lead Counsel served document subpoenas on 11 third parties, as follows:

4923-2230-1576.v1

| Person/Entity | Date | Relationship to Litigation |
|---|---|---|
| UnitedHealth Group Inc. | 4.28.2025 | Health care company through which DocGo purportedly signed up asylum seekers onto New York State Medicaid |
| Clarkson University | 4.28.2025 | University where Capone purportedly received his master's degree |
| The State University of New York at Potsdam | 4.28.2025 | University where Capone purportedly graduated with triple *summa cum laude* |
| 5W Public Relations, LLC | 7.08.2025 | Public relations firm for Defendants |
| BTIG, LLC | 7.08.2025 | Financial analyst firm covering DocGo |
| Canaccord Genuity, LLC | 7.08.2025 | Financial analyst firm covering DocGo |
| Cantor Fitzgerald, L.P. | 7.08.2025 | Financial analyst firm covering DocGo |
| LifeSci Advisors, LLC | 4.28.2025 | Financial analyst firm covering DocGo |
| Needham & Company, LLC | 7.08.2025 | Financial analyst firm covering DocGo |
| Northland Securities, Inc. | 7.08.2025 | Financial analyst firm covering DocGo |
| Stifel, Nicolaus & Company, Incorporated | 7.08.2025 | Financial analyst firm covering DocGo |

39.     Lead Counsel engaged in numerous meet-and-confers with subpoenaed nonparties to discuss their objections to the subpoenas, negotiate the scope of the document requests, and arrange for the production of responsive documents.  Lead Counsel expended significant resources obtaining, reviewing, and analyzing these documents.

### 4.     Lead Counsel's Review and Analysis of Discovery Materials

40.     As a result of Lead Counsel's extensive discovery efforts, Defendants and subpoenaed third parties – combined – produced over 20,000 pages of documents.

41.     To facilitate the cost and time-efficient nature of the document review process, all of the documents were placed in an electronic database, known as Relativity, maintained in-house by Robbins Geller, for significantly less than an outside vendor would charge.  This database allowed Lead Counsel to more efficiently search for and review documents through the use of search terms, date filters, custodian fields, and other metadata.

42.     Lead Counsel analyzed the documents to assess their relevance and began to compile the documents most likely to be used in depositions and at summary judgment and trial – whether by

- 11 -

Lead Plaintiff or Defendants. Lead Counsel also began to identify relevant witnesses for depositions, and established procedures for finding deficiencies in the document productions. Throughout the document review process, Lead Counsel worked diligently to assemble the evidence needed to support Lead Plaintiff's claims and to rebut Defendants' defenses.

### 5. Lead Plaintiff's Document Production and Motion for Class Certification

43. While fact discovery was ongoing, Lead Plaintiff filed its motion for class certification.

44. In anticipation of Lead Plaintiff's motion for class certification, Defendants served requests for the production of documents on Lead Plaintiff on April 29, 2025. Lead Plaintiff responded and objected to Defendants' document requests on May 29, 2025, and the parties subsequently met and conferred, resolving their disputes. Lead Plaintiff searched for and collected documents potentially responsive to Defendants' requests, and produced responsive, non-privileged documents to Defendants on July 28, 2025.

45. Defendants also served interrogatories on Lead Plaintiff on April 29, 2025. Lead Plaintiff responded and objected to Defendants' interrogatories on May 29, 2025.

46. On July 21, 2025, Lead Plaintiff filed a motion for class certification, which requested that the Court certify the putative Class, appoint the Fund as class representative, and appoint Robbins Geller as class counsel. ECF 91-94. The motion for class certification addressed all of the requirements of Federal Rule of Civil Procedure 23, as well as the "fraud-on-the-market" presumption of reliance endorsed by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

47. In support of its motion, Lead Plaintiff submitted an expert report from Professor Matthew D. Cain, Ph.D. *See* ECF 94-2. Professor Cain's 65-page report (plus exhibits) explained

4923-2230-1576.v1

why all five of the *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and all three of the *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) factors – which courts routinely consider in addressing class certification – were met.   Professor Cain's report also included a detailed event study concerning DocGo's stock price movement that contributed to his opinion that DocGo common stock traded in an efficient market throughout the Class Period.   Professor Cain also opined that damages consistent with Lead Plaintiff's theory of liability could be determined on a class-wide basis.   Lead Counsel spent substantial time consulting with Professor Cain on his report.

### 6.     Mediation and Settlement Efforts

48.     The Settlement is the product of hard-fought negotiations, which were conducted at arm's length between experienced counsel and supervised by Miles Ruthberg of Phillips ADR, a nationally-renowned mediation firm with extensive experience in mediating securities class actions.

49.     In advance of the mediation, on August 28, 2025, the Parties submitted to Mr. Ruthberg and exchanged mediation statements with detailed descriptions of the evidence and law supporting their claims and defenses.

50.     On September 9, 2025, the Parties participated in a full-day mediation session with Mr. Ruthberg via Zoom.   During the mediation, Lead Counsel vigorously advocated Lead Plaintiff's positions regarding liability and damages.   Although the Parties made progress, no settlement was reached at the conclusion of the mediation.

51.     Thereafter, the Parties engaged in post-mediation negotiations through Mr. Ruthberg. On September 25, 2025, Mr. Ruthberg made a "mediator's recommendation" that the case settle for $12.5 million.   Lead Counsel discussed the mediator's recommendation with Lead Plaintiff, and after careful deliberation, Lead Plaintiff accepted the recommendation.   Defendants also accepted the mediator's recommendation, and on September 26, 2025, the Parties reached an agreement-in-

- 13 -

principle to resolve the Litigation, subject to the negotiation of mutually acceptable terms of a settlement agreement.

52.    Once the key terms of the Settlement were agreed upon, Lead Counsel continued to negotiate at arm's length with Defendants' counsel to work out the details of the Settlement and the Stipulation, and drafted the Stipulation and supporting documents.  These negotiations continued until November 12, 2025, when the parties executed the Stipulation.

### G.    Preliminary Approval of the Settlement

53.    On November 12, 2025, Lead Plaintiff filed its Unopposed Motion for Preliminary Approval of Settlement, Certification of the Class, and Approval of Notice to the Class.  ECF 99-100.  In connection therewith, Lead Plaintiff requested that the Court: (i) preliminarily approve the Settlement; (ii) certify the proposed Class; (iii) approve the form and manner of the settlement notices to Members of the Class; and (iv) schedule a hearing on the final approval of the Settlement, proposed Plan of Allocation, and Lead Counsel's application for an award of attorneys' fees and litigation expenses.  ECF 100.

54.    The Court granted Lead Plaintiff's motion for preliminary approval on November 18, 2025.  ECF 106.  In the order, the scheduled the final settlement hearing for March 24, 2026 at 10:00 a.m.  *Id*.

### III.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND WARRANTS APPROVAL

55.    The Settlement of $12,500,000 was the result of extensive, arm's-length negotiations between the Parties, with the assistance of an experienced mediator.  The Settlement reflects the strengths and weaknesses of the case, and would not have been achieved without Lead Counsel's efforts described herein.

4923-2230-1576.v1

56.    As set forth below and in the accompanying Memorandum in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Memorandum"), the Settlement is a favorable result for the Class when evaluated in light of the risks of continued litigation and all of the other circumstances that courts consider when determining whether to grant final approval of a proposed class action settlement under Rule 23(e) of the Federal Rules of Civil Procedure.

57.    The Settlement avoids the hurdles Lead Plaintiff would have to clear, not only with respect to proving the full amount of the Class's damages but liability as well, and avoids the significant costs associated with further litigation of this complex securities action, particularly summary judgment and trial.  In view of the significant risks and additional time and expense involved in continuing to litigate this Action, Lead Counsel respectfully submits that the Settlement is fair, reasonable, and adequate and warrants the Court's final approval.

**B.    The Risks to Establishing Falsity and Materiality**

58.    While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants are meritorious, they also recognize that there were considerable risks that made the outcome of this Litigation uncertain.  Lead Counsel carefully considered these risks throughout the Litigation and in recommending that Lead Plaintiff settle this matter.

59.    For example, Lead Plaintiff faced significant risks in proving that Defendants' alleged statements and omissions were materially misleading.  Defendants would have continued to argue, as they did in their motion to dismiss, that Lead Plaintiff would be unable to prove materiality for statements regarding Capone's education.  Likewise, Defendants would have continued to argue that investors did not understand Capone to mean that DocGo was literally signing asylum seekers up for New York State Medicaid, but rather that it was facilitating signups through UnitedHealthcare.

- 15 -

60.     While the parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if the Court at summary judgment or a jury at trial found them compelling, the Class would recover nothing.

**C.      The Risks to Establishing Loss Causation and Damages**

61.     Even if Lead Plaintiff succeeded in overcoming these arguments and establishing falsity and scienter, Defendants' arguments and defenses relating to loss causation and damages presented additional obstacles.  Defendants would likely claim that Lead Plaintiff could not prove loss causation because a portion of the final drop in DocGo's stock price was caused by the revelation that the CBP contract was not as high as Capone claimed, and that claim was dismissed from the Complaint.  Defendants would also likely contend that it was Capone's departure as CEO, not the revelation of his educational background, that was the sole cause of DocGo's stock price drop.

62.     Moreover, Defendants would likely contend that even if their loss causation argument did not eliminate damages, it severely limited them.  Defendants were likely to assert that Lead Plaintiff and the Class were only entitled to recover the portion of the stock price declines between September 10 and September 15, 2023, if any, that Lead Plaintiff could prove was attributable to revelations about Capone's education and the New York State Medicaid issue.

63.     While Lead Plaintiff would have had the burden of identifying and isolating the fraud-related damages suffered by Class Members, Defendants only had to identify a flaw with the methodology utilized by Lead Plaintiff's expected experts and prevail on a *Daubert* motion or win the inevitable, and inherently unpredictable, "battle of the experts" between the parties' loss causation and damages experts before the jury.  Defendants would have argued that the case either

4923-2230-1576.v1

should not reach a jury or that the jury had no choice but to determine that there were little or no cognizable damages.

64.    Although Lead Plaintiff is confident that it would have been able to support its claims with qualified and persuasive expert testimony, jury reactions to competing experts are difficult to predict, and Defendants would surely have put forth well-credentialed experts in an effort to prove their loss causation and damages arguments.  These risks could not be eliminated until after a successful trial and the exhaustion of all appeals.  Accordingly, in the absence of a settlement, there was a very real risk that the Class would have recovered an amount significantly less than the total Settlement Amount – or even nothing at all.

65.    In short, the parties disagreed on the merits of this case, including whether or not damages were suffered and recoverable.  Defendants strongly defended this lawsuit with experienced attorneys and consistently denied that they were liable in any respect.  Recovery of any amount at trial was far from certain.

**D.    The Complexity, Expense, and Likely Duration of the Litigation**

66.    The continuation of this Action would be long, complex, and costly to all parties involved.  It has already been pending since 2023.  Were the Litigation to proceed, the completion of fact and expert discovery, class certification briefing, summary judgment motions, trial, and almost certain appeals would be lengthy and would entail considerable additional costs.

67.    Assuming Lead Plaintiff prevailed at trial, it is likely that Defendants would file post-trial motions and appeals to limit or overturn any verdict in Lead Plaintiff's favor.  The post-trial motion and appeals process would likely span several years, during which time the Class would receive no payment.  In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no payment despite having prevailed on its claims at trial.  While

Lead Counsel had developed strong documentary evidence, it faced both factual and legal challenges in presenting this matter to a jury and potentially on appeal.

68.     Finally, there was a possibility that the Class would receive nothing even if Lead Plaintiff prevailed at every stage.  Since the filing of this Action, DocGo's common stock has experienced a precipitous decline and is now trading under $1 a share with a market cap of approximately $68 million.  By the time it would take to successfully obtain a judgment in this Action, it is far from certain that DocGo would have the ability to pay a judgment for all or even a portion of Lead Plaintiff's damages   Thus, under the current circumstances, there was no guarantee Lead Plaintiff would be able to collect anything after a trial and the exhaustion of appeals.

### E.     Additional Factors

68.     The experience of Lead Counsel also favors the Settlement.  Robbins Geller is nationally recognized for its experience and expertise in complex class action and securities litigation.  Our reputations as attorneys who are willing to zealously carry a meritorious case through trial and appeals gave us a strong negotiating position, even under the challenging circumstances presented here.  *See* Declaration of Christopher M. Wood Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Fee Decl."), Ex. D, submitted herewith (firm résumé).

69.     Finally, the lack of opposition to the Settlement also militates in favor of the Settlement.  As outlined below, notice has already been widely disseminated to potential Class Members.  The absence of any objections to the Settlement or requests to opt out of the Class, weigh in favor of the Settlement.

70.     Based on all of these factors, Lead Counsel and Lead Plaintiff respectfully submit that the Settlement, which provides a very substantial recovery to Class Members, outweighs the risks of

continued litigation.  The Settlement provides Class Members with a substantial benefit now, where there is a significant likelihood of less recovery or no recovery at all if the Litigation were to continue.

## IV.    MAILING AND PUBLICATION OF NOTICE OF SETTLEMENT

71.    The Preliminary Approval Order, among other things, appointed Verita as the Claims Administrator and directed it to cause the mailing or emailing of the Postcard Notice to all potential Class Members identifiable with reasonable effort, no later than December 9, 2025.  ECF 106, ¶9(b).

72.    The Preliminary Approval Order also directed Verita to cause the Summary Notice to be published once in *The Wall Street Journal*, and once over a national newswire service, no later than December 16, 2025.  *Id.*, ¶9(c).

73.    The Declaration of Ross D. Murray Regarding: (A) Notice Dissemination; (B) Publication; (C) Establishment of Call Center Services and Website; and (D) Requests for Exclusion Received to Date ("Murray Decl."), submitted herewith, states that 13,280 Postcard Notices have been mailed or emailed to potential Class Members, banks, brokers, and nominees to date, and that the Summary Notice was published in *The Wall Street Journal* and transmitted over *Business Wire* on December 16, 2025, in compliance with the Preliminary Approval Order.  Murray Decl., ¶¶11-12.

74.    No objections to any aspect of the Settlement have been received, and to-date, no requests for exclusion have been received.  *Id.*, ¶16.

## V.    THE PLAN OF ALLOCATION IS FAIR AND ADEQUATE

75.    The Plan of Allocation is set forth in the Notice (*see* Murray Decl., Ex. B, Notice at 9-13) and provides that the Net Settlement Fund will be distributed to Class Members who submit a valid and timely Proof of Claim and Release form and whose claims for recovery have been permitted under the terms of the Stipulation ("Authorized Claimants").  The Plan of Allocation

4923-2230-1576.v1

provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in DocGo common stock during the Class Period.

76.    For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its economics and damages expert, Professor Cain.  The Plan of Allocation is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for DocGo common stock during the Class Period and what the price of DocGo common stock would have been had the allegedly omitted and misstated information been accurately disclosed, while accounting for the Court's finding in the MTD Order.

77.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund are required to submit a valid Proof of Claim and Release and all required information, postmarked or submitted online no later than March 9, 2026.  As provided in the Notice, after deduction of taxes, approved costs, and attorneys' fees and expenses, the Net Settlement Fund will be distributed, according to the Court-approved Plan of Allocation, to Authorized Claimants who are entitled to a distribution of at least $10.00.

78.    Verita, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on each Authorized Claimant's total Recognized Loss Amount compared to the total Recognized Loss Amounts of all Authorized Claimants.  Lead Plaintiff's losses will be calculated in the same manner.

79.    Lead Counsel believes that the Plan of Allocation, which is similar to hundreds of plans approved by courts over decades, provides a fair and reasonable method to equitably distribute

4923-2230-1576.v1

the Net Settlement Fund among Authorized Claimants.  To date, not a single Class Member has objected to the proposed Plan of Allocation.  The Plan of Allocation is fair and reasonable, and should be approved.

## VI.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

80.    The successful prosecution of this Action required Lead Counsel's attorneys, investigators, paraprofessionals, and staff to perform over 1,930 hours of work and incur $183,676.18 in expenses.  *See* Fee Decl., Exs. A-B.  Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis, and has requested a fee in the amount of 33% of the Settlement Amount, plus interest – a fee approved by Lead Plaintiff.

### B.    The Requested Fee Is Reasonable

81.    In light of the nature and extent of the Litigation, the diligent prosecution of the Action, the complexity of the factual and legal issues presented, and the other factors described above and in the accompanying application for attorneys' fees and expenses, Lead Counsel believes that the requested fee of 33% of the Settlement Amount, plus interest, is fair and reasonable.

82.    A 33% fee award is consistent with percentages awarded by courts in this District and around the country (*see* accompanying Memorandum in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses ("Fee Memorandum") at II.C.), and is justified by the specific facts and circumstances in this case and the substantial risks that Lead Counsel had or in the future would have had to overcome at the summary judgment phase of the Litigation, and at trial, as set forth herein.

- 21 -

**C.    The Requested Fee Is Supported by the Effort Expended and Results Achieved**

83.    As set forth herein, the $12.5 million cash Settlement was achieved as a result of extensive investigative efforts, complicated motion practice, hard-fought discovery, analysis of voluminous evidence, and extensive mediation preparation.

84.    As discussed in greater detail above, this case was fraught with significant risks concerning liability and damages.  Lead Plaintiff's success was by no means assured.  Defendants disputed whether the alleged misstatements and omissions were even actionable, asserted that they did not act with the requisite scienter for certain claims, and sought to attribute any harm suffered to factors unrelated to the alleged fraud.  Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff potentially faced years of costly and risky appellate litigation, with ultimate success far from certain.  It is also possible that a jury could have found no liability or no damages.

85.    As a result of this Settlement, Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement. These factors also support Lead Counsel's request for an award of attorneys' fees of 33% of the Settlement Amount, plus interest.

**D.    The Risk of Contingent Class Action Litigation Supports the Requested Fee Award**

86.    As set forth in the accompanying application for attorneys' fees and expenses, a determination of a fair fee should include consideration of the contingent nature of the fee, the time and labor expended by Lead Counsel, and the difficulties that were overcome in obtaining the Settlement.

4923-2230-1576.v1

87.     This Action was prosecuted by Lead Counsel on a contingent fee basis.  Lead Counsel committed 1,932.90 hours of attorney and professional time and incurred $183,676.18 in expenses in the prosecution of the Litigation, as set forth in the accompanying Fee Declaration. Lead Counsel fully assumed the risk of an unsuccessful result.  Lead Counsel has received no compensation for its services during the course of this Litigation and has incurred significant expenses in litigating for the benefit of the Class.  Any fees or expenses awarded to Lead Counsel have always been at risk and are completely contingent on the result achieved.  Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

88.     Lead Counsel's efforts were performed on a wholly contingent basis, despite significant risk and in the face of determined opposition.  Under these circumstances, Lead Counsel is justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained for the Class.  A 33% fee, plus expenses and interest, is fair and reasonable under the circumstances present here.

89.     There are numerous cases, including many handled by Robbins Geller, where class counsel in contingent fee cases such as this, after expenditure of thousands of hours of time and incurring significant costs, have received no compensation whatsoever.  The fact that Defendants and their counsel know that the leading members of the plaintiffs' bar are able to, and will, go to trial even in high-risk cases like this one gives rise to meaningful settlements in actions such as this.  The losses suffered by class counsel in other actions where insubstantial settlement offers were rejected, and where class counsel ultimately received little or no fee, should not be ignored.  Lead Counsel

- 23 -

knows from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured.

90.    Lawsuits such as this are expensive to litigate.  Those unfamiliar with the efforts required to litigate class actions often focus on the aggregate fees awarded at the end but ignore the fact that those fees fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal and state authorities, are used to fund the expenses of other contingent cases prosecuted by class counsel, and help pay the salaries of the firms' attorneys and staff.

## VII.    CONCLUSION

91.    For the reasons set forth above and in the accompanying Settlement and Fee Memoranda, Lead Counsel respectfully submits that: (i) the Settlement is fair, reasonable, and adequate and should be finally approved; (ii) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Class Members and should also be approved; and (iii) the application for attorneys' fees of 33% of the Settlement Amount and expenses of $183,676.18, plus the interest earned on both amounts at the same rate and for the same period as that earned on the Settlement Fund until paid, should be granted in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17th day of February, 2026, at Nashville, Tennessee.

_s/ Christopher M. Wood_
CHRISTOPHER M. WOOD

- 24 -

4923-2230-1576.v1